2:27 pm

ORIGINAL

FILED
MAY 15 2008
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TIP TOP CONSTRUCTION, INC.<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) | No. 08-352 C |

COMPLAINT FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

Plaintiff, Tip Top Construction Inc., ("Tip Top") files this Complaint for preliminary and permanent injunctive and declaratory relief and alleges as follows:

INTRODUCTION

1. This action is necessitated by the improper elimination of Tip Top Construction, Inc. ("Tip Top") by the Federal Highway Administration ("FHWA") from competition for a contract under IFB No. DTFH71-08-B-0002 ("IFB") on the ground that Tip Top's bid bond was defective. Specifically, FHWA claimed that the portion of the pledged asset in the bid bond, "previously mined, extracted, stockpiled marketable coal," which was then valued at approximately $191 million was unacceptable and thus, that Tip Top, the low bidder for this contract by $1.4 million, was not a responsible contractor. The FHWA's elimination of Tip Top was improper, in violation of federal law and regulation, and lacked common sense, because:

a. The asset at issue—mined coal", like gold, meets the "acceptability" standard for assets in the FAR, as discussed below. But before reaching that issue, FHWA was required to exercise discretion to evaluate this asset by following Section 102.4 of the IFB, and relevant case law in affording Tip Top's individual surety, Edmund C. Scarborough ("ECS"), (i) an opportunity to

respond to FHWA's alleged concerns with ECS's bid bond asset and (ii) if not resolved, to allow ECS, under FAR §28.203-4, to substitute another acceptable asset for the original pledged asset. Had this opportunity been given, Tip Top's surety's bid bond either would have been accepted or ECS would have provided an acceptable substitute asset, enabling the FHWA to save $1.4 million.

b. ECS's original pledged asset, a $1.8 million portion of "previously mined, extracted, stockpiled, marketable coal" valued at $191 million, was "readily marketable" and thus, should have been found to be an acceptable asset under FAR §28.203-2(a). This mined coal has an identifiable value based on "spot prices" for coal listed on national indices, including those published by the Department of Energy ("DOE"). The pledged asset was valid on its face and covered the penal amount of the bid bond. Further, ECS certified that he owned the asset, that it was unencumbered and provided a valid security interest in favor of the Government.

3. FHWA's stated reasons for rejection of the bond, both contemporaneously and before the Government Accountability Office ("GAO") following Tip Top's protest of its elimination, have no basis in fact or law. Mined coal is not an unacceptable "speculative asset e.g. "mineral interest". Nor is mined coal remotely comparable to unacceptable "accounts receivable," or "corporate assets (e.g. plant and equipment)." The FHWA's post-hoc claims of concern with the security interest, liquidity and asset ownership have no factual basis and are in conflict with the required documentation ECS provided. None of these reasons were adopted by the GAO.

4. The GAO however attempted to rescue the FWHA's rejection with new post-hoc arguments. In an "outcome determination" conference, the GAO attorney claimed that only the personal property assets listed in FAR 28.203-2(b) were acceptable. After withdrawing this erroneous

position following receipt Tip Top's and ECS's comments in opposition, the GAO issued its formal decision on a different basis and without providing an opportunity for comment: that only personal property assets that could be placed into an "escrow account" as required by FAR §28.203-1(b) were acceptable. This new interpretation also cannot withstand scrutiny.

4. FAR §28.203-1(b) addresses the "escrow account" requirements that "may" apply to some of the acceptable assets on the list in FAR §28.203-2(b) — those in which "funds," here, money or cash, can be "deposited" in a bank account in a federally insured financial institution. This position is consistent with the minimum "escrow account" requirements in FAR §28.203-1(b)(i)-(v) to (1) pay amounts "on deposit" on demand and to "disburse monies to the Government", (2) release "accrued interest" on the account (interest on the money on deposit), and (3) submit periodic account statements (the money on deposit plus interest) to the Contracting Officer. In its decision, the GAO omitted those minimum requirements from its quote of this regulation. This omission is telling. If the only acceptable personal property assets were those capable of being placed in a compliant escrow account, as the GAO claimed, assets deemed acceptable on the list in FAR §28.203-2(b), such as irrevocable letters of credit, would become unacceptable. Further, there would be no reason to list in FAR §28.203-2(c), various types of unacceptable personal property assets none of which could be placed into a compliant escrow account. Thus, the GAO's interpretation would negate and render superfluous regulatory distinctions.

5. Finally, the FHWA and the GAO have lost sight of the purpose of the bid bond—to make certain that the individual surety is liable in the event of a default. This is a matter of responsibility, not responsiveness. The "escrow account" requirements applicable to money assets are merely a mechanism to facilitate payment. If the FHWA still had uncertainties

regarding the value of the mined coal and wanted an agreement equivalent to the escrow account for this otherwise acceptable asset, such agreement, which does not affect the individual surety's liability and merely is a mechanism to facilitate payment, it could have been supplied and thus, preserved the low bid and the $1.4 million savings it represented. Instead, the FHWA unreasonably rejected the bond and declared Tip Top non-responsible.

6. Tip Top has demonstrated a likelihood of success on the merits. But for the improper rejection of Tip Top's bid bond and later improper award, Tip Top would have won the contract. Further, unless the injunctive relief requested is granted, Tip Top will suffer immediate and irreparable harm as its ability to retain personnel who were to be assigned to this contract will be placed in jeopardy and will be improperly deprived of its profits. No other party will suffer comparable harm. The contract schedule to which the current award agreed contains far more time than necessary to complete the contract. Significant performance of that higher priced contract has not yet begun, and FWHA's decision to suspend performance following an override decision based on an "urgent and compelling" need to make that higher priced award shows that FHWA was willing to wait until June 9, 2008 before commencing performance. Any delay damages for minimal additional delay necessary to resolve this case are negligible.

7. The above factors, and the strong public interest in awarding to the lowest, responsive, responsible bidder and in properly implementing federal regulations strongly favors the granting of temporary, preliminary and permanent injunctive relief requested.

PARTIES

8. Plaintiff, Tip Top Construction, Inc. is a Virgin Islands corporation with its principal place of business in St. Croix, Virgin Islands. Tip Top is an experienced government contractor that has

successfully performed federal construction contracts for the past 19 years.

9. Defendant is the United States, acting through the Department of Transportation, Federal Highway Administration ("FHWA"), Eastern Federal Lands Highway Division located in Washington, D.C., which issued and administered the procurement at issue.

## JURISDICTION AND VENUE

10. This Court has jurisdiction and venue over this post-award protest under 28 U.S.C. §1491(b).

## FACTUAL BACKGROUND

### A. General Overview

11. On November 1, 2007, the FHWA issued an Invitation for Bids No. DTFH71-08-B-00002 ("IFB") for construction of a five-leg roundabout, and related work, on the island of St. John.

12. Tip Top is a federal construction contractor with 19 years of relevant experience. Tip Top won the Biennial DOT award for Excellence in Highway Design with a merit in Historic Preservation and recently, successfully performed work for FHWA on the Eastern Federal Lands projects. Based on its successful experience with similar projects, Tip Top timely submitted a bid.

### B. The IFB Bid Bond and Schedule Requirements

13. The IFB required a bid bond and after award, performance and payment bonds.

14. The requirements for an individual surety (which Tip Top selected for the bid bond for this contract) are found in FAR §28.203, which states in relevant part:

> "(b) An individual surety must execute the bond, and the unencumbered value of the assets (exclusive of all outstanding pledges for other bond obligations) pledged by the individual surety, must equal or exceed the penal amount of each bond. The individual surety shall execute the Standard Form 28 and provide a security interest in accordance

with 28.203-1. One individual surety is adequate support for a bond, provided the unencumbered value of the assets pledged by that individual surety equal or exceed the amount of the bond ...."

15. Instruction 4 at page 2 of the OMB Bid Bond form, OMB 9000-0045, used for the bid bond at issue specifically recognizes that individual sureties may provide a bid bond when it states:

"(b) Where individual sureties are involved, a completed Affidavit of Individual surety [sic] (Standard Form 28), for each individual surety, shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability."

16. Standard Form ("SF") 28, Affidavit of Individual Surety, is a one-page form that requires the individual surety to provide identifying and contact information (Blocks 1 – 6), state the assets being pledged, and describe the escrow account (Block 7), identify any encumbrances on the pledged asset (Block 8), identify all bonds for which the subject assets have been pledged within the past three years (Block 9), sign (Block 10), identify the bond and contract to which the affidavit relates (Block 11), and provide a notary signature/seal (block 12) and include a Certificate of Pledged Assets (here, to cover $1.8 million). This Pledge included a certification that the surety (a) has good title, (b) has assets free from liens or prior pledges, (c) has full authority to transfer the assets as collateral in support of the bond, (d) will not assign the rights to the pledged assets during the term of the agreement, and (e) is giving the Government full rights as a secured party pursuant to Article 9 of the Uniform Commercial Code ("UCC") to redeem the asset and sell it if the Principal refuses to execute the contract or furnish performance and payment bonds and, upon notice and demand to the surety, the surety is not able or willing to meet its financial obligations.

17. The IFB also required the bidders to submit a price and a schedule. Under the IFB the maximum schedule for performance of the construction work was 675 days.

C. Tip Top's Bid and Bid Bond

18. Tip Top timely submitted a bid to perform the project.

19. Tip Top furnished a bid bond with its bid, furnished by ECS, through his Attorney-in-Fact, who was authorized by Mr. Scarborough. ECS's SF 28 identified the asset pledged by means of incorporating by reference an attached and individually numbered Certificate of Pledged Assets. ECS affirmed that there were no mortgages, liens, judgments or any other encumbrances involving the pledged assets. In Block 9, ECS unequivocally stated that "[n]o other Bonds have been pledged to the allocated portion of the assets which are the subject of the attached Certificate of Pledged Assets." The affidavit was sworn to, executed and notarized.

20. In the Certificate of Pledged Assets, ECS specifically identified the pledged asset, and provided the legal metes and bounds description of the land on which the "allocated portion of $191,350,000.00 of previously mined, extracted, stockpiled and marketable coal" is located, land which ECS owns outright. ECS also identified the bond number, amount of the asset pledged, which amount is sufficient to cover the penal amount of the bond, Principal (Tip Top), Obligee (FHWA), and the Project.

21. ECS also notified FHWA that the Government had the rights of a secured party pursuant to Article 9 of the UCC. This established the Government's required security interest in the asset.

D. Actions Preceding FHWA's Rejection of the Bond

22. On January 10, 2008, the bids were opened. Tip Top submitted the low bid with a price approximately $1.4 million lower than the next low bidder.

23. By e-mail dated January 28, 2008, FHWA asked Tip Top to confirm its 300-day proposed schedule. Neither Tip Top's price nor its bid bond was mentioned as an issue. FHWA

"directed" Tip Top as follows:

> "In order to determine if your proposed days are consistent with these requirements, the EFLHD is directing you to provide a construction schedule (CPM) with a written explanation of how you will perform the work within the limitations of the contract and specifically how you plan to accomplish this project in the short time frame with the heavy volume of traffic. Please be aware, if your bid is accepted, the calendar days in your bid package becomes the required period for contract performance of this project, and any performance past that time will result in liquidated damages per day being charged to your company. Please provide your schedule within 5 business days of your receipt of this notice."

23. Tip Top hired a CPM consultant and incurred substantial expenses in drafting a preliminary CPM which was timely submitted to FHWA.

24. On February 11, 2008, FHWA sent additional questions to Tip Top about its crew size and workday schedule. FHWA also asked for a Construction Schedule listing the sequence of work in the Critical Path.

25. Tip Top responded that it would provide the requested information but that it would not spend the significant additional resources needed for a final CPM before a formal award notice was issued. In its e-mail, Tip Top pointed out that the preliminary CPM was sufficient to show that the contract work could be easily accomplished within Tip Top's schedule.

26. According to the FHWA, after this review, the FHWA Contracting Officer ("CO") first became aware that Tip Top's bid bond had been issued by an individual surety. Although individual sureties are permitted to issue bonds, the CO apparently became concerned with Tip Top's use of an individual surety.

27. The CO's next action was a letter dated February 19, 2008 rejecting ECS's bid bond "because it does not meet the requirements of an Individual Surety" and eliminating Tip Top from the competition. The sole reason given was that FAR §28.202-3(c)(7) prohibited

acceptance of "speculative assets" which "would include marketable coal."

E. Post-Rejection Correspondence

28. On February 21, 2008, ECS, by counsel, responded to the rejection. ECS pointed out that, using standard legal dictionary definitions, "previously mined, extracted, stockpiled, marketable coal" was not a "mining interest" or "speculative."

29. ECS provided additional support for the bond and asset and offered assays of the mined coal, the most recent "spot price" and any other information to support the quality and value of the coal.

30. By letter dated February 26, 2008, the CO disagreed with ECS's interpretation of the FAR without addressing the points in ECS's counsel's letter. The CO also alleged for the first time that a security interest had not been provided to the Government and that the bid bond had to be facially valid and no "proof of value" was submitted. The CO stated that the Government could not accept the additional evidence to support marketability which ECS had offered because it would be "untimely" and in violation of unidentified "regulations."

31. The CO now called ECS's coal "mined but not marketed coal" which was claimed without citation to any legal regulatory or financial authority, to be more comparable to a "corporate asset, speculative asset or accounts receivable," all of which are unacceptable assets. No explanation was provided for why this was so other than to cite a regulation regarding the CO's obligation to assure that the assets were adequate. The CO concluded by stating that the FHWA had no option but to reject Tip Top's bid.

32. On February 29, 2008, Tip Top filed a protest at the GAO. This protest sought a stay pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. §3553(c).

33. By letter dated February 29, 2008, ECS responded to the CO's letter of February 26, 2008. ECS pointed out that the bond met all the requirements stated in the IFB and the FAR. With respect to the CO's newfound concern regarding a security interest, ECS stated that a valid security interest had been provided based on the definition of a security interest under Article 9 of the UCC.

34. ECS explained again in detail why the mined coal it had pledged was materially different from the unacceptable assets which the CO had cited. ECS also provided a list of federal agencies that had accepted this particular asset and notified the CO that the FHWA had accepted ECS as an individual surety and his bonds on two previous occasions.

35. On March 3, 2008, Tip Top filed a supplemental protest to the GAO to include the additional information in ECS's February 29, 2008 letter.

F. Proceedings Before the GAO

36. On March 26, 2008, FHWA submitted its agency report to the GAO. In its comments, the FHWA raised a number of new "concerns" that had allegedly contributed to its decision. They included claims that the CO believed that ECS had not provided a value for the coal, which was considered "speculative as to liquidity and value."

37. The FHWA also claimed for the first time that there was no "independent" confirmation of each representation in SF 28 and the Certificate of Pledged Assets and that the Government was at risk because the asset had not been given to a third party for safekeeping.

38. The FHWA did not address any of the arguments made by Tip Top or ECS in their letters, or provide any legal authority for any of the positions taken in its agency report other than a general obligation to protect the Government's interests. The FHWA did not explain why it had not

asked ECS any questions about the asset before rejecting the bond and claimed that if it had, it would have violated unidentified regulations. Those regulations were not cited.

39. On April 9, 2008, Tip Top timely submitted its comments on the agency report. In its comments, Tip Top refuted each of FHWA's excuses. Tip Top pointed out that FHWA did not protect the Government's interests by failing to follow the IFB and case law requiring it to raise its concerns with ECS and to entertain, if necessary, a substitute bid bond under FAR §28.203-4.

41. On April 10, 2008, FHWA sent an e-mail pressing the GAO for a quick decision, stating that the next low bidder had only extended its bid to April 16, 2008.

42. On April 11, 2008, an "outcome determination" telephone conference was held during which the GAO attorney expressed his informal view that the term "personal property" in FAR §28.203-2(c)(4) was intended to mean any asset that was not "real property" and therefore, that all personal property not listed in FAR §28.203-2(b) was unacceptable per se. Although the GAO attorney apparently had not reviewed the IFB or regulations in detail, he stated that FAR §28.203-4 was inapplicable because it only covered post-award substitutions. His proof was that FAR §28.203-5, the next regulation after FAR §28.203-4, involved the release of the bond.

43. On April 11, 2008, Tip Top wrote to the FHWA and asked whether it would consider a substitute bond. If not, Tip Top asked whether the FHWA intended to issue an override of the stay and to furnish the override decision. No response was received.

44. On April 14, 2008, Tip Top and ECS each submitted detailed comments opposing the GAO's views. In addition to arguments demonstrating that the GAO's initial interpretation of what constituted an acceptable asset was incorrect as a matter of law, Tip Top pointed out that that FHWA's rejection of the bond and elimination of Tip Top without giving ECS a chance to

respond to any FWHA concerns or to substitute the original asset with another acceptable violated GAO case law and FAR §28.203-4 and was improper. Ex. 15.

45. In his comments, ECS explained why readily marketable coal should have been accepted, and why it the security interest provided was valid. ECS indicated that he concurred with Tip Top's position that ECS would have furnished another acceptable asset of the types listed in FAR §28.203-2(b) as a substitute asset had it been unable to resolve FHWA's concerns. Id.

G. The Override Decision to Award and Suspension of Performance

46. On April 16, 2008, FHWA notified the GAO that an override of the CICA stay had been issued. FHWA stated that "urgent and compelling" reasons supported the override, apparently because it would have to pay higher price if it waited to make award until a GAO decision was issued. However, apparently after making the award, the FHWA suspended contract performance of until the GAO issued its decision, the statutory deadline for which was June 9, 2008. Ex. 16.

47. On May 5, 2008, the GAO issued its decision denying the protest. The GAO no longer asserted that only the "personal property" listed in FAR §28.203-2(b) was acceptable per se. Instead, it claimed sua sponte, that mined coal was unacceptable because it could not be placed in an escrow account as required by FAR §28.203-1(b). The GAO also changed its interpretation of FAR §28.203-4, now claiming that an agency had no obligation to allow a request for substitution of an asset before rejecting the bond since the obligation to attempt to resolve concerns with the bond only extended to "minor" defects. This action followed.

COUNT I

Tip Top Has Established Its Likelihood of Success on the Merits

A. FHWA Abused its Discretion in Automatically Rejecting the Bond and Eliminating Tip Top from the Competition Without Seeking to Resolve its Concerns Regarding the Asset or to Allow a Substitution of the Another Acceptable Asset

48. Tip Top realleges and incorporates the allegations contained in paragraphs 1-47 as though set forth herein.

49. FHWA's rejection of the bond without providing an opportunity to ECS to either resolve the agency's concerns or to substitute that asset with another acceptable asset as permitted by regulation was a prejudicial violation of the IFB and an abuse of discretion.

50. The IFB contemplates this at page J-2 in special requirements relating to the bid bond:

> "…the CO may, after reviewing the affidavit of the individual surety and documentary information on the security interest and the assets pledged, by certified mail, to the surety's business or resident address (as shown on the bond) request the surety to provide further information and/or documents with respect to any of the documents provided. The CO may require such information to be furnished under oath. Failure of the surety to accept such mail or failure of the surety to respond with the requested information or documents within 7 business days of receipt of the request, will be cause for rejection of the surety."

51. Had FHWA not rejected the bid and questioned the asset's acceptability based on concerns which it claimed to have at that time, FHWA either (a) would have accepted ECS's original asset of readily marketable coal as other federal agencies have done, or (b) would have accepted another acceptable ECS substitute asset. FHWA's claim that it was prohibited from seeking or reviewing this information based on unidentified regulations has no basis.

52. The acceptability of a bid bond is a matter of responsibility that can be resolved at any time prior to award. Substitution of a timely proffered unacceptable asset is specifically authorized by FAR §28.203-4 at any time and thus, by regulation is a matter that was reasonably susceptible to resolution. But for this improper rejection of the bid bond and elimination of Tip Top as non-responsible without providing these opportunities, Tip Top's surety would have supplied another

acceptable substitute asset and Tip Top would have won the contract as the low bidder.

B. Readily Marketable Mined Coal is an Acceptable Asset

53. Tip Top realleges and incorporates the allegations contained in paragraphs 1-52 as though set forth herein.

54. The original asset pledged -- $1.8 million portion of "previously mined, extracted, stockpiled marketable coal" valued at approximately $193 million at that time-- had an "identifiable value" and was "readily marketable." Thus, this coal met the FAR standard for an acceptable asset.

55. The FHWA's contemporaneous claim that mined coal was a "mining interest", or its later post-hoc claims that mined coal was comparable to "accounts receivable," or "corporate assets (e.g. plant and equipment)", the types of assets listed as unacceptable in FAR §28.203-2(c) have no merit. None of these or its other post-hoc excuses were adopted by the GAO.

56. The GAO's last proposition that all personal property that cannot be placed in an escrow account as allegedly required by FAR 28.203-1(b) is unacceptable per se, is without merit.

57. The regulations requiring an "escrow account" apply to some of the types of acceptable personal property listed in FAR §28.203-2(b)—specifically, those assets in which money "funds" or cash can be deposited in a federal insured bank account.

58. FAR §28.203-1(b)(1) provides:

> "(1) An escrow account with a federally insured financial institution in the name of the contracting agency. (See 28.203-2(b)(2) with respect to Government securities in book entry form.) Acceptable securities for deposit in escrow are discussed in 28.203-2. While the offeror is responsible for establishing the escrow account, the terms and conditions must be acceptable to the contracting officer. At a minimum, the escrow account shall provide for the following: ..." (Emphasis added).

The GAO's decision omitted FAR §28.203-1(b)(1)(i)-(v), which sets forth the "minimum "escrow account" requirements as follows:

"(i) The account must provide the contracting officer the sole and unrestricted right to draw upon all or any part of the funds deposited in the account. A written demand for withdrawal shall be sent to the financial institution by the contracting officer, after obtaining the concurrence of legal counsel, with a copy to the offeror/contractor and to the surety. Within the time period specified in the demand, the financial institution would pay the Government the amount demanded up to the amount on deposit. If any dispute should arise between the Government and the offeror/contractor, the surety, or the subcontractors or suppliers with respect to the offer or contract, the financial institution would be required, unless precluded by order of a court of competent jurisdiction, to disburse monies to the Government as directed by the contracting officer.

(ii) The financial institution would be authorized to release to the individual surety all or part of the balance of the escrow account, including any accrued interest, upon receipt of written authorization from the contracting officer.

(iii) The Government would not be responsible for any costs attributable to the establishment, maintenance, administration, or any other aspect of the account.

(iv) The financial institution would not be liable or responsible for the interpretation of any provisions or terms and conditions of the solicitation or contract.

(v) The financial institution would provide periodic account statements to the contracting officer." (Emphasis added).

59. Under the GAO's interpretation, these escrow account requirements would render otherwise acceptable irrevocable letters of credit in FAR §28.203-2(b) unacceptable. Thus, the GAO's "escrow account" requirement for all personal property assets is inconsistent with even the FAR's listed acceptable assets. Further, if the GAO's test --whether the personal property could be placed in a compliant escrow account-- was valid, there would have been no need to identify various types of unacceptable personal property that cannot be placed in escrow. See e.g. FAR §28.203-2(c)(4) "personal property other than that listed in paragraph (b) (e.g. furs, jewelry, antiques)"; FAR 28.203-2(c)(6) ("corporate assets (e.g. plant and equipment)." These subsections would be rendered superfluous.

60. The FHWA has conceded that the lists of acceptable and unacceptable assets in FAR §28.203-2 are not exclusive. Ex. 9. That is why FAR §28.203-2(a), entitled "Acceptability of Assets," sets forth a standard of "acceptability" instead of stating that the following assets are the sole acceptable assets. There are no "escrow account" requirements in the FAR for acceptable assets like mined coal (or gold). All that is required is to provide the government "a security interest in assets acceptable under 28.203-2," in an amount equal to (or greater than) the aggregate amount of the penal sum of the bonds. FAR §28.203-1(a)-(b). This is exactly what ECS gave– a security interest, here recordable by a UCC-1.

61. Finally, as noted above, if the FHWA actually had uncertainties regarding the value of a $1.8 million portion of the approximately $191 million in coal and had requested an agreement under which an escrow agent would have the right to convert the mined coal to cash in the event of a demand, such an agreement could have been supplied. An escrow or escrow account does not create or affect the liability of the individual surety but is merely a mechanism to facilitate payment. Since ECS had supplied all required documentation fixing his liability, this additional bid bond documentation, had it been requested, must be treated like all other non-liability issues, as a matter of responsibility which here, was reasonably susceptible to resolution. It was therefore improper for the FHWA to reject the asset and declare Tip Top non-responsible. Indeed, the FHWA's actions in this case were an abdication of discretion.

Indeed, this action was an abdication of discretion.

62. In sum, Tip Top has established a likelihood of success on the merits as it has demonstrated that but for the errors and violation of federal regulations, it had a substantial chance, as the low priced, responsive, responsible bidder, of winning this contract.

COUNT II

Tip Top is Entitled to Declaratory Relief

63. Tip Top realleges and incorporates the allegations contained in paragraphs 1-62 as though set forth herein.

64. A justiceable controversy exists between Tip Top and the FHWA as to the acceptability of the bid bond and the decision to eliminate Tip Top on that basis.

65. Tip Top is entitled to a declaration that the FHWA's decision to reject the bid bond without questioning ECS and or allowing ECS the opportunity to submit a substitute bid bond was an improper and material violation of the IFB, case law and federal regulations.

66. Tip Top is entitled to a declaration that FHWA's rejection of a $1.8 million portion of its original pledged asset of previously mined, extracted, stockpiled marketable coal valued at approximately $193 million at that time was improper as this coal is a readily marketable asset and acceptable under FAR §28.203-2.

67. Tip Top is entitled to a declaration that but for this erroneous determination, Tip Top, as the low, responsive, responsible bidder, of a substantial chance for this award.

COUNT III

Tip Top is Entitled to Injunctive Relief

68. Tip Top realleges and incorporates the allegations contained in paragraphs 1-67 as though set forth herein.

69. Tip Top has established a strong likelihood of success that but for the errors and violations of federal regulations, it had a substantial chance, as the low priced, responsive, responsible bidder, of winning the contract.

70. Unless temporary, preliminary and permanent injunctive relief is granted, Tip Top will be immediately and irreparably in its ability to retain the key personnel who were to work on the contract and will be deprived of a contract and profits to which it is entitled.

71. Neither the FHWA nor the higher priced bidder will be comparably harmed by awaiting this Court's decision. The construction schedule in the current contract allows far more time than is needed to complete the work and the current awardee has agreed to that schedule. Moreover, the FHWA already indicated through its suspension of performance following its illegal override that it was willing to await the GAO's decision which was to be issued under the CICA by June 9, 2008. The FHWA's costs of any possible delay damages to the awardee for the additional time necessary for this Court to resolve the protest are therefore negligible.

72. Finally, the intended contract to the higher priced bidder is the result of violations of federal laws and regulations. The public has a strong interest in assuring that federal procurements are conducted fairly and correctly. The public also has an interest in assuring that the Government obtains the lowest priced, responsive, responsible bidder which Tip Top represents.

REQUEST FOR RELIEF

WHEREFORE, Plaintiff, Tip Top Construction, Inc., respectfully requests that this Court grant judgment in its favor and grant the following relief:

1. A temporary restraining order, temporarily restraining the FHWA from beginning performance of the contract until this Court decides the motion for preliminary injunctive relief;

2. A preliminary injunction restraining and/or enjoining the FHWA from continuing performance of the contract pending this Court's determination of the merits of Tip Top's complaint;

3. A declaratory judgment, declaring that (a) the rejection of Tip Top's bid bond without affording ECS an opportunity to answer material questions about its original pledged asset and/or to submit an acceptable substitute bid bond was improper and a violation of the IFB, federal law and regulations, (b) the rejection of Tip Top's bid bond based on the claim that "previously mined, extracted, stockpiled marketable coal" was an unacceptable asset was improper and a violation of federal regulations, and (c) but for these improper actions and violations, Tip Top would have a substantial chance for the award of the contract as the low, responsive, responsible bidder.

4. A permanent injunction enjoining award and/or performance of the contract and precluding anyone but Tip Top from performing the contract;

5. An award of Tip Top's reasonable costs, including costs expended in response to FHWA's direction to develop a CPM diagram to supports its proposed schedule and attorney fees in prosecuting this action, and alternatively, its bid and proposal costs; and

6. Such other and further relief as this Court deems just and proper.

Respectfully submitted,

Michael A. Gordon
MICHAEL A. GORDON PLLC
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)
Counsel of Record for Tip Top Construction, Inc.

OF COUNSEL:
Fran Baskin, Esquire
MICHAEL A. GORDON PLLC

May 15, 2008