ORIGINAL

FILED
MAY 15 2008
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TIP TOP CONSTRUCTION, INC. | ) | |
| Plaintiff, | ) | |
| | ) | No. 08-352 C |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATIONS FOR A TEMPORARY RETRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTION RELIEF AND DECLARATORY JUDGMENT

Michael A. Gordon
Counsel of Record for Tip Top Construction, Inc.
MICHAEL A. GORDON PLLC
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)

OF COUNSEL:
MICHAEL A. GORDON PLLC
Fran Baskin, Esquire
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)

May 15, 2008

# TABLE OF CONTENTS


| | |
|---|---|
| MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, APPLICATION FOR A TEMPORARY RESTRAINING ORDER, PRELININARY AND PERMANENT INJUNCTIONS AND DECLARATORY JUDGMENT | 1 |
| I. STATEMENT OF THE CASE | 1 |
| II. FACTUAL BACKGROUND | 4 |
| A. General Overview | 4 |
| B. The IFB Bid Bond and Schedule Requirements | 5 |
| C. Tip Top's Bid and Bid Bond | 6 |
| D. Actions Preceding FHWA's Rejection of the Bond | 7 |
| E. Post-Rejection Correspondence | 8 |
| F. Proceedings Before the GAO | 9 |
| G. The Override Decision to Award and Suspension of Performance | 11 |
| SUMMARY OF THE ARGUMENT | 12 |
| LEGAL ARGUMENT | 15 |
| I. Standard for Review for Injunctive Relief | 15 |
| II. Tip Top is Likely to Succeed on the Merits | 15 |
| A. FWHA's Failure to Afford ECS an Opportunity to Respond to its Concerns or to Submit a Substitute Bid Bond Prior To Rejection Violated Federal Law | 15 |
| B. ECS's Mined Coal is an Acceptable Asset | 19 |
| 1. Mined Coal is not a "Speculative" Asset, or a Mineral Right" | 20 |
| 2. Mined Coal is not "Comparable" to Plant Equipment or Accounts Receivable | 20 |
| 3. FHWA Received a Valid Security Interest | 20 |

4. The Liquidity and Value of the Bond Was Sufficient and Attested 21

5. There is no Requirement that a Third Party Hold the Asset 22

6. The GAO's Attempt to Rescue the FWHA Must be Rejected 22

a. Only Cash Assets are Subject to the "Escrow Account" Requirements 23

b. The GAO's Position Violates Principles of Regulatory Construction 25

c. There are no "Escrow Account" Requirements for Mined Coal 26

d. There is no Requirement for a "Perfected" Security Interest 27

e. Case Precedent Refutes the Automatic Elimination of this Asset 27

III. Tip Top Has Established Irreparable Harm 28

IV. The Balance of Harms and Public Interest Strongly Favor Injunctive Relief 29

V. Bond 29

CONCLUSION AND REQUEST FOR RELIEF 30

**COURT CASES**


| | |
|---|---|
| Aeroplate Corp v. United States, 67 Fed. Cl. 1, 4 (2005) | 27, 30 |
| All Seasons Construction, Inc. v. United States, 55 Fed. Cl. 175 (2003) | 28 |
| Global Computer Enterprises, Inc. v. United States, __Fed. Cl. _ (Mar. 31, 2008) | 15 |
| Hawaiian Dredging Construction Co., Inc. v. United States, 59 Fed. Cl. 305 (2004) | 27 |
| Interstate Rock Products, Inc. v. United States, 50 Fed. Cl. 349 (2001) | 28 |
| PCI/RCI, a Joint Venture v. United States, 36 Fed. Cl. 761 (1996) | 28 |
| Shader Contractors v. United States, 276 F.2d 1, 6 (Ct. Cl. 1960) | 19 |
| TRW Environmental Safety Systems, Inc. v. United States, 16 Cl. Ct. 520, 529 (1989) | 28 |


**ADMINISTRATIVE CASES**


| | |
|---|---|
| Bundick Enterprises, Inc., 70 Comp. Gen. 94, B-239867-.2, November 19, 1990, 98-2 CPD ¶402 | 18 |
| Burtch Construction, B-240695, B-240696, November 23, 1990, 90-2 CPD ¶423 | 27 |
| D.M. Potts Corporation , B-231855, November 4, 1988, 88-2 CPD ¶440 | 16 |
| Gene Quigley, Jr., 70 Comp. Gen. 273, B-241565, February 19, 1991, 91-2 CPD ¶182 | 16-17, 27 |
| Noslot Pest Control, Inc., B-234290, 68 C.G. 396, April 20, 1989, 89-1 CPD ¶396; | 28 |
| O.V. Campbell & Sons Industries, Inc., B-229555, March 14, 1988, 88-1 CPD ¶259 | 28 |
| U.S. Floors, Inc., B-241552, B-241555, February 6, 1991, 91-1 CPD ¶130 | 17 |

**STATUTES AND REGULATIONS**


| | |
|---|---|
| 28 U.S.C. §1491(b) | 1 |
| 31 U.S.C. §3553 | 9, 18 |
| 31 U.S.C. §3111 | 15 |
| 41 U.S.C. §253 | 15 |
| 41 U.S.C. §253(b) | 15 |
| FAR §28.203-1(b) | passim |
| FAR §28.203-2(a) | passim |
| FAR §28.203-2(c) | passim |
| FAR §28.203-4 | passim |
| FAR §28.203-2(b) | passim |
| FAR §28.203 | 19 |
| FAR §28.203(b) | passim |
| FAR §28.203-5 | 10 |
| FAR §28.203-1 | 5 |


**COURT RULES**


| | |
|---|---|
| CFC Rule 65 | 1 |
| CFC Rule 65(c) | 25 |


**TREATISES**


| | |
|---|---|
| Article 9 of the Uniform Commercial Code | passim |
| Black's Law Dictionary, 6th Edition 1990, p. 144, 995, 1357 | 20-21, 25 |
| Black's Law Dictionary, 18, (8th ed. 2004) | 24 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TIP TOP CONSTRUCTION, INC.<br>Plaintiff, | ) | |
| | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| THE UNITED STATES,<br>Defendant. | ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATIONS FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

Pursuant to Court of Federal Claims Rule 65, Plaintiff, Tip Top Construction, Inc. ("Tip Top"), seeks a temporary restraining order, and preliminary and permanent injunctive and declaratory relief enjoining Defendant, the United States, acting through the Department of Transportation, Federal Highway Administration ("FHWA"), from proceeding with performance of a contract for construction of a five-leg roundabout, and miscellaneous related work, on the island of St. John under FHWA Invitation for Bids No. DTFH71-08-B-00002 ("IFB").

STATEMENT OF THE CASE

This is a post-award bid protest case brought under 28 U.S.C. §1491(b) against Tip Top's improper elimination by the FHWA, in spite of being the low bidder, on the ground that Tip Top's bid bond was defective. Specifically, FHWA claimed that the $1.8 million portion of the pledged and certified asset supporting the bid bond, "previously mined, extracted, stockpiled marketable coal" then valued at approximately $191 million, was unacceptable and thus, Tip Top, the low bidder for the contract by $1.4 million was not a responsible contractor.

The FHWA's elimination of Tip Top was improper, in violation of statute and regulation, and lacked a reasonable basis, because:

a. The asset at issue—mined coal", like gold, meets the "acceptability" standard for assets in the FAR, as discussed below. But before reaching that issue, FHWA was required to exercise discretion to evaluate this asset and the individual surety by following Section 102.4 of the IFB, and relevant case law. FHWA should have given Tip Top's individual surety, Edmund C. Scarborough ("ECS"), (i) an opportunity to respond to FHWA's alleged concerns with ECS's bid bond asset and (ii) if not resolved, to allow ECS, under FAR §28.203-4, to substitute another acceptable asset for the original pledged asset. Had this opportunity been given, Tip Top's ECS's bid bond either would have been accepted or ECS would have provided an acceptable substitute asset, enabling the FHWA and the taxpayers to save $1.4 million.

b. ECS's original pledged asset, a $1.8 million portion of "previously mined, extracted, stockpiled, marketable coal" valued at $191 million, was "readily marketable" and thus, should have been found to be an acceptable asset under FAR §28.203-2(a). This mined coal has an identifiable value based on "spot prices" for coal listed on national indices, including those published by the Department of Energy ("DOE"). The pledged asset was valid on its face and covered the penal amount of the bid bond. Further, ECS certified that he owned the asset, that it was unencumbered and provided a valid security interest in favor of the Government.

FHWA's stated reasons for rejection of the bond, both contemporaneously and before the Government Accountability Office ("GAO") following Tip Top's protest of its elimination, have no basis in fact or law. None of these reasons were adopted by the GAO.

The GAO's attempt to rescue the FWHA's rejection by claiming that only personal property assets that could be placed into an "escrow account" as required by FAR §28.203-1(b) were acceptable cannot withstand scrutiny. FAR §28.203-1(b) addresses the "escrow account" requirements that apply only to one type of asset comprised of "funds," here, money or cash,

"deposited" in a bank account in a federally insured financial institution. In its decision, the GAO omitted the "escrow account" minimum requirements from its quote of this regulation which show the limited applicability of this requirement.

This omission is telling. If the only acceptable personal property assets were those capable of being placed in a compliant escrow account, as the GAO claimed, assets deemed acceptable on the list in FAR §28.203-2(b), such as irrevocable letters of credit, would become unacceptable. Further, there would be no reason to list in FAR §28.203-2(c), various types of unacceptable personal property assets, none of which could be placed into a compliant escrow account. Thus, the GAO's interpretation would conflict with and render superfluous regulatory distinctions.

Tip Top's position that mined coal is acceptable does not negate the escrow account requirements that are applicable to money or cash assets. "Acceptability" of assets is determined under a regulatory standard — that the asset be "readily marketable." Mined coal, like gold, meets this standard. As the FHWA admitted, the list of acceptable assets in FAR 28.203-2(b) is not exclusive and the FAR contains no escrow account requirements for assets not on the list.

Moreover, even if some type of "escrow" agreement was needed to convince the FWHA that it would be receive $1.8 million from mined coal valued at $191 million, the GAO has confused concepts of responsiveness with responsibility. The purpose of the bid bond is to make certain that the individual surety is liable in the event of a default. The "escrow account" requirements do not affect the liability of the individual surety. Thus, any defects regarding this issue are a matter of responsibility. If the FHWA actually had concerns about the mechanism for payment for the mined coal, an agreement like an escrow account for this otherwise acceptable asset would be easily and reasonably resolved. Such agreement or another substitute asset would

have been furnished and preserved the $1.4 million savings that Tip Top's low bid represented.

Instead, the FHWA unreasonably rejected the bond and declared Tip Top non-responsible. This was an abdication and abuse of discretion. This Court should so hold.

The standards for injunctive relief are met. Tip Top has established its likelihood of success on the merits. But for the improper rejection of Tip Top's bid bond and its elimination, Tip Top would have won this contract as the low, responsive, responsible bidder. Instead, the FHWA awarded to the second lowest bidder at an additional cost of $1.4 million to the taxpayer and is planning to proceed with performance. If the injunctive relief requested is not granted, Tip Top will be immediately and irreparably harmed because its ability to retain key personnel who were retained for this contract will be jeopardized and it will be deprived of its lost profits.

No other party will suffer comparable harm. The contract schedule to which the current award agreed contains far more time than necessary to complete the contract. Significant performance of that higher priced contract has not yet begun, and FWHA's suspension decision following an "override" decision to make that award shows that FHWA was willing to wait until June 9, 2008, the GAO's statutory deadline, before commencing performance. Any delay damages for minimal additional delays needed to resolve this case are negligible or non-existent.

The above factors, and the strong public interest in awarding to the lowest, responsive, responsible bidder by properly implementing federal regulations, strongly favor the granting of temporary, preliminary and permanent injunctive relief requested.

## FACTUAL BACKGROUND

### A. General Overview

On November 1, 2007, the FHWA issued an Invitation for Bids No. DTFH71-08-B-00002 ("IFB") for construction of a five-leg roundabout, and related work, on the island of St.

John. Tip Top is a federal construction contractor with 19 years of relevant experience. Tip Top won the Biennial DOT award for Excellence in Highway Design with a merit in Historic Preservation and recently performed work for FHWA on the Eastern Federal Lands projects. Based on its successful experience with similar projects, Tip Top timely submitted a bid.

B. The IFB Bid Bond and Schedule Requirements

The IFB required a bid bond. The bid bond requirements for an individual surety (which Tip Top selected for this contract) are found in FAR §28.203, which states in relevant part:

> "(b) An individual surety must execute the bond, and the unencumbered value of the assets (exclusive of all outstanding pledges for other bond obligations) pledged by the individual surety, must equal or exceed the penal amount of each bond. The individual surety shall execute the Standard Form 28 and provide a security interest in accordance with 28.203-1. One individual surety is adequate support for a bond, provided the unencumbered value of the assets pledged by that individual surety equal or exceed the amount of the bond ...."

Instruction 4 at page 2 of the OMB Bid Bond form, OMB 9000-0045, used for the bid bond at issue specifically recognizes that individual sureties may provide a bid bond when it states:

> "(b) Where individual sureties are involved, a completed Affidavit of Individual surety [sic] (Standard Form 28), for each individual surety, shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability." Ex. 1.

Standard Form ("SF") 28, Affidavit of Individual Surety, is a one-page form that requires the individual surety to provide identifying and contact information (Blocks 1 – 6), to state the assets being pledged, and describe the escrow account (Block 7), to identify any encumbrances on the pledged asset (Block 8), to identify all bonds for which the subject assets have been pledged within the past three years (Block 9), to sign (Block 10), to identify the bond and contract to which the affidavit relates (Block 11), and to provide a notary signature/seal (block 12) and include a Certificate of Pledged Assets (here, to cover $1.8 million).

This Certificate of Pledged Assets included a certification that the surety (a) has good title, (b) has pledged assets free from liens or prior pledges, (c) has full authority to transfer the assets as collateral in support of the bond, (d) will not assign the rights to the pledged assets during the term of the agreement, and (e) is giving the Government full rights as a secured party pursuant to Article 9 of the Uniform Commercial Code ("UCC") to redeem the asset and sell it if the Principal refuses to execute the contract or furnish performance and payment bonds and, upon notice and demand to the surety, the surety is not able or willing to meet its financial obligations. Ex. 2.

The IFB also required the bidders to submit a price and a schedule. Ex. 1. Under the IFB the maximum schedule for performance of the construction work was 675 days.

C. Tip Top's Bid Bond

Tip Top timely submitted a bid to perform the project. Tip Top's bid bond was furnished by ECS, through his Attorney-in-Fact, who was authorized in writing by Mr. Scarborough, who signed the Bid Bond and furnished the required affidavit on an SF 28. ECS's SF 28 identified the asset pledged by means of incorporating by reference an attached and individually numbered Certificate of Pledged Assets. ECS affirmed that there were no mortgages, liens, judgments or any other encumbrances involving the pledged assets. In Block 9, ECS unequivocally stated that "[n]o other Bonds have been pledged to the allocated portion of the assets which are the subject of the attached Certificate of Pledged Assets." The affidavit was sworn to, executed and notarized. Ex. 2. In the Certificate of Pledged Assets, ECS specifically identified the pledged asset, and provided the legal metes and bounds description of the land on which the "allocated portion of $191,350,000.00 of previously mined, extracted, stockpiled and marketable coal" is located, land which ECS owns outright. ECS also identified the bond number, amount of the

asset pledged, which amount is sufficient to cover the penal amount of the bond, Principal (Tip Top), Obligee (FHWA), and the Project. Id.

ECS also notified FHWA that the Government had the rights of a secured party pursuant to Article 9 of the Uniform Commercial Code ("UCC"). This established the Government's required security interest in the asset. Id.

D. Actions Preceding FHWA's Rejection of the Bond

On January 10, 2008, the bids were opened. Tip Top submitted the low bid by approximately $1.4 million. Ex. 3.

By e-mail dated January 28, 2008, FHWA asked Tip Top to demonstrate its capability to perform within its 300-day proposed schedule. Neither Tip Top's price nor its bid bond was mentioned as an issue. FHWA "directed" Tip Top as follows:

> "In order to determine if your proposed days are consistent with these requirements, the EFLHD is directing you to provide a construction schedule (CPM) with a written explanation of how you will perform the work within the limitations of the contract and specifically how you plan to accomplish this project in the short time frame with the heavy volume of traffic. Please be aware, if your bid is accepted, the calendar days in your bid package becomes the required period for contract performance of this project, and any performance past that time will result in liquidated damages per day being charged to your company. Please provide your schedule within 5 business days of your receipt of this notice." Ex. 4.

Tip Top retained a CPM consultant and incurred substantial expenses in drafting a preliminary CPM which was submitted to FHWA. Ex. 5. On February 11, 2008, FHWA sent additional questions to Tip Top about its crew size and workday schedule. FHWA also asked for a Construction Schedule listing the sequence of work in the Critical Path. Ex. 6.

Tip Top responded that it would provide the information requested but that it would not spend the additional significant additional resources needed for a final CPM before a formal award notice was issued. Tip Top pointed out that the preliminary CPM was sufficient to show

that the contract work could be easily accomplished within Tip Top's schedule. Ex. 7.

After this review, the FHWA Contracting Officer ("CO") first became aware that Tip Top's bid bond had been issued by an individual surety. Although individual sureties are permitted to issue bonds, the CO apparently became concerned with Tip Top's use of an individual surety. The CO's next action was a letter dated February 19, 2008, which rejected Tip Top's bid bond "because it does not meet the requirements of an Individual Surety" and eliminated Tip Top from the competition. The CO's sole basis for rejection was that FAR §28.202-3(c)(7) prohibited acceptance of "speculative assets" which "would include marketable coal." Ex. 8.

E. Post-Rejection Correspondence

On February 21, 2008, ECS, by counsel, responded to the rejection. ECS pointed out that, using standard legal dictionary definitions, "previously mined, extracted, stockpiled, marketable coal" was not a "mining interest" or "speculative." ECS provided additional support for the bond and asset and offered to provide assays of the mined coal, the most recent "spot price" and any other information to support the quality and value of the coal. Ex. 9.

By letter dated February 26, 2008, the CO disagreed with ECS's interpretation of the FAR without addressing the points in ECS's counsel's letter. The CO also alleged for the first time that a security interest had not been provided to the Government and that the bid bond had to be facially valid and no "proof of value" was submitted. The CO stated that the Government could not accept the additional evidence to support marketability which ECS had offered because it would be "untimely" and in violation of unidentified "regulations." The CO now called ECS's coal "mined but not marketed coal" which was claimed to be more comparable to a "corporate asset, speculative asset or accounts receivable," all of which are unacceptable assets. No

explanation was provided for why this was so other than to cite a regulation regarding the CO's obligation to assure that the assets were adequate to protect the Government's interests. The CO concluded by stating that the FHWA had no option but to reject Tip Top's bid. Ex. 10.

On February 29, 2008, Tip Top filed a protest at the GAO. This protest sought a stay of award pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. §3553(c).

By letter dated February 29, 2008, ECS responded to the CO's letter of February 26, 2008. Ex. 11. ECS pointed out that the bond met all the requirements stated in the IFB and the FAR. With respect to the CO's newfound concern with the security interest, ECS stated that a valid security interest had been provided based on the definition of a security interest under Article 9 of the UCC. ECS explained again in detail why the coal it had pledged was materially different from the unacceptable assets which the CO had cited. ECS also provided a list of federal agencies that had accepted this particular asset and notified the CO that the FHWA had accepted ECS as an individual surety and his bonds on two previous occasions.

On March 3, 2008, Tip Top filed a supplemental protest to the GAO to include the additional information in ECS's February 29, 2008 letter.

F. Proceedings Before the GAO

On March 26, 2008, FHWA submitted its agency report to the GAO. In its comments, the FHWA raised a number of new post-hoc "concerns" that had allegedly contributed to its decision. Included were claims for the first time that that the CO believed that ECS had not provided a value for the coal, which was considered "speculative as to liquidity and value." The FHWA also claimed there was no "independent" confirmation of each representation in the SF 28 and Certificate of Pledged Assets and that the Government was at risk because the asset had not been given to a third party for safekeeping. The FHWA did not address any arguments made

by Tip Top or ECS in their letters, or provide any legal authority for any of the positions taken in its agency report (other than a general obligation to protect the Government's interests). Ex. 12.

On April 9, 2008, Tip Top timely submitted its comments on the agency report. Tip Top refuted each of FHWA's excuses. Tip Top also pointed out that FHWA did not protect the Government's interests by failing to follow the IFB and case law requiring FHWA to raise its concerns with ECS and to entertain, if necessary, a substitute bid bond under FAR §28.203-4. Ex. 13.

On April 10, 2008, FHWA sent an e-mail pressing the GAO for a quick decision, stating that the next low bidder had only extended its bid to April 16, 2008. Ex. 14. The GAO's statutory deadline for issuing the decision was June 9, 2008.

On April 11, 2008, a telephone "outcome determination" conference was held during which the GAO attorney expressed his informal view that the term "personal property" in FAR §28.203-2(c)(4) was intended to mean any asset that was not "real property" and therefore, all personal property not specifically listed in FAR §28.203-2(b), was unacceptable per se. Although the GAO attorney apparently had not reviewed the IFB or regulations in detail, he stated that substitution of assets under FAR §28.203-4 was inapplicable because it only covered post-award substitutions. His proof was that FAR §28.203-5, the next regulation after FAR §28.203-4, involved the release of the bond.

On April 11, 2008, Tip Top wrote to the FHWA and asked whether it would consider a substitute bond. If not, Tip Top asked whether the FHWA intended to issue an override of the stay and if so, to furnish the override decision. Ex. 15. No response was received.

On April 14, 2008, Tip Top and ECS each submitted detailed comments opposing the GAO's views. In addition to arguments demonstrating that the GAO's initial interpretation of

what constituted an acceptable asset was incorrect as a matter of law, Tip Top pointed out that that FHWA's rejection of the bond and elimination of Tip Top without giving ECS a chance to respond to any FWHA concerns or to substitute the original asset with another acceptable violated GAO case law and FAR §28.203-4 and was improper. Ex. 16.

In his comments, ECS explained why readily marketable coal should have been accepted and why the security interest provided was valid. ECS indicated that he concurred with Tip Top's position that ECS would have furnished another acceptable asset of the types listed in FAR §28.203-2(b) as a substitute asset had it been unable to resolve FHWA's concerns. Ex. 17.

G. The Override Decision to Award and Suspension of Performance

On April 16, 2008, FHWA notified the GAO that an override of the CICA stay had been issued. FHWA stated that "urgent and compelling" reasons supported the override, apparently because it would have to pay a higher price if it waited to make award until a GAO decision was issued. However, apparently after making the award, the FHWA suspended contract performance the statutory deadline for the GAO decision, which was June 9, 2008. Ex. 18.

On May 5, 2008, more than a month before that statutory deadline, the GAO issued its formal decision denying the protest. Ex. 19. The GAO no longer asserted that only the "personal property" listed in FAR §28.203-2(b) was acceptable per se. Instead, without giving Tip Top or ECS an opportunity to comment, the GAO claimed for the first time that mined coal was unacceptable because it could not be placed in an escrow account as required by FAR §28.203-1(b). The GAO also changed its interpretation of FAR §28.203-4, now claiming that an agency had no obligation to allow a request for substitution of an asset before rejecting the bond since that obligation to attempt to resolve concerns with the bond only extended to "minor" defects. This action followed.

SUMMARY OF THE ARGUMENT

In sealed bid procurements, the Government is required to use competitive procedures to obtain the lowest price. Tip Top's bid was $1.4 million lower than that of the current awardee.

Federal law requires a number of bonds for construction contracts which can be provided by a corporate or an individual surety. The purpose of a bid bond or guarantee is to secure the liability of the surety in the event that the low bidder fails to execute the contract or submit performance and payment bonds. The acceptability of the bid bond is a matter of bidder responsibility, not responsiveness.

Under applicable federal law, regulations, and this IFB, if FHWA was uncertain about the bid bond of the low bidder, including the acceptability of the pledged asset, to be certain that it was correct before forfeiting the otherwise lowest bid (by $1.4 million) by rejecting the bond, the FHWA was required to give ECS an opportunity to resolve those uncertainties. If for some reason, FHWA still remained concerned about the mined coal asset, ECS was to have the opportunity submit an acceptable substitute asset, as specifically permitted under FAR §28.203-4. That opportunity was never provided and Tip Top was prejudiced by this violation. If ECS had been unable to resolve FHWA's concerns, ECS would have submitted another acceptable substitute asset, entitling Tip Top to the award and preserving the Government's interest in awarding the contract at the lowest cost, here, a savings of $1.4 million to the taxpayer.

Moreover, the FWHA's rejection of the asset was unreasonable. The pledged asset—"previously mined, extracted, stockpiled, marketable coal", like gold or any other regularly traded commodity, has an identifiable value, -- a "spot price" published by the Department of Energy ("DOE") and other industry sources. Mined coal is therefore "readily marketable," the standard for "acceptability" in FAR §28.203-2(a).

The FHWA's sole contemporaneous reason for rejecting this coal before elimination of Tip Top is unsupported by law or logic. Mined, above-ground coal is not a "mineral interest," or remotely comparable to "plant equipment," or "accounts receivables." Unlike mined coal, the value of these unacceptable assets cannot be ascertained from any market standard. The post-hoc concerns later proffered to the GAO are equally without merit and were not adopted.

The GAO's attempts to rescue the FHWA's improper rejection are also unsupportable. When the GAO's first argument that only personal property on the list of acceptable assets in FAR 28.203-2(b) was shown to be legally unsupportable, the GAO claimed, without providing an opportunity for comment from Tip Top or ECS, that mined coal was unacceptable because it could not be placed into an escrow account, as allegedly required FAR §28.203-1(b). This argument cannot withstand scrutiny.

FAR §28.203-1(b) addresses the "escrow account" requirements for some of the acceptable assets on the list in FAR §28.203-2(b). Specifically covered are those assets where "funds," i.e. money, can be "deposited" in a bank account, a defined legal term, in a federally insured financial institution. Thus, the FAR only requires that money be deposited in an escrow account. This is consistent with the minimum "escrow account" requirements to (1) pay amounts "on deposit" on demand and to "disburse monies to the Government", (2) release "accrued interest" on the account (interest on money), and (3) submit periodic account statements (the money plus interest) to the Contracting Officer. See FAR §28.203-1(b)(i)-(v). In its decision, the GAO omitted these minimum "escrow account" requirements from its quote of this regulation, which show the limited applicability of the "escrow account" requirements.

Moreover, under the GAO's newfound rule that the only acceptable personal property assets were those capable of being deposited in a compliant "escrow account," acceptable

personal property assets listed in the FAR, such as irrevocable letters of credit, would be unacceptable. There also would be no reason to include various unacceptable "personal property" assets in FAR §28.203-2(c) that could not be deposited into a compliant escrow account. The GAO's rule would negate and render superfluous these regulatory distinctions.

Contrary to the GAO's position, finding "mined coal" acceptable does not nullify the "escrow account" requirements — those minimum requirements continue apply to the money or cash assets. However, as the FHWA has conceded, the lists of acceptable and unacceptable assets are non-exclusive. The "escrow account" requirements for cash do not apply to an acceptable "readily marketable" mined coal asset.

More importantly, even if some type of "escrow" was considered necessary to assure the FWHA that it would be able to receive $1.8 million from $191 million of mined coal, this was not a matter of responsiveness allowing an automatic rejection of the bond. Bid bonds are only non-responsive when the liability of the individual surety cannot be determined on the face of the bond. The SF 28 which seeks details of the escrow account, even if applicable, does not affect the individual surety's liability. It is merely a mechanism to facilitate payment. Thus, any defects regarding this issue are a matter of responsibility.

Accordingly, if FHWA had actually identified uncertainties regarding the value of the mined coal and wanted an agreement like an escrow account for this otherwise acceptable asset, such agreement would have been provided and resolved the matter, or another acceptable asset would have been furnished. FHWA's rejection without giving ECS the opportunity to address those issues was an improper abdication of discretion.

LEGAL ARGUMENT

I. Standard of Review for Injunctive Relief

In Global Computer Enterprises, Inc. v. United States, __ Fed. Cl. __ (March 31, 2008), this Court reiterated the standard for granting temporary and preliminary injunctive relief:

> " ... (1) it has a likelihood of success on the merits; 2) it will suffer irreparable harm if preliminary relief is not granted; (3) the harm it will suffer outweighs the harm to the government and to third parties; and (4) the grant of relief is not contrary to the public interest. (citations omitted). No one factor, taken individually, is necessarily dispositive.... [T]he weakness of the showing regarding one factor may be overborne by the strength of the others. (citation omitted). "

Tip Top meets these standards.

II. Tip Top is Likely to Succeed on the Merits

A. FHWA's Failure to Afford ECS an Opportunity to Respond to its Concerns or to Submit a Substitute Bond Prior to Rejection Violated Federal Law

The Competition in Contracting Act, 41 U.S.C. §253 and 41 U.S.C. §253b, required the FHWA, when competing a contract using sealed bids, to award to the lowest priced offeror. Under the Miller Act, 31 U.S.C. §3111 et seq., for this federal road construction contract over $100,000, to protect the Government's interest in the low bid, contractors were required to submit a bid bond which would result in payment of a set amount to the Government in the event that the low bidder elected not to execute the contract or performance and payment bonds.

Tip Top was the low bidder by $1.4 million. FHWA alleged that during its evaluation of the bid bond, it had a number of concerns about the acceptability of the pledged asset. Without contacting the individual surety, ECS, or Tip Top, FHWA rejected the bond and eliminated Tip Top as non-responsible. These actions were contrary to the IFB, p. J-2, and federal law.

The IFB states in pertinent part:

> "...the CO may, after reviewing the affidavit of the individual surety and documentary information on the security interest and the assets pledged, by certified mail, to the surety's business or resident address (as shown on the bond) request the surety to provide further information and/or documents with respect to any of the documents provided. The CO may require such information to be furnished under oath. Failure of the surety to accept such mail or failure of the surety to respond with the requested information or documents within 7 business days of receipt of the request, will be cause for rejection of the surety." Ex. 1.

This IFB provision follows GAO case law requiring an agency to make the type of inquiries FHWA has asserted. See Gene Quigley, Jr., 70 Comp. Gen. 273, B-241565, February 19, 1991, 91-2 CPD ¶182. FHWA was not permitted, as it did here, to assume the worst and reject the low bid. D.M. Potts Corporation, B-231855, November 4, 1988, 88-2 CPD ¶440. Unfortunately, that is exactly what FWHA did in this case without any legitimate basis.

FHWA's sole contemporaneous reason for rejecting ECS's pledged asset in its February 21, 2008 rejection letter—that mined coal is a prohibited "mineral interest"-- has no basis in fact or law. Ex. 8. This claim, and even FHWA's post-protest "concerns" regarding ownership, value, and liquidity would have been answered through the arguments and documentation ECS offered after the rejection. FHWA's claim that it was prohibited from seeking or reviewing this information prior to rejection of the bond, based on still unidentified regulations, has no basis.

Moreover, even if ECS had been unable to satisfy FHWA's concerns, where the initial bond was valid on its face, FHWA was required to afford the individual surety, ECS, the opportunity to submit an acceptable substitute asset.

FAR §28.203-4, "Substitution of Assets" states:

> "An individual surety may request the Government to accept a substitute asset for that currently pledged by submitting a written request to the responsible contracting officer. The contracting officer may agree to the substitution of assets upon determination, after consultation with legal counsel, that the substitute assets to be pledged are adequate to protect the outstanding bond or guarantee obligations. If acceptable, the substitute assets shall be pledged as provided for in subpart 28.2."

The GAO's evolving interpretation of this regulation must be rejected. After changing its initial view that asset substitution only applied to post-award situations, the GAO then attempted to minimize the significance of FAR §28.203-4 by claiming that it did not prevent an automatic rejection of an allegedly unacceptable asset. This view ignores the fact that this is a matter of responsibility and that discretion must be reasonably exercised to determine whether the Government's interest in awarding to the low bid under the competition statutes, 41 U.S.C. §253 and 41 U.S.C. §253a, can be preserved. Here, there was no possible reason for the FHWA to refuse to entertain a substitution of an asset before rejection of the bid bond and elimination of Tip Top since substitution, specifically permitted by regulation, would accomplish that purpose.

The GAO also ignores the language of the regulation and GAO precedent. FAR §28.203-4 contains no limitation on when the request for substitution can be made. Gene Quigley, Jr., supra, cited by the GAO for the proposition that the duty to make inquiries is limited to correction of "minor" defects, is irrelevant. The case did not involve a substitution of assets. However, in that case, the GAO restated the longstanding rule that the adequacy of a bid bond is a matter of a bidder's responsibility, not responsiveness. The GAO continued:

> "On matters of responsibility that are susceptible to reasonable resolution, the contracting officer should ordinarily solicit and consider information on the issue before proceeding to award (citations omitted)."

A federal regulation expressly authorizing the substitution by the same surety of an unacceptable asset with an acceptable asset falls within the category of matters susceptible of "reasonable resolution." Moreover, the GAO did not distinguish its own precedent interpreting FAR §28.203-4. The GAO had recognized that unacceptable assets could be substituted by a bidder, even after a protest was filed. In U.S. Floors, Inc., B-241552, B-241555, February 6, 1991, 91-1 CPD ¶130, after a protest alleged that there were deficiencies in the awardee's bid

bond, the awardee's surety requested that certain personal property and real estate that had been pledged (which were unacceptable) be substituted with a certificate of deposit. The GAO rejected the protester's position that the initial unacceptable pledged assets required rejection of the bid bond, stating:

> "… FAR §28.203-4 specifically permits the contracting officer to agree to a surety's substitution of assets for those originally pledged after determining that the substitute assets to be pledged are adequate to protect the outstanding bond or guarantee obligation. (footnote omitted). Hence, we find that the sureties' initial failure to submit a pledge of assets, as well as the other documentation noted by USF, and the fact that a substitution of assets by the surety Brent D. Butcher was permitted, had no effect on the acceptability of the Butcher bid."

Accord Bundick Enterprises, Inc., 70 Comp. Gen. 94, B-239867-.2, November 19, 1990, 98-2 CPD ¶402 (regulation means substitution permitted for assets pledged).

The GAO's implication that acceptance of the same surety's substitution of another acceptable asset is discretionary is incorrect:

> "… The contracting officer may agree to the substitution of assets upon determination, after consultation with legal counsel, that the substitute assets to be pledged are adequate to protect the outstanding bond or guarantee obligations. If acceptable, the substitute assets shall be pledged as provided for in subpart 28.2." (Emphasis added).

As set forth in his comments to the GAO, ECS would have submitted an acceptable substitute asset. Ex. 13.[1] Accordingly, the CO was required ("shall") to accept it. Indeed, since an acceptable substitute asset would result in an award to Tip Top as the low, responsive, responsible bidder, there could be no legitimate basis to reject substitution and forfeit $1.4 million taxpayer dollars. FHWA's failure to provide this opportunity before rejecting Tip Top's bid and making award to the next lowest bidder was a prejudicial abuse of discretion.

---

[1] After being advised that ECS would have provided a substitute asset, FHWA was asked whether it would entertain an acceptable substitute asset from ECS. Ex. 15. The FHWA's response was an "override" of the stay of award under 31 U.S.C. §3553(c), supposedly because "urgent and compelling circumstances" were present. Ex. 16. This override was an unequivocal rejection of the proffer of a substitute asset.

B. ECS's Mined Coal is an Acceptable Asset

Irrespective of the opportunity to substitute assets, the CO should never have rejected the proffered mined coal asset in the first place as the FHWA had no basis to question its acceptability under the FAR standard. FAR §28.203, entitled "Acceptability of Assets", states in paragraph (a):

> "(a) The Government will accept only cash, readily marketable assets, or irrevocable letters of credit from a federally insured financial institution from individual sureties to satisfy the underlying bond obligations.
>
> (b) Acceptable assets include— …." (Emphasis added).

The FHWA conceded that the list of acceptable assets is non-exclusive. Ex. 10. The documentation offered to FHWA after the bond's rejection demonstrates that the pledged coal has been previously mined, extracted, and stockpiled above ground on a specific piece of property owned by ECS. Exs. 16-17. Its present value and sale price can be determined by reference to "spot prices" published by the DOE and other industry indices. Ex. 20.

The type and grade of ECS's coal were based on assays and professional assessments which determined the value of the ECS's asset at approximately $191 million (as of that date). Exs. 16, 21. This coal has already been mined, analyzed, valued, stored, and could be transported and sold on the active coal market based on the published "spot price" for direct use, further processing or resale. Id. The mined coal met the FAR standard for ready marketability.

Indeed, the ability to readily establish a market price is why coal and other similar commodities have been accepted by other federal agencies and why mined coal has been referred to as "readily marketable." Ex. 20; see Shader Contractors v. United States, 276 F.2d 1, 6 (Ct. Cl. 1960) (finding coal to be a readily marketable commodity).

As discussed below, each of FHWA's reasons for rejecting the bond were unreasonable,

arbitrary and capricious. The GAO's attempts to rescue the FHWA's actions lack merit.

1. Mined Coal is not a "Speculative" Asset, or a "Mineral Right"

FHWA sole reason for finding this asset unacceptable at the time of its rejection was that mined was a speculative "mineral right" under FAR §28.203-2(c)(7). This claim has no basis in fact or law. A "mineral right" involves minerals "in land" or below ground. See Black's Law Dictionary, 6th Edition 1990, p. 995. Mineral rights are not tangible minerals that have previously mined. Mined coal is not an intangible legal right but an existing, already-mined, tangible, above-ground and stockpiled mineral for which there is a ready market.

2. Mined Coal is not "Comparable" to Plant Equipment or Accounts Receivable

When faced with the illogic of its stated basis for rejection, the FHWA's position began to evolve. It argued that mined coal was comparable to unacceptable plant and equipment, the examples of corporate assets listed under FAR §28.203-2(c)(6) or an unacceptable "account receivable" under FAR §28.203-2(c)(1). Plants and equipment are typically mechanical and a permanent fixture. It is a depreciating asset. There is no ready market and, no established "spot price" like there is for gold, silver, oil, coal and other commodities.

An account receivable is even more dissimilar because it is an intangible asset – an accounting book entry claiming a legal right to receive monies believed to be due to the individual or corporate creditor. It involves a risk that the accounts will never be collected in whole or in part due to the risk of default by the third party debtor. Further, there is no ready market for this asset and, even if there were, there is no market under which the value could be ascertained by reference to a published "spot price."

3. FHWA Received a Valid Security Interest

Before the GAO, without citing any legal authority, FHWA argued that no security

interest had been provided. This claim has no merit. FAR §28.203-1, entitled "Security interests for an Individual Surety," requires a "security interest" in the pledged asset. It provides:

> "(a) An individual surety may be accepted only if a security interest in assets acceptable under 28.203-2 is provided to the Government by the individual surety. The security interest shall be furnished with the bond.

The required "security interest" in paragraph (a) above is not defined in the regulations. However, Black's Law Dictionary, 6th Edition, p. 1357, defines a security interest as an:

> "... [i]nterest in property resulting from a security agreement. A form of interest in property which provides that the property may be sold on default in order to satisfy in order to satisfy the obligation for which the security interest is given ... an interest in personal property (i.e. mined coal) or fixtures which secures payment or performance of an obligation. U.C.C. §2-201(37), 9-102." (Emphasis added).

In this case, ECS's Certificate of Pledged Assets, including paragraph 3 of the pledge, specifically meets this definition. ECS gave the FHWA a security interest recognized by Article 9, UCC, which the CO could record by means of a Form UCC-1 (although not required by the UCC to establish the security interest).

4. The Liquidity and Value of the Bond Was Sufficient and Attested

FHWA asserted that mined coal would put more of a burden on the Government because a willing buyer and seller are needed, and thus, that coal is "speculative as to liquidity and value." This confusing argument overlooks the fact that this could be said of any asset and here, willing buyers abound, as shown by the DOE's publication of daily "spot" prices. Ex. 20. It has been accepted by other federal agencies. Ex. 22. Given this country's and the world's dependence on fossil fuels, and the recent increases in the value of fossil fuels (including coal), ECS's coal is arguably more secure than any of the listed acceptable assets and certainly more "liquid" than real estate. Ex. 23.

Nowhere does the FAR provide that "burden on the Government" is a valid basis for

rejection of a readily marketable pledged asset. Likewise, the value of an asset upon sale is not the FAR standard. FHWA's apparently related claim that value cannot be determined unless there is an "independent" confirmation of each representation in SF 28 and the Certificate of Pledged Assets is contradicted by the use of Government forms, which do not require it. The SF 28 is an affidavit signed under oath, and that is sufficient. FAR §28.203(b). The CO cites no regulatory or legal authority in support of this argument and it must be rejected.

5. There is no Requirement that a Third Party Hold the Asset

FHWA erroneously implied that ECS did not own the asset. Ex. 16. FHWA then complained post-hoc that "the assets must be held by a third party." No such requirement exists.

6. The GAO's Attempts to Rescue the FHWA Must be Rejected

The GAO did not adopt any of the reasons for rejection offered by the FHWA. Instead, during an April 10, 2008 "outcome determination" conference, the GAO attorney expressed his view that the rejection was proper because the only types of acceptable personal property were those listed in paragraph (b) of FAR §28.203-2. The basis for his argument was FAR §28.203-2(c)(4) which identifies as an unacceptable asset:

> "(4) Personal property other than that listed in paragraph (b) of this subsection (e.g., jewelry, furs, antiques) …." (Emphasis added).

Mined coal, which, according to the GAO is not real estate and thus, "personal property," and which is not on the list, was unacceptable per se.

Tip Top and ECS submitted comments showing that the GAO's interpretation did not take into consideration that (a) the lists of acceptable and unacceptable assets in the FAR were not exclusive, (b) the significance of the listed examples in the definition of unacceptable assets in FAR §28.203-2(c), such as "furs, jewelry, antiques", which were not "readily marketable" like mined coal, and (c) the listing of other types of unacceptable personal property in FAR §28.203-

2(c), which if the GAO was correct, would have been superfluous. See Exs. 16-17.

Faced with these legal arguments, the GAO apparently struggled to find some way to uphold the outcome prediction. Although the statutory deadline for its decision was June 9, 2008, apparently to facilitate FHWA's desire to start contract performance with the higher priced bidder and without seeking comments from Tip Top or ECS, on May 5, 2008, the GAO denied the protest, but under a new theory. The GAO now pronounced that all acceptable personal property assets must be capable of being placed in an "indispensable" escrow account. Because mined coal cannot be physically placed in an "escrow account," it was unacceptable.

The GAO's new position was based on FAR §28.203-1(b), FAR §28.203-2(c)(4) (apparently because it lists unacceptable "personal property" that cannot be placed in an escrow account) and a parenthetical on the SF 28 (which asks for details of the escrow account). The GAO's new theory is not supported by the regulations or its case precedent.

a. Only Cash Assets are Subject to the "Escrow Account" Requirements

FAR §28.203-1(b), which is included as part of the requirement for a security interest, and entitled "Security interests by an individual surety," provides that the value of the pledged asset "may be provided by one or a combination of" methods which include an escrow account and a lien on real property. (Emphasis added). It does not say "shall" or exclude other methods. The word "may" indicates the contrary.

Moreover, the regulations detailing the minimum "escrow account" requirements in subparagraphs (b)(1)(i)-(v), omitted from the GAO's decision, show that "escrow accounts" are only required for one type of acceptable asset – cash or money.

FAR §28.203-1(b)(1) provides:

> (1) An escrow account with a federally insured financial institution in the name of the contracting agency. (See 28.203-2(b)(2) with respect to Government securities in book

entry form.) Acceptable securities for deposit in escrow are discussed in 28.203-2. While the offeror is responsible for establishing the escrow account, the terms and conditions must be acceptable to the contracting officer. At a minimum, the escrow account shall provide for the following:

(i) The account must provide the contracting officer the sole and unrestricted right to draw upon all or any part of the funds deposited in the account. A written demand for withdrawal shall be sent to the financial institution by the contracting officer, after obtaining the concurrence of legal counsel, with a copy to the offeror/contractor and to the surety. Within the time period specified in the demand, the financial institution would pay the Government the amount demanded up to the amount on deposit. If any dispute should arise between the Government and the offeror/contractor, the surety, or the subcontractors or suppliers with respect to the offer or contract, the financial institution would be required, unless precluded by order of a court of competent jurisdiction, to disburse monies to the Government as directed by the contracting officer.

(ii) The financial institution would be authorized to release to the individual surety all or part of the balance of the escrow account, including any accrued interest, upon receipt of written authorization from the contracting officer.

(iii) The Government would not be responsible for any costs attributable to the establishment, maintenance, administration, or any other aspect of the account.

(iv) The financial institution would not be liable or responsible for the interpretation of any provisions or terms and conditions of the solicitation or contract.

(v) The financial institution would provide periodic account statements to the contracting officer.

(vi) The terms of the escrow account could not be amended without the consent of the contracting officer." (Emphasis added).

Subsection (b)(1)(i) refers specifically to "funds deposited in the account . . . ." This means that (1) there must be a bank account which, based on FAR §28.203-1(b)(1), must be in a federally insured financial institution, and (2) funds (i.e., money or cash ) must be deposited in the account. An escrow account is defined in Black's Law Dictionary, 18, (8th ed. 2004) as a:

"... bank account, generally held in the name of depositor and the escrow agent that is returnable to the depositor or to a third person on the fulfillment of specified conditions."

In turn, a "bank account" is:

> "[a] sum of money placed with a bank or banker, on deposit, by a customer, and subject to be drawn out on the latter's check . . . ." Black's Law Dictionary, 144 (6th ed. 1990) (Emphasis added).

That same subsection goes on to explain that, in the event of a dispute between the Government and the offeror/contractor, the surety or others, "the financial institution would be required ... to disburse monies to the Government as directed by the contracting officer." (Emphasis added.) The next subsection, (b)(1)(ii), also discusses the contents of the account as monies in saying that the "balance of the escrow account, including any accrued interest" must be released under the stated conditions. (Emphasis added.) Subsection (b)(1)(v) then refers to "periodic account statements", showing that the contents of the escrow account are to be cash accruing interest, which accrual is reported in periodic statements. Thus, the only personal property required to be placed in an "escrow account" in FAR §28.203-1(b)(1) is cash. Thus, FAR §28.203-1(b)(1) therefore shows that the escrow account defined in subsections (b)(1)(i)-(v) does not cover all of the listed acceptable personal property.

b. The GAO's Position Violates Principles of Regulatory Construction

Under the GAO's interpretation, the Court would have to accept the illogical conclusion that irrevocable letters of credit, which are identified as "acceptable" in FAR §28.203-2(b)(5), are unacceptable because they cannot be deposited into an escrow account and, thus, do not comply with §(b)(1)(i). Thus, the GAO's "escrow account" requirement for all personal property assets is inconsistent with even the FAR's listed acceptable assets.

The GAO's interpretation also would render superfluous the FAR's listing of unacceptable assets, which include various types of personal property, none of which could be placed in a compliant escrow account. See e.g. FAR §28.203-2(c)(4) (jewelry, furs, antiques), FAR §28.203-2(c)(6) (corporate assets, e.g. plant and equipment). If all of these personal

property assets were automatically unacceptable because they cannot be placed in a compliant "escrow account," there would have been no need to list them and to include examples.

The GAO's position that finding mined coal to be an acceptable asset would eliminate the "indispensable" requirement for an escrow account is not supported by the regulations. As shown above, the "escrow account" requirements apply to cash assets and as to those assets, the "escrow account" requirements remain. Indeed, it is the GAO's imposition of "escrow account" requirements on otherwise acceptable assets that would undermine the standard for "acceptability" and limit acceptable personal property assets solely to those specifically, a conclusion that is not intended by the plain language of FAR §28.203-2(b) ("[a]cceptable assets include – " and (c) "[u]nacceptable assets include but are not limited to – " (emphasis added).

c. There are no "Escrow Account" Requirements for Mined Coal

FAR §28.203-1(b)(1) states: "Acceptable securities for deposit in escrow are discussed in 28.203-2." (Emphasis added). There is no discussion of this "escrow" in FAR §28.203-2 and, by the language of FAR §28.203-1(b)(1), applies to "securities." Presumably, this "escrow" must be materially different than an "escrow account" meeting the minimum requirements (which, as shown above, applies only to cash assets). For example, the escrow agent must take additional steps to convert the securities to cash to make payment. Thus, a different agreement, not defined by the regulations, is contemplated for securities.

The FHWA has conceded that the lists of acceptable and unacceptable assets in FAR §28.203-2 are not exclusive. Ex. 10. That is why FAR §28.203-2(a), entitled "Acceptability of Assets," sets forth a standard of "acceptability" instead of stating: "the following assets are the sole acceptable assets." There are no "escrow account" requirements in the FAR for acceptable assets like mined coal (or gold) which makes sense as these are numerous readily marketable

commodities not easily (if at all) subject to placement in an escrow. Thus, the "escrow account" requirements applicable to cash assets, and any "escrow" requirement that might be applicable to securities (although the FAR does not define or establish standards for such escrows), do not apply to coal and other commodities. Thus, the absence of an escrow account as part of ECS's pledge of mined coal could not be validly rejected by the FHWA.

d. There is no Requirement for a "Perfected" Security Interest

Apparently realizing that its interpretation is unsupported, the GAO attempts to rewrite the FAR by contending that the "escrow account" requirements prove that the security interest required by FAR §28.203-1 must be a "perfected" security interest. Nothing supports this claim.

The word "perfected" or concerns about "priorities" that are at issue in a perfected security interest are absent in the regulations. All that is required is to provide the government "a security interest in assets acceptable under 28.203-2," in an amount equal to (or greater than) the aggregate amount of the penal sum of the bonds. FAR §28.203-1(a)-(b). This is exactly what ECS gave– a security interest, here recordable by a UCC-1.

e. Case Precedent Refutes the Automatic Elimination of this Asset

The GAO has ignored the distinction in its own case law between matters of responsibility and responsiveness. As stated in Gene Quigley, supra:

> "The purpose of a bid guarantee is to secure the liability of a surety (in this case sureties) in the event that the bidder fails to fulfill his obligation to execute a written contract and provide proper bonds under the contract." (Emphasis added).

Since ECS had supplied all required documentation fixing his liability, and his liability for the penal amount was valid on its face, issues relating to this additional documentation should have been treated like all other non-liability issues, as a matter of responsibility. Aeroplate Corp. v. United States, 67 Fed. Cl. 4 (2005) (where bid bond facially compliant, rejection of bid as nonresponsive was improper); Hawaiian Dredging Construction Co., Inc. v. United States, 59

Fed. Cl. 305 (2004) (bid bond improperly rejected as non-responsive where facially compliant) PCI/RCI, a Joint Venture v. United States, 36 Fed. Cl. 761 (1996) (where surety liable, bid bond responsive); Cf. All Seasons Construction, Inc. v. United States, 55 Fed. Cl. 175 (2003) (photocopied signatures non-responsive); Interstate Rock Products, Inc. v. United States, 50 Fed. Cl. 349 (2001) (bid bond non-responsive where penal amount of the bond was omitted).

An escrow or escrow account, even if some sort were required for certain assets, (but not, Tip Top demonstrated, for the asset pledged), this does not create or affect the liability of the individual surety but is part of the SF 28 for purposes of facilitating payment. Burtch Construction, B-240695, B-240696, November 23, 1990, 90-2 CPD ¶423 (failure to submit pledge of assets containing escrow account details was not a basis to reject the bid); accord Noslot Pest Control, Inc., B-234290, 68 C.G. 396, April 20, 1989, 89-1 CPD ¶396; O.V. Campbell & Sons Industries, Inc., B-229555, March 14, 1988, 88-1 CPD ¶259 (holding the deficiencies in the SF 28 do not concern the individual surety's liability and were matters of responsibility).

The above case law shows that even assuming for the sake of argument that some sort of "escrow" agreement was necessary, this was easily and reasonably susceptible to resolution. If the FHWA actually had uncertainties with receipt of payment, such an agreement would have been supplied and/or ECS would have furnished another acceptable substitute asset. It was therefore unreasonable for the FHWA to reject the asset and declare Tip Top non-responsible. Indeed, it was an abuse and abdication of discretion.

III. Tip Top Has Established Irreparable Harm

With respect to irreparable harm, in TRW Environmental Safety Systems, Inc. v. United States, 16 Cl. Ct. 520, 529 (1989), this Court stated:

> " … a plaintiff moving for preliminary injunction need only allege, in order to establish irreparable injury, that by failing to enjoin, it will not be awarded the contract and will lose profits thereunder …These cases are based on the proposition that an unsuccessful bidder's damages are limited at law to bid preparation costs…
>
> [I]f this court were to deny the motion for a preliminary injunction, and thereafter TESS were to be successful on the merits, the resulting delays and extra costs to all parties, including the public, will be exacerbated if [the awardee] has already begun performance thereunder. In the past, this court has held that a plaintiff's need 'to engage in extensive post-award activities to restore the status quo' constitutes immediate and irreparable harm warranting a grant of a preliminary injunction."

If the awardee begins active performance while Tip Top awaits a decision, Tip Top will place its ability to retain key personnel in jeopardy involving extensive post-award activities to restore the status quo and will lose the profits for any portion of the roadwork that is completed before a decision is issued. Ex. 23, Declaration of Percy J. Hollins. Thus, Tip Top has established the element of immediate and irreparable harm. Id.

IV. The Balance of Harms and Public Interest Strongly Favors Injunctive Relief

The balance of harms favors the granting of injunctive relief. The harm to the next high bidder and the FHWA from a minor delay in awaiting a decision of this Court pales when compared to the immediate, irreparable harm to Tip Top. Id. As shown by Tip Top's CPM schedules, the schedule in the current contract allows far more time than is needed to complete the work and the current awardee has agreed to that schedule. Id.

Moreover, as shown by its "override" decision in which the FWHA agreed to suspend performance to await the GAO's decision, FHWA was willing to stay performance up to the GAO's statutory deadline of June 9, 2008, to issue its decision. The FHWA's costs of any possible delay damages to the awardee for the additional time necessary for this Court to resolve the protest are therefore negligible.

The intended contract to the higher priced bidder is the result of violations of federal laws

and regulations. The public has a strong interest in assuring that federal procurements are conducted fairly and correctly. The public also has an interest in assuring that the Government obtains the lowest priced, responsive, responsible bidder which Tip Top represents.

V. Bond

Tip Top, a small business, believes that neither the intended awardee nor FHWA will suffer appreciable damages from the short delay needed to resolve this case. Ex. 23. Thus, the Court should not require a bond under Rule 65(c). If the Court feels compelled to require a bond from Tip Top, under Rule 65(c), the Court should only require a bond in a nominal amount, e.g. $5000 or less. See e.g. Aeroplate, supra ($2,000 bond).

CONCLUSION AND REQUEST FOR RELIEF

Individual sureties provide bonds primarily to small and small disadvantaged businesses which cannot afford corporate sureties or for a variety of other reasons, have a difficult time obtaining bonding. While the Government had encountered problems with some pledged assets of individual sureties in the 1980s which resulted in a strengthening the verification requirements in the above regulations, the intent of an "acceptability" standard, objectively expressed in the regulations, remains to provide small businesses with access to individual sureties who have pledged assets meeting the "readily marketable" acceptability test, and have included a valid security interest.

These regulations should not be construed, as the FHWA and GAO have repeatedly done here, to create absolute responsiveness requirements, unsupported by the language of the regulations, that automatically exclude "readily marketable" assets like mined coal (or even gold under FHWA's and GAO's construction) which meets the acceptability standard in FAR §28.203-2(a), and in which the FHWA received a valid security interest.

statutory interest in awarding to the low bidder, agencies must explore ways as part of its responsibility analysis to resolve any concerns regarding the bond with an otherwise acceptable individual surety. The FHWA's failure to take this course in this case was in violation of statute and regulation and an improper abdication of discretion.

For the reasons above, Tip Top respectfully requests that the Court grant the injunctive relief requested and order the FHWA to terminate its current award, rescind its decision rejecting Tip Top's bid bond, either accept the asset pledged after resolving any issues or an acceptable substitute asset, and make award to Tip Top, the low priced, responsive, responsible contractor, as requested in Tip Top's Complaint.

Respectfully submitted,

Michael A. Gordon
MICHAEL A. GORDON PLLC
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)

Counsel of Record for Tip Top Construction, Inc.

OF COUNSEL:
Fran Baskin, Esquire
MICHAEL A. GORDON PLLC

May 15, 2008

## INDEX TO EXHIBITS

Ex. 1 Excerpts of IFB No. DTFH71-08-B-00002

Ex. 2 Excerpts of Tip Top's Bid and Bid Bond

Ex. 3 January 10, 2008, Results of Bid Opening

Ex. 4 E-Mails from FWHA to Tip Top f January 28, 2008

Ex. 5 Tip Top's Response and Preliminary CPM

Ex. 6 FWHA February 11, 2008 e-mail requesting additional data

Ex. 7 Tip Top's Response dated February 11, 2008

Ex. 8 FWHA Rejection Letter to Tip Top dated February 19, 2008

Ex. 9 ECS Letter to FWHA dated February 21, 2008

Ex. 10 FWHA Letter to ECS dated February 26, 2008

Ex. 11 ECS Letter to FWHA dated February 29, 2008

Ex. 12 FWHA Agency Report dated March 28, 2008

Ex. 13 Tip Top Comments on the Agency Report dated April 9, 2008 and certain exhibits

Ex. 14 FWHA e-mail to the GAO dated April 10, 2008

Ex. 15 Tip Top e-mail to FWHA dated April 11, 2008

Ex. 16 Comments of Tip Top on the GAO Conference dated April 14, 2008

Ex. 17 ECS Comments on the GAO Conference dated April 14, 2008

Ex. 18 FWHA Notice to the GAO over the Override Decision dated April 16, 2008.

Ex. 19 GAO Decision dated May 5, 2008

Ex. 20 EIA "Spot Price" Data, dated April 2, 2008

Ex. 21 Alliance Consulting, Inc. Assessment and Exhibits

Ex. 22 ECS Bonds Accepted by FWHA and other Federal Agencies

Ex. 23 Crookwell News dated April 3, 2008

Ex. 24 Declaration of Percy J. Hollins