**MICHAEL A. GORDON PLLC**
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)

April 9, 2008

**VIA E-MAIL**
Kenneth Kilgour, Esquire
Office of the General Counsel
U.S. Government Accountability Office
441 G Street N.W.
Washington, D.C. 20548

Re: B-311305; Comments on the Agency Report

Dear Mr. Kilgour:

The Federal Highway Administration's ("FHWA") report fails to reasonably support its rejection of Tip Top Construction Corporation's ("Tip Top") bid bond. Marketable, previously mined coal is like gold or any other regularly traded commodity with a known value, in this case, a "spot price" published by the Department of Energy ("DOE") and other industry sources. Mined coal is a readily marketable asset that is acceptable under any reasonable reading of the regulations and fully protects the Government. The documentation submitted shows that this mined coal asset physically exists and is available to support the bond. There is no basis to reject this bond.

The FHWA offers no authority or logic for considering mined coal as a "mining interest," or comparable to "plant equipment," or "accounts receivables." The value of these unacceptable assets cannot be ascertained from any market standard. Thus, they are not readily marketable, like acceptable stocks and bonds, and mined coal. FHWA ignores the facts and legal authority submitted by Tip Top's individual surety and its protests and instead, proffers post-hoc concerns that either have no basis or should have been resolved by asking questions to learn the facts before rejecting the bond.

The FHWA's rejection of Tip Top's bond also lacks common sense. The purpose of a bid bond is to protect FHWA from bidders who refuse to execute the contract or furnish payment and performance bonds. That risk is minimal here and does not justify the bond's rejection. As FHWA is aware, Tip Top is an experienced federal road construction contractor with a record of successful performance for FHWA. Tip Top has never defaulted on a project. Further, prior to the rejection, FHWA received Tip Top's Critical Path Method Diagram ("CPM") schedule which shows that Tip Top had the intention and capability of performing. The FHWA also knows that the individual surety has a good track record at FHWA and other federal agencies.



COMMERCIAL TRADE SECRETS; DISCLOSURE OUTSIDE THE FEDERAL GOVERNMENT IS SUBJECT TO 5 U.S.C. §551 AND 18 U.S.C. §1905

Yet, without a legitimate legal basis and without asking any questions about the asset, the FHWA was unreasonably willing to pay $1.4 million more to the next highest bidder rather than take a "risk" that Tip Top would default and FHWA would be unable to recoup the $1.4 million from the surety's previously mined coal valued at over $191 million. This makes no sense.

In sum, the bid bond assets pledged are in full conformity with the regulations and acceptable. As the low, responsive, responsible bidder, Tip Top is entitled to this award.

## FACTUAL BACKGROUND

### A. Overview

FHWA issued Invitation for Bids No. DTFH71-08-B-00002 ("IFB") for construction of a five-leg roundabout and miscellaneous related work, on the island of St. John.

### B. Tip Top's Performance History

Tip Top is an experienced federal road construction contractor located in the Virgin Islands which has been performing this type of work for 19 years. Tip Top recently won the Biennial DOT award was for Excellence in Highway Design with a merit in Historic Preservation and recently, successfully performed work for FHWA on the Eastern Federal Lands projects. Tip Top was the low bidder due to its unique labor and equipment resources located on islands close to St. John. This enables Tip Top to complete the project in less time and by doing so, enables the Government a significant savings through a lower bid price.

### C. The IFB's Bid Bond Requirement

The IFB required a bid bond and after award, performance and payment bonds. The requirements for an individual surety (which Tip Top selected for the bid bond in this case) are found in FAR §28.203, which states in relevant part:

> "(b) An individual surety must execute the bond, and the unencumbered value of the assets (exclusive of all outstanding pledges for other bond obligations) pledged by the individual surety, must equal or exceed the penal amount of each bond. The individual surety shall execute the Standard Form 28 and provide a security interest in accordance with 28.203-1. One individual surety is adequate support for a bond, provided the unencumbered value of the assets pledged by that individual surety equal or exceed the amount of the bond ...."

Instruction 4 at page 2 of the OMB Bid Bond form, OMB 9000-0045, used for the bid bond at issue specifically recognizes that individual sureties may provide a bid bond when it states:



COMMERCIAL TRADE SECRETS; DISCLOSURE OUTSIDE THE FEDERAL GOVERNMENT IS SUBJECT TO 5 U.S.C. §551 AND 18 U.S.C. §1905

"(b) Where individual sureties are involved, a completed Affidavit of Individual surety [sic] (Standard Form 28), for each individual surety, shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability." See TT-Bonds.[1]

Standard Form ("SF") 28, Affidavit of Individual Surety, is a one-page form that requires the individual surety to provide identifying and contact information (Blocks 1 – 6), state the assets being pledged (Block 7), identify any encumbrances on the pledged asset (Block 8), identify the all bonds for which the subject assets have been pledged within the past three years (Block 9), sign (Block 10), identify the bond and contract to which the affidavit relates (Block 11), and provide a notary signature/seal (block 12) and include a Certificate of Pledged Assets to cover $1.8 million. This Pledge included a certification that the surety (a) has good title, (b) has assets free from liens or prior pledges, (c) has full authority to transfer the assets as collateral in support of the bond, (d) will not assign the rights to the pledged assets during the term of the agreement, and (e) is giving the Government full rights as a secured party pursuant to Article 9 of the UCC to redeem the asset and sell it if the Principal refuses to execute the contract or furnish performance and payment bonds and, upon notice and demand to the surety, the surety is not able or willing to meet its financial obligations.

D. Tip Top's Bid Bond

Tip Top's individual surety, E.C. Scarborough ("ECS"), signed the Bid Bond and furnished the required affidavit on an SF 28. ECS' SF 28 properly identifies the asset pledged by means of incorporating by reference an attached and individually numbered Certificate of Pledged Assets. ECS also affirmed that there are no mortgages, liens, judgments or any other encumbrances involving the pledged assets. In Block 9, ECS unequivocally states that "[n]o other Bonds have been pledged to the allocated portion of the assets which are the subject of the attached Certificate of Pledged Assets." The affidavit was properly sworn to, executed and notarized.

In the Certificate of Pledged Assets, ECS specifically identifies the pledged asset, and provides the legal metes and bounds description of the land on which the "allocated portion of $191,350,000.00 of previously mined, extracted, stockpiled and marketable coal" is located, land which ECS owns outright. ECS also identified the bond number, amount of the asset pledged, which amount is sufficient to cover the penal amount of the bond, Principal (Tip Top), Obligee (FHWA), and the Project. ECS further made certain representations and provided certain assurances not required by either the Bid Bond form or the SF 28. ECS also notified FHWA that it has the rights of a secured party pursuant to Article 9 of the Uniform Commercial Code ("UCC"). Thus, the bid bond package submitted by ECS met and went beyond the specific elements required by either the Bid Bond Form or the SF 28, and was proper and valid on its face. See TT-Bonds.

[1] FHWA has not numbered its exhibits in the report or produced a number of relevant documents, including Tip Top's supplemental protest and attachments and an e-mail. Tip Top will cite to documents by the name of the file where practicable or by letter date and by its own exhibits ("Ex.").



COMMERCIAL TRADE SECRETS; DISCLOSURE OUTSIDE THE FEDERAL GOVERNMENT IS SUBJECT TO 5 U.S.C. §551 AND 18 U.S.C. §1905

E. Actions Preceding FHWA's Rejection of the Bond

Bids were opened on January 10, 2008. Tip Top was the apparent low bidder. By e-mail dated January 28, 2008, FHWA questioned whether Tip Top could perform within its 300-day proposed schedule, which was less than FHWA's estimate of the maximum time of 675 days in the IFB. Tip Top's price or bid bond was not mentioned. FHWA "directed" Tip Top as follows:

> "In order to determine if your proposed days are consistent with these requirements, the EFLHD is directing you to provide a construction schedule (CPM) with a written explanation of how you will perform the work within the limitations of the contract and specifically how you plan to accomplish this project in the short time frame with the heavy volume of traffic. Please be aware, if your bid is accepted, the calendar days in your bid package becomes the required period for contract performance of this project, and any performance past that time will result in liquidated damages per day being charged to your company. Please provide your schedule within 5 business days of your receipt of this notice." See TTe-mailfollowupclarification.

Tip Top incurred substantial expense and hired a CPM consultant to draft a preliminary CPM which was timely submitted to FHWA. See RoundaboutPreliminarySchedule. FHWA states that "no other review was conducted at that time due to other responsibilities of the Acquisition section." However, on February 11, 2008, FHWA sent additional questions to Tip Top about its crew size and workday schedule. FHWA also asked for a Construction Schedule listing the sequence of work in the Critical Path. Tip Top responded that it would provide the other information but that it would not spend the significant additional resources needed for a final CPM before a formal award notice was issued. In its e-mail, Tip Top pointed out that the preliminary CPM was sufficient to show that the contract work could be easily accomplished within Tip Top's schedule. Id.

According to the FHWA, after this review, the Contracting Officer ("CO") first became aware that Tip Top's bid bond had been issued by an individual surety. Although individual sureties are permitted to issue bonds, she apparently became concerned.

The CO's next action was a letter dated February 19, 2008, rejecting Tip Top's bid bond "because it does not meet the requirements of an Individual Surety." The CO stated that FAR §28.202-3(c)(7) prohibited "speculative assets" which "would include marketable coal." See TTBidRejection. No questions had been asked of ECS or Tip Top.

F. Post-Rejection Correspondence

On February 21, 2008, ECS' counsel responded to the rejection. ECS pointed out that, using standard legal dictionary definitions, "previously mined, extracted, stockpiled, marketable coal" was not a "mining interest" or "speculative."



COMMERCIAL TRADE SECRETS; DISCLOSURE OUTSIDE THE FEDERAL GOVERNMENT IS SUBJECT TO 5 U.S.C. §551 AND 18 U.S.C. §1905

ECS provided additional support for the bond and asset and offered assays of the mined coal, the "spot price" and any other information to support the quality and value of the coal. See 080221TipTopexecutedEsqlettertoDOT.

By letter dated February 26, 2008, the CO disagreed with ECS's interpretation of the FAR without addressing the points raised in ECS' counsel's letter. She also alleged for the first time that a security interest had not been provided to the Government. She further stated that she could not accept the additional evidence to support marketability which ECS had offered because it would be "untimely" and in violation of unidentified "regulations." She also claimed for the first time that the bid bond had to be facially valid and no "proof of value" was submitted. See SignedDatedScanLtrSuretyLawVI.

The CO now called ECS's coal "mined but not marketed coal" which she claimed without citation to any legal regulatory or financial authority, was more comparable to a "corporate asset, speculative asset or accounts receivable," all of which are unacceptable assets. No explanation was provided for why this was so other than to cite a regulation regarding her obligation to assure that the assets were adequate. She then stated she had no option but to reject Tip Top's bid. Id.

On February 29, 2008, Tip Top filed its protest in this Office.

By letter dated February 29, 2008, ECS responded to the CO's letter. ECS pointed out that the bond was complete on its face and met all the requirements stated in the IFB and the FAR. With respect to the security interest, ECS stated that a valid security interest had been provided based on the definition of a security interest under Article 9 of the UCC.

ECS explained again in detail why the coal it had pledged was materially different from the unacceptable assets which the CO had cited. ECS also provided a list of federal agencies that had accepted this particular asset and notified the CO that the FHWA had accepted ECS as an individual surety and his bonds on two previous occasions.

On March 3, 2008, Tip Top filed a supplemental protest to this Office to include the additional information in ECS's letter. Also included were ECS' February 29, 2008 letter and an attachment showing the agencies where ECS' assets had been accepted.

ARGUMENT

A. ECS's Mined Coal is an Acceptable Asset

A bid bond is intended to protect the Government if a contractor that refuses to execute the contract or to provide performance and payment bonds. The bid bond enables the Government to obtain all or some of the difference between the low bid and the bid it awards to the next responsive, responsible bidder. Gene Quigley, Jr., 70 Comp. Gen. 273, B-241565, February 19, 1991, 91-2 CPD ¶182


COMMERCIAL TRADE SECRETS; DISCLOSURE OUTSIDE THE FEDERAL GOVERNMENT IS SUBJECT TO 5 U.S.C. §551 AND 18 U.S.C. §1905

The FAR permits two types of sureties, corporate sureties and individual sureties. Individual sureties are typically used by small businesses that do not have the required bonding capacity either because of their size, capitalization, the number of other bonded jobs being performed at the time, and/or other factors considered by the surety industry. Moreover, it is widely known that the corporate surety bond market has shrunk in the last five years or so to the point that corporate sureties generally are only interested in bonding large contractors.

In order to protect itself (and as it has done with corporate sureties, see FAR §28.202), the Government has imposed certain requirements in the FAR and in its Standard Forms with which an individual surety must comply. ECS, its bond and the underlying asset, met each and every requirement. FHWA's evolving arguments to the contrary are unsupported by the facts, regulations, case law, financial standards, or logic.

Initially, FHWA's only basis for rejecting the bond was an unsupported view that "marketable coal" was prohibited as a speculative asset under FAR §28.203-2(b)(7). The CO seemed to take the view that the only acceptable assets were those listed as acceptable. ECS correctly pointed out that the FAR lists were not exclusive (which FHWA concedes), and that previously mined, extracted, stockpiled and marketable coal was not listed as unacceptable and as a factual and legal matter, is totally unlike speculative "mineral interests." FHWA then argued that this asset was more like other unacceptable assets -- "corporate assets (plant and equipment)" and "accounts receivable." Not surprisingly, no authority or reasoning was provided. None exists.

1. Coal is not a "Speculative" Asset, or a "Mineral Right"

As ECS' counsel demonstrated, a "mineral right" involves minerals "in land." See Black's Law Dictionary, 6th Edition 1990, p. 995. Mineral rights are not tangible minerals that have previously mined. Coal such as that pledged by ECS is not an intangible legal right to a mineral under the ground but an existing, already-mined, tangible, above-ground and stockpiled mineral for which there is a ready market. The CO's "analysis" that a mineral right "includes the right to sell the coal after it is mined" is apparently based on the view an individual surety, as the owner of a mineral asset, has the right to sell the mineral. This is not a "mineral right"; nor does the transparent re-naming of the asset as "mined but not marketed coal" change its meaning.

The FAR drafters were aware that commodities had been pledged by individual sureties in the past and could have included this type of asset as one of those considered unacceptable. They did not do so. Case law shows that the only issue involving an individual surety's pledge of commodities has been whether the individual surety established that the commodities physically existed. Cf. T&A Painting, Inc., B-236846, December 29, 1989, 90-1 CPD ¶6 (oil and gas leases rejected because there was no evidence that any actual oil or gas was being produced); Electrical Generation Technology, B-235809, August 31, 1989, 89-2 CPD ¶204 (owner unable to prove existence of gold ore concentrate pledged).



COMMERCIAL TRADE SECRETS; DISCLOSURE OUTSIDE THE FEDERAL GOVERNMENT IS SUBJECT TO 5 U.S.C. §551 AND 18 U.S.C. §1905

The intent of the regulations defining acceptable assets in FAR §28.203-2 was thus, on requiring documentation showing existence and ownership, and that the value of the asset be readily ascertainable. ECS' coal meets all these tests.

The documentation required and which was offered to FWHA by ECS established that the coal ECS pledged physically exists. The bond specifically states that the coal has been previously mined, extracted, and stockpiled on a specific piece of property owned by ECS. Its present value and sale price can be determined by reference to "spot prices" published by the Department of Energy ("DOE") and other indices. Ex. 2. The type and grade of coal are based on assays and professional assessments which determined the value of the ECS' asset at approximately $191 million (as of that date). Ex. 3. This coal physically exists as it has already been mined, analyzed, valued, stored, and could be transported and sold on the active coal market based on the published "spot price" for direct use, further processing or resale. Id.

The ability to readily establish a market price is why coal and other similar commodities have been routinely accepted by other federal agencies and have been referred to as readily marketable. Ex. 4; see Shader Contractors v. United States, 276 F.2d 1, 6 (Ct. Cl. 1960) (finding coal to be a readily marketable commodity).

2. Coal is not Comparable to Plant Equipment or Accounts Receivable

Plant equipment is typically mechanical and a permanent fixture. It is a depreciating asset. There is no ready market and, no established "spot price" like there is for gold, silver, oil, coal and other commodities.

An account receivable is even more dissimilar because it is an intangible asset – an accounting book entry claiming a legal right to receive monies believed to be due to the individual or corporate creditor. An account receivable involves a risk that the accounts will never be collected in whole or in part due to the risk of default by the third party debtor. An account receivable entry is also not a security interest under Article 9. Even if an account receivable were a tangible asset or could be a security interest, there is no ready market for this asset and, even if there were, there is no market under which the value could be ascertained by reference to a published "spot price."

B. ECS Submitted a Valid Security Interest

Apparently recognizing that the value is not "speculative," FHWA argues, without any authority, that no security interest was provided. There is no basis for this post-hoc claim.

FAR §28.203-1 requires a "security interest" in the pledged asset as set forth in FAR §28.203-2. The "security interest" for the pledged asset of coal is not defined in the regulations. However, Black's Law Dictionary defines a security interest as:



COMMERCIAL TRADE SECRETS; DISCLOSURE OUTSIDE THE FEDERAL GOVERNMENT IS SUBJECT TO 5 U.S.C. §551 AND 18 U.S.C. §1905

"... [i]nterest in property resulting from a security agreement. A form of interest in property which provides that the property may be sold on default in order to satisfy in order to satisfy the obligation for which the security interest is given ... an interest in personal property (*i.e.* mined coal) or fixtures which secures payment or performance of an obligation. U.C.C. §2-201(37), 9-102."

In this case, ECS' Certificate of Pledged Assets, including paragraph 3 of the pledge, specifically meets this definition. ECS gave the FHWA a security interest recognized by Article 9, UCC, which the CO could record by means of a Form UCC-1 (although not required by the UCC to establish the security interest). FHWA totally fails to address ECS's legal authority demonstrating that FHWA was given a valid and enforceable security interest. This CO's post-hoc objection to the bid bond on this basis cannot stand.

C. <u>The Value of the Bond Was Attested and Sufficient</u>

FHWA asserts that coal would put more of a burden on the Government because a willing buyer and seller are needed, and thus, that coal is "speculative as to liquidity and value." This argument overlooks the fact that willing buyers abound, as shown by the DOE's continual publication of spot prices. Ex. 2. Further, the Government's sale of any asset pledged in support of a bond could be said to cause some "burden" on the Government. Taken to its logical conclusion, this argument would not allow the Government to accept any asset and would render FAR Part 28.2 meaningless. Nowhere does the FAR provide that "burden on the Government" is be a valid basis for rejection of a pledged asset. The value of an asset upon sale is not the FAR standard.

Here, the value of this coal is as readily determinable as that of any stock or bond traded on an exchange by reference to the "spot price" recognized and published by the DOE. Exs. 2, 3. The price of a commodity can be determined more readily than that of most "[r]eal property owned in fee simple by the surety without any form of concurrent ownership . . . and located in the United States . . . .", which asset is specifically considered acceptable. <u>See</u> FAR §28.203-2(b)(4). Indeed, given this country's and the World's dependence on fossil fuels, and the recent increases in the value of fossil fuels (including coal), ECS' coal is arguably more secure than any of the above acceptable assets and certainly more "liquid" than real estate. Ex. 5.

FHWA's concept that there must be an "independent" confirmation of each representation in SF 28 and the Certificate of Pledged Assets is contradicted by the use of Government forms which do not require it. The SF 28 is an affidavit signed under oath, and that is sufficient. FAR §28.203(b). The CO cites to no regulatory or legal authority for this argument and the same must be rejected.

In sum, the value of this coal is as readily determinable as any stock, bond or real estate and is based on the "spot price" recognized and published by the DOE. Exs. 2, 3. This asset should have been accepted.



COMMERCIAL TRADE SECRETS; DISCLOSURE OUTSIDE THE FEDERAL GOVERNMENT IS SUBJECT TO 5 U.S.C. §551 AND 18 U.S.C. §1905

D. There is no Requirement that a Third Party Hold the Asset

ECS owns this asset and the land on which it sits, and attested to the fact that the coal is stockpiled on his land is an added benefit or protection to the Government. In spite of the certification, FHWA implies that ECS does not own the asset. FHWA then complains that "the assets must be held by a third party." No such requirement exists in the FAR and there would no reason to require a third party to hold an asset under the circumstances. Such a requirement would add another signatory to the agreements that would add risk. ECS in fact, owns this asset, which ownership would have been confirmed by asking the surety, rather than rejecting the asset. Ex. 6.

The FAR states that "[s]olicitations shall not preclude offerors from using the types of sureties or other security permitted by this subpart [i.e., Subpart 28.2], unless prohibited by law or regulation." FAR §28.201(b). In arbitrarily imposing new and increased requirements on the contractor and individual surety, the CO has de facto precluded Tip Top from using type of surety (i.e., an individual surety). The Government should not be allowed to re-write the FAR.

E. FHWA did not Safeguard its Interest in Awarding to the Lowest, Responsible Bidder

Since FHWA has no principled basis to object to the asset, FHWA argues that it must be allowed to safeguard the interests of the United States. This is essentially a request for unfettered discretion which has no basis and should be rejected.

To truly safeguard the Government's interests, the CO should have asked the surety for documentation if she actually had the concerns now claimed post-hoc. The IFB contemplates this at page J-2 in special requirements:

> "...the CO may, after reviewing the affidavit of the individual surety and documentary information on the security interest and the assets pledged, by certified mail, to the surety's business or resident address (as shown on the bond) request the surety to provide further information and/or documents with respect to any of the documents provided. The CO may require such information to be furnished under oath. Failure of the surety to accept such mail or failure of the surety to respond with the requested information or documents within 7 business days of receipt of the request, will be cause for rejection of the surety."

The CO ignored this provision in spite of the fact that this type of inquiry, involving material issues with the bond or supporting documentation is required and commonly done to protect the Government's interest. Gene Quigley, Jr., supra. Here, FHWA had nothing on which to base its rejection except total speculation and interpretations without a logical or legal basis. But even if FHWA had facts that put the value of the asset or documentation into question, it cannot just assume the worst and reject the bid. D.M. Potts Corporation, B-231855, November 4, 1988, 88-2 CPD ¶440. Further, FHWA failed to give ECS the opportunity to substitute assets. FAR §28.203-4.



COMMERCIAL TRADE SECRETS; DISCLOSURE OUTSIDE THE FEDERAL GOVERNMENT IS SUBJECT TO 5 U.S.C. §551 AND 18 U.S.C. §1905

The result is illogical. Rejection of Tip Top's bid required the taxpayers to pay $1.4 million more for the same work in order to avoid a risk that it might not recover the $1.4 million with a pledge of "previously mined, extracted, stockpiled and marketable coal," valued at $191 million, which is far more than needed to cover this obligation. The CO's decision to reject without questioning did not safeguard the Government's interests. Indeed, it would cost the taxpayers more than they should have had to pay for this contract without a legitimate reason.

Given FHWA's zeal to eliminate a reputable contractor based on non-existent flaws with its bid bond without a legitimate basis, one must assume that the decision was related either to internal convenience in having the contractor perform to the estimated schedule or indicates that the FHWA is attempting to circumvent the Small Business Administration's ("SBA") Certificate of Competency ("COC") program. Such grounds do not support or rejection and/or are in violation of SBA regulations.

CONCLUSION

For the reasons set forth above, Tip Top respectfully requests that the GAO recommend that FHWA reverse its decision rejecting Tip Top's bid bond, accept the same and make award to Tip Top as the lowest priced, responsive, responsible contractor providing a valid bid bond. Alternatively, that FHWA reverse its rejection decision and, if the CO can demonstrate legitimate remaining concerns regarding the bid bond or asset, that the CO request and fairly consider additional information as contemplated by the FAR or allow the surety to provide a substitute asset.

Respectfully submitted,

Michael A. Gordon
Fran Baskin
Counsel for Tip Top Construction Corp.

cc. Julia L. Perry, Esq.



COMMERCIAL TRADE SECRETS; DISCLOSURE OUTSIDE THE FEDERAL GOVERNMENT IS SUBJECT TO 5 U.S.C. §551 AND 18 U.S.C. §1905

FILE COPY

Doc ID: 002350390003 Type: DEE
Recorded: 10/31/2007 at 02:34:28 PM
Fee Amt: $1,129.90 Page 1 of 3
Excise Tax: $1,098.90
Stamp# 850
Nicholas County Clerk
Wanda Hendrickson County Clerk
BK 444 PG 427-429

6352 Cypress Garden Blvd Winter Haven FL 33884

SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED made this the 22nd day of October 2007, by and between, **Barry L. Mullens, and Melissa J. Mullens, his wife, Grantors**, and, **E.C. SCARBOROUGH, Grantee;**

WITNESSETH:

That for and in consideration of the sum of Ten Dollars ($10.00), cash in hand paid, and other good and valuable considerations, the receipt and sufficiency of all of which are hereby acknowledged, the said Grantors do hereby grant and convey, unto the Grantee with covenants of **SPECIAL WARRANTY OF TITLE**, all of that certain lot or parcel of land in Kentucky District, Nicholas County, West Virginia, more particularly bounded and described as follows:

> "Beginning at a point on the old rail road grade right-of-way and in Laurel Creek, where said right-of-way crosses Laurel Creek; thence, in an Easterly direction with said rail road grade right-of-way and corner to Mullens tract; thence, through Mullens tract and with Plum Creek Timberlands to a point between the two said permits; thence, in a Westerly direction to a point between mining permit R707 and R 644 and in Laurel Creek; thence, with Laurel Creek in a Northerly direction to the point of beginning, containing 115.41 acres more or less and being the entire acreage of permit R 707."

Being a portion of the same tract or parcel of real estate conveyed to Barry L. Mullens and Weymouth L. Mullens, by deed dated the 15th day of November, 1996, and of record in the office of the Clerk of the County Commission of Nicholas County, West Virginia, in Deed Book 374 at page 680.

This conveyance is expressly made and accepted upon and subject to the following covenants, which shall be binding upon and enforceable against the Grantee and the Grantee's successors and assigns, and shall be deemed covenants running with the land

and which, by execution of this Special Warranty Deed, Grantee does acknowledge and accept:

1. The property hereby conveyed has been held for mining or mining related purposes. The Grantee agrees that no claim shall ever be asserted against the Grantor, or any company or entity presently or formerly associated with or operating under the Grantor, for damages, injunctive relief or regulatory relief arising directly or indirectly out of any surface or subsurface conditions or occurrence, known or unknown, now existing or hereafter occurring or discovered and whether or not such condition or occurrence arises out of or is the result of mining related activities on the property hereby conveyed.

2. The Grantee assumes all risk and responsibility for any injuries or damages sustained by any person or to any property, in whole or in part, resulting from, arising out of, or in any way connected with the possession or use by Grantee of the property hereby conveyed.

3. The Grantor does not warrant or represent subjacent or lateral support of the surface or subsurface of the property hereby conveyed.

4 The Grantor does not warrant or represent that the property conveyed or the improvements thereon are safe, habitable or otherwise suitable for the purpose for which they are intended to by used by the Grantee, or for any other purpose whatsoever. The Grantee has inspected the property hereby conveyed and the improvements thereon and agrees to accept the same in their "as is, where is" condition, with all faults.

5. The Grantor does not warrant or may any representations regarding the quality or quantity of coal located in, on or under the property hereby conveyed, including, but not limited to, any coal located in the existing impoundment on the property hereby conveyed, nor does the grantor warrant or represent the availability of the any particular rights regarding the extraction of coal from the property hereby conveyed.

This conveyance is made **SUBJECT** to all covenants, easements and reservations of record affecting the property hereby conveyed, including, but limited to,. the obligations set forth in that certain deed dated November 15, 1996, by and between **THE LADY H COAL COMPANY, INC., CONSOLIDATED SEWELL, INC.**, and **SEWELL COAL COMPANY** and **BARRY L. MULLENS** and **WEYMOUTH L. MULLENS**, of record in the Clerk of the County Commission office of Nicholas County, West Virginia in Deed Book 374, at page 680.

**TO HAVE AND TO HOLD** the same, together with all appurtenances thereunto belonging, unto the Grantee, with covenants of special warranty of title.

**DECLARATION OF CONSIDERATION VALUE**

Under the penalties of fine and imprisonment as provided by law, the undersigned Grantors do hereby declare that the total consideration paid for the conveyance herein made is $

**WITNESS** the following signatures and seals:

Barry L. Mullens
BARRY L. MULLENS

Melissa J. Mullens
MELISSA J. MULLENS

**STATE OF WEST VIRGINIA,**

**COUNTY OF NICHOLAS,** to-wit:

I, Judy A. Rose, a Notary Public in and for the aforesaid County and State, do hereby certify Berry L. Mullens and Melissa J. Mullens, whose names are signed to the writing above, bearing date on the 30th day of October, 2007, have this day acknowledged the same before me.

My commission expires May 7, 2013

Judy A. Rose
Notary Public

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
JUDY A. ROSE
433 ASHLEY LANE
SUMMERSVILLE, WV 26651
My commission expires May 7, 2013

**This document was prepared by:**
**Randall W. Galford**
**Attorney at Law**
**1047 Arbuckle Road**
**Summersville, WV 26651**
**State Bar ID # 1323**
**304-872-0496**



STATE OF WEST VIRGINIA, Nicholas County Commission Clerk's Office 10/31/2007. The foregoing Deed together with the certificate of its acknowledgment, was this day presented in said office and admitted to record.

Teste: Hendrickson Clerk
BG

Wanda G. Hendrickson
Nicholas County Clerk
700 Main Street, Suite 2
Summersville, West Virginia 26651-1485

UNITED STATES POSTAGE
$ 00.41⁰
02 1M
0004215887 NOV 02 2007
MAILED FROM ZIP CODE 26651

E. C. Scarborough
6353 Cypress Gardens Blvd
Winter Haven FL 33884

33884+3176

## FINAL CERTIFICATE OF TITLE

PREPARED FOR: E. C. Scarborough

I certify that I have made an examination of the records of the Office of the Clerk of the County Commission of Nicholas County, West Virginia, in regard to the ownership of the real estate situate in the said county, briefly described as follows:

**115.41 acres more or less, Permit R 707, Kentucky District, Nicholas County, West Virginia**

My examination covers the period from November 14, to 4:00 p.m., on October 18, 2007.

Subject to errors, inaccuracies and omissions in the said records and indices, subject to conditions not appearing of record, and subject as well to any instruments not permanently indexed, and upon the basis of the information set out herein, I certify that in my opinion:

1. Good and marketable title is vested in Barry L. Mullens subject to matters stated below.

2. The property is assessed and taxed on the Land Books in Kentucky District of said county for the year 2006, as follows:

**ASSESSED VALUATIONS**

| | | |
|---|---|---|
| **Land: 59,940** | **Buildings: 0** | **Total: 59,940** |
| **Tax Ticket 16360** | **Map 15** | **Parcel 27** |

3. Taxes for the year of 2006 are paid. Taxes for 2007 are due in the amount of $1,206.39.

4. There is a Mechanic's Lien of the unpaid non-union employees of Lady H Coal Company, Inc. And Eastwood Construction Company, Inc., Mechanic's Lien Book 5 at page 1, which has been partially Released by Release recorded in Book 72 at page 191 but which lien is of no moment or not enforceable where suit or action was not timely filed and more that ten (10) years has expired.

5. There is a Mechanic's Lien of the unpaid non-union employees of Lady H Coal Company, Inc. And Eastwood Construction Company, Inc., Mechanic's Lien Book 5 at page 53, which has been partially Released in Release Book 72 at page 189 but which lien is of no moment or not enforceable where suit or action was not timely filed and more that ten (10) years has expired.

6. There is judgement for Twenty Four Thousand Eight Hundred Ninety Eight Dollars and Eighty-Six Cents ($24,898.86), plus interest at the rate of ten percent (10%) per annum and costs, in favor of Erwin Supply Company, Inc. against The Lady H Coal Company, Inc., recorded in Judgement Book 12 at page 733, but which lien is of no moment and not enforceable because it is over ten (10) years and was not renewed.

7. This opinion is further qualified by the following exceptions, reservations, liens, restrictions, covenants and other objections:

A. Any defects which may be disclosed by an accurate survey of the premises.

B. Any defects not disclosed by the records in the Office of said Clerk.

C. Any defects which may be disclosed by an actual visible and physical inspection of the premises.

D. Statutory liens of general contractors, subcontractors, materialmen, mechanics or laborers, of which no notice appears of record.

E. Any and all easements and rights-of-way for utilities, or others, which affect said real estate.

F. Any zoning regulations or requirements, if any, promulgated by any federal, state, county, municipal or other governmental agency.

G. The existence of any environmental hazard or liability affecting the premises is excepted from this opinion.

H. **NOTE:** Certification is for <u>surface only</u>, inasmuch as this opinion concerns itself with surface ownership and interests only, and does not attempt or intend to indicate the state of any mineral title incident thereto.

DATE: October 25, 2007

RANDALL W GALFORD
Attorney at Law
1047 Arbuckle Road
Summersville WV 26651
Telephone 304-872-0496
Fax 304-872-0497