**McMANUS, SCHOR, ASMAR & DARDEN, L.L.P.**
ATTORNEYS AT LAW
1155 FIFTEENTH STREET, N.W.
SUITE 900
WASHINGTON, D.C. 20005

TELEPHONE (202) 296-9260
FACSIMILE (202) 659-3732
WWW.MSADLAW.COM

JOSEPH A. MCMANUS, JR. (DC, GA, NC, NY)
LAURENCE SCHOR (DC, MD)
C[illegible]LES M. ASMAR (DC, MD)
E[illegible] J. DARDEN (DC, MD)
SUSAN L. SCHOR (DC, MD, VA)
DANIEL K. FELSEN (DC, MD, VA)
JOHN J. MCKENNA, JR. (DC, MD)
JORDAN M. SAMUEL (DC, MD, VA)
CHRISTOPHER A. TAGGI (DC, MD, VA)
DENNIS C. EHLERS (DC, GA, TN)
DAVID J. BUTZER (DC, MD, VA)
SHONA M. GARBER (VA)
CHERYL E. CARROLL (DC, MD, VA)
AMANDA K. MORKEN (DC, MN)

OF COUNSEL:
BRETT L. ANTONIDES (DC, VA)
GEOFFREY T. KEATING (DC, MD)
THOMAS B. CARR (DC, VA)
MARK D. CRAWFORD (DC, VA)

April 14, 2008

**VIA E-MAIL (KilgourK@gao.gov) AND TELEFAX**
Kenneth Kilgour, Esq.
Senior Staff Attorney
Office of the General Counsel
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548

Re: Protest of Tip Top Construction Corp.; **B-311305;**
Individual Surety's Response to the GAO's Arguments, and Comments on the Agency Report

Dear Mr. Kilgour:

Edmund C. Scarborough ("Scarborough"), individual surety and the issuer of the bid bond submitted by Tip Top Construction Corporation ("Protester" or "Tip Top"), hereby submits, through counsel, his comments to the Agency Report ("AR" or "Agency Report"). A copy of Scarborough's bid bond and supporting documents are at **Attachment 1** hereto.

Scarborough also responds herein to arguments raised *sua sponte* by the GAO during the telephone conference ("TC") held the afternoon of Thursday, April 10, 2008. Unless otherwise stated, Scarborough concurs with Tip Top's Comments on the Agency Report dated April 9, 2008 ("Protester Comments") and incorporates the same herein as if fully set forth.

## I. Introduction

Scarborough concurs with Tip Top's position that the Federal Highway Administration's ("FHWA") Agency Report fails to reasonably support its rejection of Tip Top's bid bond. Scarborough takes the position that, before even reaching the issue of the validity of the bid bond and/or the underlying assets, the GAO must consider the threshold issue of the Contracting Officer's ("CO") failure to follow procedures mandated by the IFB, FAR and standard bond forms.

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
GOVERNMENT ACCOUNTABILITY OFFICE PROTECTIVE ORDER

As Scarborough and Tip Top argued during the TC, the CO had the duty to fairly and reasonably examine the bid bond and related documents and, if she had further questions about the bond or underlying asset, to ask that Tip Top and/or the surety provide additional information or substitute the asset.[1] The CO did none of this, reflexively and arbitrarily[2] rejecting the bid bond and Tip Top's bid. Scarborough argues that the CO's cavalier rejection of the bid bond and the low bid for this Project was unreasonable, irrational and an abuse of discretion that must be addressed by the GAO. *See Diversified Data Corp.*, B-204969, 82-2 CPD ¶ 146 (August 18, 1982) (repeating the standard that "contracting officers enjoy a reasonable range of discretion in determining which offer should be accepted for award and their determinations will not be questioned by [the GAO] unless there is a clear showing of unreasonableness, an arbitrary abuse of discretion, or a violation of the procurement statutes and regulations.").

As the court stated in *Great Lakes Dredge & Dock Company v. United States*, 60 Fed. Cl. 350, 358-59 (2004):

> **An agency decision will be set aside as arbitrary and capricious if the agency has not considered all relevant factors and articulated a rational connection between the facts found and the choice made.** . . . While the agency's decision is entitled to "a presumption of regularity," that presumption does not shield the agency's decision from a "thorough, probing, in-depth review." . . . **After-the-fact rationalizations for agency action should be rejected,** and legal arguments for agency actions must find support in the administrative record. . . . And although the arbitrary and capricious standard is highly deferential, "it is not a rubber stamp." . . . Only by "carefully reviewing the record and satisfying [itself] that the agency has made a reasoned decision" can this court "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors."

[Citations omitted.] "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself" and not *post hoc* rationalizations, *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Auto Insurance Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). A fair review of the CO's actions should result in the GAO recommending that the FHWA accept Tip Top's bid or, at a minimum, follow the proper procedures and perform a full and fair review of the bid and bid bond.

Even if, after a review, the GAO find that the CO's actions pass muster, Scarborough argues that the GAO's *sua sponte* interpretations of the FAR and arguments against Scarborough's bonds are wrong as a matter of fact, regulation and law for the

---

[1] The surety did provide additional information to the CO, but that was on his own initiative and after the CO had rejected the bid bond and Tip Top's bid.

[2] Black's Law Dictionary, 6th Edition (Centennial) Edition (1991) at 104 defines "arbitrary" as "in an unreasonable manner, as fixed or done capriciously or at pleasure. Without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment; depending on the will alone. . . ."

reasons discussed below. In short, Scarborough submitted a bid bond that was proper and valid on its face and in all respects. The asset he pledged and gave FHWA a security interest in is acceptable under the FAR. Previously mined, extracted, stockpiled, analyzed and valued coal is a commodity that certainly falls within the definition of a "readily marketable asset" and does not fall under the definition of a "speculative asset" or "mineral right."

Although Scarborough fully supports Tip Top's Protest and positions taken therein, if the GAO nevertheless is inclined to uphold the FHWA's actions and deny the Protest, Scarborough submits that the GAO should do so in a decision drafted as narrowly as possible and not venture into matters on which the GAO has no expertise and/or are within the jurisdiction of other agencies. According to the GAO Redbook, the "GAO has traditionally declined to render decisions in a number of areas that are specifically within the jurisdiction of some other agency and concerning which GAO would not be in the position to make authoritative determinations, even though the other agency's determination is not statutorily 'final and conclusive.'" *Principles of Federal Appropriations Law*, 3rd Ed., ("GAO Redbook"), Chapter 1.E.2.b, at 1-43. Whichever agency or agencies address issues of bonds, assets, and security interests, Scarborough submits that GAO is not one.

Scarborough argues that, **at most**, the arguments raised by the GAO during the April 10, 2008 TC (which are vigorously disputed by Scarborough and belied by many Federal agencies' acceptance of Scarborough bonds) suggest a potential alternative interpretation of the language, purpose and intent of the FAR. Where reasonable minds may differ, the GAO can and should find that the CO's decision to reject Tip Top's bid bond was within her discretion and end the inquiry there. Under the principle of deciding cases narrowly, there is no need and it would be damaging to individual sureties, their small, minority and disadvantaged contractor clients, and the procurement system as a whole for GAO to opine on the other issues.

## II. Response to Your Arguments Raised During the April 10, 2008 Telephone Conference

Before commenting on the AR, Scarborough will address the arguments you raised *sua sponte* during the January 10, 2008 TC. As the new arguments you raised appear to be, to you, the dispositive issues,[3] they render the FHWA's arguments (and Scarborough's response thereto) secondary in importance. Thus, Scarborough will comment on FHWA's AR arguments in Section III below.

### A. The April 10, 2008 Telephone Conference ("TC")

During the TC, you raised at least three arguments (addressed individually in §§ II.B, C, D and E below). As we understand your arguments, they are based on the view

[3] Scarborough does not concede that the arguments you raised in the TC are the dispositive issues.

that, because all property is either real property or personal property, and coal is not real property, it must be the "personal property" referred to in FAR 28.203-2(c)'s list of unacceptable assets. Also, as coal is not specifically named in FAR 28.203-2(b)'s list of acceptable assets, it is an asset prohibited by the FAR and, thus, the CO could not have accepted the same. You also argued that coal is not a "readily marketable asset," and that Scarborough has not provided a security interest in the pledged asset. Scarborough notes that, with the exception of the security interest issue, these arguments were not raised by the CO or her counsel in the AR.

Frankly, given the facts of this procurement, the posture of the Protest, and the arguments raised by the FHWA in its AR, as well as your statement of the issues to be discussed during the TC, *see* **Attachment 2**, Scarborough was surprised by the positions you took and the apparent strength of your convictions. Undersigned counsel for Scarborough believes that, despite what amounts to a lack of fair notice as to the issues to be discussed, he and counsel for Tip Top adequately responded to your arguments during the TC and, upon further reflection and research, have found additional arguments to rebut your position, as discussed below.

Your arguments were also surprising because, in the almost four years that Scarborough has been writing bonds in support of Federal agency contracts, no contracting officer or agency counsel has raised these arguments. Scarborough has written over 38 bonds to the Federal Government,[4] *see* **Attachment 3a**, which means that as many contracting officers, after carefully reviewing the Scarborough Bonding Program, Scarborough bonds and bond forms, and underlying assets, and after receiving the required advice of agency counsel, have made the reasoned decision to accept the Scarborough bonds.[5] Indeed, two (2) Scarborough bonds were recently accepted by other divisions of the FHWA, *see* **Attachment 4**. Many of the Scarborough bonds accepted utilized the same documents provided and coal asset pledged in the instant case. *See* **Attachment 3b** (containing a list of other accepted Federal bonds supported by coal). Some of the contracting officers who have accepted Scarborough bonds have done so based solely on the documents provided, and others have, as it is their right to do, asked questions and requested additional information before accepting the bonds.

What is particularly distressing to Scarborough is that, if the GAO issues a decision along the lines you set out during the TC, this will have a chilling effect on the entry of new individual sureties into the market, a market which is growing as a result of corporate sureties' unwillingness to bond small, minority and disadvantaged contractors,

---

[4] Scarborough has never defaulted on any obligation to the Federal Government or any other obligee, and has an enviable claims record due in large part to his careful selection of contractors and projects to bond, his proactive monitoring of the contractor's performance and project status, and prompt corrective action (including funds control) at the first sign of trouble.

[5] Other contracting officers unfamiliar with individual suretyship have, in the exercise of their business judgment, decided not to accept the Scarborough bonds, but none to date has done so as arbitrarily and capriciously as the CO in this case. In each case, the contracting officer has at least requested additional information and/or considered the arguments of Scarborough's counsel.

the very kinds of contractors that the FAR promotes and agency contracting officers often seek.

**B. The "Prohibited Personal Property" Argument is Flawed**

As we understand your main argument, it is based on the view that, because all property is either real property or personal property, and coal is not real property, it must be the "personal property" referred to in FAR 28.203-2(c)'s list of unacceptable assets. Also, because FAR 28.203-2(c)(4) provides an exception for personal property in 28.203-2(b), but coal is not specifically named in 28.203-2(b)'s list of acceptable assets, it is an asset prohibited by the FAR and, thus, the CO could not have accepted the same.

As shown below, your position is based on an overly expansive reading of "personal property" as used in the FAR, and of the FAR itself. Before reviewing the FAR's use of the term, it is important to remember that "personal property," in addition to its most broad and general sense advocated by you, has another legal meaning, as follows: "Personal property also can refer to property which is not used in a taxpayer's trade or business or held for the production or collection of income." Black's Law Dictionary, 6th Edition (Centennial) Edition (1991) at 1217. In other words, it can mean property personal to an individual, such as jewelry, furs and antiques.

FAR 28.203-2(c) states:

(c) Unacceptable assets include but are not limited to—

(1) Notes or accounts receivable;

(2) Foreign securities;

(3) Real property as follows:
(i) Real property located outside the United States and its outlying areas.
(ii) Real property which is a principal residence of the surety.
(iii) Real property owned concurrently regardless of the form of co-tenancy (including joint tenancy, tenancy by the entirety, and tenancy in common) except where all co-tenants agree to act jointly.
(iv) Life estates, leasehold estates, or future interests in real property.

(4) Personal property other than that listed in paragraph (b) of this subsection (*e.g.*, jewelry, furs, antiques);

(5) Stocks and bonds of the individual surety in a controlled, affiliated, or closely held concern of the offeror/contractor;

(6) Corporate assets (*e.g.*, plant and equipment);

(7) Speculative assets (*e.g.*, mineral rights);

(8) Letters of credit, except as provided in 28.203-2 (b)(5).

You argue that § (c)(4) above prevents acceptance of any personal property except that specifically listed in § (b), despite the examples provided of jewelry, furs and antiques. FAR 28.203-2(b) states:

(b) Acceptable assets include—

(1) Cash, or certificates of deposit, or other cash equivalents with a federally insured financial institution;

(2) United States Government securities at market value. (An escrow account is not required if an individual surety offers Government securities held in book entry form at a depository institution. In lieu thereof, the individual shall provide evidence that the depository institution has—
(i) Placed a notation against the individual's book entry account indicating that the security has been pledged in favor of the respective agency;
(ii) Agreed to notify the agency prior to maturity of the security; and
(iii) Agreed to hold the proceeds of the security subject to the pledge in favor of the agency until a substitution of securities is made or the security interest is formally released by the agency.);

(3) Stocks and bonds actively traded on a national U.S. security exchange with certificates issued in the name of the individual surety. National security exchanges are—(i) the New York Stock Exchange; (ii) the American Stock Exchange; (iii) the Boston Stock Exchange; (iv) the Cincinnati Stock Exchange; (v) the Midwest Stock Exchange; (vi) the Philadelphia Stock Exchange; (vii) the Pacific Stock Exchange; and (viii) the Spokane Stock Exchange. These assets will be accepted at 90 percent of their 52-week low, as reflected at the time of submission of the bond. Stock options and stocks on the over-the-counter (OTC) market or NASDQ Exchanges will not be accepted. Assistance in evaluating the acceptability of securities may be obtained from the—
Securities and Exchange Commission
Division of Enforcement
450 Fifth Street NW
Washington, DC 20549.

(4) Real property owned in fee simple by the surety without any form of concurrent ownership, except as provided in paragraph (c)(3)(iii) of this subsection, and located in the United States or its outlying areas. These assets will be accepted at 100 percent of the most current tax assessment

> value (exclusive of encumbrances) or 75 percent of the properties' unencumbered market value provided a current appraisal is furnished (see 28.203-3).
>
> (5) Irrevocable letters of credit (ILC) issued by a federally insured financial institution in the name of the contracting agency and which identify the agency and solicitation or contract number for which the ILC is provided.

As FAR 28.203(b) nowhere lists coal, it must be an unacceptable asset, you concluded. Therefore, the CO could not accept the asset pledged and the bid bond.

It is Scarborough's position that the GAO is reading "personal property" much too broadly, and that the FAR clearly did not intend to make the entire universe of personal property, or even all personal property not specifically mentioned in FAR 28.203-1(b), unacceptable.

First, the language of § (b)(4) addressing unacceptable personal property provides specific examples of the types of personal property that are unacceptable by including "(*e.g.*, jewelry, furs, antiques)." A common sense reading of this short list of examples compels a finding that the FAR only prohibits personal property of a nature similar to jewelry, furs and antiques. These listed examples are similar to each other in that they are commonly small, unique, personal, artistic, and/or collectible in nature, unlike a commodity or a security. They are excluded, Scarborough argues, because they are generally not as "readily marketable" as a commodity or security. What we do know is they are very dissimilar to coal. Other than the fact that coal is "personal property" in the broad sense of the term (because it is not real property), it has few if any similarities to jewelry, furs and antiques.

Second, your interpretation of "personal property" in 28.203-2(c)(4) goes against the age old maxims of *ejusdem generis, noscitur a sociis,* and *expressio unius est exclusio alterius*. *Ejusdem generis* means: "Of the same kind, class, or nature." Black's Law Dictionary, 6th Edition (Centennial) Edition (1991) at 517. In the construction of laws, wills, and other instruments, the rule is that general words coupled with an enumeration of persons or things, or words of a particular and specific meaning, are "not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned." *Id. Noscitur a sociis* is a broader maxim encompassing *ejusdem generis*[6] and means:

> It is known from its associates. The meaning of a word is or may be known from the accompanying words. Under the doctrine of 'noscitur a sociis', the meaning

[6] *See* Black's Law Dictionary, Fourth Edition (1957) at p. 608, stating as part of the definition of *ejusdem generis* that "[t]he maxim 'ejusdem generis,' is only an illustration of the broader maxim, 'noscitur a sociis.'"

> of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it.

Black's Law Dictionary, 6th Edition (Centennial) Edition (1991) at 1060. One court has stated:

> In divining legislative intent, however, a venerable precept of statutory construction, the doctrine of ejusdem generis . . . . [T]his maxim of statutory analysis counsels courts to **construe the broad in light of the narrow, in a commonsense recognition that general and specific words, when present together, are associated with and take color from each other**. . . . In light of these settled principles of statutory analysis, the more reasoned view of congressional intent is that by employing general terms in this context, Congress did not intend to sweep within the statute's coverage all campaign-related writings not specifically enumerated, particularly since any other view would render meaningless the detailed recitation of specific items.

*U.S. v. Insco*, 496 F.2d 204 (C.A. Fla. 1974) (emphasis added).

*Expressio unius est exclusio alterius* is a maxim meaning that "the expression of one thing is the exclusion of another. . . Mention of one thing implies exclusion of another. . . . Where certain persons or things are specified in a law, contract, or will, an intention to exclude all others from its operation may be inferred." Black's Law Dictionary, 6th Edition (Centennial) Edition (1991) at 581. By specifying jewelry, furs and antiques, the FAR obviously intended to make unacceptable personal property only of this type or nature. The GAO applies the above canons of statutory construction. *See* GAO Redbook, § 2.D.5, at pp. 2-85 *et seq.*

Third, if the FAR intended to prohibit all non-real property not specifically mentioned in FAR 28.303-2(b), it would have ended § (b)(4) immediately after the word "subsection." There would have been no need for examples of any kind. The fact that it included examples speaks volumes.

Fourth, if the FAR had intended to prohibit all non-real property not specifically mentioned in FAR 28.303-2(b), it also would not list other types of personal property in 28.203-2(c). An absolute bar to all personal property except cash, certificates of deposit, other cash equivalents with a federally insured financial institution (FAR 28.203-2(b)(1)), United States Government securities at market value (FAR 28.203-2(b)(2)), stocks and bonds actively traded on a national U.S. security exchange (FAR 28.203-2(b)(3)), and irrevocable letters of credit (FAR 28.203-2(b)(5)) would, by definition, render the specific mention, in 28.203-2(c), of notes and accounts receivables (§(c)(1)), foreign securities (§(c)(2)), stocks and bonds of the individual surety in a controlled, affiliated, or closely held concern of the offeror/contractor (§(c)(5)), "corporate assets (e.g., plant and equipment)" (§(c)(6)), speculative assets (§(c)(7)), and letters of credit (§§(c)(8)) superfluous.

Fifth, § (c)(4), in "looping back" to FAR 28.203-2(b), refers the reader to a list that is itself an open-ended list. Subsection 28.203-2(b) states that "[a]cceptable assets include" those listed in §§ (b)(1) – (b)(5), but it does not limit acceptable assets, either real or personal property, to only those listed. Your interpretation ignores this point and closes off the list in § (b).

Sixth, the reading you propose goes against the FAR's intent to allow non-listed assets to be pledged and accepted. It ignores the fact that neither the list of acceptable assets at FAR 28.203-2(b) nor the list of unacceptable assets at 28.203-2(c) is an exhaustive or exclusive list. Both simply list examples. If this were not the case, there would be little reason for the FAR to include § 28.203-2(c) at all, as it could simply have stated as follows in § 28.203-2(b): "Acceptable assets are . . . ." or "Acceptable assets include only: . . ."

Moreover, it can even be argued that, if this were the intent of the FAR, then § (a) of § 28.203-2 would have been left out. All 28.203-2 would need to include is a list of acceptable assets. Even the name of § 28.303-2, "Acceptab**ility** of assets" [emphasis added] suggests that the FAR envisioned new and developing assets. If the FAR meant to list, once and for all, a limited number of assets that could be accepted, it is likely that § 28.203-2 would have been titled "Accept**able** assets."

Seventh, and perhaps most importantly, your argument reads out of the FAR § (a) of 28.203-2. Subsection (a) provides:

> (a) The Government will accept only cash, **readily marketable assets**, or irrevocable letters of credit from a federally insured financial institution from individual sureties to satisfy the underlying bond obligations.

(Emphasis added.) While it would have been better form for the FAR to have included the language presently at §§ (b) and (c) of FAR 28.203-2 in subparagraphs labeled as §§ (a)(1) and (a)(2), respectively, the structure of FAR 28.203-2 strongly suggests that § (a) states the general rule regarding the acceptability of proposed assets and §§ (b) and (c) provide only examples of some acceptable assets and/or guidance as to the acceptability of new assets not listed or, perhaps, even considered.

### C. The Correct Reading of the FAR With Regard to Individual Sureties

To juxtapose his construction of Subpart 28.2 against yours, in this section Scarborough will outline his reading of the FAR. There is no question that Subpart 28.2 of the FAR could have been written more clearly. However, Scarborough's proffered reading of the FAR, and that of the many contracting officers who have accepted his bonds, is more accurate and better harmonizes all subsections of Subpart 28.2 as well as the FAR's purpose and intent. The proferred construction of FAR Subpart 28.2 goes as follows.

FAR 28.200 sets forth the purpose of Subpart 28.2, *Scope of subpart*, as prescribing "procedures for the use of sureties and other security to protect the Government from financial losses." FAR Part 28.201, *Requirements for security*, states: (a) Agencies shall obtain adequate security for bonds (including coinsurance and reinsurance agreements) required or used with a contract for . . . services (including construction). Acceptable forms of security include – (1) Corporate **or** individual sureties . . . [emphasis added]."

Note that, as written, the FAR recognizes that individual sureties, as a class, can and do provide "adequate security" for construction bonds like the one at issue. Furthermore, the FAR places individual sureties on equal footing as corporate sureties. These points were apparently not considered by the CO who, the AR suggests, had a problem with the fact that an individual surety was involved and, apparently, never allowed her review to go any further.

In any event, ostensibly to prevent CO's from unilaterally excluding any authorized form of security, the FAR included subsection (b) of FAR 28.201, which warns that "[s]olicitations **shall not** preclude offerors from using the **types of surety** or other security permitted by this subpart, unless prohibited by law or regulation."[7] Scarborough argues that, by her rejection of the bond and/or underlying asset in the manner she did, the CO has *de facto* precluded Tip Top from using Scarborough (and perhaps any individual surety) as security allowed by FAR Subpart 28.2.

The next section of Subpart 28.2, FAR 28.202, *Acceptability of corporate sureties*, is not relevant here other than to note that this section provides the CO wide latitude in accepting and retaining corporate sureties and their bonds in a wide variety of situations. Examples of the latitude and discretion to use business judgment afforded to CO's include the following:

- § (a)(2) ("[t]he penal amount of the bond **should not** exceed the surety's underwriting limit . . . .");
- § (a)(3) ("When reinsurance is contemplated, the contracting office **generally shall require** reinsurance agreements to be executed and submitted with bonds before making a final determination on the bonds.");
- § (a)(4) ("When specified in the solicitation, the contracting officer **may accept a bond** from the direct writing company in satisfaction of the total bond requirement of the contract. . . .");

[7] There is no legal or regulatory prohibition on the use of an individual surety or the asset pledged in support of the bid bond at issue. The CO's dislike or lack of understanding of individual surety bonds or the underlying asset does not amount to a regulatory prohibition. Also, a misinterpretation of the FAR or even an alternate interpretation of the FAR do not rise to the level of a regulatory or statutory prohibition.

- § (b) ("**For contracts performed in a foreign country, sureties not appearing on Treasury Department Circular 570 are acceptable** if the contracting officer **determines that it is impracticable** for the contractor to use Treasury listed sureties.");[8]

- § (c) ("Upon receipt of notification of termination of a company's authority to qualify as a surety on Federal bonds, the contracting officer shall review the outstanding contracts and take action necessary to protect the Government, including, **where appropriate,** securing new bonds with acceptable sureties in lieu of outstanding bonds with the named company.").[9]

Such latitude should include the ability to find an asset not listed as either acceptable or unacceptable to be a readily marketable asset.

Continuing with FAR Subpart 28.2, Section 28.203, *Acceptability of individual sureties*, unequivocally states that "(a) An individual surety is acceptable for all types of bonds except position schedule bonds. . . ." It goes on to state that

> [t]he contracting officer shall determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation. . . .[[10]]
>
> (b) An individual surety must execute the bond, and the unencumbered value of the assets (exclusive of all outstanding pledges for other bond obligations) pledged by the individual surety, must equal or exceed the penal amount of each bond. The individual surety shall execute the Standard Form 28 and provide a security interest in accordance with 28.203-1.[[11]] One individual surety is adequate support for a bond . . . .
>
> (c) If the contracting officer **determines that no individual surety in support of a bid guarantee is acceptable**, the offeror utilizing the individual surety shall be rejected as nonresponsible,[[12]] except as

---

[8] This subsection debunks the myth that all corporate sureties are listed on Circular 570 and are, thus, safer because they are "Government approved." Scarborough argues that his bonds are safer than any written by foreign corporate sureties not subject to United States law.

[9] This subsection shows that, even if a corporate surety's financial position deteriorates to the point that it does not even qualify for listing in Circular 570, a standard that is not very high to begin with given some high profile corporate surety failures in recent years, a contracting officer still has the authority to continue with a bond written by the corporate surety. If the contracting officer has this level of discretion, then s/he at least has sufficient discretion to find that Scarborough's pledged asset is a "readily marketable asset" and that his bonds otherwise comply with the FAR.

[10] This subsection strongly suggests a thorough, reasoned review and consideration of the surety and his assets.

[11] Scarborough's bond and bond documents

[12] Scarborough notes that this clause supports what it understands to be Tip Top's argument that the CO was required to provide Tip Top an opportunity to provide additional information or substitute assets. This

> provided in 28.101-4. A finding of nonresponsibility based on unacceptability of an individual surety, need not be referred to the Small Business Administration for a competency review. (See19.602-1 (a)(2)(i) and 61 Comp. Gen. 456 (1982).)
>
> (d) A contractor submitting an unacceptable individual surety in satisfaction of a performance or payment bond requirement may be permitted a reasonable time, as determined by the contracting officer, to substitute an acceptable surety for a surety previously determined to be unacceptable.
>
> (e) When evaluating individual sureties, contracting officers may obtain assistance from the office identified in28.202 (d).
>
> (f) Contracting officers shall obtain the opinion of legal counsel as to the adequacy of the documents pledging the assets[[13]] prior to accepting the bid guarantee and payment and performance bonds.
>
> * * *

(Emphasis added.) Clearly, the CO's duties include a thorough review of the surety and bond, determination that both meet the FAR (and Scarborough and his bonds do), and consideration of alternatives short of total rejection of the bond, surety or contractor if any perceived discrepancies are identified. The CO in this case failed to meet her responsibilities.

FAR 28.203-1, *Security interests by an individual surety*, requires an individual surety such as Scarborough to provide a security interest in assets acceptable under 28.203-2, and to provide such security interest with the bond. As explained during the TC, Scarborough has met this requirement as well. Scarborough's Certificate of Pledged Assets, which is incorporated by reference into the Section 28.203(b) required Standard Form ("SF") 28, gives the FHWA a security interest recognized by Article 9 of the Uniform Commercial Code ("UCC"). This issue is addressed in more detail in § II.E below.

At this point in the analysis of Subpart 28.2 and any bond submitted thereunder, the CO looks at the assets pledged in support of the bond to determine if they are acceptable. FAR 28.203-2, *Acceptability of assets*, addresses this point. As shown above, FAR 28.203-2(a) states the general rule which allows FHWA, *inter alia*, to accept any readily marketable asset. In § II.D immediately below, Scarborough explains that

---

language envisions the CO not rejecting a bid bond and/or assets without further consideration. Had the CO inquired, Scarborough could have provided another acceptable asset.

[13] Note that the role of agency counsel is limited to opining on the legality of the documents presented, and not in making the business judgment that is the CO's responsibility to determine whether to accept the surety and his bond.

coal is a "readily marketable asset." Following this general rule, FAR 28.203-2(b) lists **examples** of acceptable assets, and FAR 28.203-2(c) lists **examples** of unacceptable assets, neither of which list is exclusive. The fact that neither list is closed is consistent the with regulatory history of FAR Subpart 28.2. Scarborough incorporates herein by reference the Tip Top arguments in its submission of the same date based on the legislative history of the FAR.

As the above construction of Subpart 28.2 is much more consistent with the language and intent of the FAR, it should be accepted in lieu of the one you proposed on Thursday. It follows that the Government will accept, and the CO should have been willing to accept, any readily marketable asset (unless explicitly prohibited as unacceptable), including coal, to satisfy the underlying bid bond obligations.

**D. Coal is Certainly a "Readily Marketable Asset"**

During the TC, you argued that coal is not a "readily marketable asset." Scarborough strongly disagrees. Despite searching for a definition of that term, and asking two accountants for an accounting/financial definition for the same, Scarborough has been unable to find a definition of the term.

One of the accountants consulted provided Scarborough a Securities and Exchange Commission ("SEC") definition of the **opposite** – an "investment not readily marketable." Although the coal is not a security, the definition is useful as an analogy. RegS-X.T.Rule 12-13, *Investments Other Than Securities*, states that, with respect to management investment company reporting, the term "shall include investments for which **there is no independent publicly quoted market and investments which cannot be sold because of restrictions or conditions** applicable to the investment or the company." *See* **Attachment 5** (emphasis added).

The same accountant also provided an excerpt from an American Institute of Certified Public Accountants ("AICPA") Audit and Accounting Guide for brokers and dealers in securities. It states that "securities not readily marketable" refers to

> (1) securities, except exempted securities, **for which there is no market on a securities exchange or no independent publicly quoted market**; (2) **securities that cannot be publicly offered or sold** unless registration has been effected under the Securities Act of 1933 (or the conditions of an exemption, such as Regulation A under section 3(b) of this act, have been complied with); or (3) **securities that cannot be offered or sold because of other arrangements, restrictions, or conditions** applicable to the securities or the broker-dealer

*Id.* (emphasis added). Although the asset pledged in this case is not a security, the logic is the same in both definitions and applicable to the asset in this case. Basically, if there is no independent publicly quoted market for the asset or the asset cannot be sold because

of restrictions or conditions, then it is considered "not readily marketable." Any other asset such as coal, by extension, is considered readily marketable.

In this case, the pledged asset is previously mined, extracted, stockpiled, analyzed and valued (by means of a third party offer to buy) coal. *See* **Attachment 6** (analysis including third party offer at Appendix C thereto). Coal is like any other regularly traded commodity with a known value, in this case, a "spot price" published by, among other sources, the Department of Energy ("DOE") and other industry sources. Scarborough refers you to http://www.eia.doe.gov/cneaf/coal/page/coalnews/coalmar.html , an official **Government** website, for an example of a publication of such spot prices.

According to the DOE, a "spot price" is the price for a one-time open market transaction for immediate delivery purchased 'on the spot' at current market rates." *See* **Attachment 7.** A spot price has also been defined as "[t]he present delivery price of a given commodity being traded on the spot market, also called the cash price." *Id.* (*see* InvestorWords.com printout of this and other web definitions). A "spot market" is [a] market in which commodities, such as grain, gold, crude oil, or RAM chips, are bought and sold for cash and delivered immediately, also called cash market." *Id.* A "commodity" is

> **[a] physical substance, such as food, grains, and metals, which is interchangeable with another product of the same type,** and which investors buy or sell, usually through futures contracts. The price of a commodity is subject to supply and demand. . . . More generally, a product which trades on a commodity exchange; this would also include foreign currencies and financial instruments and indexes.

*Id.* (emphasis added).

Clearly, mined coal is a readily marketable asset that is acceptable under any reasonable reading of the financial definitions and regulations and fully protects the Government. The documentation submitted by Scarborough shows that this mined coal asset physically exists and is available to support the bond. *See* **Attachment 5;** *see also* Attachments 1 and 11. There is no basis to reject this bond.

Scarborough went further than required in providing an analysis and valuation of the coal at issue. *See Id.* The valuation is based, in part, on a third party offer to buy the coal. *Id.*, at Appendix C thereto. Although it is a truism that the price of coal will vary with the quality and fluctuations in the market, the coal in this instance is high quality Met Coal with 12,000 BTUs and with less than 3% ash. The type and grade of coal are based on assays and professional assessments which determined the value of Scarborough's asset at approximately $191 million (as of that date). *Id.* Moreover, the market for coal is growing rapidly. *See* **Attachments 8a and 8b** (articles on the coal market) and **Attachment 9 and Attachments 9a – 9d** (memo summarizing coal market research and supporting research).

The ability to readily establish a market price is why coal and other similarly marketable commodities have been routinely accepted by other federal agencies and have been referred to as a readily marketable asset. *See, e.g., Shader Contractors v. United States*, 276 F.2d 1, 6 (Ct. Cl. 1960) (finding coal to be a readily marketable commodity).

In sum, the bid bond assets pledged exist, are readily marketable, have value and certainly sufficient value to cover the bond obligation, are in full conformity with the regulations and acceptable.

**E. Scarborough Provided the FHWA a Valid Security Interest in the Coal**

As stated above, FAR 28.203-1 requires that a security interest be provided with the bond. The "security interest" for the pledged asset of coal is not defined. However, Black's Law Dictionary defines a security interest as:

> Interest in property obtained pursuant to security agreement. [Citation omitted.] A form of interest in property which provides that the property may be sold on default in order to satisfy the obligation for which the security interest is given ... an interest in personal property or fixtures which secures payment or performance of an obligation, U.C.C. §1-201(37), 9-102 . . . .

Black's Law Dictionary, 6th Edition (Centennial) Edition (1991) at 1357. The UCC defines a "security interest" as follows:

> (35) 'Security interest' means an interest in personal property or fixtures **which secures payment or performance of an obligation**. 'Security interest' includes any interest of a consignor and a buyer of accounts, chattel paper, a payment intangible, or a promissory note in a transaction that is subject to Article 9. . . .

UCC § 1-201(37). For purposes of Article 9, the UCC defines "goods" to include commodities such as timber and crops, as well as oil and gas after extraction.

> (44) **"Goods" means all things that are movable when a security interest attaches**. The term includes (i) fixtures, (ii) standing timber that is to be cut and removed under a conveyance or contract for sale, (iii) the unborn young of animals, (iv) crops grown, growing, or to be grown, even if the crops are produced on trees, vines, or bushes, and (v) manufactured homes . . .[and computer programs under some conditions]. . . . The **term also does not include** accounts, chattel paper, commercial tort claims, deposit accounts, documents, general intangibles, instruments, investment property, letter-of-credit rights, letters of credit, money, **or oil, gas, or other minerals *before* extraction.**

UCC § 9-102(a)(44). Clearly, "goods," which are covered under Article 9, includes coal and other minerals after extraction. Article 9 of the UCC also covers commodities and even commodities contracts. *See*, UCC § 9-102(15) – (17):

> (15) "Commodity contract" means a commodity futures contract, an option on a commodity futures contract, a commodity option, or another contract if the contract or option is:
> (A) traded on or subject to the rules of a board of trade that has been designated as a contract market for such a contract pursuant to federal commodities laws; or
> (B) traded on a foreign commodity board of trade, exchange, or market, and is carried on the books of a commodity intermediary for a commodity customer.
>
> (16) "Commodity customer" means a person for which a commodity intermediary carries a commodity contract on its books.
>
> (17) "Commodity intermediary" means a person that:
> (A) is registered as a futures commission merchant under federal commodities law; or
> (B) in the ordinary course of its business provides clearance or settlement services for a board of trade that has been designated as a contract market pursuant to federal commodities law.

While a complete dissertation on Article 9 of the UCC is beyond the scope of this paper, and the issues confronting the GAO, suffice is to say that coal is covered by Article 9, UCC, and that a security interest can be perfected in coal without physically possessing the same. Article 9 does not require the Government to physically possess commodities such as coal in order to perfect an interest in the same, as you argued during the TC. *See* Parts 3 and 5 of Article 9, UCC. We believe you were referring to perfection by control which is one way to perfect a security interest in certain listed assets, and even then possession is not required. *See, e.g.*, § 9-314. *Perfection by Control* ("(a) [Perfection by control.] A security interest in investment property, deposit accounts, letter-of-credit rights, or electronic chattel paper **may be perfected by control** of the collateral under Section 9-104, 9-105, 9-106, or 9-107 (emphasis added).)"

In this case, Scarborough's Certificate of Pledged Assets, including paragraph 3 of the pledge, specifically meets the above definitions and Scarborough gave the FHWA a security interest recognized by Article 9, UCC. The CO can put all others on notice of the Government's security interest by means of a simple Form UCC-1 (although this is not required by the UCC or the FAR). In the unlikely event that Tip Top defaulted, the CO, as with any other bond, would put Scarborough on notice and Scarborough would have the opportunity (and has the wherewithal) to cover the obligation by a cash payment to the Government. Resort to the coal would only be needed if he could not so cover the obligation. In the even more unlikely event that a sale of the coal (or a portion therof) became a necessity, in all likelihood that would be easier (and less risky) than the Government attempting a sale of real estate, another acceptable asset.

**III. Response to FHWA Agency Report**

The arguments raised by the CO in the AR can and will be systematically rebutted below. As the factual, regulatory and legal underpinnings of the CO's decision are wrong, her resulting decision must fall of its own weight.

**A. The CO's "Review" of the Bid Bond and Stated Basis for Rejection**

The CO claims that she performed a "review of the Bid Bond and the applicable provisions in the Federal Acquisition Regulations (FAR)" and, after doing so, "determined that the Bid Bond was not sufficient." AR § I.a.7.[14] It is not at all clear from that statement or the rest of the AR what review she actually performed before rejecting the bond. Certainly, it did not include asking questions of Tip Top or the surety, a fact she did not dispute during the TC. It appears that her "review" also did not include consideration of the information provided by the surety on its own initiative.[15] *See* counsel for Scarborough's letters to the CO in the record of this Protest, incorporated herein.

Although the CO's discretion is broad, it is not unfettered. *See, e.g., Sun Chemical Corp.*, B-288466, et. seq., 2001 CPD ¶ 185 (October 17, 2001) ("solicitation's broad grant of discretion to the BEP to terminate the testing of ink samples that caused 'any adverse effect upon BEP employees,' and to reject them as technically unacceptable, does not give the contracting officer unfettered discretion here . . . ."); *see also Pacifica Services, Inc.*, B-280921, 98-2 CPD ¶ 137 (December 7, 1998) ("The contracting officer has broad discretion to make award on the basis of initial proposals, but that discretion is not unfettered; we will review the exercise of such discretion to ensure that it was reasonably based on the particular circumstances of the procurement, including consideration of the proposals received and the basis for the selection decision."). The standard of reasonableness requires some review and a reasoned analysis before her decision was made. Here, the record is devoid of any explanation as to the review conducted. The CO's refusal to request and, later, consider additional information after the same was provided by the surety was arbitrary and capricious.[16]

Later in the AR, the CO provides a little more detail on the contemporaneous grounds for her rejection, stating that she "notified Tip Top that its bid was rejected because of the inadequacy of its Individual Surety Bid Bond based on unacceptable assets by letter dated February 19, 2008. After reviewing Tip Top's Bid Bond, it was clear to me that the assets offered as security for the Individual Surety Bid Bond were

[14] The pages of the AR are not numbered; therefore, reference will be made to the relevant section of the AR and, where possible, the paragraph.
[15] Attempting to rebut Scarborough's information and arguments after-the-fact, in the AR, is not the same as giving the information and arguments fair consideration before making her rejection decision.
[16] The cases cited by Tip Top on this point, in its submission of the same date, are incorporated herein by reference.

unacceptable." AR § I.b.(2nd. Para.)[17] Thus, it was the assets and not the acceptability of the individual surety or the bid bond documents (despite other comments and implications in the CO's Statement in the AR) that are the basis for her rejection decision, and the GAO should limit the issues under consideration to this.

In an attempt to bolster an irrational and unreasoned decision, the CO argues that, under FAR 1.602-2, she has the responsibility to safeguard the interests of the United States. She adds that this includes the responsibility to determine the acceptability of assets securing an individual surety bond. *Id.* (at last para.). Scarborough does not dispute that she has a responsibility to protect the Government, but subsection (b) of FAR 1.602-2 also says that she must "[e]nsure that contractors receive impartial, fair, and equitable treatment . . ." in the process of doing so, and this is something she failed to do. Furthermore, in protecting the Government the CO must follow the FAR and law. Scarborough is asking the GAO to enforce the CO's responsibility to act reasonably and follow the FAR and to ensure that Tip Top receives impartial, fair and equitable treatment. FAR 1.602-2(b).

The CO also argues that "determination of which category the proposed asset falls into by necessity belongs to the Contracting Officer - as stated at FAR Section 28.203(a), 'The contracting officer shall determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation.'" AR § I.b.(4th para.). Arguably, this section of the FAR states only her responsibility to ensure that the pledged assets are of an amount sufficient to cover the bond obligation, a representation that Scarborough made in his affidavit and according to the FAR. *See* FAR 28.203(b) (requiring only an SF 28 and that a security interest be provided). To our knowledge, the CO has never argued that insufficient assets were pledged; therefore, there is no issue in this regard.

In another attempt to bolster her unfounded decision, the CO argues that, in reaching her conclusion, she consulted with legal counsel, as required by FAR 28.203(f). AR § I.b. (4th para.). As noted above, subsection (f) only requires the opinion of counsel as to the adequacy of the documents submitted;[18] thus, consultation with counsel does not relieve the CO of her responsibility to act reasonably and follow the law.

---

[17] At one point in her statement, the CO says that, "[b]y letter dated February 19, 2008, the Contracting Officer notified the Protester that its Bid was rejected for failure to furnish a bid guarantee in accordance with the requirements of the invitation for bid." AR § I.a.8. Although she here claims that Tip Top's failure was in allegedly not furnishing a bid guarantee in accordance with the IFB's requirements, her later arguments suggest that she meant to say "in accordance with the FAR's requirements." *See* AR § I.a.7. (claiming that she "determined that the security assets listed did not meet the requirements of the FAR.") If she meant IFB, she has failed to explain how the bond failed to meet the requirements of the IFB. Not having such an explanation, Scarborough cannot respond to any IFB-based argument and reserves the right to do so.

[18] As Scarborough used the standard bid bond form and the FAR-required SF 28, there should be no issue regarding the sufficiency of the documentation used. The FAR requires nothing more. *See* FAR 28.203(b).

Later, the CO adds: "In either case, it is still my responsibility as the Contracting Officer to determine whether this asset is acceptable." AR § I.b.(penultimate para.). Scarborough does not take issue with this statement, but it is not particularly helpful to the resolution of the dispute. Additionally, Scarborough notes that such a determination must be performed rationally and in accordance with the FAR and law.

**B. Individual Sureties Are Allowed By the FAR and Are On Equal Footing with Corporate Sureties**

The CO states that, at the time Protester's Bid was opened, it was obvious that Protester's Bid for time (300 days) was significantly less than that of the Government estimate (675 days . . .). No other review of the bid was done at that time due to other responsibilities in the Acquisition Section. AR § I.a.4. Thereafter, a Contract Specialist was directed to complete review of the remainder of the bid package. AR § I.a.5. She raised a question about the "feasibility" of the Bid Bond. *Id.* "This was the first time that the Contracting Officer became aware of the fact that the Bid was secured by an Individual Surety Bid Bond." *Id.*

The CO's statement regarding her discovery that the bid was secured by an individual surety bid bond suggests that she believes there is something inherently wrong with an individual surety or individual surety bond. If this was in any way the basis of the CO's decision, and it appears that it may have been, she is flatly wrong and her decision must be considered tainted. As discussed above, the FAR places individual and corporate sureties on equal footing. *See* FAR 28.201(a); *cf.* FAR 28.202 and 28.203. The CO's personal opinions regarding individual sureties and their bonds must cede to the FAR's acceptance of the same.

**C. The Bid Bond and Related Forms Used Were Proper, Valid and Sufficient**

Despite stating that the issue was the assets, the CO appears to take some potshots at the bid bond and related forms provided, but try as she might she cannot make the case that they are deficient. *See*, *e.g.*, AR § I.b.(5th para.). The forms were proper, valid and sufficient as submitted. They clearly identify the pledged assets by reference to and incorporation of the Certificate of Pledged Assets. Note that Scarborough has sworn that there no ("None") mortgages, liens, judgments or any other encumbrances involving the subject assets. *See* Certificate of Pledged Assets, attached to and incorporated within the SF 28 submitted with the bid bond, at **Attachment 1.** This rebuts the CO's argument that there was no way for her to know if the pledged assets were encumbered.

The CO argues that "[i]n this instance, the only documentation provided by the Individual Surety with the Bond was a "Certificate of Pledged Assets." AR § I.b.(5th para.). She is, again, wrong. Scarborough provided a standard bid bond form, properly completed, and an SF-28, *Affidavit of Individual Surety*, which itself incorporated the attached and individually numbered Certificate of Pledged Assets. The Certificate, by its

language, pledges the described assets "in support of, and as collateral for," the clearly identified bonds. *See* **Attachment 1.** Moreover, Scarborough gave FWHA secured party rights under Article 9, UCC. *Id.*, at para. 3 of Certificate; *see also* security interest discussion, *supra.*

The CO next argues that "[n]othing bound the assets to the Bond except the word of the Individual Surety." AR § I.b.(5th para.). Again, this is not correct. The FHWA has an Article 9 security interest and could even have filed a UCC-1 statement recording such interest. *See* § II E supra. Moreover, the CO ignores the fact that Scaroborough is providing a sworn affidavit. The FAR and standard forms do not require more than the sworn statement of the surety. The very fact that an affidavit is the only form required by the FAR to support the bid bond is strong evidence that "the word" of the individual surety is sufficient to show no encumbrances exist or, more broadly, to make any required showing regarding the surety and/or his assets. Neither the CO nor the GAO can unilaterally impose additional documentation requirements not found in the FAR.

**D. The CO's Self-Serving Attempt to Re-Characterize the Asset**

In attempting to explain her "analysis," it is evidence that she either misunderstood or is mischaracterizing the underlying asset. *See* AR §I.b.(3rd para.) ("In my analysis, the asset listed in this instance - mined but not marketed coal . . . ."); *Id.* ("The Protester argues that mined but not marketed coal . . . ."). The term "mined but not marketed coal" is an invention of the CO's. Neither Scarborough nor the bid bond forms identify the asset as such. The CO uses this term to rename the proferred asset in an obvious attempt to set up the argument that the coal is not a readily marketable asset, which it is (*see* discussion *supra*). Scarborough actually pledged "previously mined, extracted, stockpiled and marketable coal" located on a specifically identified piece of property which he owns. *See* Certificate of Pledged Assets, at **Attachment 1.**

The CO also conveniently leaves out part of the asset description provided. She states only part of Scarborough's description as follows: "The Individual Surety Bid Bond identified E.C. Scarborough as the Individual Surety and listed as its security assets the following:

> "Description of Assets Pledged
> An allocated portion of $191,350,000.00 of previously mined, extracted, stockpiled and marketable coal, located on the property of E.C. Scarborough . . . .

AR § I.a.6. The CO fails to mention that the description goes on to identify the exact piece of property on which the coal is located by a legal metes and bounds description. All of these are incorporated into the individual surety affidavit, so these assertions are being made under oath and are sufficient per the FAR.

**E. Mined Coal is Not a "Mineral Right" or Other Form of "Speculative Asset" Under FAR 28.203-2(c)(7)**

The CO argues that coal is a "mineral right" or other form of "speculative asset." AR § I.b.(3rd para.). FAR 28.203-2(c)(7) excludes speculative assets, a term not defined by the FAR other than providing one example, which is "mineral **rights**." (Emphasis added.) The law defines a "mineral right" as "an **interest** in minerals **in land**. A **right to take** minerals or a right to receive a royalty." Black's Law Dictionary, 6th Edition, 1990 at p. 995 (emphasis added). Scarborough was not pledging the right to extract coal "in land" or underneath the ground or a legal interest in underground coal but, rather, already extracted coal, which is above ground. This difference is significant as this coal is a recognized available commodity and not a right to discover or explore for a commodity.

There is no logical or legal basis for any argument that the VA might make along the lines that mined, extracted, stockpiled and marketable coal – a commodity that one can physically load onto a truck or railroad car and send to market – is the same as a legal right to mine a plot of land and extract whatever minerals there might be underground. Scarborough argues this even though the various States where coal is found in large quantities levy taxes on unmined coal deposits as soon as those deposits are confirmed and assayed.

Although coal is not specifically mentioned in the FAR, the same can be said for a lot of other assets. The important thing is that the FAR's lists of "acceptable" and "unacceptable" assets (compare FAR 28.203-2(b) to 28.203-2(c)) are not all-inclusive. The drafters of the FAR clearly knew that they could not list every acceptable asset that might be offered and the established policy is that if something is not specifically prohibited by the FAR it is allowable and can be considered as such by contracting officers. Scarborough argues that, if the FAR drafters had wanted to prohibit valuable minerals already extracted and ready for sale, they could and would have said so. There is no FAR language that lists "mined minerals and mineral rights" as speculative assets.

Clearly, the coal that Scarborough pledged, and that has been acceptable to other Federal and State contracting officers, is not a precluded mineral right but an existing, already-mined, tangible and stockpiled mineral for which there is a ready market.

Furthermore, the CO's "analysis" that a mineral right "includes the right to sell the coal after it is mined," AR § I.b.(3rd para.), is apparently based on the view that, because an individual surety, as the owner of a mineral asset, has the right to sell the mineral, that constitutes a "mineral right." This is silly. The right to sell a mined product is not what the law means by a "mineral right."

The FAR drafters were aware that commodities had been pledged by individual sureties in the past and could have included this type of asset as one of those considered unacceptable. They did not do so. Case law shows that the only issue involving an individual surety's pledge of commodities has been whether the individual surety established that the commodities physically existed. *Cf. T&A Painting, Inc.*, B-236846, December 29, 1989, 90-1 CPD ¶6 (oil and gas leases rejected because there was no

evidence that any actual oil or gas was being produced); *Electrical Generation Technology*, B-235809, August 31, 1989, 89-2 CPD ¶204 (owner **unable to prove existence** of gold ore concentrate pledged). Scarborough did not pledge a lease, or any derivative security based on the coal, and can and has proven the existence of the coal (and its exact location) to and beyond the level required by the FAR.

The documentation required and provided by Scarborough established that the coal he pledged physically exists. The bond specifically states that the coal has been previously mined, extracted, and stockpiled on a specific piece of property owned by Scarborough. Its present value and sale price can be determined by reference to "spot prices" published by the Department of Energy ("DOE") and other indices. *See* § II.D, *supra.*

At one point, the CO applies a "closer in similarity" standard in evaluating the pledged asset. AR § I.b.(3rd. para.). Aside from being a redundant term, "closer in similarity" is not a standard found in Subpart 28.2. Even if it were the standard, and even if the FAR required the CO to simplistically match the pledged asset to one of the listed assets and determine that they are "close" or "similar enough," a completely undefined standard, the comparisons she makes between the pledged coal and certain of the FAR-listed assets are not at all close. *See* discussion at § III.F, immediately below.

The CO argues that coal is "closer in similarity to a corporate asset, speculative asset [*i.e.*, mineral rights], or accounts receivable, than it is to cash, certificates of deposit, or U.S. Government securities." AR § I.b.(3rd para.). Interestingly, she conveniently leaves out another asset listed in FAR 28.203-2(b) – stocks and bonds actively traded. *See*, FAR 28.203-2(b)(3). We say this is interesting because, arguably, this is the FAR-listed asset closest to mined coal in that there is a daily, published price for actively traded common stocks just as there is for coal.

Later, the CO argues that, despite all the arguments proposed by Scarborough, the asset is still speculative as to liquidity and value. AR § I.b. (3rd. para.). This argument is, first of all, nonsensical. Also, it appears that the CO is confounding and/or equating "speculative" with "liquidity" and "value." If so, this definition or test has no basis in the FAR. In fact, a search of Subpart 28.2 by undersigned counsel showed only one word containing the root word "liquid," and that was in FAR Part 28.203-3 addressing the acceptance of real estate. *See* FAR 28.203-3(c) ("The individual surety is liable for the payment of all administrative costs of the Government, including legal fees, associated with the liquidation of pledged real estate.").

There is also no FAR-based relation between the term "speculative" and "value." A search of FAR Part 28.2 revealed only one mention of the word "speculative," and that was in FAR 23.303-2(c)(7), immediately before the sole example provided to guide contracting officers as to what a speculative asset is – *i.e.*, "mineral rights." In any event, even if the meanings of "speculative" and "value" were somehow tied in the Subpart 28.2, Scarborough did state the value of the pledged asset, a value which the CO has not

and cannot dispute. Therefore, any value-based argument that the coal is speculative must fail.

In the AR, the CO argues that "[a]cceptance of a speculative asset is not in the best interest of the United States which is why the FAR lists it as unacceptable." AR § I.b.(4th para.). She provides no FAR citation for this assertion. Even if this were the FAR test, she has failed to show that the coal is speculative.

**F. Coal is Not Akin to "Plant Equipment" or "Accounts Receivable"**

The CO argues that coal is speculative because it is like a corporate asset – plant equipment – or accounts receivable. AR § I.b. (3rd. para.). Plant equipment is typically mechanical and a permanent fixture. It is a depreciating asset. There is no ready market and, no established "spot price" like there is for gold, silver, oil, coal and other commodities. An account receivable is even more dissimilar because it is an intangible asset – an accounting book entry claiming a legal right to receive monies believed to be due to the individual or corporate creditor. An account receivable involves a risk that the accounts will never be collected in whole or in part due to the risk of default by the third party debtor. An account receivable entry is also not, to Scarborough's knowledge, a security interest under Article 9. Even if an account receivable were a tangible asset or security interest, there is no ready market for the same and, even if there were, there is no market such that the value can be ascertained by reference to a published "spot price."

The FHWA offers no authority or logic for considering mined coal as a "mining interest," or comparable to "plant equipment," or "accounts receivables." The value of these unacceptable assets cannot be ascertained from any market standard. Thus, they are not readily marketable, like acceptable stocks and bonds, and mined coal.

**G. The CO's Argument that the Value of the Asset Cannot be Known, and that the Price Varies**

The CO argues that the bond is defective because the actual value of the named asset is not known. AR § I.b.(3rd. para.). This is not correct. The estimate of the value, prepared by a third party relying on test and analysis data, is stated in the Certificate of Pledged Assets which is incorporated into the affidavit. Additionally, Scarborough provided additional information in support and offered more if needed. The CO could have asked for more but chose not to. To the contrary, at any given point in time the value of the asset can be determined, as coal is a commodity for which there exists a spot price.

The CO argues that the value "can only be conjectured until an actual sale takes place." *Id.* This is not correct. The fact that there is a spot price means that there exist a very large volume of sales from which the spot price can be determined. Also, the existence of a published spot price means the value can be determined almost exactly at any point in time. *See* discussion of "readily marketable asset," *supra*, at § II.D. The

price of coal can be determined at least as accurately as that of a stock or bond traded on a national exchange, and certainly more easily and accurately than the value of real estate which is acceptable under the FAR. *See* FAR 28.203-3.

She then states that "[t]he price of coal will vary with the quality of the coal mined and the fluctuations of the market." *Id.* This is correct, to a certain extent. The price of a sample of coal depends on the type and quality and existing market conditions. However, in our situation, the coal has already been mined, so the quality is a known fact – it will not change. The coal in this instance is high quality Met Coal with 12,000 BTUs and with less than 3% ash.

The CO next argues that "[t]here was no independent basis offered for the valuation suggested by the Individual Surety." AR § I.b.(5th para.). Scarborough is not sure what she means by an "independent basis," or if that is even a requirement of the FAR, and the CO should not be allowed to "raise the bar" on what an individual surety must provide. Had she simply asked, as it would have been reasonable to do, Scarborough could have told her (and later did tell her) about the existence of an "independent" spot price. If the CO meant a third-party, arms-length offer to buy, Scarborough would have provided the third-party offer which is appended to the analysis of the pledged coal. *See* **Attachment 5.** The analysis and offer evidence far more coal and value of assets (as compared to the bond obligation) than needed. *Id.*

By letter dated February 21, 2008, undersigned counsel indicated to the CO that his client offered to provide documentation supporting the quality and market price of the pledged asset. In the AR, the CO acknowledges the offer, as she must. Importantly, Scarborough offered her everything which she now claims she did not have and caused her to "have to" reject the bond. Her failure to accept the very information and documentation which formed the basis of her rejection because she did not have this in front of her is *per se* arbitrary and capricious or, at least, unreasonable.

**H. The CO's Argument that Ownership Was Not Shown**

Another CO post-hoc argument is that "nor was there any independent confirmation that the assets validly belonged to the named Individual Surety." AR § I.b.(5th para.). Had she asked, Scarborough would have provided the Special Warranty Deed and title report at **Attachments 10a and 10b.**

The CO adds: "No documentation was provided to independently confirm that there was clear title, that there were no other liens or other legal rights attached to the assets." AR § I.b. (5th para.). This is incorrect. The SF 28, at block 8, which incorporates the Certificate, including para. 1 thereof, certifies that Scarborough has good title and there were no encumbrances. If a sworn statement by the surety were not sufficient, why would the FAR mandate the use of a standard form affidavit requiring the surety to "identify all mortgages, liens, judgments or any other encumbrances"? Note that the SF-28, block 8 does not require the surety to attach evidence or explanation of

any identified encumbrances; only that they be identified. Again, had she asked, Scarborough would have provided the Special Warranty Deed and title report at **Attachments 10a and 10b.**

### I. The CO's "Burden on the Government" and Liquidity Argument Are not Supported by the FAR

The CO raises "burden on the Government" and "liquidity" as separate arguments. She states: "In addition, I found the asset to be speculative because it is would present more of a burden on the Government to secure or liquidate the asset." AR § I.b. (3rd. para.). She adds: "Since liquidation depends upon identifying a willing and responsible buyer the asset would still be so speculative as to be unacceptable because of the liquidity issue. . . ." *Id.* As discussed above, the FAR has no such test for "speculative" or "liquidity."

If the CO is attempting to argue that, because the Government may have to sell the asset in the even that the contractor defaults and then the individual surety defaults when payment is demanded, and that such a sale requires the Government to find a willing and responsible buyer which would present an undue burden on the Government, this is nonsense. Aside from there being no support for this argument in the FAR, any asset other than cash pledged in support of a bond requires the Government to find a buyer.

If the CO is attempting to argue that it would take too long to sell the coal in the event of a default by Scarborough, she is again wrong. If the time it takes to sell and asset were the test, and it is not, then real estate, which is specifically acceptable under the FAR, generally takes longer to sell than coal which can be sold on the spot market. In virtually all cases, it is more difficult to find a willing and responsible buyer for a piece of real estate than it is to find a buyer for a commodity traded so often that there is a published spot price at which any seller can sell his coal. Consider also gold bullion and other easily traded commodities. Applying the CO's test, real estate, which is allowed by FAR 28.203-2(b)(4) and 28.203-3 would be a speculative asset.

### J. The CO's Argument That A Third Party Must Hold the Asset

The CO further argues that "[t]he assets were not even being held by a third party, but sat on Mr. Scarborough's land." AR § I.b. (5th para.). Aside from being unclear as to the exact concern, this argument, which seems to be that a third party must hold Scarborough's coal, is without support. If anything, the Government's interests are more protected by Scarborough safekeeping the asset on his land and removing any potential issue of whether a third party holding the asset would give the Government access to it. Adding a third party to the transaction would actually increase the complexity and risks to the Government.

### K. The CO's Argument That A Security Interest Was Not Provided

The CO follows the "no third party holding the asset" argument with: "Therefore, not only the nature of the asset, but the absence of a valid security interest caused me to reject it as speculative and therefore unacceptable." AR § I.b (5th para.). First, it is not clear what the CO means by "the nature of the asset." Second, if she is saying that not having a third party hold the asset equates to a failure to give the Government a valid security interest, this is patently wrong. She is confounding two separate issues. Third, if she is saying that the absence of a valid security interest equates to the asset being speculative, she is wrong factually and as a matter of law (*i.e.*, the FAR does not say this at all). Fourth, the "therefore unacceptable" conclusion is based on so many wrong statements/assumptions that it must fall of its own weight.

In any event, as discussed above, Scarborough did provide the Government a security interest, and did so at the time he provided the bond. *See* § II.E, *supra*.

**L. The CO's Argument That The FHWA Has Never Accepted Individual Surety Bonds**

The Protester indicated in his Protest that FHWA has previously accepted the same coal asset at issue here. In response, the CO states:

> After review, we disagree with this contention. There is no evidence that this Agency has previously accepted unmarketed coal[[19]] as a valid Individual Surety asset. In fact, no Individual Surety Bid Bonds have been approved by this Agency since I became the lead Contracting Officer for EFLHD in 2003. We have also checked with the other Divisions of this Program, and they also confirm that no Individual Surety has been accepted within their memory.

AR § I.b. (penultimate para.). Neither Tip Top nor Scarborough stated that EFLHD approved individual surety bonds, but simply that FHWA did. Obviously, the CO is relying on memory. The documented facts prove her memory wrong, as there are at least two such bonds which Scarborough has identified. *See* **Attachment 4**. The FHWA's previous acceptance of the Scarborough bonds and assets belies its arguments now that the same are not acceptable under the FAR.

## IX. Conclusion

For the reasons set forth above, Scarborough respectfully requests that the GAO recommend that FHWA reverse its decision rejecting Tip Top's bid bond, accept the same and make award to Tip Top as the lowest priced, responsive, responsible contractor providing a valid bid bond. Alternatively, that FHWA reverse its rejection decision and, if the CO can demonstrate legitimate remaining concerns regarding the bid bond or asset,

[19] It should be noted that Scarborough did not pledge "unmarketable" coal – to the contrary, it is highly marketable. The CO is distorting Scarborough's representations to then address them in a way favorable to her position.

that the CO request and fairly consider additional information as contemplated by the FAR or allow the surety to provide a substitute asset. If the GAO rejects both of these requests and is inclined to uphold the CO's decision rejecting the bid bond, a finding that will very likely be appealed, Scarborough requests that that the GAO abide by the principle of deciding cases narrowly and uphold the decision of the GAO simply on the basis that it was within the CO's discretion to make the decision she did and not go further and decide the case, or opine, on the bid bond or underlying assets, as this will have significant negative consequences on individual sureties, their small, minority and disadvantaged contractor clients, the agencies that are actively seeking the same and, ultimately, the procurement system. If the GAO nevertheless decides to issue a decision opinion on the bid bond at issue and/or the related documents and underlying asset, Scarborough requests specific findings and conclusions of fact and law so that it may appeal the same.

Sincerely,

Dennis C. Ehlers

Attachments:

Cc: Julia L. Perry, Esq.
Michael A. Gordon, Esq.
Edmund C. Scarborough
Laurence Schor, Esq.

NORMAN T. DANIELS, JR., CPA †
CARL L. FLETCHER, JR.
CHARLES R. HUGHES *
GENE W. BAILEY, II
D. ADRIAN HOOSIER, II

† LAW LICENSE IN KY, NC, PA & WV
* LAW LICENSE IN KY & WV

DANIELS LAW FIRM, PLLC
BB&T SQUARE
300 SUMMERS STREET, SUITE 1270
P.O. BOX 1433
CHARLESTON, WEST VIRGINIA 25325

TELEPHONE
(304) 342-6666
FACSIMILE
(304) 342-6677

*On the web at www.danielslawfirm.com*

April 21, 2008

Edmund Scarborough
IBCS International Bonding & Construction Services
6352 Cypress Garden Boulevard
Winter Haven, FL 33884

Re: Affidavit of Charles Steven Robinson

Dear Mr. Scarborough:

Enclosed please find the signed "Affidavit of Charles Steven Robinson."

Should you have any questions, I wish you would be kind enough to contact me.

With warmest regards.

Sincerely,

DANIELS LAW FIRM, PLLC

Norman T. Daniels, Jr.

Norman T. Daniels, Jr.

NTD,JR:aam
Enclosure

**AFFIDAVIT OF CHARLES STEVEN ROBINSON**

Charles Steven Robinson, being duly sworn, deposes and states under the penalty of perjury that the following is true based on my personal knowledge.

1. I am an adult, am knowledgeable of the facts set forth below and am competent to testify herein.

2. I am a consultant to the coal industry with over thirty (30) years experience in leasing, mining, marketing and selling coal.

3. From my personal and professional experience, I know coal to be generally accepted as, and widely considered, a commodity, much like oil, gas, precious metals and other items.

4. Coal is a commodity that is very widely traded and for which there is a very large world-wide market.

5. Under the generally accepted definition of a "readily marketable asset," and the common usage of that term in the commodities and financial markets in which I make a living, coal is most certainly considered a "readily marketable asset."

6. To my knowledge, since at least the industrial revolution, coal has been considered a readily marketable asset, one for which there exists a ready market in the form of commodities exchanges and broker-dealer networks.

7. Coal is, in fact, so readily marketable that there exists at any point in time a published "spot" price for various types and qualities of coal. The weekly average of the spot prices for each major type of coal is published by, among other entities, the U.S. Federal Government on the Department of Energy's Energy Information Administration ("EIA") web site at:
http://www.eia.doe.gov/cneaf/coal/page/coalnews/coalmar.html

8. It is widely reported and known that, in at least the last decade, the United States and worldwide demand for coal of all types is growing by leaps and bounds, and economic estimates I have read consistently forecast a strong demand, if not an explosive growth in demand, for the foreseeable future.

9. Already mined, extracted, stockpiled and analyzed coal is, in my opinion and experience, a readily marketable and valuable asset. It is also a very "liquid" asset in the sense that a given amount of coal can be sold or otherwise converted quite readily to cash.

10. Already mined, extracted, stockpiled and analyzed coal is, in my opinion and experience, not a "mineral right," and is not considered as such by the commodities markets in which I work as a broker.

11. In my experience, the term "mineral rights" refers to a person's right to mine, extract or otherwise exploit minerals that may exist underground. Such intangible rights can, and are, bought and sold. However, intangible "mineral rights" are to be contrasted against already mined, extracted above-ground (*i.e.*, tangible) coal for which there exists a much more robust market and published spot prices.

12. Also, in my opinion and experience, already-mined coal is not considered in the industry and markets to be a "speculative asset." To the contrary, it is in such demand and of such value that I view it as the near opposite of a speculative asset.

13. I strongly disagree with any person who espouses an opinion that already-mined coal is akin to "plant and equipment" owned by a corporation or "accounts receivable."

Further your affiant sayeth not.

Charles Steven Robinson

COUNTY OF KANAWHA,

STATE OF WEST VIRGINIA:

Taken, sworn to, and subscribed before the undersigned Notary Public, under his/her official seal, this 21st day of April 2008.

NOTARY PUBLIC OFFICIAL SEAL
[illegible]
My Commission [illegible] June 1, 2014

Notary Public

My Commission Expires: June 1, 2014.