IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TIP TOP CONSTRUCTION, INC. | ) | |
| Plaintiff, | ) | |
| | ) | No. 08-352C |
| v. | ) | Judge Lynn J. Bush |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

TIP TOP'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Michael A. Gordon
Counsel of Record for Tip Top Construction, Inc.
MICHAEL A. GORDON PLLC
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)

OF COUNSEL:
Fran Baskin, Esquire
MICHAEL A. GORDON PLLC
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)

June 3, 2008

# TABLE OF CONTENTS

TIP TOP'S MOTION FOR SUMMARY JUDGMENT ON THE ADMINISTRATIVE RECORD 1

NATURE OF THE CASE 1

ISSUES PRESENTED 2

SUMMARY OF THE ARGUMENT 2

FACTUAL BACKGROUND 4

A. General Overview 4

B. The IFB Bid Bond and Schedule Requirements 4

C. Tip Top's Low Bid and Bid Bond 5

D. Actions Preceding FHWA's Rejection of the Bond 6

E. Post-Rejection Correspondence 8

F. Proceedings Before the GAO 9

G. The Override Decision to Award and Suspension of Performance 12

LEGAL ARGUMENT 13

I. Standard of Review 13

II. FWHA's Failure to Afford ECS an Opportunity to Respond to its Concerns or to Submit a Substitute Bid Bond Prior To Rejection Violated Federal Law 14

A. Bid Bond and Bid Guarantee Requirements 14

B. The FHWA's Sole Basis for Rejection was a Matter of Responsibility 16

III. FWHA's Contemporaneous Basis for Rejection was Unreasonable 20

A. Previously Mined, Above Ground Coal is not a "Speculative" Asset 20

B. FHWA's Post-Hoc Reasons for Rejecting Mined Coal are Unjustifiable 21

C. The GAO's Post-Hoc Rationale is Irrelevant and Incorrect 23

1. Only Cash Assets are Subject to the "Escrow Account" Requirements 24

2. The GAO's Position Violates Principles of Regulatory Construction 25

3. There is no "Escrow" Requirement for Mined Coal 27

IV. Tip Top Has Been Competitively Prejudiced 28

V. Tip Top Has Met the Other Elements for Injunctive Relief 29

CONCLUSION AND REQUEST FOR RELIEF 29

**COURT CASES**


Ace-Federal Reporters, Inc. v. Federal Energy Regulatory Commission, 732 F. Supp. 10, 13 (D.D.C. 1990) 28

A&D Fire Protection v. United States, 72 Fed. Cl. 126, 138, fn. 13 (2006) 15

Aeroplate Corp v. United States, 67 Fed. Cl. 1, 8 (2005) 13, 15

All Seasons Construction, Inc. v. United States, 55 Fed. Cl. 175 (2003) 13

Chas. H. Tompkins Co. v. United States, 43 Fed. Cl. 716 (1999) 14

District of Columbia v. United States, 67 Fed. Cl. 292, 327-28 (2005) 26

Hawaiian Dredging Construction Co., Inc. v. United States, 59 Fed. Cl. 305, 308, 317 (2004) 13, 15, 28

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001) 14, 28

Norfolk Dredging, Co. Inc. v. United States, 58 Fed. Cl. 167, 184-85 (2003); 28

OMV Medical Inc. v. United States, 219 F.3d 1337, 1343-44 (Fed. Cir. 2000) 14

SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) 13

Shader Contractors v. United States, 276 F.2d 1, 6 (Ct. Cl. 1960) 21


**ADMINISTRATIVE CASES**


Advance Building Maintenance Co., B-176849, Jan. 2, 1973, 79-2 CPD ¶72 14, 18

Altex Enterprises, Inc., 67 Comp. Gen. 184, B-228200, January 6, 1988, 88-1 CPD ¶7 23

Astro Painting Company, B-247922-.2, June 19, 1992, 92-1 CPD ¶535 19

| | |
|---|---|
| Bundick Enterprises, Inc., 70 Comp. Gen. 94, B-239867-.2, November 19, 1990, 98-2 CPD ¶402 | 18 |
| Burtch Construction, B-240695, B-240696, Nov. 23, 1990, 90-2 CPD ¶423 | 15 |
| D.M. Potts Corporation , B-231855, Nov. 4, 1988, 88-2 CPD ¶440 | 16, 17 |
| E.C. Development, Inc., B-231523, Sept. 26, 1988, 88-2 CPD ¶285 | 15, 16, 17 |
| Gene Quigley, Jr., 70 Comp. Gen. 273, B-241565, February 19, 1991, 91-2 CPD ¶182 | passim |
| Gulf & Texas Trading Co., B-253991-.2, Jan. 24, 1994, 94-1 CPD ¶31 | 19 |
| Jay Jackson & Associates, B-271236-.3, Sept. 10, 1996, 96-2 CPD ¶111 | 16, 19 |
| Noslot Pest Control, Inc., B-234290, 68 C.G. 396, April 20, 1989, 89-1 CPD ¶396; | 14 |
| Pamfilis Painting, Inc., B-247922, June 15, 1992, 92-1 CPD ¶521 | 19 |
| R.C. Benson & Sons, Inc., B-240251.2, July 31, 1990, 90-2 CPD ¶92 | 14 |
| Secretary of the Army, 52 Comp. Gen. 184, Oct. 10, 1972, B-176392, 1972 CPD ¶87 | 14 |
| Transcontinental Enterprises, Inc., 66 Comp. Gen. 549, B-225802, July 1, 1987, 87-2 CPD ¶3 | 14, 18 |
| U.S. Floors, Inc., B-241552, B-241555, February 6, 1991, 91-1 CPD ¶130 | 18 |

**STATUTES AND REGULATIONS**

| | |
|---|---|
| 5 U.S.C. §706(2)(A) | 13 |
| 28 U.S.C. §1491(b)(1) | 13 |
| 31 U.S.C. §3111 | 14 |

31 U.S.C. §3553 9, 10

41 U.S.C. §253(a)(2) 14

41 U.S.C. §253b(c) 14

FAR §28.203-1(b) passim

FAR §28.203-2(a) 27, 29

FAR §28.203-2(c) passim

FAR §28.203-4 passim

FAR §28.203-2(b) passim

FAR §28.203-5 11

**COURT RULES**

COFC Rule 52.1 13, 14

**TREATISES**

Article 9 of the Uniform Commercial Code 5, 6, 23

Black's Law Dictionary, (6th ed.1990), p. 144, 995, 1357 22, 25

Black's Law Dictionary, (8th ed. 2004) p. 18 21, 25

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TIP TOP CONSTRUCTION, INC. Plaintiff, | ) | |
| | ) | No. 08-352C |
| v. | ) | Judge Lynn J. Bush |
| | ) | |
| THE UNITED STATES, Defendant. | ) | |

TIP TOP'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Pursuant to Rule 52.1 of the United States Court of Federal Claims ("COFC"), Plaintiff, Tip Top Construction, Inc. ("Tip Top") respectfully moves this Court for Judgment on the Administrative Record in favor of Tip Top. In support of this motion, Tip Top relies on its Statement of Facts and the Administrative Record ("AR").

NATURE OF THE CASE

Tip Top, the low bidder, was unreasonably eliminated from the competition by the Federal Highway Administration ("FHWA") due to FHWA's rejection of an asset that was pledged by Tip Top's individual surety to back up an otherwise facially compliant bid bond. Issues dealing with the pledged asset — here, previously mined, readily marketable coal — are a matter of responsibility, not responsiveness, and can be resolved prior to award. Yet, FHWA rejected Tip Top's low bid without first investigating the asset, or providing an opportunity to either resolve any concerns or substitute an acceptable asset. FHWA's contemporaneous position that any support for the bond after bid opening would be "untimely" or a "violation of procurement law" has no basis. FWHA's actions were an unreasonable abdication and abuse of discretion.

Further, mined coal is readily marketable, meeting the FAR standard for acceptability. The FWHA's contemporaneous reason for rejection of this asset was unreasonable, as were the post-hoc rationales.

## ISSUES PRESENTED

1. Whether the FHWA's elimination of Tip Top's low bid based on the alleged unacceptability of the mined coal pledged in its bid bond, without first investigating the asset, and providing an opportunity to either resolve any concerns or substitute an acceptable asset under FAR §28.203-4, was unreasonable and/or in violation of law?
2. Whether mined coal met the standard for acceptability under FAR §28.203-2?

## SUMMARY OF THE ARGUMENT

Federal agencies are still required to obtain a bid bond or guarantee for construction contracts. The ostensible purpose is to protect the Government against the possibility that the low bidder will refuse to execute a contract and/or to execute performance and payment bonds. Because of the importance of retaining the low bid for the actual work being procured, the Government Accountability Office ("GAO") and this Court have interpreted the requirements relating to the responsiveness of the bid bond very narrowly. If the surety has agreed to be liable for the required penal amount on the face of the Standard Form ("SF") 24, the bid bond is responsive. All other requirements relating to the bid bond in the SF 28, including those relating to the acceptability of the asset pledged to back up the bid bond, are matters of the surety's financial responsibility.

Thus, before rejection of the bond and the low bidder's elimination, agencies must provide an opportunity for the low bidder to resolve any responsibility concerns and/or to allow the substitution of an acceptable asset under FAR §28.203-4.

The contemporaneous evaluation record shows that without any investigation of the asset, FHWA held the unreasonable belief that “marketable coal” that had been pledged to back up the bond was an unacceptable because it was “specifically excluded” under FAR 28.203-2(c)(7) as “speculative assets (e.g. “mineral rights.)” FWHA rejected the bid bond and eliminated Tip Top without providing any opportunity to address its concerns. Indeed, the FHWA slammed the door shut on considering any support for the bid bond based on a claim that such support would be “untimely” and prohibited under non-existent “procurement regulations.”

Tip Top has suffered competitive prejudice. Had FHWA provided Tip Top and its surety, Edmund C. Scarborough (“ECS”) the above required opportunities, and if ECS was unable to resolve any concerns FHWA might have raised, ECS could and would have submitted an acceptable substitute asset. But for FHWA’s violation of federal law, Tip Top would have won the award as the low, responsive responsible bidder.

Further, the sole basis FHWA asserted at the time of rejection of the asset and elimination of Tip Top is patently unreasonable. The asset pledged, mined coal, like mined gold, is a readily marketable commodity and by definition, is not speculative like a mineral right. FHWA’s later post-hoc comparisons or concerns with this asset are legally irrelevant, have no merit and were not even adopted by the GAO.

Likewise, the GAO’s own post-hoc claim that an “escrow account” is “indispensable” and its absence therefore justified FWHA’s rejection is also legally irrelevant and incorrect. Moreover, none of these post-hoc rationales justify rejection without first providing an opportunity to address them or substitute an asset.

In sum, FHWA's rejection of Tip Top's low bid, and the consequent loss of $1.4 million to the taxpayer, is in violation of law and was an abdication and abuse of discretion. Tip Tip's request for injunctive relief should be granted.

## FACTUAL BACKGROUND

### A. General Overview

On November 1, 2007, the FHWA issued an Invitation for Bids No. DTFH71-08-B-00002 ("IFB") for construction of a five-leg roundabout, and related work, on the island of St. John. AR 1.[1] Tip Top is a federal construction contractor with 19 years of relevant experience. Tip Top won the Biennial DOT award for Excellence in Highway Design with a merit in Historic Preservation and recently performed work for FHWA on the Eastern Federal Lands projects and won awards. AR 565-66. Based on its successful experience with similar projects, Tip Top elected to bid on this project.

### B. The IFB Bid Bond and Schedule Requirements

The IFB required a bid bond in an amount equaling 20% of the bid price or $3 million. AR 23. Sureties had to sign a SF 24, OMB Bid Bond form, OMB 9000-0045, which when signed, made them liable for the amount of the bond. AR 34-35.

Instruction 4(b) at page 2, of the bid bond at issue, specifically recognizes that individual sureties may provide a bid bond and states:

> "(b) Where individual sureties are involved, a completed Affidavit of Individual surety [sic] (Standard Form 28), for each individual surety, shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability." AR 35.

[1] References to the Administrative Record are cited as "AR."

SF 28, Affidavit of Individual Surety, is a one-page form that requires the individual surety to provide identifying and contact information (Blocks 1 – 6), to state the assets being pledged, and describe the escrow account (Block 7), to identify any encumbrances on the pledged asset (Block 8), to identify all bonds for which the subject assets have been pledged within the past three years (Block 9), to sign (Block 10), to identify the bond and contract to which the affidavit relates (Block 11), and to provide a notary signature/seal (block 12) and include a Certificate of Pledged Assets (here, to cover $1.8 million). AR 229-30.

This Certificate of Pledged Assets included a certification that the surety (a) has good title, (b) has pledged assets free from liens or prior pledges, (c) has full authority to transfer the assets as collateral in support of the bond, (d) will not assign the rights to the pledged assets during the term of the agreement, and (e) is giving the Government full rights as a secured party pursuant to Article 9 of the Uniform Commercial Code ("UCC") to redeem the asset and sell it if the Principal refuses to execute the contract or furnish performance and payment bonds and, upon notice and demand to the surety, the surety is not able or willing to meet its financial obligations. AR 230-32.

The IFB also required the bidders to submit a price and a schedule. AR 22. The maximum schedule for performance of the construction work was 675 days. Id.

C. Tip Top's Low Bid and Bid Bond

Tip Top timely submitted a bid to perform the project. AR 219-32. It was the lowest bid received, being $1.4 million lower than the next bid. AR 218.

Tip Top's bid bond was furnished by ECS. His Attorney-in-Fact, who he authorized in writing, signed the Bid Bond and furnished the affidavit on an SF 28.

ECS's SF 28 identified the asset pledged by means of incorporating by reference an attached and individually numbered Certificate of Pledged Assets. ECS affirmed that there were no mortgages, liens, judgments or any other encumbrances involving the pledged assets. In Block 9, ECS unequivocally stated that "[n]o other Bonds have been pledged to the allocated portion of the assets which are the subject of the attached Certificate of Pledged Assets." The affidavit was sworn to, executed and notarized. AR 227-32.

In the Certificate of Pledged Assets, ECS specifically identified the pledged asset, and provided the legal metes and bounds description of the land on which the "allocated portion of $191,350,000.00 of previously mined, extracted, stockpiled and marketable coal" is located, land which ECS owns outright. ECS also identified the bond number, amount of the asset pledged, which amount is sufficient to cover the penal amount of the bond, Principal (Tip Top), Obligee (FHWA), and the Project. Id.

ECS also notified FHWA that the Government had the rights of a secured party pursuant to Article 9 of the Uniform Commercial Code ("UCC"). This established the Government's required security interest in the asset. Id.

D. Actions Preceding FHWA's Rejection of the Bond

After the bids were opened on January 10, 2008, and it was determined that Tip Top had submitted the low bid by approximately $1.4 million, the Highway Program Manager reviewed the bid. AR 218. On January 24, 2008, he sent the Contracting Specialist, Peggy Shaad, an e-mail stating in pertinent part:

> "You indicate the possibility of allowing the contractor by CPM (Critical Path Method diagram) to show how he will complete the project in the allotted time. This will enable us to see what was considered in the bid.

* * *

> There is <u>some benefit for DPW</u> to award, <u>because of the bid price</u>; however we are concerned that the contractor (a) did not consider the utilities work and the strict MOT (maintenance of traffic) phasing in his bid <u>or</u> (b) that he did consider this and realized <u>that this may be the window to win a bid</u>, expecting additional time for delays through all the coordination that is expected. I know that we never expect to have delays to amount to over 300 days, however, the contractor <u>has showed an ability to read and interpret his contracts to suit his goals</u>." (Emphasis and parenthetical added). AR 558.

By e-mail dated January 28, 2008, FHWA directed that Tip Top submit a CPM to show its capability to perform within its 300-day proposed schedule. Neither Tip Top's price nor its bid bond was mentioned as an issue:

> "In order to determine if your proposed days are consistent with these requirements, the EFLHD is directing you to provide a construction schedule (CPM) with a written explanation of how you will perform the work within the limitations of the contract and specifically how you plan to accomplish this project in the short time frame with the heavy volume of traffic. Please be aware, if your bid is accepted, the calendar days in your bid package becomes the required period for contract performance of this project, and any performance past that time will result in liquidated damages per day being charged to your company. Please provide your schedule within 5 business days of your receipt of this notice." AR 327-28.

Tip Top retained a CPM consultant and incurred substantial expenses in drafting a preliminary CPM which was submitted to FHWA. AR 265-87. On February 11, 2008, FHWA sent more questions to Tip Top about its crew size and workday schedule and asked for a construction schedule listing the sequence of work in the Critical Path. AR 322.

Tip Top said it would answer the questions but that it would not spend additional significant resources to produce a final CPM before award, noting that the preliminary CPM was sufficient to support Tip Top's schedule. AR 288, 573. On February 14, 2008, Tip Top provided the additional information. AR 288.

On the morning of February 19, 2008, the FHWA Contracting Officer ("CO") sent Tip Top's February 14, 2008 responses to the field. Id. Later that day, she rejected Tip Top's bid bond "because it does not meet the requirements of an Individual Surety" and eliminated Tip Top from the competition. Nothing in the record indicates that FHWA conducted any research into the assets pledged to support the bond. The CO's sole basis for rejection was that "[s]peculative assets-- which would include marketable coal—are specifically excluded by Subsection 28-203(c)(7)." AR 233.

E. Post-Rejection Correspondence

On February 20, 2008, Tip Top advised the CO that he had used the same surety on FWHA's Eastern Lands project with no problems. Tip Top further stated that the performance and payment bonds would be issued by a corporate surety which was a treasury listed company. Finally, Tip Top asked that it be allowed an opportunity to clarify the listed assets:

> "The bid bond entity has other marketable assets including cash in addition to what you reference as a deficiency in your letter." AR 565; see also AR 567-68.

On February 21, 2008, ECS, by counsel, pointed out that using standard legal dictionary definitions, "previously mined, extracted, stockpiled, marketable coal" was not a "mineral right" or "speculative." ECS provided additional legal and factual support for the bond and asset and offered to provide assays of the mined coal, the most recent "spot price," and any other information to support the quality and value of the coal. AR 260-62.

By letter dated February 26, 2008, the CO rejected further consideration of its rejection decision because it would be "untimely, and it would be a violation of the procurement regulations to accept support of a bid bond at this time." AR 262.

The CO claimed for the first time that "no proof of value" was submitted with the bond. She also disagreed with ECS's view of the acceptability of mined coal, stating:

> "In our analysis, the asset listed in this instance — mined but not marketed coal — is closer in similarity to a corporate asset, speculative asset, or accounts receivable, than it is to cash, certificates of deposit, or U.S. Government securities. In any case, the determination of which category the asset belongs to the Contracting Officer – as stated in FAR Section 28.203, "The contracting officer shall determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation." (Emphasis added).

The CO then stated that since she had determined that there was no individual surety in support of Tip Top's bid guarantee, and no exceptions applied, she was required to make a finding of "non-responsibility" and eliminate Tip Top. AR 233.

On February 29, 2008, Tip Top filed a protest at the GAO. AR 234-35. This protest sought a stay of award pursuant to the Competition in Contracting Act ("CICA"), 31 U.S.C. §3553(c). AR 235. On March 3, 2008, Tip Top filed a supplemental protest to the GAO. Attached was ECS's February 29, 2008 letter. AR 579-84. It indicated that FHWA had accepted other ECS assets on two contracts, AR 584. Included was a list of contracts in which ECS coal assets had been accepted by other federal agencies. AR 585.

F. Proceedings Before the GAO

On March 26, 2008, FHWA submitted its report to the GAO. The FHWA argued that the asset, which she now called "mined but not marketed coal" was "speculative" because (a) the actual value could not be known until a sale took place, (b) the price of coal would "vary" with the quality of the coal and market fluctuations, and (c) there was an additional burden to secure or liquidate the asset "since liquidation depends on identifying a willing and responsible buyer." In response to ECS's letter, she then argued that mined coal was more like a "mineral right" even though above ground:

> "But my analysis is "mineral rights" includes the right to sell coal after it is mined, and the asset is still speculative as to liquidity and value." AR 243.

The CO also claimed for the first time that there was no "independent" confirmation of each certified representation in the SF 28 and Certificate of Pledged Assets, and that nothing bound the assets except the "word of the "Individual Surety"." She pointed out that the assets:

> "… were not even held by a third party but sat on Mr. Scarborough's land. Therefore, not only the nature of the asset, but the absence of a valid security interest caused me to reject it as speculative and therefore unacceptable." AR 244.

Ultimately, though, she stated:

> "However, even if an independent proof of value and ownership had been provided, the asset would still be speculative as to be unacceptable because of the liquidity as stated previously." Id.

The CO indicated that she had had been unable to find ECS's bonds for FHWA contracts. She indicated that "within their memory," no one at FHWA had accepted bonds from an "Individual Surety." Id.

On April 9, 2008, the GAO allowed ECS to submit comments. AR 304. That same day, FHWA's counsel complained to the GAO that ECS's submission would somehow put a "significant burden on the Government regarding award of the Project…." AR 305. The GAO attorney was unaware of the burden but assured FHWA that he was already writing his decision. AR 306. (Emphasis added.)

Shortly after, counsel for FHWA immediately advised that FHWA had:

> "…. gotten agreement from the proposed awardee to extend the availability of its bid through April 16. If the Agency has not received a Decision from the Comptroller General by that date, the Agency will have to consider whether to authorize award prior to a Decision, per 31 USC 3553. I would recommend a conference call on the morning of the 16th." AR 308.

After this exchange, on April 9, 2008, Tip Top submitted comments that refuted each of FHWA's excuses and included numerous exhibits supporting the value and ready marketability of the coal. AR 310-81. Tip Top also noted that the CO had failed to provide an opportunity to resolve her concerns or submit a substitute bid bond under FAR §28.203-4. AR 319.

On April 10, 2008, FHWA sent another e-mail to GAO pressing for a quick decision. AR 384. The GAO attempted to comply. On April 11, 2008, a telephone "outcome determination" conference was held. AR 388. During the call, the GAO attorney accepted for purposes of argument that pledged coal was readily marketable but claimed it did not matter. While not adopting any of FHWA's arguments, he stated his informal view that the term "personal property" in FAR §28.203-2(c)(4) was intended to mean any asset that was not "real property," and therefore, that all personal property not specifically listed in FAR §28.203-2(b), was unacceptable per se.

Although the GAO attorney apparently had not reviewed the IFB or regulations in detail, he also stated that substitution of assets under FAR §28.203-4 was inapplicable because it only covered post-award substitutions. His proof was that FAR §28.203-5, the next regulation after FAR §28.203-4, involved the release of the bond.

On April 11, 2008, Tip Top wrote to the FHWA and again asked whether it would consider a substitute bond. If not, Tip Top asked whether the FHWA intended to issue an override and if so, to furnish the override decision. AR 564. No response was received.

On April 14, 2008, Tip Top and ECS submitted detailed comments opposing the GAO's initial views. AR 521-27. ECS, through counsel, explained again why its coal was readily marketable and why the security interest provided was valid. AR 391-519.

ECS indicated that it would have furnished another acceptable asset as a substitute asset had it been unable to resolve FHWA's concerns. AR 418.

G. The Override Decision to Award and Suspension of Performance

On April 16, 2008, FHWA notified the GAO that an override of the CICA stay had been issued. FHWA's "urgent and compelling" reasons were:

> "… the need for the project and the fact that the bids—which have been extended twice—will lapse after today. In addition, the Comptroller General's decision is unlikely to be issued until the end of next week because of the late and extensive filings by the Protester—despite of the efforts of the Comptroller General's efforts to narrow the focus of the protest during the conference call last week." AR 562.

However, apparently aware that these so-called "urgent and compelling" reasons were legally inadequate, the FHWA attorney limited the override to making an award to the higher priced bidder and suspended performance of the contract until the GAO's decision was issued, which FHWA somehow knew would be issued shortly. AR 545.

On April 21, 2008, ECS submitted a declaration from a coal industry expert in support of its position. AR 547-51.

On May 5, 2008, more than a month before the GAO's statutory deadline of June 9, 2008, the GAO issued its formal decision denying the protest. AR 553-57. The GAO changed its theory, now claiming that mined coal was unacceptable because it could not be physically placed in an escrow account as supposedly required by FAR §28.203-1(b). The GAO also claimed that an agency could reject a bid bond without allowing a request for substitution of an asset under FAR §28.203-4 since the obligation to attempt to resolve concerns with the bond only extended to "minor" defects. AR 552-57. This action followed.

## LEGAL ARGUMENT

I. Standard of Review

The standard of review for granting relief in a bid protest case under 28 U.S.C. §1491(b)(1) and 5 U.S.C. §706(2)(A) is whether the agency actions under protest are arbitrary, capricious, and abuse of discretion or otherwise not in accordance with law. Aeroplate Corp. v. United States, 67 Fed. Cl. 4, 8 (2005); Hawaiian Dredging Construction Co., Inc. v. United States, 59 Fed. Cl. 305, 308 (2004).

Under this Court's review, only the FHWA's contemporaneous decision for rejecting Tip Top's bid — that mined coal was "specifically excluded" as an unacceptable "speculative assets (e.g. "mineral rights)", under FAR 28.203-2(c)(7) -- is at issue. In SEC v. Chenery Corp., 332 U.S. 194, 196 (1947), the Supreme Court stated:

> "[A] reviewing court in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.")

In All Seasons Construction, Inc. v. United States, 55 Fed. Cl. 175, 177, fn. 1 (2003), following Chenery, this Court reiterated that point, stating that the same rule applied to the GAO's post-hoc views :

> "It is the agency's decision, not the decision of the GAO that is subject to judicial review. Chas. H. Tompkins Co. v. United States, 43 Fed. Cl. 716 (1999). Although the GAO upheld the agency's decision on grounds not asserted by the contracting officer ("CO"), this Court lacks authority to uphold an agency action on grounds not considered by the agency. OMV Medical Inc. v. United States, 219 F.3d 1337, 1343-44 (Fed. Cir. 2000). Thus, the Court will confine its review to the CO's conclusion that a photocopied power of attorney rendered the bid non-responsive." (Emphasis added).

Prejudice is an essential element of every protest action. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001). Tip Top has established this element.

But for FHWA's improper refusal to allow Tip Top and ECS the opportunity either resolve the agency's concerns with the asset or to provide a substitute asset before rejecting the bid bond and eliminating Tip Top from the competition, Tip Top, as the low responsive, responsible bidder, would have had a substantial chance to win this contract.

The other factors, comparative harm and the public interest, strongly favor injunctive relief. Tip Top's motion for judgment on the administrative record under COFC Rule 52.1 should be granted.

## II. FHWA's Failure to Afford ECS an Opportunity to Respond to its Concerns or to Submit a Substitute Bond Prior to Rejection Violated Federal Law

### A. Bid Bond and Bid Guarantee Requirements

This contract was awarded under an IFB, i.e. it was a sealed bid procurement. When procuring a contract using sealed bids, the Competition in Contracting Act ("CICA") requires an agency to award to the lowest priced, responsive, responsible bidder. 41 U.S.C. §253(a)(2); 41 U.S.C. §253b(c).

To protect the Government's interest in the low bid for this federal construction contract over $100,000, under the Miller Act, 31 U.S.C. §3111 et seq., contractors were required to submit a bid bond.

A bid bond is insurance furnished by a surety or the bidder that the agency will receive a set amount if the low bidder does not to execute the contract or supply performance and payment bonds. Noslot Pest Control, Inc., B-234290, 68 C.G. 396, April 20, 1989, 89-1 CPD ¶396.

The GAO has long held that responsiveness relating to the bid bond is limited to whether the surety is facially liable for the penal amount of the bond. See Secretary of the Army, 52 Comp. Gen. 184, Oct. 10, 1972, B-176392, 1972 CPD ¶87; accord Advance Building Maintenance Co., B-176849, Jan. 2, 1973, 79-2 CPD ¶72. In Transcontinental Enterprises, Inc., 66 Comp. Gen. 549, B-225802, July 1, 1987, 87-2 CPD ¶3, the GAO stated:

> "The sufficiency of a bid guarantee depends on whether a surety is clearly bound by its terms. When the liability of the surety is not clear, the guarantee properly may be regarded as defective and the bid rejected as nonresponsive."

This Court follows this rule. Aeroplate; supra (facially compliant bid bond improperly rejected); accord Hawaiian Dredging, supra; see A&D Fire Protection v. United States, 72 Fed. Cl. 126, 138, fn. 13 (2006).

In Gene Quigley, Jr., 70 Comp. Gen. 273, B-241565, Feb. 19, 1991, 91-2 CPD ¶182, the GAO distinguished between facial responsiveness of the bid bond based on the SF 24, and the surety's financial responsibility based on defects and other issues relating to the SF 28:

> "… On the other hand, the SF 28 and related supporting documentation, such as the certificates of title and pledges of assets, serve solely as an aid in determining the responsibility of an individual surety. FAR §28.203(c); Burtch Constr., B-240695; B-240696, Nov. 23, 1990, 90-2 CPD ¶423; E.C. Development, Inc., B-231523, Sept. 26, 1988, 88-2 CPD ¶285. Consequently, uncertainties or defects in these documents do not warrant the automatic rejection of a bidder. Norse Inc., B-233534, Mar. 22, 1989, 89-1 CPD ¶293. This is so because information bearing on responsibility may generally be provided at any time prior to award. Burtch Constr., B-240695; B-240696, supra. For example, we have expressly found a bid may not be rejected because it did not include the pledge of assets. Id.; R.C. Benson & Sons, Inc., B-240251.2, July 31, 1990, 90-2 CPD ¶92. An inflexible policy that permits an agency to automatically reject bidders because of uncertainties relating to their sureties' pledged assets is tantamount to converting that which is clearly a matter of responsibility to a matter of bid responsiveness. E.C. Development, B-231523, supra." (Emphasis added).

Before rejecting a low bid based on the bond of an individual surety, the Contracting Officer is obligated to investigate the financial acceptability of the individual surety under FAR §28.202-3. E.C. Development, supra; D.M. Potts Corporation, B-231855, Nov. 4, 1988, 88-2 CPD ¶440. This obligation is reflected in the IFB, p. J-2, which states in pertinent part:

> "…the CO may, after reviewing the affidavit of the individual surety and documentary information on the security interest and the assets pledged, by certified mail, to the surety's business or resident address (as shown on the bond) request the surety to provide further information and/or documents with respect to any of the documents provided. The CO may require such information to be furnished under oath. Failure of the surety to accept such mail or failure of the surety to respond with the requested information or documents within 7 business days of receipt of the request, will be cause for rejection of the surety." AR 61.

Individual surety financial responsibility issues requiring investigation and an opportunity to resolve include concerns relating to the acceptability of the assets. Id. No assets are per se unacceptable. Indeed, in Jay Jackson & Associates, B-271236-.3, Sept. 10, 1996, 96-2 CPD ¶111, the GAO upheld an agency's rejection of a mineral right, an otherwise unacceptable asset in FAR §28.203-2(c)(7), but only after holding that an investigation was necessary and that the agency requested but did not receive sufficient support from the surety and bidder.

As discussed below, FHWA's refusal to seek or even consider any support for the bid bond under an incorrect belief that any such support would be "untimely" or "prohibited by procurement regulations" confused responsiveness with responsibility requirements. AR 263. This resulted in an abdication and abuse of discretion.

B. The FHWA's Sole Basis for Rejection was a Matter of Responsibility

Tip Top was the low bidder by $1.4 million. AR 218. However, without any questioning of Tip Top or ECS, the FHWA rejected the bid bond and eliminated Tip Top.

Only one reason was given:

> "Speculative assets -- which would include marketable coal—are specifically excluded by Subsection 28-203(c)(7)." (Emphasis added), AR 233.

FHWA thus admitted that the coal was "marketable" but took the position that coal was somehow "specifically excluded" by the cited regulation. Nothing in the AR indicates that the CO made any inquiry other than a post-hoc claim that legal counsel was consulted, apparently orally. AR 243.

Later, before the GAO, after offering a number of post-hoc "concerns", the CO stated with respect to her sole reason for the rejection:

> "… But my analysis is "mineral rights" includes the right to sell coal after it is mined, and the asset is still speculative as to liquidity and value." Id.

Apparently realizing that her other post-hoc concerns regarding value and ownership were without a basis legally or factually, she stated:

> "However, even if an independent proof of value and ownership had been provided, the asset would still be speculative as to be unacceptable because of the liquidity as stated previously." (Emphasis added). AR 244.

Thus, the only basis for the CO's rejection was that "mined but not marketed coal" (a new FHWA term coined to avoid the admission in her rejection letter that the coal was "marketable") was "speculative" as to "liquidity." Apparently for mined coal to meet FHWA's "liquidity" standard, it had to be sold first or it would be "speculative."

Notwithstanding the lack of merit of this post-hoc reasoning, addressed below, the CO's sole basis for rejection of the bid bond related to a matter involving ECS's pledge of assets on the SF 28--the liquidity of the asset-- and not to the surety's facial liability on the bond on the SF 24. Thus, her concern was a matter of the surety's responsibility and the rejection without inquiry was improper. E.C. Development; D.M. Potts, supra.

FHWA's refusal to inquire or investigate was particularly unreasonable here. FHWA and other agencies had accepted ECS bonds. AR 579-84. FHWA knew that Tip Top was a reputable contractor from its FHWA contracts, AR 566, and from Tip Top's CPM which that Tip Top intended to and could perform within its schedule. AR 265-288, 321, 558. The risk of Tip Top not executing the contract or submitting performance and payment bonds was minimal compared with the certain loss of $1.4 million. AR 218.

Even if FHWA believed after that inquiry that ECS would be unable to satisfy its concerns with the mined coal asset, to attempt to preserve the low bid, the CO was required to afford ECS the opportunity to submit an acceptable substitute asset.

FAR §28.203-4, entitled "Substitution of Assets" states:

> "An individual surety may request the Government to accept a substitute asset for that currently pledged by submitting a written request to the responsible contracting officer. The contracting officer may agree to the substitution of assets upon determination, after consultation with legal counsel, that the substitute assets to be pledged are adequate to protect the outstanding bond or guarantee obligations. If acceptable, the substitute assets shall be pledged as provided for in subpart 28.2."

This regulation was an outgrowth of longstanding practice of accepting other assets in support of a surety's financial responsibility when the assets pledged were questioned. Advance Building; supra; accord Transcontinental; supra.

In U.S. Floors, Inc., B-241552, B-241555, Feb. 6, 1991, 91-1 CPD ¶130, after a protest alleged that there were deficiencies in the awardee's bid bond, the awardee's surety requested that certain personal property and real estate that had been originally pledged (which were unacceptable) be substituted with a certificate of deposit. The GAO rejected the protester's position that the initial unacceptable pledged assets required rejection of the bid bond, stating:

> "… FAR §28.203-4 specifically permits the contracting officer to agree to a surety's substitution of assets for those originally pledged after determining that the substitute assets to be pledged are adequate to protect the outstanding bond or guarantee obligation. (footnote omitted). Hence, we find that the sureties' initial failure to submit a pledge of assets, as well as the other documentation noted by USF, and the fact that a substitution of assets by the surety Brent D. Butcher was permitted, had no effect on the acceptability of the Butcher bid."

Gulf & Texas Trading Co., B-253991-.2, Jan. 24, 1994, 94-1 CPD ¶31 (substitution requested upon determination that initial asset was unacceptable); Bundick Enterprises, Inc., 70 Comp. Gen. 94, B-239867-.2, Nov. 19, 1990, 90-2 CPD ¶402 (regulation means substitution is permitted for assets pledged).

In Jay Jackson; supra, the GAO, while not citing the regulation stated:

> "Since these matters concern bidder responsibility, absent any evidence that sureties lacked integrity or credibility, the agency should give the bidder the opportunity to have his sureties provide satisfactory explanations or pledge sufficient and acceptable assets…." (Emphasis added)

Accord Pamfilis Painting, Inc., B-247922, June 15, 1992, 92-1 CPD ¶521; Gene Quigley; Astro Painting Company, B-247922-.2, June 19, 1992, 92-1 CPD ¶535. As stated in Gene Quigley:

> "On matters of responsibility that are susceptible to reasonable resolution, the contracting officer should ordinarily solicit and consider information on the issue before proceeding to award (citations omitted)."

A regulation expressly authorizing the substitution of another acceptable asset falls within the category of matters susceptible of "reasonable resolution."

Yet, after Tip Top advised the FWHA on the day after rejection of the bid that the surety had other assets available, AR 564, FHWA's response was to slam the door, stating that anything submitted in support of the bid bond would be "untimely" and "prohibited by procurement regulations." AR 263. FHWA did not then provide, and has never provided any authority for this position.

Later, after ECS and Tip Top again offered to submit an acceptable substitute asset, AR 393, 417, 564, FHWA's reaction was to make award based on alleged "urgent and compelling circumstances." AR 562.

The GAO's implication that acceptance of an individual surety's substitution of another acceptable asset is discretionary is incorrect. The regulation states:

> "… The contracting officer may agree to the substitution of assets upon determination, after consultation with legal counsel, that the substitute assets to be pledged are adequate to protect the outstanding bond or guarantee obligations. If acceptable, the substitute assets shall be pledged as provided for in subpart 28.2." (Emphasis added).

Thus, if after a legitimate investigation and inquiry, the CO somehow still considered the mined coal pledged to be "speculative," which conclusion would be unreasonable as explained below, the CO would be required ("shall") to accept an acceptable substitute asset which was and would be offered. AR 565, 417.

## III. FWHA's Contemporaneous Basis for Rejection was Unreasonable

### A. Previously Mined, Above Ground Coal is Not a "Speculative" Asset

In its rejection letter, FHWA stated that mined coal was "marketable," but was unacceptable because "[s]peculative assets-- which would include marketable coal — are specifically excluded by Subsection 28-203(c)(7)." AR 233. FHWA's apparent reasoning, without any factual investigation of the actual asset, was that until a sale of coal was concluded at an exact dollar amount, coal was a "speculative" asset like a "mineral right."

This interpretation of "speculative" is in conflict with the regulations. Acceptable assets like stocks and bonds and real estate, which are not required to be sold, would also be "speculative". See FAR §28.203-2(b)(3)(4).

Further, like the other types of unacceptable assets, an example was given to define the category. The example of a “speculative” asset in the regulation was a “mineral right.” A “mineral right” or “mineral interest” is defined as the “right to search for, develop, and remove minerals from land or to receive a royalty based on the production of minerals.” See Black’s Law Dictionary (8th ed. 2004). Because the value of the minerals is uncertain and intangible until they are mined and above ground where they can be assayed and quantified, mineral interests are considered “speculative.”

In stark contrast, mined coal is an existing, already-mined, tangible, above-ground and stockpiled mineral. This coal has a readily determinable value based on “spot prices” published by the Department of Energy and other industry indices. AR 359-63, 366-81, 458-513, 549-51. Mined coal is therefore “readily marketable,” meeting the standard for acceptability in FAR §28.203-2(a). Indeed, the ability to readily establish a market price is why this coal has been accepted by other federal agencies and why mined coal has been referred to as “readily marketable.” AR 430-31; see Shader Contractors v. United States, 276 F.2d 1, 6 (Ct. Cl. 1960) (finding coal to be readily marketable).

None of the characteristics which make mineral rights “speculative” are present in mined coal. Thus, the FHWA lacked a reasonable basis for finding “marketable coal” to be “specifically excluded” as a “speculative” asset. AR 233.

B. FHWA’s Post-Hoc Reasons for Rejecting Mined Coal are Unjustifiable

The FHWA’s post-hoc attempts to expand the concept of a speculative asset to encompass concerns regarding the ownership, value, liquidity, security interest, and independent confirmation of ECS’s statements must be rejected. Chenery, supra; All Seasons, supra.

But even if FWHA had asserted its post-hoc grounds contemporaneously, none justify rejection of the asset. See AR 315-19, 404-18. ECS's sworn statement that previously mined, extracted, and stockpiled coal was located above-ground on a specific piece of property owned by ECS was confirmed by deeds of ownership and a listing of other federal agencies that had accepted the coal asset. This reasonably established the existence of this asset. AR 432, 514-19.

The assays and professional assessments submitted to the CO after her rejection showed the type, grade and value of the coal at approximately $191 million (as of that date). AR 435-457. This coal could be transported and sold on the active coal market based on the published "spot price" for direct use, further processing or resale. Id. This would have reasonably resolved any legitimate questions as to its liquidity.

The FHWA's post-hoc claim that no "security interest" was provided also has no basis in the regulations. FAR §28.203-1, entitled "Security interests for an Individual Surety," requires a "security interest" in the pledged asset. It provides:

> "(a) An individual surety may be accepted only if a security interest in assets acceptable under 28.203-2 is provided to the Government by the individual surety. The security interest shall be furnished with the bond."

FAR §28.203-1 does not define this security interest. However, Black's Law Dictionary, (6th ed. 1990), p. 1357, defines a security interest as an:

> "… [i]nterest in property resulting from a security agreement. A form of interest in property which provides that the property may be sold on default in order to satisfy in order to satisfy the obligation for which the security interest is given … an interest in personal property (i.e. mined coal) or fixtures which secures payment or performance of an obligation. U.C.C. §2-201(37), 9-102." (Emphasis added).

ECS's affidavit and Certificate of Pledged Assets, ¶3, meets this definition. AR 232. Indeed, "mined coal" is the example given for a personal property security interest.

ECS's security interest is recognized by Article 9, UCC. FHWA could record this security interest by means of a Form UCC-1 (although not required by the UCC to create a security interest).

Finally, the FHWA's post-hoc claims that the "word of the Individual Surety" was inadequate to support the attested value of the coal and its demand for "independent" verification of ECS's ownership appears to question the use of the SF 28 and appears to reflect an unjustified and negative double standard. AR 244.

Individual sureties are authorized to provide bonds and do so primarily for small and small disadvantaged businesses which either cannot afford corporate sureties or for a variety of other reasons, have a difficult time obtaining bonding. It is widely known that the corporate surety bond market has shrunk in the last five years or so to the point that corporate sureties generally are only interested in bonding large contractors.

The SF 28, the form designated in the regulations, does not require additional confirmation of the sworn statements therein. FHWA has accepted ECS bonds in the past and had no basis to question any of the statements in the SF 28. Thus, the apparent doubts about ECS's "word" would appear to be the improper imposition of more onerous standards on an individual surety. See Altex Enterprises, Inc., 67 Comp. Gen. 184, B-228200, January 6, 1988, 88-1 CPD ¶7.

C. The GAO's Post-Hoc Rationale is Irrelevant and Incorrect

The GAO did not adopt any of the FHWA's initial or post-hoc reasons. However, after receiving FHWA pressure to decide the protest, the GAO attorney called for an "outcome determination" conference and contended that mined coal was unacceptable per se because it was not on the list of acceptable assets.

Tip Top and ECS submitted comments showing that the GAO's post-hoc interpretation was legally unsupportable. AR 522-27, 392-404. Faced with these legal arguments, the GAO abandoned its prior view but was unwilling to change its outcome prediction. On May 5, 2008, without providing further opportunity for Tip Top or ECS to comment, the GAO denied the protest, finding a new "indispensable" requirement--that all acceptable personal property assets must be capable of being physically placed in an "escrow account." Because mined coal cannot be physically placed in an "escrow account," the GAO found the asset was unacceptable per se and although the FHWA had not relied on this "requirement," upheld the FHWA's rejection. AR 552-57.

The GAO's new post-hoc theories are legally irrelevant. All Seasons. In any event, as shown below, they are not supported by case law or regulations.

1. Only Cash Assets are Subject to the "Escrow Account" Requirements

FAR §28.203-1(b), which is included as part of the requirement for a security interest, and entitled "Security interests by an individual surety," provides that the value of the pledged asset "may be provided by one or a combination of" methods which include an escrow account and a lien on real property. (Emphasis added). It does not say "shall" or exclude other methods. The word "may" indicates the contrary.

Moreover, the minimum "escrow account" requirements in subparagraphs (b)(1)(i)-(v) show that "escrow accounts" are only required for cash or money assets. FAR §28.203-1(b)(1), omitted from the GAO's decision, provides in pertinent part:

> (1) An escrow account with a federally insured financial institution in the name of the contracting agency. (See 28.203-2(b)(2) with respect to Government securities in book entry form.) Acceptable securities for deposit in escrow are discussed in 28.203-2. While the offeror is responsible for establishing the escrow account, the terms and conditions must be acceptable to the contracting officer. At a minimum, the escrow account shall provide for the following:

> (i) The account must provide the contracting officer the sole and unrestricted right to draw upon all or any part of the funds deposited in the account. A written demand for withdrawal shall be sent to the financial institution by the contracting officer, after obtaining the concurrence of legal counsel, with a copy to the offeror/contractor and to the surety. Within the time period specified in the demand, the financial institution would pay the Government the amount demanded up to the amount on deposit. If any dispute should arise between the Government and the offeror/contractor, the surety, or the subcontractors or suppliers with respect to the offer or contract, the financial institution would be required, unless precluded by order of a court of competent jurisdiction, to disburse monies to the Government as directed by the contracting officer.
>
> (ii) The financial institution would be authorized to release to the individual surety all or part of the balance of the escrow account, including any accrued interest, upon receipt of written authorization from the contracting officer.
>
> * * *
>
> (v) The financial institution would provide periodic account statements to the contracting officer. (Emphasis added).

Subsection (b)(1)(i) refers specifically to "funds deposited in the account . . . ." This means that (1) there must be a bank account which, based on FAR §28.203-1(b)(1), must be in a federally insured financial institution, and (2) funds (i.e., money or cash ) must be deposited in the account. An escrow account is defined in Black's Law Dictionary, (8th ed. 2004), p. 18, as a:

> "… bank account, generally held in the name of depositor and the escrow agent that is returnable to the depositor or to a third person on the fulfillment of specified conditions." (Emphasis added).

In turn, a "bank account" is:

> "[a] sum of money placed with a bank or banker, on deposit, by a customer, and subject to be drawn out on the latter's check . . . ." Black's Law Dictionary, 144 (6th ed. 1990) (Emphasis added).

Subsection (b)(1) states that, in the event of a dispute between the Government and the offeror/contractor, the surety or others:

> "the financial institution would be required … to disburse monies to the Government as directed by the contracting officer." (Emphasis added.)

The next subsection, (b)(1)(ii), also discusses the contents of the account as monies in saying that the "balance of the escrow account, including any accrued interest" must be released under the stated conditions. (Emphasis added.) Subsection (b)(1)(v) then refers to "periodic account statements," showing that the contents of the escrow account are to be cash accruing interest, which accrual is reported in periodic statements. Thus, the only personal property required to be placed in an "escrow account" in FAR §28.203-1(b)(1) is cash. The escrow account defined in subsections FAR §28.203-1(b)(1)(i)-(v) is not applicable to all acceptable personal property.

2. The GAO's Position Violates Principles of Regulatory Construction

Under the GAO's interpretation, this Court would have to accept the illogical conclusion that irrevocable letters of credit, identified as "acceptable" in FAR §28.203-2(b)(5), are also unacceptable because they cannot be physically deposited into an "escrow account" and, thus, do not comply with §(b)(1)(i).

Likewise, the GAO's interpretation would render superfluous the FAR's listing of unacceptable assets, which include various types of personal property, none of which could be placed in an escrow account. See e.g. FAR §28.203-2(c)(4) (jewelry, furs, antiques), FAR §28.203-2(c)(6) (corporate assets, e.g. plant and equipment). If all of these personal property assets were automatically unacceptable because they could not be physically placed in a compliant "escrow account," there would have been no need to list them or the specific examples of each. Such regulatory interpretations are disfavored. See District of Columbia v. United States, 67 Fed. Cl. 292, 327-28 (2005).

The GAO's claim that finding mined coal to be an acceptable asset would "eliminate" the regulatory requirement for an "escrow account" is incorrect. As shown above, the "escrow account" requirements apply only to cash assets and as to those assets, the "escrow account" requirements remain. On the contrary, it is the GAO's imposition of an "escrow account" requirement for cash on otherwise acceptable assets that would undermine and unduly limit the FAR standard for "acceptability."

The FHWA has conceded that the lists of acceptable and unacceptable assets in FAR §28.203-2(b) and (c) are "inclusive" and not exclusive. AR 243. That is why FAR §28.203-2(a), entitled "Acceptability of Assets," sets forth a standard of "acceptability" based on ready marketability instead of stating: "the following assets are the sole acceptable assets." It is also why FAR §28.203-2(b) states: "[a]cceptable assets include-" and FAR §28.203-2 (c) states: "[u]nacceptable assets include but are not limited to – " (Emphasis added).

Given this standard, there is no reasonable basis to graft an "escrow account" requirement for cash onto coal and other commodities.

3. There is no "Escrow" Requirement for Mined Coal

FAR §28.203-1(b)(1) states:

> "Acceptable securities for deposit in escrow are discussed in 28.203-2." (Emphasis added).

This "escrow," to the extent it may be different than the "escrow account" in FAR §28.203-1, applies, if at all, to non-exempt Government securities in FAR §28.203-2(b)(2). Once again, even this escrow is not a requirement for a commodity like mined coal. But even if the FHWA had insisted on some type of "escrow" agreement for mined coal, ECS could have provided an equivalent meeting the essential elements.

The key elements in this "escrow" described in the regulation for Government securities are that (a) the asset be pledged to the agency, (b) the agency be advised of when the security becomes mature, and (c) the proceeds of the asset be held by the escrow agent. Thus, this escrow appears to contemplate that the agent must take additional step not in an "escrow account" requirements which is specifically related to the type of asset – to convert the Government securities to cash.

Here, ECS already had pledged the asset to the agency. AR 232. ECS or the escrow agent could report the coal's "spot prices" to the agency to give notice of its value. AR 502. The pledged coal could have been held in a bonded area. The escrow agent could then have agreed that the proceeds from any sale of the coal be held in its account. This or one of many variations on this arrangement would have fully protected the FHWA's interests in the bid bond, had they been reasonably explored, as required.

IV. Tip Top Has Been Competitively Prejudiced

In violation of federal regulations and case law above, before rejection of the bid bond and Tip Top's elimination, Tip Top and ECS were never given an opportunity to respond to concerns regarding the mined coal pledged or to submit a substitute asset. FHWA improperly and repeatedly slammed the door on considering any support for the bid bond. AR 564-65, 262, 393, 417. However, once either the mined coal ECS pledged is accepted after a reasonable inquiry, or an acceptable substitute asset is accepted, as required, Tip Top will be the low, responsive, responsible bidder by $1.4 million. No basis will exist to deprive Tip Top of the award. See Hawaiian Dredging, supra at p. 317. Thus, but for FHWA's regulatory violations and its abdication and abuse of discretion, Tip Top would have had a substantial chance for the award. Impresa, supra.

III. Tip Top Has Met the Other Elements for Injunctive Relief

The Declaration of Percy J. Hollins, attached to Tip Top's Memorandum of Points and Authorities, Ex. 23, establishes Tip Top's immediate and irreparable harm. Tip Top's ability to retain key personnel, which would involve extensive post-award activities to restore the status quo, will be jeopardized. Further, Tip Top will incur lost profits for a contract to which it is entitled. See Norfolk Dredging, Co. Inc. v. United States, 58 Fed. Cl. 167, 184-85 (2003); Ace-Federal Reporters, Inc. v. Federal Energy Regulatory Commission, 732 F. Supp. 10, 13 (D.D.C. 1990).

The balance of harms strongly favors the granting of injunctive relief. The intended contract to the higher priced bidder is the result of violations of federal laws and regulations. The public has a strong interest in assuring that federal procurements are conducted fairly and correctly. The public also has an interest in assuring that the Government obtains the lowest priced, responsive, responsible bidder which Tip Top represents, and which the FWHA has erroneously ignored.

CONCLUSION AND REQUEST FOR RELIEF

When a bid bond is valid on its face, as is the case here, under case precedent, to preserve the Government's statutory interest in awarding to the low bidder, as part of its responsibility analysis, agencies must explore ways with the low bidder and its surety to resolve any concerns regarding the surety's financial capability, including providing an opportunity to substitute an acceptable assets for that pledged. The FHWA's failure to take this course by refusing to consider any support for the bid bond was in violation of statute and regulation, and an improper abdication and abuse of discretion.

The “acceptability” standard in FAR 28.203-2(a) provides small businesses access to individual sureties who have pledged “readily marketable” assets, and have included a valid security interest. The bid bond regulations for individual sureties should not be construed, as the FHWA and GAO have repeatedly done here, to effectively create “indispensable” responsiveness requirements, unsupported by the language of the regulations or case precedent, that automatically exclude an individual surety’s “readily marketable” assets like mined coal and to improperly refuse to consider the substitution of otherwise acceptable assets.

Accordingly, for the reasons above, Tip Top respectfully requests that the Court grant the injunctive relief requested in Tip Top’s Complaint and order the FHWA to terminate its current award, rescind its decision rejecting Tip Top’s bid bond, either accept the asset pledged after resolving any issues or accept an acceptable substitute asset, and make award to Tip Top, the low priced, responsive, responsible contractor.

Respectfully submitted,
s/ Michael A. Gordon
MICHAEL A. GORDON PLLC
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)
Attorney of Record
for Plaintiff, Tip Top Construction, Inc.

OF COUNSEL:
Fran Baskin, Esquire
MICHAEL A. GORDON PLLC

June 3, 2008