IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TIP TOP CONSTRUCTION, INC. | ) | |
| | ) | |
| Plaintiff, | ) | No. 08-352C |
| | ) | (Judge Bush) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS, CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

AMANDA L. TANTUM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 616-8131
Fax. (202) 514-8624

June 10, 2008

Attorneys for Defendant

# TABLE OF CONTENTS


ISSUES PRESENTED ....................................................................................1

STATEMENT OF THE CASE........................................................................2

I. Nature of the Case......................................................................2

II. Statement of Facts......................................................................2

A. The Invitation For Bids And Bid Opening ....................................2

B. FHWA's Review Of Tip Top's Bid And Bid Bond ........................4

C. Tip Top's GAO Protest ....................................................5

SUMMARY OF ARGUMENT ....................................................................6

ARGUMENT ....................................................................................7

I. The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Claims Because Plaintiff Has Failed To Demonstrate That It Has Suffered Prejudice ....................................................................7

A. Standard Of Review For Motion To Dismiss..................................7

B. Tip Top Did Not Stand A "Substantial Chance" Of Being Selected For Award And Therefore Cannot Demonstrate Prejudice. ....................................................................8

1. The Power Of Attorney....................................................10

2. The Identity Of The Individual Surety..................................11

II The Record Demonstrates That The CO's Decision Was Not Arbitrary, Capricious, Unsupported By Substantial Evidence In The Record Or Contrary To Law ....................................................................12

A. Standard For Motion For Judgment On Administrative Record....................................................................12

B. Standard Of Review For Responsibility Determinations....................12

C. The CO Properly Used Business Judgment To Determine That The Assets Were Unacceptable And That She Required No Additional Information....................................................................13

1. Background Of The Requirements Of FAR 28.203-2 And 28.203-4 ........ 14

2. The Pledged Coal Pile Is Not An Acceptable Asset Under FAR 28.203 ........ 16

3. The CO Had No Duty To Request Or Consider Additional Information Regarding The Assets ........ 19

4. Information Supplied By Tip Top And Mr. Scarborough Demonstrated That The Value And Quality Of The Coal Refuse Was Uncertain And Supported The CO's Initial Determination And Decision Not To Request Additional Information ........ 22

5. Tip Top's Unfounded Claims Of Bad Faith Should Be Rejected ........ 26

III. Tip Top Has Suffered No Prejudice Because It Cannot Demonstrate That It Is Responsible ........ 26

A. The Limited Scope Evaluation Submitted By Tip Top And Mr. Scarborough Demonstrates Conclusively That The Coal Refuse Was Not A Readily Marketable Asset And Tip Top Was Nonresponsible ........ 27

B. The Asset Was Not "Reasonably Identified" In The Certificate Of Pledged Assets ........ 27

C. The Failure To Create An Escrow Account Demonstrates Tip Top's Nonresponsibility ........ 28

D. Tip Top And Mr. Scarborough Ignored The Solicitation's Prohibition Against The Use Of Powers Of Attorney By Individual Sureties ........ 31

E. Ambiguity As To The Identity Of The Surety Makes Tip Top Nonresponsible ........ 32

F. The Certificate of Pledged Assets Places Conditions Upon The Agency's Rights Against The Assets ........ 33

IV. The CO Had No Duty To Suggest Substitution Of Assets And Had Discretion To Reject A Suggestion To Do So Made By Tip Top ........ 33

A. An Individual Surety Must Request Substitution Of Assets, Something That Mr. Scarborough Never Did ........ 35

B. Even Assuming That Tip Top's Counsel, Rather Than Mr. Scarborough, Could Make The Request, FHWA Urgently Needed To Make An Award........37

V. Tip Top Is Not Entitled To Injunctive Relief ..........................................38

VI. The Court Lacks Authority To Grant Tip Top's Requests For A Directed Contract Award, Declaratory Relief, Reasonable Costs, And Attorneys' Fees And Costs ..........................................................................39

CONCLUSION ..........................................................................41

# TABLE OF AUTHORITIES

## CASES

Adams v. United States, 20 Cl. Ct. 132 (1990) ....................8

Aeroplate Corp. v. United States, 67 Fed. Cl. 4 (2005)....................9

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365 (Fed. Cir. 1999) ....................19

American Federation of Government Employees, AFL-CIO v. United States, 258 F.3d 1294 (Fed. Cir. 2001)....................9

Andersen Consulting v. United States, 959 F.2d 929 (Fed. Cir. 1992) ....................18

Awad v. United States, 61 Fed. Cl. 281 (2004) ....................8

Banknote Corp. of America, Inc. v. United States, 56 Fed. Cl. 377 (2003) ....................12

Barclay Square Properties v. Midwest Federal Savings and Loan Association of Minneapolis, 935 F.2d 157 (8th Cir. 1991)....................31

Caldwell v. Martin, No. 87-2317, 1988 U.S. Dist. LEXIS 10080 (D. Kan. Aug. 3, 1988)........31

C & G Excavating v. United States, 32 Fed. Cl. 231 (1994)....................13, 35

CCL Service Corp. v. United States, 43 Fed. Cl. 680 (1999)....................39

Data General Corp. v. Johnson, 78 F.3d 1556 (Fed. Cir. 1996)....................27

Eisenhuth v. United States, 59 Fed. Cl. 460 (2004) ....................12

EP Productions, Inc. v. United States, 63 Fed. Cl. 220 (2005)....................26

Firth Construction Co., Inc. v. United States, 36 Fed. Cl. 268 (1996)....................9

Galen Medical Associates, Inc. v. United States, 74 Fed. Cl. 377 (2006) ....................9

Hawaiian Dredging Construction Co., Inc. v. United States, 59 Fed. Cl. 305 (2004)....................10

Hayes International Corp. v. United States, 7 Cl. Ct. 681 (1985)....................13

Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618 (2005)....................38

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001)....................12, 13, 20

In re NTA, LLC, 380 F.3d 523 (1st Cir. 2004)....................28, 29, 35

Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879 (Fed. Cir. 1985)....................8

Interstate Rock Producst, Inc. v. United States, 50 Fed. Cl. 349 (2001)....................9

John C. Grimberg Co. v. United States, 185 F.3d 1297 (Fed. Cir. 1999).............. 12, 19, 20, 21

Kinnett Dairies, Inc. v. Farrow, 580 F.2d 1260 (5th Cir. 1978)....................38

Lion Raisins, Inc. v. United States, 52 Fed. Cl. 629, 631 (2002)....................40

Management Solutions & Systems v. United States, 75 Fed. Cl. 820 (2007)....................12

MCI Telecommunications Corp. v. United States, 878 F.2d 362 (Fed. Cir. 1989)....................9

Myers Investigative and Security Services, Inc. v. United States, 275 F.3d 1366 (Fed. Cir. 2002)....................8, 27

News Printing Co. v. United States, 46 Fed. Cl. 740 (2000)....................13

PGBA, LLC v. United States, 389 F.3d 1219 (2004)....................38, 39

Precision Images, LLC v. United States, 79 Fed. Cl. 598 (2007)....................21

Precision Standard, Inc. v. United States, 71 Fed. Cl. 216 (2006)....................13

Scarborough v. Sec'y of Army, 493 F. Supp. 2d 1 (2007)....................31

Shader Contractors, Inc. v. United States, 276 F.2d 1 (Ct. Cl. 1960)....................18

Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573 (2003)....................38

S.K.J. & Associates v. United States, 67 Fed. Cl. 218 (2005)....................40

Spherix, Inc. v. United States, 62 Fed. Cl. 497 (2004)....................38

United Enterprise & Associates v. United States, 70 Fed. Cl. 1 (2006)....................13, 20

YRT Services Corp. v. United States, 28 Fed. Cl. 366, 394 (1993) ....................13

Zenith Radio Corp. v. United States, 710 F.2d 806 (Fed. Cir. 1983)....................38

## ADMINISTRATIVE DECISIONS

Advance Building Maintenance Co., B-17684, 79-2 CPD ¶ 72 (1973)..........................35

Altex Enterprises, Inc., B-228200, 1988 WL 222746 (1988)..........................................17

Bundick Enterprises, Inc., B-239867.2, 98-2 CPD ¶ 402, 1990 WL 292479 (1990)..............15

D.M. Potts Corp., B-231855, 88-2 CPD ¶ 440 (1988) ..............................................21

E.C. Development, Inc., B-231523, 88-2 CPD ¶ 285 (1988).......................................21

Gene Quigley, Jr., B-241565, 91-2 CPD ¶ 182, 1991 WL 72855 (1991)..........................20

Gulf & Texas Trading Co., B-253991.2, 94-1 CPD ¶ 31, 1994 WL 21913 (1994)................36

Hewlett-Packard Co., Medical Products Group, B-216125.2, 85-1 CPD ¶ 597 (1985)............37

Horizon Shipbuilding, Inc., B-292992, 2003 CPD ¶ 223, 2003 WL 22901835 (2003)...........11

Hust Brothers, Inc., B-255363.2, 94-1 CPD ¶ 192, 1994 WL 82521 (1994)........................11

Jay Jackson & Associates, B-271236, 96-2 CPD ¶ 11 (1996)........................................21

Karden Constr., Inc., B-235324 (1989)..............................................................14

Munford Constr. Co., B-239830, 90-2 CPD ¶ 265, 1990 WL 278515 (1990).......................14

Niles Janitorial Service and Supply, Inc., B-246575, 1992 WL 48458 (1992).....................19

O.V. Campbell and Sons Indus., Inc., B-216699, 85-1 CPD ¶ 1, 1984 WL 47140
(1984).................................................................................11

Quantum Construction, Inc., B-255049, 93-2 CPD ¶ 304, 1993 WL 505807 (1993) ..........9, 10

Santurce Construction Corp., B-240728, 90-2 CPD ¶ 469, 1990 WL 292483 (1990)..........26, 27

Transcontinental Enterprises, B-225802, 87-2 CPD ¶ 3 (1987)....................................35

U.S. Floors, B-241552, B-241555, 91-1 CPD ¶ 130 (1991).........................................36

## STATUTES AND REGULATIONS

18 U.S.C. § 494 ..........................................................................17

18 U.S.C. § 1001 ........................................................................17

28 U.S.C. § 1491(b)(2) .......... 40

28 U.S.C. § 2412 .......... 40

Defense Acquisition Regulation 10-201.2(d) (1976 ed.) .......... 14

FAR 9.103(a) .......... 27

FAR 9.103(b) .......... 13, 19

FAR 9.103(c) .......... 13, 20, 27, 35

FAR 14.301(a) .......... 9

FAR 28.001 .......... 6, 7

FAR 28.101-4(c) .......... 9

FAR 28.203 .......... 4, 28, 29

(a) – 13, 16, 28
B – 16, 17, 29, 30
© -- 5, 21

FAR 28.203-1 .......... 5, 28, 33

FAR 28.203-1(a) .......... 29, 30

FAR 28.203-1(b) .......... 30

FAR 28.203-2 .......... passim

(a) – 5
(b) – 5, 15
(c) – 5, 14, 15, 17

FAR 28.203-4 .......... passim

FAR 52.214-7(g) .......... 6

FAR 53.301-28 .......... 28

**LEGISLATIVE HISTORY**

Federal Acquisition Regulation (FAR); Individual Sureties; Proposed Rule, 53 FR 44564, 1988 WL 272482 (1988)....................14

Federal Acquisition Regulation (FAR); Miscellaneous Amendments, 54 FR 48978 (1989)....................28

## SECONDARY SOURCES

American Heritage Dictionary of the English Language (3d ed. 2006) ....................17

Black's Law Dictionary (6th ed. 1990)....................31

Black's Law Dictionary (8th ed. 2004)....................31

John Downes and Jordan Elliott Goodman, Dictionary of Fin. and Inv. Terms (5th ed. 1998)....................15

Steven M. Feldman, Government Contract Awards § 18:4 (2007) ....................20

Webster's Third International Dictionary (1986)....................18

## MISCELLANEOUS

Uniform Commercial Code § 4-104(a)....................27

Uniform Commercial Code § 4-104(1)(g)....................27

Uniform Commercial Code § 9-110....................27

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TIP TOP CONSTRUCTION, INC. | ) | |
| | ) | |
| Plaintiff, | ) | No. 08-352C |
| | ) | (Judge Bush) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS, CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court dismiss the claims of Tip Top Construction, Inc. ("Tip Top") for lack of subject matter jurisdiction. In the alternative, pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), the United States respectfully requests that the Court grant judgment upon the administrative record in the United States' favor. Additionally, Tip Top cannot establish the requisite criteria for injunctive relief and, therefore, its motion for a preliminary injunction should be denied.

**ISSUES PRESENTED**

1. Whether the Court has subject matter jurisdiction to entertain Tip Top's protest, given that it submitted a nonresponsive bid and, therefore, lacks standing.

2. Whether the contracting officer ("CO") made an arbitrary or capricious decision, abused her discretion, or otherwise acted contrary to law by determining that a pile of coal pledged in support of an individual surety's bid bond was unacceptable to cover the bond obligation under Federal Acquisition Regulation ("FAR") 28.203-3 and that Tip Top was therefore nonresponsible.

3. Whether Tip Top has suffered any prejudice or injury from this decision, given that the record demonstrates that the coal pledged by the individual surety did not exist in a readily marketable form, if at all, making Tip Top's bid nonresponsible.

4. Whether the CO's decision not to solicit a substitution of assets from the individual surety and not to accept a substitution proposed by Tip Top was rational.

5. Whether Tip Top has shown a prejudicial error in the CO's decision relating to substitution, given that bid bond deficiencies unrelated to the assets make it nonresponsible.

## STATEMENT OF THE CASE

### I. Nature Of The Case

In this post-award bid protest, Tip Top challenges the CO's decision that it was nonresponsible because of the unacceptability of its bid bond and, therefore, could not be awarded a contract under the Federal Highway Administration's ("FHWA") Solicitation No. DTFH71-08-00002 ("the Solicitation") for Project No. VI 9999(117). Tip Top also challenges the CO's conclusion that she needed no additional information to draw this conclusion and should not allow substitution of assets.

### II. Statement Of Facts

#### A. The Invitation For Bids And Bid Opening

On November 1, 2007, the Eastern Federal Lands Highway Division of the FHWA, United States Department of Transportation, issued the Solicitation for Project No. VI 9999(117). The Solicitation invited bids for construction of a five-leg roundabout to replace an existing intersection on the island of St. John, along with miscellaneous related work. AR 2.[1]

[1] "AR __" refers to pages of the administrative record filed on May 20, 2008, and supplemented on May 28, 2008. "Compl." refers to the complaint filed in this case. "Pl. Br." refers to Tip

The Solicitation required that bidders submit a bid for cost and a bid for time. AR 24-25. It also required that bidders submit a bid guarantee, or bond, in the amount of not less than 20 percent of the bid price or $3 million, whichever was less. AR 23. The Solicitation included Standard Form ("SF") 24, the bid bond form, for bidders to complete. AR 34-35.

The face of Tip Top's SF24 lists an individual surety, Edmund C. Scarborough, as the "principal" purporting to guarantee his ability to pay Tip Top's obligations to the FHWA, should Tip Top withdraw its bid or fail to supply other required bonds. AR 227-28. The SF24 was signed by an attorney-in-fact for Mr. Scarborough, AR 227, but the Power of Attorney submitted with the SF24 states that the attorney-in-fact was created by "E.C. Scarborough on Behalf of the Scarborough Bond and Guarantee Program." AR 231. Tip Top supplied a copy of SF28, the Affidavit of Individual Surety, which requires that, when pledging assets other than real property, the individual surety must "describe the assets, the details of the escrow account, and attach certified evidence of both." AR 229. Mr. Scarborough did not describe the assets or an escrow account or provide certified evidence of an escrow account, referring the CO only to a Certificate of Pledged Assets, AR 229, in which he listed as assets:

> Description of Assets Pledged
> An allocated portion of $191,350,000.00 of previously mined, extracted, stockpiled and marketable coal, located on the property of E.C. Scarborough, all of that certain lot of parcel of land in Kentucky District, Nicholas County, West Virginia, . . . containing 115.41 acres more or less and being the entire acreage of [mining] permit R 707. . . .

AR 232. Mr. Scarborough provided no support for the assigned value of over $191 million.

Following submission of bids by three bidders, FHWA opened the bids on January 10, 2008. AR 218. At this time, Tip Top was the apparent low bidder. AR 218.

---

Top's motion for judgment upon the agency record.

**B. FHWA's Review Of Tip Top's Bid And Bid Bond**

Tip Top asserted that it could complete the project in 300 days, less than half of the FHWA engineer's estimate of 675 days, which was bid by the other two bidders. AR 218, 226. The CO communicated with Tip Top and with the project engineers to ensure that the 300 days bid was not a mistake. AR 288-90, 558-59. The CO directed Tip Top to provide a critical path method diagram ("CPM") to clarify its ability to perform within the number of days bid. AR 321-29. Tip Top submitted a CPM on January 28, and, in response to further questions by FHWA, it provided additional information. AR 327-28, 288-90.

After reviewing the bid bond submitted by Tip Top, the CO considered whether it complied with the requirements of FAR § 28.203, concluded that the bid bond submitted by Tip Top was unacceptable, and notified Tip Top of her decision in a February 19 letter, stating that

> the Bid Bond . . . does not meet the requirements of the Federal Acquisition Regulations (FAR) for an Individual Surety at Section 28.203. Individual Surety Bonds must be supported by acceptable assets, as listed in the FAR. Acceptable assets include cash, United States Government securities, stocks and bonds that are actively traded, real property owned in fee simple, and irrevocable letters of credit. Speculative assets – which would include marketable coal – are specifically excluded by Subsection 28.203-2(c)(7).

AR 233. Tip Top and Mr. Scarborough responded by insisting that the CO reconsider her determination, asserting that her application of FAR § 28.203-2 was incorrect and offering to clarify the coal asset. AR 565, 567-68, 260-62. Mr. Scarborough offered to provide "assays" and "spot prices" he claimed supported the quality and market price of the coal pile. AR 261.

The CO responded to Mr. Scarborough's suggestion, disagreeing with his interpretation of the FAR and stating that

> a bid bond must be complete as submitted. The FAR specifically states at Section 28.203-1 that, "The security interest shall be furnished with the bond." Your

> client's offer to provide documentation supporting the quality and market price of the pledged asset is untimely, and it would be a violation of the procurement regulations to accept support of a bid bond at this time. The bid bond must be acceptable on its face, and in this instance, no proof of value was submitted with the bond.

AR 263-64. Furthermore, the CO disagreed with Mr. Scarborough's view that the coal pile fell within the acceptable assets described in FAR § 28.203-2(a) and (b), noting that the pledged coal was "closer in similarity to" FAR § 28.203-2(c)'s examples of unacceptable assets, including corporate assets and speculative assets, than the acceptable assets like cash, certificates of deposit ("CDs"), and United States Government securities. AR 263. The CO concluded that FAR § 28.203(c) required rejection of Tip Top's bid as non-responsible without further information. AR 264. By letter dated February 29, 2008, Mr. Scarborough again asserted that the CO's interpretation was incorrect. AR 581-84.

### C. Tip Top's GAO Protest

On February 29, 2008, Tip Top filed a protest at the General Accountability Office ("GAO"). AR 234-35. In response to the agency report, AR 239-48, on April 9, 2008, Tip Top submitted comments and attached a "Limited Scope Estimation of Recoverable Sewell Coal Tonnage From The Coal Refuse Disposal Facility Identified As Permit No. R-707 Nicholas County West Virginia." AR 334-356. As described further below, this document demonstrated that the "coal" pledged by Mr. Scarborough was, in fact, "coal refuse" that IBCS, Mr. Scarborough's mining company, "intend[ed]" to reprocess. AR 336, 338. IBCS did not plan to begin re-mining until July or August 2008 and lacked the necessary equipment and permits. AR 356. The document further established that a number of costs, including reprocessing and

shipping, would diminish the estimated value of any coal recovered, making the value of the coal refuse impossible to predict. AR 338.

On April 10, 2008, FHWA reported to the GAO that it was running out of time to make an award, since the next-lowest bidder extended its bid until only April 16, 2008, and therefore FHWA would likely override the GAO stay. AR 308. On April 16, 2008, FHWA informed the GAO of its award to the next-lowest bidder. AR 545. On May 2, 2008, June 10, 2008, the GAO denied the protest. AR 553-57.

## SUMMARY OF ARGUMENT

In a sealed bidding acquisition, bidders may not withdraw their offers after the time set for bid opening. FAR § 52.214-7(g). The Government considers a bidder's offer firm for the period for acceptance set forth in the solicitation, 60 days in this case. AR 20. The bid bond is a form of insurance that indemnifies the Government to protect the benefit of the bargain in the event that the low bidder withdraws its bid within this period or fails to furnish the performance and payment bonds required by the solicitation. FAR § 28.001. Should the bidder withdraw its bid or fail to supply the additional bonds, the bid bond protects the Government from losing the benefit of its bargain by making the bidder liable for the costs of the reprocurement and the difference in price between its bid and the bid that the Government ultimately accepts to procure the same work. The bond itself is a written instrument executed by a bidder (the "principal") and a second party (the "surety") to assure fulfillment of the principal's obligations to the third party (the "obligee" or "Government") identified in the bond. FAR § 28.001. If the principal defaults, the surety is liable to the extent provided in the bond.

Tip Top's bid bond was deficient in a number of ways. First, the Solicitation expressly prohibited use of a power of attorney, and that submitted with the bid bond fails to unambiguously identify the entity that will be bound by the signature of the representative and casts doubt on the identity of the surety submitting the bond. Although these flaws were not the basis of the CO's decision, they make the bid nonresponsive, depriving Tip Top of standing.

The FAR required the CO to make an affirmative determination that Tip Top was a responsible offeror. The record demonstrates that the CO's decision that the bid bond's assets were not readily marketable and were therefore unacceptable was rational, particularly in light of the deferential standard of review of responsibility determinations and deference to the CO's business judgment. Further, the CO had no duty to investigate the assets further, to solicit substitution of assets from Mr. Scarborough, or to accept a substitution. Given that the record shows the "coal" pledged was "coal refuse" that was not readily marketable, Tip Top cannot establish that it was a responsible bidder, and, therefore, it has no direct economic interest in this procurement. Even if the CO's decision regarding substitution of assets was in error, other bid bond deficiencies unrelated to the asset pledged make Tip Top a nonresponsible bidder.

## ARGUMENT

### I. The Court Lacks Subject Matter Jurisdiction Over Plaintiff's Claims Because Plaintiff Has Failed To Demonstrate That It Has Suffered Prejudice

#### A. Standard Of Review For Motion To Dismiss

"[T]he plaintiff bears the burden of proving that subject-matter jurisdiction is proper." Id. If the factual basis for jurisdiction is challenged, the Court may consider evidentiary matters outside the pleadings, and the allegations in the complaint are not controlling. Indium Corp. of

Am. v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985); Adams v. United States, 20 Cl. Ct. 132, 133 n.1 (1990).

### B. Tip Top Did Not Stand A "Substantial Chance" Of Being Selected For Award And Therefore Cannot Demonstrate Prejudice

#### 1. Standing Is A Jurisdictional Issue

The threshold issue before the Court, before consideration of the merits, is whether Tip Top possesses standing to bring this protest. Myers Investigative and Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002). Tip Top argues that it has suffered competitive prejudice, asserting that, "once either the mined coal ECS [Mr. Scarborough] pledged is accepted after a reasonable inquiry, or an acceptable substitute is accepted, as required, Tip Top will be the low, responsive, responsible bidder by $1.4 million," and "[n]o basis will exist to deprive Tip Top of the award." Pl. Mot. at 28. Given the facial invalidity of its bid bond, however, Tip Top's bid was non-responsive, and the bidder did not have a substantial chance of winning the award.

As the party invoking jurisdiction, Tip Top bears the burden of establishing the elements of standing. Myers, 275 F.3d at 1369. Prejudice, or injury, is a necessary element of standing, id., and requires a "direct economic interest [that] would be affected by the award of the contract or by failure to award the contract," or, in other words, a substantial chance of receiving the contract award but for the errors alleged. Am. Fed'n of Gov't Employees, AFL-CIO v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001). A bidder lacks a direct economic interest if its bid was nonresponsive. MCI Telecom. Corp. v. United States, 878 F.2d 362 (Fed. Cir. 1989). "[D]eterminations as to standing, which require consideration of prejudice, are not confined to

the reasoning expressed by the agency in resolving the merits of the protest controversy." Galen Med. Assocs., Inc. v. United States, 74 Fed. Cl. 377, 380 (2006).

FAR § 14.301(a) provides that a bid "must comply in all material aspects with the invitation for bids." FAR §14.301(a). "This juncture, or lack of it, between the invitation and the offer is referred to in the regulations as 'responsiveness.'" Firth Constr. Co., Inc. v. United States, 36 Fed. Cl. 268, 275 (1996). "Such compliance enables bidders to stand on an equal footing and maintain the integrity of the sealed bidding system." FAR 14.301(a). It is firmly established that bid responsiveness is determined at the time bids are opened. Aeroplate Corp. v. United States, 67 Fed. Cl. 4, 11 (2005).

"In sealed bidding, noncompliance with a solicitation requirement for a bid guarantee requires rejection of the bid . . . ."[2] FAR § 28.101-4(a). When a bidder supplies a defective bond, the bid itself is thus rendered defective and must be rejected as nonresponsive on opening, Interstate Rock Prods., Inc. v. United States, 50 Fed. Cl. 349, 366 (2001); Quantum Constr., Inc., B-255049, 93-2 CPD ¶ 304, 1993 WL 505807, at *2 (1993), and "may not be made responsive by subsequent submissions or communications." Firth, 36 Fed. Cl. at 275.

A bid bond's sufficiency depends on whether the surety is clearly bound by its terms. Quantum, 1993 WL 505807, at *1-2. "The determinative question as to the acceptability of a bid bond is whether the bid documents, including the power of attorney appointing an attorney-in-fact with authority to bind the surety, establish unequivocally at the time of bid opening that the bond is enforceable against the surety should the bidder fail to meet its obligations." Hawaiian Dredging Const. Co., Inc. v. United States, 59 Fed. Cl. 305, 310-11 (2004) (emphasis added).

---

[2] Certain exceptions described in FAR § 28.101-4(c) are not applicable in the present case.

Since the FHWA cannot determine definitively from the documents submitted with the bid that Mr. Scarborough would be bound, the bid is non-responsive and must be rejected. Quantum, 1993 WL 505807, at *2.

**2. The Power Of Attorney**

The Solicitation incorporated the "Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects (FP-03)." AR 20, 60-61. The FP-03 clearly states that "[t]he individual surety shall personally sign the SF 28. Execution by power of attorney is not acceptable." FP-03, at 13 (relevant pages attached as Exh. A). The failure to comply with a Solicitation requirement makes the bid bond facially invalid and Tip Top's bid nonresponsive.

The SF24 also requires that "[a]ny person signing in a representative capacity (e.g., an attorney-in-fact) must furnish evidence of authority if that representative is not a member of a firm, partnership, or joint venture, or an officer of the corporation involved." AR 230. Because the signature of the individual surety on the bid bond, SF24, is by an attorney-in-fact, the Power of Attorney is incorporated by reference onto the face of the bid bond. "The contracting officer should not be forced, when making a procurement decision, to accept a power of attorney when some ambiguity exists about the authority of the person signing the bond on behalf of the surety." Hawaiian Dredging, 59 Fed. Cl. at 316.

The Power of Attorney states:

> KNOW ALL MEN BY THESE PRESENTS that, E.C. SCARBOROUGH on behalf of Scarborough Bond and Guarantee Program ("Principal"), hereby makes, constitutes and appoints:
>
> CONNIE F. SOULEYRETTE
>
> To be Principal's true and lawful attorney-in-fact . . .

AR 231.

The Power of Attorney submitted with Tip Top's SF24 states that the attorney-in-fact was created by "E.C. Scarborough on Behalf of the Scarborough Bond and Guarantee Program." AR 231. The "principal" on the Power of Attorney creating the attorney-in-fact status of Connie F. Souleyrette, however, is ambiguous, indicating either E.C. Scarborough or the Scarborough Bond and Guarantee Program ("Program"). The Power of Attorney also offers no indication that E.C. Scarborough can act upon behalf of the Program. The Power of Attorney submitted by Tip Top does not demonstrate unambiguously that Ms. Souleyrette signed upon behalf of Mr. Scarborough, the represented person identified in the SF24. AR 227. Given the uncertainty that the attorney-in-fact has the power to bind the individual surety listed on the face of the bond, the bid is non-responsive, since either E.C. Scarborough or the Program could deny the bond if enforcement was attempted. O.V. Campbell and Sons Indus., Inc., B-216699, 85-1 CPD ¶ 1, 1984 WL 47140, at *1-2 (1984).

### 3. The Identity Of The Individual Surety

Ambiguity as to the identity of the individual surety renders a bid bond unacceptable. Horizon Shipbuilding, Inc., B-292992, 2003 CPD ¶ 223, 2003 WL 22901835, at *3 (2003).[3] The SF24 cautions that "[n]o corporation, partnership, or other unincorporated associations or firms," like the Program, "are acceptable as individual sureties." AR 230. The uncertainty as to the identity of the individual surety makes it unclear which entity is bound and thus makes the bid bond facially invalid, causing Tip Top's bid to be non-responsive.

---

[3] While Horizon Shipbuilding involved a negotiated procurement, and the Comptroller General thus referred to the bond as "unacceptable," in the situation of an invitation for bids, the bid would be considered non-responsive. The concepts of nonresponsiveness and technical unacceptability have the same legal effect regarding the ultimate evaluation decision. Hust Bros., Inc., B-255363.2, 94-1 CPD ¶ 192, 1994 WL 82521, at *1 & n.1 (1994).

## II. The Record Demonstrates That The CO's Decision Was Not Arbitrary, Capricious, Unsupported By Substantial Evidence In The Record, Or Contrary To Law

### A. Standard For Motion for Judgment On The Administrative Record

The inquiry in this bid protest submitted on the administrative record under RCFC 52.1 is whether FHWA's responsibility determination was arbitrary, capricious, unsupported by substantial evidence in the administrative record, or contrary to law. Eisenhuth v. United States, 59 Fed. Cl. 460, 462 (2004). This Court can grant relief only where "the procurement official's decision lacked a rational basis." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). This is a deferential standard that limits judicial review and "recognizes the possibility that there exists a zone of acceptable results in a particular case." Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 380 (2003). The plaintiff cannot carry its burden by merely demonstrating that the record can support a different decision. Mgmt. Solutions & Sys. v. United States, 75 Fed. Cl. 820, 827-28 (2007). Courts have recognized that contracting officials may properly exercise wide discretion in applying procurement regulations. See Impresa, 238 F.3d at 1332.

### B. Standard of Review for Responsibility Determinations

No award may be made to an offeror unless the contracting officer makes an affirmative determination of responsibility for the awardee. See FAR § 9.103(a)-(b); Impresa, 238 F.3d at 1329; John C. Grimberg Co. v. United States, 185 F.3d 1297, 1301 (Fed. Cir. 1999). The prospective contractor always bears the burden of persuading the contracting officer that it is responsible. FAR § 9.103(b) & (c); C & G Excavating v. United States, 32 Fed. Cl. 231, 244 (1994). "[I]n the absence of information clearly indicating that the prospective contractor is

responsible, the contracting officer shall make a determination of non-responsibility." FAR § 9.103(b) (emphasis added); see Impresa, 238 F.3d at 1334.

Responsibility determinations are of necessity a matter of business judgment and are not "subject to reasoned judicial review." YRT Servs. Corp. v. United States, 28 Fed. Cl. 366, 394 (1993); United Enter. & Assocs. v. United States, 70 Fed. Cl. 1, 29 (2006); see also Hayes Int'l Corp. v. United States, 7 Cl. Ct. 681, 685 (1985). "A contracting agency has broad discretion in making responsibility determinations since it must bear the brunt of difficulties experienced in obtaining the required performance." News Printing Co. v. United States, 46 Fed. Cl. 740, 746 (2000). Indeed,

> correct appraisal of the responsibility of a prospective contractor is clearly in the self-interest of the procuring agency; there is a built-in stimulus against error. If the determination is erroneous, and the contractor ultimately defaults on his obligation, the Government will likely suffer substantial delay and inconvenience, even though the defaulting party will be liable to answer in damages, including perhaps reprocurement costs.

Precision Std., Inc. v. United States, 71 Fed. Cl. 216, 220 (2006).

### C. The CO Properly Used Business Judgment To Determine That The Assets Were Unacceptable And That She Required No Additional Information.

#### 1. Background Of The Requirements Of FAR §§ 28.203-2 and 28.203-4

FAR § 28.203(a) requires that "[t]he contracting officer shall determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation." FAR § 28.203(a). In light of the record evidence, Tip Top cannot meet the burden of showing that the CO lacked a rational basis to conclude that a portion of a coal pile was not an acceptable asset. Furthermore, the record prior to award of the contract on April 16, 2008 clarified that the "coal" was, in fact, "coal refuse" to be reprocessed beginning

several months in the future, demonstrating that the asset was unacceptable and that the CO properly exercised her discretion to request no further information.

In 1988, having concluded that bonds submitted by individual sureties were frequently uncollectable to the detriment of the Government, the FAR's drafters decided to revise the requirements for individual sureties. Proposed Rule, 53 Fed. Reg. 44564, 44564 (Nov. 3, 1988). Prior to 1990, the agency was required to determine the value of the surety's assets, Defense Acquisition Regulation § 10-201.2(d) (1976 ed.), which forced the CO frequently to investigate hundreds of listed assets for the purposes of establishing their value. In one procurement, the CO had to investigate the value of two hundred mineral leases, jewelry, and stock in a closely held corporation by reviewing public records and even the phonebook, yet could not establish the assets' existence. Munford Constr. Co., B-239830, 90-2 CPD ¶ 265, 1990 WL 278515, at *1-2 (1990). The value of the mineral leases in Munford could not be determined "without resorting to the services of geologists and professional appraisers," and the CO could not determine the value of stock in surety's closely-held corporation as it was not listed on a national security exchange. Id. at *2; see also Karden Constr., Inc., B-235324 (1989) (discussing difficulty in verify asset's value where no stock quotes are available). Given the history of assets proffered by individual sureties, listing examples of unacceptable assets in FAR § 28.203-2(c), in addition to requiring an escrow account, was absolutely necessary and was not "superfluous," as Tip Top claims. Pl. Mot. at 26.

To overcome the difficulties described above, the new FAR § 28.203-2, revised in 1990, required the surety to provide independent, nationally-recognized evidence of value for a vastly-diminished, specific list of highly-liquid assets. This section advises individual sureties that

"[t]he Government will accept only cash, readily marketable assets, or irrevocable letters of credit from a federally insured financial institution from individual sureties to satisfy the underlying bond obligations." FAR § 28.203-2. To clarify "readily marketable assets," the revised regulations "specifically delineate those assets which are acceptable and identif[y] some, but not all, of those that are unacceptable." Bundick Enters., Inc., B-239867.2, 98-2 CPD ¶ 402, 1990 WL 292479, at *3 (1990). FAR § 28.203-2(b) lists as acceptable assets (1) cash, CDs, or other cash equivalents with a federally insured financial institution; (2) United States Government securities at market value; (3) stocks and bonds actively traded on a national U.S. security exchange with certificates issued in the name of the individual surety; (4) real property owned in fee simple by the surety without any form of concurrent ownership; and (5) irrevocable letters of credit. FAR § 28.203-2(b).

FAR § 28.203-2(c) describes unacceptable assets, listing those types of assets those that are not readily marketable because the Government might not be able to collect on these types of assets and their value cannot be determined to cover an obligation. FAR § 28.203-2(c) states that:

> Unacceptable assets include but are not limited to–
> . . .
> (4) Personal property other than that listed in paragraph (b) of this subsection (*e.g.*, jewelry, furs, antiques).
> . . .
> (7) Speculative assets (*e.g.*, mineral rights) . . .

FAR § 28.203-2(c). Personal property is defined as "tangible and intangible assets other than real estate." Downes & Goodman, Dictionary of Fin. and Inv. Terms 446 (5th ed. 1998). Thus, other than real estate, the only assets that the CO may accept are those listed in FAR § 28.203-2(b): cash, CDs, and certain other cash equivalents and stocks and bonds.

### 2. **The Pledged Coal Pile Is Not An Acceptable Asset Under FAR § 28.203**

Even should the Court conclude that acceptable assets are not limited as described above, Tip Top's arguments amount to no more than a disagreement with the manner in which the CO weighed the facts and exercised her business judgment in determining that she could not find that the assets were acceptable – that is, that, if necessary, the agency could sell them to recoup its losses should the bidder default. FAR § 28.203(a) requires that "[t]he contracting officer shall determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation." FAR § 28.203(a). If the CO concludes that the pledged assets are insufficient, the CO must reject the bid as nonresponsible.

Block 7.b of the SF28 requires that the individual surety "describe the assets, the details of the escrow account, and attach certified evidence of both." AR 229. Mr. Scarborough did not describe the assets or an escrow account or provide certified evidence of an escrow account, referring the CO only to a Certificate of Pledged Assets. Mr. Scarborough described the assets in the January 3, 2008 Certificate of Pledged Assets as an "allocated portion" of "$191,350,000 of previously mined, extracted, stockpiled and marketable coal" worth $1.8 million. AR 232. He warranted that he had good title to this allocated portion of approximately 1% of the pile of coal and that this portion was "free from liens or encumbrances or prior pledges[.]" AR 232.

Mr. Scarborough did not describe the quality or quantity of the allocated portion of coal, making it impossible to determine how he came to the conclusion that it was valued at $1.8 million. Nor did he explain how the 1 percent portion was segregated from the remainder of the pile in the event that the remaining 99 percent was not free from liens or encumbrances or prior pledges and, therefore, might be removed from the property at some date after January 3, 2008.

Tip Top failed to comply with a Solicitation requirement to "[f]urnish documentary evience as to the ownership and value of the assets pledged in support of the bond and details of the security interest in the assets . . . within 14 calendar days after the opening of bids[,]" which itself was "grounds for declaring the surety unacceptable." AR 61. Tip Top argues that the individual surety's word should suffice as proof that the assets exist, again relying on a pre-1990 GAO decision. Pl. Mot. at 22, 23 (citing Altex Enters., Inc., B-228200, 1988 WL 222746 (1988)). The fact that an individual surety is willing to sign the SF28, an affidavit, under oath, and therefore risk prosecution under 18 U.S.C. §§ 1001 and 494, however, does not prove the acceptability, sufficiency, or value of the asset. Contrary to Tip Top's assertions, the SF28 requires confirmation of the sworn statements with evidence of the asset and escrow account.

The CO, exercising business judgment, could not conclude that the coal pile was the type of personal property that was acceptable under FAR §§ 28.203(b) and 28.203-2 and informed Tip Top of her determination. AR 233. Given the lack of indication of the coal pile's value, the CO reasonably characterized the asset as "speculative,"[4] AR 233 – that is, "involving chance" and "risky," Am. Heritage Dictionary of the English Language (3d ed. 2006), and having a value "not established by demonstration[,]" which prevented them from being readily marketable.[5]

---

[4] Tip Top claims that, by stating that "[s]peculative assets – which would include marketable coal – are specifically excluded by Subsection 28-203(c)(7)," the agency "admitted" that the coal was marketable. Pl. Mot. at 17. However, it is clear that the CO simply repeated the description of the coal pile provided by Mr. Scarborough in his Certificate of Pledged Assets. AR 231.

[5] Tip Top asserts that this Court found coal to be readily marketable in its decision in Shader Contractors, Inc. v. United States, 276 F.2d 1, 6 (Ct. Cl. 1960), pointing to the Court's description of an argument made by the plaintiff: "Plaintiff suggests that the Gemsco decision modifies the holdings in the Brawley and Bickett cases in instances where the dealings are with a particular product or service rather than with a commodity like coal, lumber, or stone which is readily marketable elsewhere if not needed by the buyer." The Court did not adopt the plaintiff's view of coal and quickly rejected its reasoning as inapplicable to the case before it. Id. Even

Webster's Third Int'l Dictionary (1986). While Tip Top claims that the concerns expressed by the CO before the GAO regarding value, liquidity, and ownership were "without a basis legally or factually[,]" Pl. Mot. at 17, AR 243-44, the history of pledges of illiquid and overvalued assets and the intent and language of the regulations at issue establish the validity of her concerns. FAR § 28.203-2(b) clearly authorizes only liquid assets like cash and CDs and assets, like stocks traded on a national exchange, that have been "sold first" "at an exact dollar amount" and therefore have an easily identifiable market and value based on stock price averages. Pl. Mot. at 17, 20.

Tip Top also quibbles with the CO's attempts to explain the unacceptable nature of the coal, arguing that she erred by describing it as a "speculative asset" and a "mineral right." Pl. Mot. at 17. The CO's difficulty characterizing the coal pile was obviously due to its confusing nature, not because the CO was merely fabricating reasons to reject the bond, as Tip Top implies. In light of the deferential standard of review of responsibility determinations, and deference to the contracting officer's business judgment, disagreements with the CO's choice of words do not demonstrate that her decision was not rational.[6] In addition, Tip Top has not demonstrated how the difficulty in characterizing the coal pile prejudiced it. Because coal is unacceptable personal property, Tip Top had no "substantial chance" of being awarded the

---

assuming that the Court agreed with the plaintiff, it did not address how the coal became marketable or the costs of shipping it "elsewhere."

[6] Indeed, the Federal Circuit has held that "[o]verturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations." Andersen Consulting v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992).

contract but for the CO's description. Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999).

Tip Top argues that the FHWA and other agencies have accepted bid bonds from Mr. Scarborough and have accepted coal as an asset. Pl. Mot. at 18. However, a responsibility determination is made by a particular contracting officer for a particular contract offered by a particular Executive agency, as a routine part of contracting procedure. See FAR § 9.103(b). A decision by another contracting officer to accept a particular asset did not require the CO evaluating bids for this Solicitation to accept it and is not a basis for questioning this CO's application of otherwise correct procurement practices. Niles Janitorial Serv. and Supply, Inc., B-246575, 1992 WL 48458, at *3 (1992). Tip Top also has not clarified whether the asset accepted by other agencies was "coal refuse," like that pledged by Mr. Scarborough.

### 3. The CO Had No Duty To Request Or Consider Additional Information Regarding The Assets

Tip Top asserts that the CO was obligated to ask it for more information about the pledged assets prior to making a non-responsibility determination and to afford it an opportunity to respond to concerns about the assets.[7] Pl. Mot. at 16. The Federal Circuit rejected this exact argument in John C. Grimberg, 185 F.3d at 1303, concluding that "the USDA did not act illegally when it chose not to ask Grimberg for additional information before finding Grimberg to be non-responsible, and when it decided not to afford Grimberg the opportunity to cure its defective schedule or respond to concerns about its proposed manager." Id. The Federal Circuit concluded that

[7] Tip Top quotes section J.2 of the Solicitation in support of its argument. However, this section places no duty on the CO and, instead, merely states that the CO "may . . . request the surety to provide further information and/or documents." AR 61.

> although the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so. . . . Similarly, the contracting officer may allow a contractor to cure problems related to its responsibility, but he may also properly make a nonresponsibility determination based on the existing record, without giving the contractor an opportunity to explain or defend against adverse evidence.

Id. Since FAR § 9.103(c) places the burden on a prospective contractor affirmatively to demonstrate its responsibility, "the contracting agency has no duty to request additional information to resolve doubts created by the prospective awardee's evidence on responsibility." S. Feldman, Gov't Contract Awards § 18:4 (2007). The GAO decisions cited by Tip Top, including Gene Quigley, Jr., B-241565, 91-2 CPD ¶ 182, 1991 WL 72855 (1991), are at odds with the clear guidance provided by the Federal Circuit.

Contracting officers are given wide discretion not only in making responsibility determinations, but also in determining the amount of information that is required to make a responsibility determination. Impresa, 238 F.3d at 1334-35; see John C. Grimberg Co., 185 F.3d at 1303 ("[T]he contracting officer is the arbiter of what, and how much, information he needs."); United Enter., 70 Fed. Cl. at 29. The CO also had discretion to determine that she did not need to request additional information or to review any information that Mr. Scarborough offered to provide. AR 263. As noted above, the Solicitation required that the low bidder submit documentation relating to the assets within 14 days, AR 61, making an offer to provide this information after 30 days untimely, as recognized by the CO.[8] AR 263. The Court therefore

[8] Contrary to Tip Top's assertions, the CO did not abdicate her duties or abuse her discretion by stating that Mr. Scarborough's offer to provide documentation was untimely and that consideration of such documentation would violate procurement regulations. Pl. Mot. at 16 (quoting AR 263). The CO concluded that FAR § 28.203(c), requiring a finding of nonresponsibility when an individual surety is determined to be unacceptable, foreclosed consideration of additional information related to the assets. AR 244.

should not intrude upon the contracting officer's evaluation and determination that she had enough information to determine the unacceptability of the individual surety.

Tip Top cites E.C. Development, Inc., B-231523, 88-2 CPD ¶ 285 (1988), and D.M. Potts Corp., B-231855, 88-2 CPD ¶ 440 (1988), as support for its view that, "[b]efore rejecting a low bid based on the bond of an individual surety, the Contracting Officer is obligated to investigate the financial acceptability of the individual surety under FAR § 28.20[3-2]" and investigate the actual asset. Pl. Mot. at 16. However, both of these GAO decisions pre-date the revisions to FAR subpart 28 in 1990, described above, and, therefore, apply a outdated standard inconsistent with the Federal Circuit's guidance in John C. Grimberg.

Tip Top also cites Jay Jackson & Associates, B-271236, 96-2 CPD ¶ 11 (1996), asserting that, contrary to the Federal Circuit's reasoning in John C. Grimberg, the GAO determined that "an investigation was necessary" before rejection of an asset.[9] Pl. Mot. at 16. Jay Jackson is distinguishable from the instant case, given that the surety listed as assets pledged in support of the bond "a lien on real estate," which was described as "lode mining claims," thus presenting an ambiguous asset that could be characterized as either real estate, an acceptable asset, or as a mineral right, an unacceptable asset. Id. at *1. The coal pile, however, was not in any way similar to an acceptable asset.

Tip Top asserts that the CO's decision not to investigate was "particularly unreasonable" because of FHWA's knowledge "that Tip Top was a repuable contractor from its FHWA contracts, AR 566, and from Tip Top's CPM" outlining its performance schedule. Pl. Mot. at 18. In fact, the record does not support any conclusion regarding Tip Top's reliability or the

---

[9] GAO decisions, while possibly instructive, are not binding upon this Court. Precision Images, LLC v. United States, 79 Fed. Cl. 598, 619 n.40 (2007).

CPM's accuracy, and, in the cited e-mail, AR 565-66, Mr. Hollins mentions just one prior contract.

#### 4. Information Supplied By Tip Top And Mr. Scarborough Demonstrated That The Value And Quality Of The Coal Refuse Was Uncertain And Supported The CO's Initial Determination And Decision Not To Request Additional Information

Although labeling the coal a readily marketable asset, Tip Top and its individual surety did not obtain an estimation of the value of the coal until March 31, 2008, over two months after Mr. Scarborough attested to a $1.8 million value. Tip Top and Mr. Scarborough attached the Limited Scope ("LS") document as an exhibit to their respective April submissions in the GAO protest. AR 310-20, 334-56, 419-20, 435-57. Tip Top relies on the LS document as proof of "the type, grade and value of the coal[,]" which "could be transported and sold . . . for direct use." Pl. Mot. at 22. In reality, the LS document reveals that the "coal" is actually "coal refuse" at an "abandoned coal refuse disposal facility." AR 336-37. As described below, the record before the FHWA prior to the granting of the award on April 16, 2008 contains overwhelming evidence that the assets were unacceptable and that the CO needed no additional information related to the pledged assets.

Barry L. Mullens, an engineer formerly employed by the Sewell Coal Company and former owner of the "R-707 coal refuse disposal facility," attested that the thirteen million tons of coal refuse was the "remnant material disposed following attainment of 50% coal recovery from the processing of raw Sewell tonnage mined" and that "500,000 tons of slurry was pumped into the impoundment of the subject refuse facility." AR 336-37. Alliance thus merely provided an "estimate of coal tonnage that <u>may prospectively be recovered during the re-mining of the abandoned coal refuse disposal facility</u> designated as permit No. R-707." AR 337 (emphasis

added). Alliance notes that, "from discussions with IBCS," it understood that "IBCS intends to reprocess the coal refuse material." AR 338 (emphasis added), which would require "steam application," "metallurgical application," or "blending with met. Coals." AR 356. This indicates that no coal, let alone coal in a readily-marketable form, existed when Mr. Scarborough attested to its existence. In addition, IBCS informed Sohnen Coal Sales, Inc., that it did not intend to begin the re-mining until July or August 2008 and lacked the necessary equipment and permits to mine it. AR 356. Thus, had FHWA accepted the bid bond and had Tip Top defaulted within 60 days following the January 10, 2008 bid opening, FHWA could not have recovered from Mr. Scarborough for at least three months. If IBCS was unable or simply declined to reprocess the coal refuse, FHWA could not simply sell the coal, as Tip Top has asserted. Instead, it would have to contract with another company to reprocess a portion of the refuse on Mr. Scarborough's property.

Alliance noted that its report was "limited to the reliability of the data provided to us from the various sources noted" in the report, once of which was IBCS Mining Corp., a company apparently controlled by Mr. Scarborough, the individual surety. AR 336-37. The tonnage of coal involved was based on the 2008 affidavit of Mr. Mullens, who attested to the "tonnage of coal refuse material placed within the subject refuse disposal area during the period of his familiarity, encompassing the years of 1962 to 1987." AR 336 (emphasis added). The LS document cannot quantify the amount of coal refuse remaining at the site over 20 years later.

The LS document also failed to provide a reliable estimate of the condition or value of the coal refuse, as it was not based upon any independent collection and assay of materials by Alliance, but rather on documents provided by ICBS, without any "exploratory drilling, testing

of refuse from the specific area of proposed reprocessing, or volumetric calculations of actual in-place material."[10] AR 336. The assay reports regarding the quality of the material were not taken from disposal site R-707, but are "reported to have originated from the same mines (Sewell Mines No. 1 and 4) and processing plant as the No. R-707 material." AR 336. Alliance cautioned that "it was not within our work scope to address the coal quality, but rather to estimate the prospective quantity of coal that may be recovered." AR 338 (emphasis added).

Furthermore, the "resultant coal recovered" would have to be "trucked to a river barge load-out facility for shipment." AR 338. Sohnen Coal did not provide a definite price, but merely stated that it "is looking at a price FOB truck at plant of $79 per net ton," indicating by "FOB," or "free on board," that the shipper would pay shipping and insurance costs until the recovered coal reached the buyer. AR 356. The LS report also notes that IBCS had to subtract from the suggested $79 price the costs of "production, processing, transportation, and other costs, such as permitting, equipment, labor and material, reclamation, trucking, etc." AR 338.

To determine whether the coal has any value, the CO would have had to assume (1) that the amount of coal refuse material was correct, based on the former owner's knowledge 20 years ago; (2) that the coal was of the alleged quality of the refuse material on a nearby disposal refuse facility, an assumption not confirmed by Alliance; and (3) that the reprocessing, transportation, labor, and other costs were not high enough to wipe out the value of the coal refuse material. Tip Top makes no representation that processing the refuse material and then getting the coal to market is economically viable and asserts only that "coal spot prices" demonstrate the value of

---

[10] "Alliance Consulting . . . has reviewed various documents provided to us in regard to the historical placement of Sewell seam refuse and the potential future recovery of coal from this material on the area identified as Permit No. R-707." AR 336.

its coal refuse. Pl. Mot. at 21. However, the Department of Energy ("DOE") document that Tip Top and Mr. Scarborough provided notes that the average price is based on "relatively high-Btu coal" for delivery in the 'prompt quarter,'" that is, "the quarter following the current quarter." AR 367. The DOE document explains that, "from January through March, the 2nd quarter is the prompt quarter." AR 367. Other documents provided by Tip Top define spot price as the price of goods "available for almost immediate delivery," AR 374, and appear to refer solely to prices derived from commodities trading. AR 377. Given that IBCS Mining Corp. was not planning even to begin re-mining the coal refuse until July or August 2008, months that fall within the third quarter of the year, the spot prices in the DOE document based on delivery in April, May, or June were inapplicable to the pledged coal refuse. There is also no indication that the re-mining the coal refuse will result in "relatively high-Btu coal" or be sold on the commodities market, which would be necessary to allow comparison with the spot prices.

Based upon the foregoing, the record supports the CO's decision not to consider the coal acceptable and not to request additional information from the surety regarding the assets. Indeed, the LS report contradicts the very idea of any "above-ground and stockpiled," "tangible mountain of coal," as Tip Top and Mr. Scarborough describe, let alone "marketable" coal, being located at mining permit R-707 at the time the Affidavit of Individual Surety was submitted. AR 583; Pl. Mot. at 21. The LS report also calls into question the credibility of Mr. Scarborough's representations. "[A] contracting officer may reject a bidder as nonresponsible without further inquiries for having unacceptable sureties where there is doubt as to the integrity of the sureties and the credibility of their representations." Santurce Constr. Corp., B-240728, 90-2 CPD ¶ 469, 1990 WL 292483, at *2 (1990).

#### 5. Tip Top's Unfounded Claims Of Bad Faith Should Be Rejected

Underlying Tip Top's factual and legal contentions is a wholly unsupported allegation that FHWA and the GAO acted in bad faith. To overcome the well-settled presumption that Government officials act in good faith in discharging their duties, plaintiff "must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government" with a "specific intent to injure the plaintiff." EP Prods. Inc. v. United States, 63 Fed. Cl. 220, 226 n.12 (2005), aff'd, 163 Fed. Appx. 892 (Fed. Cir. 2006). Here, Tip Top's allegations should be rejected based on the presumption of good faith and Tip Top's failure to allege any specific acts of bad faith or intent to injure it.

## III. Tip Top Has Suffered No Prejudice Because It Cannot Demonstrate That It Is Responsible

### A. The Limited Scope Evaluation Submitted By Tip Top And Mr. Scarborough Demonstrates Conclusively That The Coal Refuse Was Not A Readily Marketable Asset And Tip Top Was Nonresponsible

Even should the Court determine that the CO abused her discretion by determining that the coal pile was an unacceptable asset, Tip Top protest should fail for lack of prejudice. As noted above, the Federal Circuit has held that, "to prevail in a protest, the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). Awards may not be made to contractors that are not responsible. Therefore, the burden rests on the protestor affirmatively to demonstrate to the Court its responsibility, without which it would not have a substantial chance of receiving the contract award. Myers, 275 F.3d at 1371; see also FAR § 9.103(a) and (c). Tip Top has not demonstrated its responsibility. Indeed, the record shows that its bid bond could

never be found acceptable and, therefore, that Tip Top is non-responsible and lacks a direct economic interest.

For the reasons described above in Section A.4, the LS report demonstrates that the coal pledged by Mr. Scarborough was, in actuality, coal refuse that had to be reprocessed to extract coal of an unknown quality or quantity. The descriptions of the true nature of the coal refuse make the credibility of individual surety's representations highly doubtful. As noted above, when the integrity of the surety and the credibility of its representations is in doubt, the CO may reject a bidder as nonresponsible without further inquiries. Santurce Constr. Corp., 1990 WL 292483, at *2. Therefore, given this lack of credibility and the unacceptability of the pledged assets, Tip Top cannot show that it is a responsible bidder.

**B. The Asset Was Not "Reasonably Identified" In the Certificate Of Pledged Assets**

Moreover, a pledge of "an allocated portion" without identifying which portion or how the asset is segregated, as to be identifiable, becomes very problematic. It is highly doubtful that such an asset is "reasonably identified" and, therefore, would be difficult to identify were the agency to act against the property. See U.C.C. § 9-110.

**C. The Failure To Create An Escrow Account Demonstrates Tip Top's Nonresponsibility**

In addition, as the GAO correctly concluded, Mr. Scarborough's failure to establish an escrow account made the bid bond unacceptable and Tip Top non-responsible. AR 552-57. FAR § 28.203 requires the CO to ensure that the surety's pledged assets are sufficient to cover the bond obligation. FAR § 28.203(a). The individual surety is directed to ("shall") execute the SF28 and provide a security interest in certain assets in accordance with FAR § 28.203-1. The

Block 7.b of the SF28 states that, if the assets pledged are "other than real estate," the surety must provide a certified representation of the assets pledged to the United States, describe the details of the escrow account, and attach certified evidence of the assets and the escrow account. FAR § 53.301-28; AR 229. The Standard Specifications, FP-03, incorporated in the Solicitation also states that "[a]ssets named [by an individual surety] shall be committed to the project with a bank designated to serve as trustee," clearly envisioning an escrow account. FP-03 at 13, Exh. A; see, e.g., In re NTA, LLC, 380 F.3d 523, 529-30 (1st Cir. 2004).

Despite the clear instructions provided by SF28, FAR § 53.301-28, and the Solicitation, Tip Top, without reference to these regulations and requirements, asserts that a lack of clarity in the language of FAR §§ 28.203 and 28.203-2 eliminates the requirement for an escrow account. Pl. Mot. at 24. The 1990 revisions to the FAR, however, required "a Government security interest in the pledged assets by means of a lien or real property or the establishment of an escrow account for acceptable personal property." Miscellaneous Amendments, 54 Fed. Reg. 48978, 49878 (Nov. 28, 1989). When the Civilian Agency Acquisition Council and Defense Acquisition Regulatory Council issued the proposed revisions for comment, they noted:

> The Government is relying on the validity of the SF 28 information in the event of contractor default of its obligations.
> Experience has shown that the information contained on the SF 28 is inadequate. The frequent result is that bonds submitted by individual sureties are uncollectable to the detriment of the Government and suppliers under Government contracts.
>
> * * *
>
> Accordingly, it has been determined that certain revisions are warranted to strengthen procedures governing individual sureties. The proposed rule would accomplish these objectives by the following revisions:
> A bond supported by an individual surety will be accepted only with a pledge of specific assets equal to the penal amount of the bond.
> (a) To pledge real estate, the individual surety will be required to furnish the Government with a recorded covenant not to convey supported by a title search, evidence that local

> taxes have been paid for the last three years, the current tax assessment on the property and evidence of recordation.
> (b) To pledge assets other than real estate, an escrow account will be required.

Proposed Rule, 53 Fed. Reg. 44564, 44564 (Nov. 3, 1988) (emphasis added). The FAR's drafters, therefore, required an irrevocable trust created by the surety's pledge of the assets to the Government by placing them in escrow (trust) with the Government as trust beneficiary and the escrow agent (the bank) as trustee. See, e.g., NTA, 380 F.3d at 529-30.

FAR § 28.203 requires that the individual surety provide, with the bond, a security interest in the assets. FAR §28.203(b); FAR § 28.203-1(a) ("The security interest shall be furnished with the bond."). The value at which the CO accepts the pledged assets

> may be provided by one or a combination of the following methods:
> (1) An escrow account with a federally insured financial institution in the name of the contracting agency. . . .
> . . .
> (2) A lien on real property . . .

FAR § 28.203-2. In this context, the word "may" indicates permission to use one (or a combination) of only two options, and does not make compliance optional. Again, Tip Top's reading would place this section, FAR § 28.203-1(b), at odds with the section directly preceding it, FAR § 28.203-1(a), with FAR § 28.203(b), and with the intent of the regulation.

Tip Top also relies on a strained reading of FAR § 28.203-1(b) to assert that cash and money assets are the only forms of personal property that can placed in escrow. Pl. Mot. at 24-25. While FAR § 28.203-1(b)(1)(i) specifies the minimum requirements of an escrow account containing "funds," i.e., money, that fact does not implicitly exempt other highly liquid personal property listed in FAR § 28.203-2 from the requirements of an escrow account. Indeed, United States securities, an acceptable asset, are specifically exempted from the escrow requirement

under certain conditions described in FAR § 28.203-2(b)(1) – which would not be necessary if, as Tip Top argues, they were implicitly exempt.

Tip Top also assumes that the regulation effective in 1990 adopts the definition of "escrow account" found in the 2004 edition of Black's Law Dictionary, namely, "[a] bank account, generally held in the name of the depositor and an escrow agent[.]" Pl. Mot. at 25 (citing Black's Law Dictionary 18 (8th ed. 2004)). Tip Top inexplicably turns to the 1990 edition to define "bank account" as a "[a] sum of money placed with a bank or banker on deposit[.]" Pl. Mot. at 25 (citing Black's Law Dictionary 144 (6th ed. 1990)). However, the definition of "bank account" in the 2004 edition of Black's includes "[a] deposit or credit account with a bank." Black's Law Dictionary 18 (8th ed. 2004). Furthermore, the Uniform Commercial Code states that "account" means "any account with a bank" and notes that banks regularly deal in "items." U.C.C. § 4-104(a) & (1)(g). Contrary to Tip Top's assertions, Pl. Mot. at 24-26, non-cash items, including bonds, are routinely deposited in escrow accounts and accrue interest. Caldwell v. Martin, No. 87-2317, 1988 U.S. Dist. LEXIS 10080, at *1, 11 (D. Kan. Aug. 3, 1988). Mr. Scarborough, the individual surety, is well-aware that an individual surety has placed a stock, a non-cash item, in an escrow account. Scarborough v. Sec'y of Army, 493 F. Supp. 2d 1, 8 n.20 (2007).

Tip Top next asserts that requiring all personal property to be placed in escrow would violate principles of regulatory construction because irrevocable letters of credit ("ILCs"), which are acceptable, cannot be placed in escrow.[11] Pl. Mot. at 26. However, it is well-recognized that

---

[11] Tip Top argues that requiring an escrow account would be inappropriate because FAR § 28.203-2 does not list all acceptable assets and, therefore, some of these unenumerated assets might not be suitable for escrow. This argument is addressed in Section C.1 above.

ILCs can be held in escrow by a financial institution. See, e.g., Barclay Square Props. v. Midwest Fed. Savings and Loan Ass'n of Minneapolis, 935 F.2d 157, 158-59 (8th Cir. 1991) (describing the responsibilities of a financial institution holding ILCs in escrow).

**D. Tip Top and Mr. Scarborough Ignored The Solicitation's Prohibition Against The Use Of Powers Of Attorney By Individual Sureties**

As noted above, the standard specifications in FP-03, incorporated into the Solicitation, clearly advise that "[t]he individual surety shall personally sign the SF 28. Execution by power of attorney is not acceptable." FP-03, at 13, Exh. A. The disregard of Solicitation requirements by Tip Top and Mr. Scarborough again evidences a lack of responsibility.

**E. Ambiguity As To The Identity Of The Surety Makes Tip Top Nonresponsible**

Even assuming that the SF24 was facially valid, making the bid responsive, additional ambiguity as to the individual surety's identity, as reflected in the SF28, the Affidavit of Individual Surety, demonstrate that Tip Top would be rejected as non-responsible. While the SF24 identified the individual surety as E.C. Scarborough of "191 Main Street Suite 200, Annapolis, MD 21401," AR 227, the SF28 identified this address as the address of Mr. Scarborough's employer and listed his home address as "6850 CR 544 E., Haines City, FL 33844." AR 229. Alternatively, as noted above, the pledgor might be the Scarborough Bond and Guarantee Program at "6352 Cypress Gardens Blvd., Winter Haven, FL 33884." AR 231. Thus, the "E.C. Scarborough" who ostensibly owns the pledged asset, according to the Warranty Deed, AR 514-16, may not be the same entity as the pledgor.

Furthermore, the SF24 cautions that "[n]o corporation, partnership, or other unincorporated associations or firms, as such, are acceptable as individual sureties." AR 230. The Scarborough Bond and Guarantee Program is not an individual and would, therefore, be

unacceptable. Furthermore, the Power of Attorney lists a website, www.ibcs.com, for the Scarborough Bond and Guarantee Program. AR 231. This website states that IBCS International Bonding & Construction Services is a "risk management company offering Individual Surety Bonds," acting as "an authorized Risk Manager for the Scarborough Bond and Guarantee Program." See http://www.ibcs.com. Mr. Hollins, Tip Top's President, informed the CO that IBCS was "the company that issued the bid bond to Tip Top." AR 571. Thus, it is even more unclear that the individual surety was actually an individual, as required by SF24.

### F. The Certificate of Pledged Assets Places Conditions Upon The Agency's Rights Against The Assets

The Certificate of Pledged Assets placed limitations inconsistent with the FAR's requirements upon the CO's rights against the property should Tip Top default. AR 232. First, the third paragraph conditions the availability of the asset on a "valid and final determination that the Principal cannot or will not accept the contract for performance of the project for which its bid or proposal has been submitted and the failure of individual surety to otherwise fulfill the obligations of the bid bond." AR 232 (emphasis added). FAR § 28.203-1, however, requires execution on the asset unless a court of competent jurisdiction intervenes. FAR § 28.203-1(b)(1)(i).

## IV. The CO Had No Duty To Suggest Substitution Of Assets And Had Discretion To Reject A Suggestion To Do So Made By Tip Top

Tip Top argues that the FHWA refused to "allow Tip Top and ECS [Mr. Scarborough] the opportunity . . . to provide a substitute asset before rejecting the bid bond." Pl. Mot. at 14 (emphasis added). The record demonstrates, however, that, in several communications with the CO, Mr. Scarborough never made any request to substitute assets, as required by FAR § 28.203-4, AR 581-84, nor did Tip Top make such a request until nearly two months after the CO's initial

determination of non-responsibility. Tip Top thus asserts, without providing any authority, that the CO was required to suggest that Mr. Scarborough should substitute another asset for the pile of coal refuse. Pl. Mot. at 19-20. The CO had no such duty under the FAR and had discretion to determine whether to consider such a suggestion from the individual surety.

On April 9, 2008, in its comments on the agency report, Tip Top raised the issue of substituting assets for the first time, complaining that "FHWA failed to give ECS [Mr. Scarborough] the opportunity to substitute assets," citing FAR § 28.203-4. AR 319. On April 11, 2008, Tip Top's counsel sent an e-mail to counsel for the FHWA stating that "it occurred to me that the agency had not considered the possibility of accepting substitute assets from this surety." AR 564. This e-mail gave no indication that Mr. Scarborough was amenable to any substitution. AR 564. Tip Top asserts that it made multiple requests of this sort, stating that, through this April 11 e-mail, its counsel "again offered to submit an acceptable substitute asset, AR 393, 417, 564, FHWA's reaction was to make award based on alleged 'urgent and compelling circumstances.' AR 562."[12] Pl. Mot. at 20. Tip Top's citation to three pages of the administrative record as offers to substitute assets, however, is misleading. Only one document mentioned involved any type of request to the FHWA – the April 11, 2008 e-mail from Mr. Gordon to Ms. Perry (AR 564). The other two pages, AR 393 and AR 417, are within Mr. Scarborough's brief to the GAO and are not offers to the FHWA to submit a substitute asset. AR

[12] Tip Top's assertion that the override decision was made in response to the offer to substitute assets is completely unfounded. On Wednesday, April 9, 2008, FHWA informed the GAO and Tip Top's counsel that it was running out of time to make an award, the next-lowest bidder having only extended its bid to Wednesday, April 16, 2008. AR 308. On Friday, April 11, 2008 at 4:03 p.m., Tip Top's counsel suggested the substitution of assets. AR 564. On Wednesday, April 16, 2008, FHWA informed the GAO and Tip Top's counsel of the override decision. AR 545. It is therefore clear that the potential loss of the lowest responsible bidder led to the override decision. In any event, this has no relevance to the issue before the Court.

393 mentions that the CO should have asked Mr. Scarborough to substitute assets, and AR 417 contains no reference to substitution of assets at all. In an e-mail to the CO, Tip Top's president, seeking to clarify the existing assets, mentioned that Mr. Scarborough had other assets, but made no request for a substitution. AR 565.

### A. An Individual Surety Must Request Substitution Of Assets, Something That Mr. Scarborough Never Did

Tip Top argues that FAR § 28.203-4 required the CO to afford Mr. Scarborough an opportunity to submit substitute assets, stating that "[t]his regulation was an outgrowth of longstanding practice of accepting other assets in support of a surety's financial responsibility when the assets pledged were questioned," citing Advance Building Maintenance Co., B-17684, 79-2 CPD ¶ 72 (1973), and Transcontinental Enterprises, B-225802, 87-2 CPD ¶ 3 (1987). Again, Tip Top has misconstrued the language of the FAR and relied upon caselaw pre-dating extensive revisions to the FAR's regulations involving individual sureties intended to address the problems resulting from the "longstanding practice" that it describes.

In reality, FAR 28.203-4 presumes a set of circumstances in which the individual surety makes a request to the CO:

> An individual surety may request the Government to accept a substitute asset for that currently pledged by submitting a written request to the responsible contracting officer. The contracting officer may agree to the substitution of assets upon determination, after consultation with legal counsel, that the substitute assets to be pledged are adequate . . .

FAR 28.203-4 (emphasis added). When, as required by the FAR, an individual surety provides a bid bond for acceptable personal property in an escrow account, which Mr. Scarborough failed to do, the individual surety gives the Government an equitable interest in the escrowed property held by the escrow agent who is a trustee. NTA, 380 F.3d at 529-30; Restatement (Second) of

Trusts, § 32 cmt. d (noting that a trust is created at the time of delivery in escrow). The individual surety has no right to then substitute the property. Furthermore, the contracting officer has no duty to request that the individual surety substitute the asset, since the demonstration of affirmative responsibility is the burden of the bidder, not the government. FAR § 9.103(c); C & G Excavating, 32 Fed. Cl. at 244.

Tip Top only asserts that its counsel offered to submit a substitute asset. Pl. Mot. at 20. The facts indicate that, at every relevant point, Mr. Scarborough knew that the CO considered his assets unacceptable, and, despite numerous communications on the point, never requested substitution of assets. AR 260-262. Mr. Scarborough failed to abide by the requirements of the FAR, and Tip Top cannot now assert that the CO was required affirmatively to reach out to him.

Furthermore, Tip Top's interpretation of FAR 28.203-4 would leave the CO with no discretion regarding whether to consider or allow substitution of assets. U.S. Floors, Inc., Gulf & Texas Trading Co., and Bundick Enterprises, Inc., GAO decisions cited by Tip Top, do not stand for the proposition that the CO must take any particular affirmative action. Pl. Mot. at 19. In U.S. Floors, the CO exercised discretion to allow the low bidder to substitute assets, which the second-lowest bidder then asserted was improper. U.S. Floors, Inc., B-241552, B-241555, 91-1 CPD ¶ 130 (1991). In Gulf & Texas Trading Co., B-253991.2, 94-1 CPD ¶ 31, 1994 WL 21913 (1994), the CO permitted the surety to substitute assets, without awaiting a request, then rejected the substitute assets. Id. at *1. The protestor did not challenge the CO's decision not to seek substitution again, and the GAO did not discuss any such duty on the part of the CO. Id. at *1-2. In Bundick, 1990 WL 292479, at *3, the GAO merely stated that FAR 28.203-4 "permits a surety to substitute new assets for those already pledged" – which it does, provided that the CO

has "agree[d.]" FAR 28.203-4. Tip Top has not indicated, however, any regulation imposing a duty upon the CO to solicit substitution of assets or any caselaw even suggesting this duty exists.

**B. Even Assuming That Tip Top's Counsel, Rather Than Mr. Scarborough, Could Make The Request, FHWA Urgently Needed To Make An Award**

Even assuming that the April 11 suggestion by Tip Top's counsel could constitute a request by the individual surety, the CO had discretion not to allow substitution, particularly given that the request came nearly two months after the CO's determination of non-responsibility and at a time when the agency urgently needed to make an award and begin construction.

FAR 28.203-4 states that, after a request by the individual surety,

> [t]he contracting officer may agree to the substitution of assets upon determination, after consultation with legal counsel, that the substitute assets to be pledged are adequate to protect the outstanding bond or guarantee obligations. If acceptable, the substitute assets shall be pledged as provided for in subpart 28.2.

FAR 28.203-4 (emphasis added).

Tip Top argues that the last sentence above requires the CO to allow substitution, stating that "the CO would be required ('shall') to accept an acceptable substitute asset which was and would be offered." Pl. Mot. at 20. However, Tip Top ignores the preceding sentence, which states that the CO "may agree to the substitution of assets" and therefore clearly contradicts its interpretation of the final sentence. The phrase "shall be pledged" clearly refers to the way in which the individual surety, the pledgor, will pledge the assets. Tip Top's interpretation would deprive the CO of all business judgment necessary in making responsibility determinations.

Furthermore, the CO is not required give more time for the surety to demonstrate responsibility, particularly in the face of a need to make award. See Hewlett-Packard Co., Med. Prods. Group, B-216125.2, 85-1 CPD ¶ 597 (1985). As noted by FHWA counsel, the agency

was running out of time to award the contract. AR 308. Furthermore, as noted above, the LS report submitted to the GAO prior to the April 11, 2008 e-mail from Tip Top's counsel demonstrated that Mr. Scarborough's representations lacked credibility, thus making him unacceptable as an individual surety regardless of the assets pledged.

## V. Tip Top Is Not Entitled To Injunctive Relief

Even if Tip Top were to succeed in establishing that FHWA committed prejudicial errors in determining that its bid bond was unacceptable, the Court must also consider (1) "whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief[;]" (2) "whether the balance of hardships to the respective parties favors the grant of injunctive relief[;]" and (3) "whether it is in the public interest to grant injunctive relief." PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (2004). Here, Tip Top has satisfied none of these criteria.

Should the Court withhold injunctive relief, Tip Top has alleged that it will incur lost profits and that its "ability to retain key personnel" will be jeopardized, and "extensive post-award activities [would be required] to restore the status quo." Pl. Mot. at 29; Compl. ¶ 70. This Court has concluded that loss of employees does not constitute irreparable harm. Sierra Military Health Servs., Inc. v. United States, 58 Fed. Cl. 573, 582 (2003). In addition, economic loss, without more, does not rise to the level of irreparable injury. Spherix, Inc. v. United States, 62 Fed. Cl. 497, 506 (2004) (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)).

Requiring the Government to resolicit the St. John roundabout contract, reconsider the bids, or directly award the contract to Tip Top would not serve the public interest, particularly given the

> strong public interest in avoiding disruptions in procurements, and for withholding judicial interjection, unless it clearly appears that the case calls for an overriding public interest in having the agencies follow the regulations which control government contracting.

Kinnett Dairies, Inc. v. Farrow, 580 F.2d 1260, 1270-71 (5th Cir. 1978). Additionally, ordering the Government to resolicit the contract would unfairly prejudice each of the other offerors that provided an acceptable bid bond. See Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618 (2005). In addition, given the evidence that this procurement was conducted fairly and reasonably, any reconsideration of the agency's decision would fail to serve the public interest.

The balance of harms in this case also favors the Government, because ordering FHWA to accept as a trustworthy asset a pile of coal refuse whose quality and existence has not been demonstrated would jeopardize FHWA's ability to recover should Tip Top default and require it to rely upon an individual surety whose credibility is in doubt. Requiring FHWA to investigate the quality of the coal refuse would result in a significant expenditure of Government funds and resources and would unnecessarily intrude upon the contracting officer's discretion. Imposing any of these remedies or directing award to Tip Top would inappropriately reward Tip Top for circumventing regulatory requirements. The balance of harms therefore favors the Government.

## VI. The Court Lacks Authority To Grant Tip Top's Requests For A Directed Contract Award, Declaratory Relief, Reasonable Costs, And Attorneys' Fees And Costs

Tip Top makes a number of requests for relief that this Court lacks the authority to grant. First, Tip Top requests that the Court "order the FHWA to terminate its current award, rescind its decision rejecting Tip Top's bid bond, either accept the asset pledged after resolving any issues or accept an acceptable substitute asset, and make award to Tip Top." Pl. Mot. at 30. This Court, however, lacks the authority to direct the contract award to Tip Top, as the ultimate grant of a contract is solely within the discretion of the contracting agency. See, e.g., CCL Serv. Corp.

v. United States, 43 Fed. Cl. 680, 688 (1999). Tip Top's request that the Court enter a permanent injunction "precluding anyone but Tip Top from performing the contract" has the same effect and is similarly misguided.[13] Compl. at 19. While Tip Top urges that "[n]o basis will exist to deprive Tip Top of the award[,]" Pl. Mot. at 28, as explained above, were the Court to find that the agency committed a prejudicial error, numerous other responsibility concerns relating to Tip Top's bid exist, which would require the CO's evaluation prior to any award.

Tip Top also seeks "reasonable costs," including cost expended in developing its CPM diagram. Compl. at 19. The only monetary relief available in a bid protest, however, is the award of bid preparation and proposal costs. [14] 28 U.S.C. § 1491(b)(2). Tip Top also has not submitted evidence sufficient to support its claim that those costs were incurred and are properly attributable to bid preparation. Lion Raisins, Inc. v. United States, 52 Fed. Cl. 629, 631 (2002).

Finally, Tip Top's claim for attorneys' fees and costs is unsupported and premature and should be dismissed. "A disappointed bidder . . . can no longer recover bid protest costs as part of a successful bid protest action." S.K.J. & Assocs. v. United States, 67 Fed. Cl. 218, 225 (2005). The Court only has authority to make awards of attorneys' fees under 28 U.S.C. § 2412,

[13] Tip Top also requests declaratory relief. Compl. at 17, 19. However, the Court should treat a request for declaratory relief as one for injunctive relief, requiring the Court to weigh the equities. PGBA, 389 F.3d at 1228.

[14] In addition to its requests for declaratory judgment, injunction relief, bid preparation costs, attorneys' fees, and costs, Tip Top has sought "[s]uch other and further relief as this Court deems just and proper." Compl. at 19. However, the Court lacks discretion to award monetary relief other than bid preparation costs in actions brought under the Tucker Act.

which provides that in certain circumstances, costs "may be awarded to the prevailing party[,]" a status Tip Top has not attained. 28 U.S.C. § 2412(a)(1).[15]

## CONCLUSION

For the foregoing reasons, the defendant respectfully requests that the Court deny Tip Top's requests for injunctive relief, contract award, and fees and costs and grant the Government's motion for judgment upon the administrative record.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Amanda L. Tantum
AMANDA L. TANTUM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 616-8131
Fax. (202) 514-8624

June 10, 2008

Attorneys for Defendant

[15] We reserve our right to oppose any application for attorneys' fees, should Tip Top submit such an application.

CERTIFICATE OF FILING

I hereby certify that on June 10, 2008, a copy of the foregoing "DEFENDANT'S CROSS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Amanda L. Tantum