IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TIP TOP CONSTRUCTION, INC. | ) | |
| Plaintiff, | ) | |
| | ) | No. 08-352C |
| v. | ) | Judge Lynn J. Bush |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

# TIP TOP'S OPPOSITION AND REPLY BRIEF

Michael A. Gordon
Counsel of Record for Tip Top Construction, Inc.
MICHAEL A. GORDON PLLC
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)

OF COUNSEL:
Fran Baskin, Esquire
MICHAEL A. GORDON PLLC
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)

June 17, 2008

# TABLE OF CONTENTS


TIP TOP'S OPPOSITION AND REPLY BRIEF 1

I. Tip Top's has Standing-- the Bid Bond was Facially Compliant

A. The IFB Allowed a Power of Attorney on the SF 24 3

B. Enforceability of the Power of Attorney is not a Matter of Responsiveness 3

II. The CO's Failure to Provide an Opportunity to Resolve Concerns or Substitute Assets Improperly Converted Matters of Responsibility to Responsiveness 6

A. FAR Part 9.1 Determinations Serve a Materially Different Function 6

B. Regulatory Changes Support the GAO Case Law 7

C. The IFB Reflects the GAO Case Law 8

D. FAR 28.203-4 Undermines Defendant's "Context" Argument 9

III. The CO's Contemporaneous Basis for Rejection of the Bid Bond is Unreasonable 10

A. FHWA's First Letter Confirms the Unreasonable Basis for the Rejection 11

B. FHWA's Later Post-Hoc Rationales Further Confirm Its Violation 13

C. Other Facts Known to FHWA Supported Acceptance of this Bid Bond 14

IV. DOJ's Post-Hoc Evaluation of the Pledged Coal is Irrelevant and Wrong 14

A. Substantial Grounds Exist for Acceptance of the Coal Asset 15

1. Other Agencies Have Accepted Mr. Scarborough's Coal Asset 15

2. Alliance's Valuation Reflected Then Current Value 15

3. Coal Refuse Contains Valuable Mined Coal 15

4. A Reasonable Basis Exists for Alliance's Valuation 16

C. Defendant's Post-Hoc Attacks on the Value Again Ignores the Evidence 17

V. Tip Top Has Been Competitively Prejudiced 18

A. Defendant's Post Hoc Claims Do Not Negate Prejudice 18

1. An Escrow Account was Neither Required Nor Grounds for Rejection 19

2. The Power of Attorney Issues are Premature 19

3. The Pledge of Assets is Consistent with the FAR 20

VI. Tip Top Has Established the Other Elements for Injunctive Relief 21

VII. The Court Has Authority to Grant the Relief Requested 22

CONCLUSION 23

**COURT CASES**


| | |
|---|---|
| Ace-Federal Reporters, Inc. v. Federal Energy Regulatory Commission, 732 F. Supp. 10, 13 (D.D.C. 1990) | 21 |
| All Seasons Construction, Inc. v. United States, 55 Fed. Cl. 175 (2003) | passim |
| Bean Dredging Corp. v. United States, 19 Cl. Ct. 561, 583 (1990) | 22 |
| Essex Electro Engineers, Inc. v. United States, 3 Cl. Ct. 277, 288 (1983) | 22 |
| Gentex Corp. v. United States, 58 Fed. Cl. 634 (2003) | 23 |
| Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 370 (2004) | 22 |
| Hawaiian Dredging Construction Co., Inc. v. United States, 59 Fed. Cl. 305, 308, 317 (2004) | 4, 10, 22 |
| John C. Grimberg v. United States, 185 F.2d 1297, 1301(1999) | 5, 7 |
| Naplesyacht.com, Inc. v. United States, 60 Fed. Cl. 459, 475-76 (2004) | 5, 10 |
| OMV Medical Inc. v. United States, 219 F.3d 1337, 1343-44 (Fed. Cir. 2000) | passim |
| SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) | passim |
| Shader Contractors v. United States, 276 F.2d 1, 6 (Ct. Cl. 1960) | 11 |
| Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573 (Fed. Cl. 2003) | 21 |


**ADMINISTRATIVE CASES**


| | |
|---|---|
| Advance Building Maintenance Co., B-176849 (January 2, 1973) | 17 |
| Altex Enterprises, Inc., 67 Comp. Gen. 184, B-228200, January 6, 1988, 88-1 CPD ¶7 | 19 |
| Astro Painting Company, B-247922-.2, June 19, 1992, 92-1 CPD ¶535 | 4, 9, 19 |

| | |
|---|---|
| Communications by Johnson, Inc., B-255478, March 2, 1994, 94-1 CPD ¶163 | 3 |
| D.M. Potts Corporation , B-231855, Nov. 4, 1988, 88-2 CPD ¶440 | 5, 13 |
| E.C. Development, Inc., B-231523, Sept. 26, 1988, 88-2 CPD ¶285 | 5, 13 |
| Gene Quigley, Jr., 70 Comp. Gen. 273, B-241565, February 19, 1991, 91-2 CPD ¶182 | passim |
| Gulf & Texas Trading Co., B-253991-.2, Jan. 24, 1994, 94-1 CPD ¶31 | 5, 9 |
| Horizon Shipbuilding, Inc., B-292992, Dec. 8, 2003, 2003 CPD ¶223 | 3 |
| Jay Jackson & Associates, B-271236-.3, Sept. 10, 1996, 96-2 CPD ¶111 | 5, 7, 9 |
| Maitland Brothers Co., B-233871, March 6, 1989, 89-1 CPD ¶244 | 19 |
| Noslot Pest Control, Inc., B-234290, 68 C.G. 396, April 20, 1989, 89-1 CPD ¶396; | 19 |
| Pamfilis Painting, Inc., B-247922, June 15, 1992, 92-1 CPD ¶521 | 9 |
| R.C. Benson & Sons, Inc., B-240251.2, July 31, 1990, 90-2 CPD ¶92 | 19 |
| U.S. Floors, Inc., B-241552, B-241555, February 6, 1991, 91-1 CPD ¶130 | 9 |


**STATUTES AND REGULATIONS AND TREATISES**


| | |
|---|---|
| 41 U.S.C. §253(a)(2) | 6 |
| 41 U.S.C. §253b(c) | 6 |
| FAR §28.101-3 | 4 |
| FAR Part 9.1 | 6 |

| | |
|---|---|
| FAR §9.103 | 6 |
| FAR §9.104-1 | 6 |
| FAR §28.203(a) | 6 |
| FAR §28.203(c) | 6 |
| FAR §28.203-1(b) | 19 |
| FAR §28.203-2(a) | passim |
| FAR §28.203-2(c) | passim |
| FAR §28.203-4 | 7, 9, 10 |
| FAR §28.203-2(b) | passim |
| FAR §28.203-5 | 6 |
| 70 Federal Register 57459-1 (Sept. 30, 2005) | 4 |
| Black's Law Dictionary, (6th ed. 1990), p. 1357 | 19 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TIP TOP CONSTRUCTION, INC.<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) | No. 08-352C<br>Judge Lynn J. Bush |

TIP TOP'S OPPOSITION AND REPLY BRIEF

The only issue before this Court is the contemporaneous determination actually made by the Federal Highway Administration's ("FHWA") Contracting Officer ("CO") to support its rejection of the bid bond — that "marketable coal" pledged to support the bid bond was "expressly excluded by Subsection 28.203-2(c)(7)" which declares as unacceptable, "speculative assets (e.g. mineral rights)." The CO later called the pledged coal "mined but not marketed coal," explaining that the mined coal was "speculative" like a "mineral right" and unacceptable per se because it had not yet been sold. The FAR contains no requirement that assets have to be sold first to be acceptable and mined, marketable coal, the CO's chosen term, cannot reasonably be viewed as a "mineral right."

Defendant knows it cannot justify the CO's contemporaneous and unreasonable basis for rejecting Plaintiff's, Tip Top Construction, Inc.'s ("Tip Top") bid bond and offers post-hoc rationales, alleging that the CO was "confused" about coal and/or that her interpretative errors were "de minimis." Nothing in the record supports these claims.

Defendant also knows it cannot distinguish the Government Accountability Office ("GAO") case law interpreting the financial responsibility determination of sureties under FAR §28.203(a) to require the CO to attempt to preserve the low bid by first providing an opportunity for the surety to support the asset or to substitute an acceptable asset.

Instead, Defendant asks this Court to overturn longstanding federal practice regarding the pre-award financial responsibility of the surety under FAR §28.203(a) based on case law involving a different responsibility determination under FAR Part 9.1, which addresses the capability of the bidder to perform at the low price.

Recognizing this case law does not apply, and that even if it did, the FHWA CO's contemporaneous rationale for rejecting the bid bond lacks a reasonable basis, Defendant spends the vast majority of its brief in classic post-hoc rationalizations, either attempting to couch its improper arguments as matters of "responsiveness," which they are not, or blatantly purporting to exercise the Department of Justice's ("DOJ") post-hoc "discretion" to attempt to prove that there was no choice but to reject the asset. DOJ's self-serving post-hoc "discretion" is flawed and misleading and in any event, is irrelevant as no such rationales were proffered by the CO. Moreover, contrary to DOJ's views, this coal asset has been reasonably accepted by a number of other federal agencies.

The bottom line is that, had FHWA complied with the law and given the surety an opportunity to answer questions or substitute the pledged asset, there is a substantial chance that an objective CO would have accepted either the coal pledged or an acceptable substitute asset. In this manner, the CO would have protected the Government's interest in Tip Top's low bid benefiting the taxpayers by $1.4 million.

This procedure never happened and no discretion was exercised because the FHWA CO, after unreasonably rejecting the pledged without any investigation, slammed the door on Tip Top and the surety in the erroneous belief that she could not consider support for the bid bond, including a substitution of assets, because such support would be "untimely" and in supposed violation of non-existent procurement regulations.

I. Tip Top's Has Standing-- the Bid Bond was Facially Compliant

Defendant claims, admittedly post-hoc, that Tip Top's bid bond was facially "nonresponsive" because: (a) the individual surety signed the Standard Form ("SF") 24 through a power of attorney which the Information for Bids ("IFB") did not allow, and (b) the power of attorney is ambiguous. Both claims lack merit.

A. The IFB Allowed a Power of Attorney on the SF 24

The IFB states that a power of attorney is not acceptable for the SF 28, not the SF 24. Def. Ex. A, p. 13.[1] For purposes of responsiveness, an alleged "ambiguity" regarding the identity of the individual surety does not exist where the SF 24 itself is unambiguous. See Horizon Shipbuilding, Inc., B-292992, Dec. 8, 2003, 2003 CPD ¶223 (SF 24 indicated both an individual and corporate surety); Communications by Johnson, Inc., B-255478, March 2, 1994, 94-1 CPD ¶163 (ambiguity existed on the SF 24 between an individual surety and an "Imperial Surety Services, Inc.").

Here, the SF 24 unambiguously indicates that Edmund S. Scarborough is the "individual surety", a person self-employed by definition, and that Ms. Connie F. Soulyrette, his duly appointed the attorney-in-fact, signed for Mr. Scarborough (in the "Individual Surety(ies)" section). AR 227. The bid bond is facially compliant.

B. Enforceability of the Power of Attorney is Not a Matter of Responsiveness

Defendant's contention that the SF 24 is nonresponsive because Ms. Soulyrette, the attorney-in-fact, did not "unambiguously" sign the SF 24 on behalf of Mr. Scarborough is without merit factually or legally.

[1] References to the Administrative Record are "AR ___"; References to Defendant's Brief are "Def. Br. ___"; References to Defendant's Exhibit A are "Def. Ex. A".

In response to this Court's criticisms in Hawaiian Dredging v. United States, 59 Fed. Cl. 305, 326 (2004), FAR §28.101-3 was revised in 2005 to make issues relating to the authenticity or enforceability of a power of attorney a matter of responsibility, not responsiveness. See FAR §28.101-3(d)(2); 70 Federal Register 57459-1 (Sept. 30, 2005).

Moreover, there is no "ambiguity." The power of attorney was conferred by an individual, Mr. Scarborough. The power of attorney authorized Ms. Soulyrette to act "for him and in his name." AR 231. The coal asset belongs personally to Mr. Scarborough and is pledged by him. AR 232. The website on the power of attorney identifies a corporation, IBCS, which offers services to the individual surety and others. See www.ibcs.com. IBCS assists Mr. Scarborough in activities relating to managing the bonds he offers as an individual surety under his "program", which is the commercial name through which he offers and supports bonds. The "Scarborough Bond and Guarantee Program" is not represented in any other document or the power of attorney itself to be a "corporation, partnership, or other unincorporated associations or firms."

In sum, reasonably interpreting the documents submitted, the "program" was not contemporaneously, and should be viewed now, as creating any ambiguity regarding Scarborough's status as Tip Top's individual surety in his personal capacity. The identity and status of the individual surety is facially compliant.

Indeed, FAR §28.101-3(e)(1) and (2) provide that concerns regarding the authenticity or enforceability of the power of attorney are to be handled by contacting the surety after bid opening and give the surety the opportunity to declare the power of attorney valid as of bid opening. As shown below, the CO improperly made no attempt to contact the surety on this or any other matter before rejecting the bond.

II. The CO's Failure to Provide an Opportunity to Resolve Concerns or Substitute Assets Improperly Converted Matters of Responsibility to Responsiveness

Defendant recognizes that the FHWA's contemporaneous actions violated the longstanding GAO case law interpreting the CO's duty to "ensure that the surety's pledged assets are sufficient to cover the bond obligation" in FAR §28.203(a). Those cases require a CO, before rejecting a facially compliant bid bond, to give the surety an opportunity to resolve uncertainties in the SF 28 or pledge of assets either by providing additional documentation or substituting assets. See Gene Quigley, Jr., 70 Comp. Gen. 273, B-241565, Feb. 19, 1991, 91-2 CPD ¶182; accord Jay Jackson & Associates, B-271236-.3, Sept. 10, 1996, 96-2 CPD ¶111 (agency sought support for what it always believed were "mineral rights"); Gulf & Texas Trading Co., B-253991-.2, Jan. 24, 1994, 94-1 CPD ¶3; Astro Painting Company, B-247922-.2, June 19, 1992, 92-1 CPD ¶535. These GAO cases hold that under these circumstances, an automatic rejection of the bid bond is improper. See also E.C. Development, Inc., B-231523, Sept. 26, 1988, 88-2 CPD ¶285; D.M. Potts Corporation, B-231855, Nov. 4, 1988, 88-2 CPD ¶440.

Defendant asks this Court to overturn this longstanding GAO precedent based on John C. Grimberg v. United States, 185 F.2d 1297, 1301(1999) which supposedly rejected the "exact" contention and/or regulatory changes in 1990. Neither position has merit.

A. FAR Part 9.1 Determinations Serve a Materially Different Function

In Grimberg, the Federal Circuit held that the CO is not absolutely required to seek clarifying information from the contractor in making a responsibility determination. Whether additional information should be sought is a matter of discretion, which can be abused. Naplesyacht.com, Inc. v. United States, 60 Fed. Cl. 459, 475-76 (2004).

However, the court in Grimberg was addressing the responsibility of the contractor under FAR §9.103 and FAR §9.104-1. This determination is focused on whether the contractor has the resources to perform for that low price and the requisite integrity. Id. Neither bid bonds nor sureties are mentioned in by FAR Subpart 9.1.

While a separate finding of non-responsibility of the surety may result in FAR Part 9 non-responsibility, a separate regulation, FAR §28.203(a), was issued to cover the pre-award financial responsibility of a surety.[2] The FAR § 28.203(a) determination relates to a bid bond that expires or is enforced before award and contract performance begins. See FAR §28.203-5. It is intended to preserve the statutory interest in the low bid in 41 U.S.C. §253(a)(2) and 41 U.S.C. §253b(c) without regard to whether the bidder can perform for the low price under a FAR Part 9.1 responsibility determination.

There are sound reasons for the GAO's rule requiring an agency to take additional steps under this regulation to provide the surety an opportunity to support its asset or submit an acceptable substitute asset before rejecting the bond. The Government is not really procuring a bid bond through competition but a contract. The business judgment in a FAR Part 9.1 determination addresses the fact that if the bidder does not have sufficient resources, the low price may not be a benefit. It is the contractor and not a third party surety outside its control that has the means to support its ability to perform at that price.

In contrast, if the Government can obtain the benefit of low price from a responsible bidder, it would make no sense to allow CO's to automatically reject a bid bond based on resolvable uncertainties regarding the surety's financial responsibility.

[2] This distinction is further reflected in the fact that surety financial responsibility determinations for small businesses like Tip Top are not subject to a statutory referral to the Small Business Administration for a Certificate of Competency ("COC"). See FAR §28.101-3(f); FAR §28.203(c).

Finally, an automatic rejection is totally inconsistent with the surety's right to propose an acceptable substitute asset under FAR §28.203-4, a regulation designed to protect the Government's pre-award interest in the low bid, as discussed further below.

B. Regulatory Changes Support the GAO Case Law

Apparently recognizing that Grimberg did not address the "exact" determination at issue in that case, Defendant argues that the GAO case law was impliedly eliminated by changes to the individual surety regulations in 1990. This "context" argument is overstated, irrelevant, and is a transparent post-hoc rationale.

While the types of acceptable assets that could be pledged by individual sureties were narrowed to a standard of "acceptability" under FAR §28.203-2(a) – whether the pledged assets were "readily marketable"--, the FAR drafters did not eliminate FAR §28.203(a) determinations regarding the surety's financial responsibility or convert them to matters of responsiveness. The lists of acceptable and unacceptable assets in FAR §28.203-2 are not exclusive under the regulatory language discussed below, as the FHWA has conceded. AR 263. Thus, when an asset is not listed in either category, and the CO has concerns, under longstanding GAO case law, the CO must take steps to see if they can be resolved so that the low bid can be preserved.

Defendant's proffer of the GAO's post-hoc rationales under its "context" argument - that the only acceptable "personal property" was listed in FAR §28.203-2 (b) – is improper and should not be considered. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); OMV Medical Inc. v. United States, 219 F.3d 1337, 1343-44 (Fed. Cir. 2000); All Seasons Construction, Inc. v. United States, 55 Fed. Cl. 175, 177, fn. 1 (2003).

Moreover, this post-hoc rationale is contradicted by (a) the title of FAR §28.203 "Acceptability of Assets" which would have been named "Acceptable Assets" if the list was intended to be exclusive, (b) establishment of a broad standard that acceptable assets be "readily marketable" and (c) inclusion in FAR §28.203-2(c) of a number of different types of unacceptable personal property assets with specific examples, which would be superfluous if the only acceptable personal property was that listed in subparagraph (b). Even the GAO abandoned this unsupportable, post hoc argument in its final decision.

After issuance of the new regulations, the GAO, which has long established federal practice in the bid bond area, reaffirmed the agency's duty to attempt to resolve any uncertainties in the SF 28 and pledge of assets by giving the surety an opportunity to support its asset or pledge other acceptable assets. See Jay Jackson; supra; Gene Quigley, supra. Indeed, in the most recent regulatory change, which designated power of attorney issues as matters of responsibility, and not responsiveness, consistent with the GAO case law, the FAR drafters required the CO to contact the surety. FAR §28.101-3(e).

C. The IFB Reflects the GAO Case Law

In the IFB, bidders were put on notice of the practice reflected by the GAO case law. Bidders were warned that the FHWA could request documentary evidence to support the bid bond, which, if not furnished, could be cause for rejection of the bid. AR 61. Defendant's position that the surety was "required" to provide this evidence with its bid ignores that this requirement comes into existence only if the CO has questions based on the documents submitted and asks for further information. Likewise, the right to reject the bid bond only comes into existence if the information is not provided. No CO request was made here. Neither the 14-day time period or any other time limit applies.

D. FAR 28.203-4 Undermines Defendant's "Context" Argument

Defendant's "context" argument as support for an automatic rejection without investigation or inquiry where an asset pledged in an SF 28 is initially considered unacceptable is undermined by the FAR drafter's retention of FAR §28.203-4. This regulation gives the surety the ability to substitute an acceptable asset in the event that the asset pledged is determined to be unacceptable after bid opening, and thus, to preserve the low bid. U.S. Floors, Inc., B-241552, B-241555, Feb. 6, 1991, 91-1 CPD ¶130; accord Jay Jackson; supra; Gulf & Texas Trading, supra; Astro Painting, supra; Pamfilis Painting, B-247922, June 15, 1992, 92-1 CPD ¶521; Gene Quigley.

Defendant argues that the FHWA had to first receive a request from the surety to substitute the bond. Further, Defendant claims that Tip Top's position would eliminate the CO's discretion. These statements also lack substance.

In fact, the surety did request to substitute the asset if Mr. Scarborough was unable to resolve the CO's concerns. See AR 417-18.

No timeliness considerations with respect to making an award were present at the time of rejection. Further, Defendant ignores that FHWA slammed the door shut on any request by the surety by eliminating Tip Top first and then stating that it would refuse to consider any support for the bid bond in the erroneous belief that such support would be "untimely" and violate non-existent procurement regulations. AR 233, 263.[3] Moreover, the door was shut after receiving Tip Top's notice that other surety had assets including cash and that they were available. AR 565. Defendant's "interpretation" of this e-mail as not being a request to substitute assets cannot withstand scrutiny.

[3] Defendant's circular argument that FAR §28.203(a) supports these claims of untimeliness, without any investigation of the asset or an opportunity for the surety to provide a substitute asset ignores the case law making these determinations matters of responsibility, not responsiveness. Gene Quigley.

Defendant's claim that the new regulations somehow affected the duty to provide an opportunity to substitute assets before rejecting the bid bond is unfounded. FAR §28.203-4 was retained. Indeed, because there are now limitations on the types of acceptable assets, the requirement to afford an opportunity to pledge substitute assets became even more important in preserving the statutory interest in the low bid.

Tip Top's position that the CO had a duty to provide an opportunity to submit a substitute asset does not eliminate the CO's discretion. However, once a substitute asset is determined to be acceptable, absent other legitimate grounds to reject the bid bond, none of which were ever asserted by FHWA contemporaneously or at the GAO, there would be no legitimate reason to reject the substitute asset or to not make award to Tip Top, the low, responsive, responsible bidder. Hawaiian Dredging; supra at p. 317.

Moreover, the CO mistakenly believed she had no discretion to accept or consider additional support for the bond based on her misunderstanding of the law. As shown below, the stated basis for the rejection was in violation of law and the refusal to allow support was patently unreasonable and an abuse of discretion. Naplesyacht, supra.

III. The CO's Contemporaneous Basis for Rejection of the Bid Bond is Unreasonable

Before addressing the actual basis for FHWA's rejection of the bid bond, Defendant first engages in a post-hoc nitpicking of Scarborough's SF 28 that supposedly bolsters the CO's rejection of the asset without an investigation or providing the surety with an opportunity to support the asset or submit a substitute asset. However, nothing in the record indicates this micro-inspection of the SF 28 or pledge of assets took place. AR 233, 263-64, 241-44. Such post-hoc rationalizations are suspect and cannot be considered. SEC v. Chenery Corp., OMV Medical; All Seasons.

Defendant adopted this tactic because even if no opportunity to support the asset was required to be provided, the failure to do so was an abuse of discretion. Without any investigation, the CO made an unreasonable determination to reject the bid bond in the erroneous belief that "marketable coal," the CO's chosen term[4], was an unacceptable "speculative" asset "expressly excluded" by FAR §28.203-2(c)(7). AR 233.

Defendant's attempt to expand the definition of "speculative" in FAR §28.203-2(c)(7) to cover assets involving any "chance" or "risk" must be rejected. Everything in life, including acceptable assets listed in the FAR, involves some chance or risk. The drafters narrowed and defined the scope of the term "speculative" through a specific example —"mineral rights." This is the only asset that is "expressly excluded" in the regulation cited and was what the CO equated to the $1.8 million portion "of $191,350,000.00 of previously mined, extracted, stockpiled and marketable coal."

A. FHWA's First Letter Confirms the Unreasonable Basis for the Rejection

When this reasoning was challenged by the surety, the FHWA apparently knew that mined, stockpiled coal had none of the characteristics that made a "mineral right" speculative – the existence of the minerals and/or the value of a mineral right is unknown until the minerals are mined. The FHWA also had the common knowledge that mined coal is a readily marketable commodity. See Shader Contractors, Inc. v. United States, 276 F.2d 1, (Ct. Cl. 1960), AR 549-50. The CO thus offered three post hoc rationales:

1. "Proof of value" had not been furnished, the absence of which allegedly made the bid bond unacceptable "on its face." AR 263.

---

[4] Defendant's post-hoc attempt to avoid the CO's contemporaneous statement that the coal pledged was "marketable", as the CO understood it without any investigation, is contradicted by her post-hoc statement that even if the value and ownership were established, the coal would be speculative because it had not yet been sold. See AR 243-44 and discussion infra at p. 12.

This alleged facial non-compliance apparently was erroneously considered a matter of responsiveness, which, if accurate, which is not the case, would make any further support of the bid bond "untimely." AR 263. However, no requirement to submit "proof of value" exists in the SF 24, which determines "facial" compliance.

The value of the pledged asset -- $1.8 million of $191 million of previously mined, extracted and stockpiled coal -- was to be stated in the SF 28 and had to exceed the penal amount of the bond. Questions about that value are not matters of responsiveness involving facial compliance of the SF 24 but go to the surety's financial responsibility, which can be resolved after bid opening. Gene Quigley.

Further, contrary to Defendant's claims and as noted above, the IFB only requires documentary support for statements as to the value on the SF 28 or the pledge of assets when the CO requests it. AR 61. Only the failure "of the surety to accept such mail or failure of the surety to respond with the requested information or documents within 7 business days of receipt of the request, will be cause for rejection of the surety." (Emphasis added). AR 61. No CO request was made here.

2. "Mined, but not marketed coal" was alleged to be more like an "accounts receivable", "corporate assets (e.g. plant and equipment)" or "mineral rights." See FAR §§28.203-2(c)(1), (6) and (7). Under FHWA's reasoning, only if the coal was marketed, i.e. sold first, would it be an acceptable asset.

No such requirement exists for acceptable assets. Stocks and bonds have not been "sold first" any more than mined coal. The value of coal, similar to stocks and bonds, is evidenced by sales on nationally-recognized commodities markets which have published "spot prices." (discussed infra) See AR 359-63, 366-81, 458-513, 549-51.

3. The CO's duty to protect the Government under FAR §28.203 justified the rejection. The CO did not explain why, nor did DOJ in its brief. This regulation does not support an automatic rejection in these circumstances. E.C. Development, supra; D. M. Potts, supra.

B. FHWA's Later Post-Hoc Rationales Further Confirm Its Violation

In the CO's submission to the GAO, the CO made essentially the same arguments. The CO explained that "mined, but not marketed coal," her term, was "speculative" because the actual value of the asset "can only be conjectured until the actual sale takes place." AR 243 (Emphasis added). Again, there is no FAR requirement that the asset be sold before it is pledged.

Her concern about "liquidity" was the alleged "burden" on the Government as "it depends upon identifying a willing and responsible buyer." The CO continued:

> "But my analysis is "mineral rights" includes the right to sell coal after it is mined, and the asset is still speculative as to liquidity and value." Id.

Thus, "mineral rights" were "speculative," like mined coal, because after the minerals hoped to found under an exercise of the "mineral rights" were actually mined and known, the minerals still had to be sold. Not having a willing buyer who had actually purchased the mined coal, in the CO's view, made the asset non-liquid. This reasoning emasculates why "mineral rights" were the FAR drafter's chosen example of a "speculative" asset and should be rejected.

The FHWA then concluded that even if additional post-hoc concerns about the coal's value and ownership were resolved, i.e. accepting as a fact that Scarborough's coal was worth $191 million and a $1.8 million portion of that coal was pledged, this coal was still "so speculative as to be unacceptable because of the liquidity issue…." AR 244.

Stockpiled coal is not kryptonite. There was no difficulty in "characterizing" it or "confusion" in the CO's mind for why she erroneously thought mined coal was "speculative" — the CO stated the coal had to be sold first to a willing buyer to be acceptable. No regulation or case law supports this position. This was not a "de minimis" error.

Defendant's last argument – that the "history" of overvalued assets justified the CO's rejection – is yet another post-hoc rationale without support in the AR, the IFB, or the case law. Nothing in the AR shows that the CO was aware of any alleged history.

C. Other Facts Known to FHWA Supported Acceptance of this Bid Bond

In addition to the loss of $1.4 million in taxpayer dollars represented by Tip Top's low bid, the CO's rejection was particularly unreasonable because the CO knew the risk of a default on the bid bond was minimal to non-existent. Tip Top spent significant resources developing a CPM, showing Tip Top's intent to execute the contract and submit payment and performance bonds.[5] AR 573. Tip Top's reliability was also shown by the one FHWA contract of which the FHWA was on notice. In it, Tip Top received an FHWA award, a copy of which was attached. AR 566. At a minimum, if the FHWA was actually concerned with the asset, these facts weigh heavily in favor of making an attempt to resolve any concerns or enabling the surety to substitute an acceptable asset.

IV. DOJ's Post-Hoc Evaluation of the Pledged Coal is Irrelevant and Wrong

Defendant seeks to support the CO's unreasonable rejection by remaking it as though DOJ was the CO. DOJ's views are an improper post-hoc rationale and irrelevant. SEC v. Cheney; OMV Medical; All Seasons.

[5] Defendant's argument that the FHWA did not necessarily accept the CPM is irrelevant to this rejection. Moreover, acceptance of the CPM is a matter of responsibility under FAR 9.1 which would be subject to final determination by the SBA under the COC program, not the FHWA.

The relevant timeframe for evaluation of the documentation of the asset by the CO is not "before the award was granted", as Defendant claims, to another higher priced bidder but before the bid bond was rejected and Tip Top was eliminated. None of DOJ's post-hoc views about the pledged coal were expressed by the CO during the evaluation. Moreover, DOJ's views are based on a selective and misleading recitation of the facts.

A. Substantial Grounds Exist for Acceptance of the Coal Asset

1. Other Agencies Have Accepted Mr. Scarborough's Coal Asset

There is no basis for Defendant's post-hoc assertion that the pledged coal could "never" have been accepted. There is more than a substantial chance that an objective contracting officer would have reasonably concluded that, given the minimal risk that Tip Top would default on the bond, and after communications with the surety, the pledged coal would be found acceptable. Indeed, this coal asset has been accepted by a number of other federal agencies. AR 432. As shown below, their acceptance was reasonable.

2. Alliance's Valuation Reflected Then Current Value

Alliance Consulting Inc.'s ("Alliance") value determination was presented to the GAO in response to FHWA's argument regarding "proof of value." This was not Scarborough's only proof of value but the most recent information as of March 2008, when the issue was raised at the GAO. AR 244, 419-20, 435-57. Had FHWA requested earlier evidence of value, Scarborough would have provided it.

3. Coal Refuse Contains Valuable Mined Coal

Alliance's independent, scientific determination is strong evidence that the value of pledged coal far exceeded the penal amount of the bond. FAR §28.203(a). Defendant attempts to denigrate "coal refuse" but ignores evidence of its value and marketability.

Coal refuse is the byproduct of prior (and often early/primitive) coal mining operations. Over the last century or more, such coal refuse, including valuable coal which was then deemed uneconomical to extract, was dumped in pits and valleys such as the R-707 site. The record shows that the coal refuse Scarborough owns contains significant amounts of coal which were not removed by the processes then employed and were placed in pits along with other non-coal materials such as rock, shale, slurry and clay. With today's technology, and factoring the recent spikes in worldwide coal prices, the remaining coal in many coal refuse sites, including Scarborough's, can be readily and economically extracted, and coal refuse itself is readily marketable.

4. A Reasonable Basis Exists for Alliance's Valuation

Defendant's post-hoc attempt to impugn the basis for Alliance's valuation ignores key facts. While the Sewell Coal Company engineer, Mr. Mullens, estimated the tonnage of coal refuse that had been placed there from 1962-87, Defendant omits that Mr. Mullens owned the land until Mr. Scarborough purchased it. AR 438, 441, 514-17.

The test results on which Alliance relied were taken by two other independent test companies in 2006 and in January 2008. AR 443-55. While the samples were taken from Gauley Eagle Holdings ("Gauley"), a nearby site, Mr. Mullens currently owns Gauley and stated in a sworn and notarized declaration that the stockpile came from the same Sewell mine. AR 441. Mr. Mullens is in the best position to know whether the same coal refuse was placed at both sites. AR 438.

The reliability of the data is further confirmed by the decision not to consider samples showing extraordinary high yields, although they existed. AR 438.

These test results and analyses are a recent and reasonably based indication that the Scarborough coal that can be recovered far exceeds the sum needed to support this bond. AR 437. Indeed, Alliance concluded that "conservatively," an approximate gross value of $261,000,000 of coal should be recovered. Processing/ transportation costs were estimated to reduce the approximate net value to $191 million. AR 439, 232.

C. Defendant's Post-Hoc Attack on the Value Again Ignores the Evidence

Defendant's claim that "no coal" was present at the site and that its value was "impossible to predict" are contrary to the evidence. Sohnen Coal Sales, Inc., a willing buyer, concluded that the coal was "12500 BTU AR and 14 ash AR and (below) 1.0 sulphur AR. Id. High quality Met coal has BTU of 12,500 and less than 3% SO2 (sulphur), and closely matched Sohnen Coal's offer. AR 405, 509. Thus, the claim that that the Department of Energy "spot prices" of coal are inapplicable is unfounded.

The claim that the coal refuse could not be immediately sold upon default is without merit. Defendant recognizes that there are other coal refuse processing firms. Def. Br. 23. If necessary, at a somewhat reduced price, one of these firms would have purchased enough of this $191 million asset "as is" to cover the amount of the bond, $1.8 million. Scarborough could have paid cash to support the obligation. See Advance Building Maintenance Co., B-176849 (January 2, 1973). DOJ's post-hoc, second-hand value "analysis" also ignores the soaring price of coal at that time. AR 472-73, 509. Sohnen Coal's offer of $79 per ton of coal or higher depending on "coking characteristics" also undercuts DOJ's claims. AR 457. Thus, DOJ's claim that if Mr. Scarborough's company, IBCS Mining, did not process the coal, FHWA would have been unable to sell it, is at best, self-serving and unjustified speculation.

Therefore, DOJ's post-hoc views of the representations in the pledge of assets are unwarranted and insufficient grounds for questioning Scarborough's credibility. The CO made no such claims either at the time of the bid bond rejection or afterwards.

An objective contracting officer could have reasonably concluded that the coal was "readily marketable" and acceptable for purposes of protecting the Government's interests on this bid bond. Six other agencies made that reasonable decision. AR 432.[6]

V. Tip Top Has Been Competitively Prejudiced

Defendant's post-hoc financial responsibility determination of the surety was never made contemporaneously by the FHWA CO and is irrelevant. SEC v. Chenery, OMV Medical; All Seasons. Had the CO provided Scarborough an opportunity to support his asset, either with documentation to show his ownership, the liquidity and value of the asset, or by providing an acceptable substitute asset, Tip Top would have had a substantial chance to win the award. Scarborough, through counsel, already offered to substitute the asset. AR 418. The record shows that Mr. Scarborough had assets other than coal, AR 430-31. He would have provided another acceptable asset.

A. Defendant's Post Hoc Claims Do Not Negate Prejudice

DOJ's position regarding Mr. Scarborough's credibility is irrelevant, post-hoc speculation, is unwarranted, and as discussed above, and grossly unfair. The remaining post-hoc assertions of "non-responsibility," are, at best, matters to be addressed with the surety. That did not occur because FHWA erroneously believed acceptance and consideration of any support for the bond was "untimely" and in violation of regulation.

[6] Defendant's claim that there is no proof that the coal asset accepted by these agencies was the same coal asset is speculation. Mr. Scarborough distinguished between bonds issued using the coal asset and its other federal bonds. FHWA did not challenge this assertion. See AR 430-33.

1. The Asset was Reasonably Identified

This mined coal is reasonably identified and is the example given for a security interest in personal property. See Black's Law Dictionary, (6th ed. 1990), p. 1357.

2. An Escrow Account was Neither Required Nor Grounds for Rejection

Defendant's adoption of GAO's post-hoc rationale that an "escrow account" was required is not supported by the regulations or case law and does not require rejection of the bid bond. As shown in Tip Top's opening brief, the "escrow account" requirements in FAR §28.203-1(b) address only cash assets. Defendant confuses an "escrow account" with escrow arrangements not in the FAR. Regardless of what the FAR drafters may have intended, neither FAR §28.203-1 nor FAR §28.203-2 contain any "escrow account" requirement for stock or irrevocable letters of credit or, of course, for coal.

Moreover, the absence of an escrow account in Scarborough's pledge of assets does not "demonstrate" non-responsibility. It was an issue to be resolved. See Noslot Pest Control, Inc., B-234290, 68 C.G. 396, April 20, 1989, 89-1 CPD ¶396; R.C. Benson & Sons, Inc., B-240251.2, July 31, 1990, 90-2 CPD ¶92. Here, an escrow account was not included because the coal could not be physically put into a bank. However, this would not preclude an escrow arrangement, if the CO had raised this issue, under which coal of an agreed-to value of $1.8 million could be placed in a bonded area and sold by an escrow agent. Defendant has not denied its feasibility.

2. The Power of Attorney Issues are Premature

Strict compliance with IFB and/or SF 28 requirements relating to the power of attorney are not a basis for a non-responsibility determination, particularly without providing an opportunity to resolve them. Gene Quigley.

Use of a power of attorney by individual sureties on SF 28s is commonplace. AR 35, see Astro Painting; Maitland Brothers Co., B-233871, March 6, 1989, 89-1 CPD ¶244. Scarborough was apparently unaware that FHWA had made this practice unacceptable on the SF 28. Had he known, a protest likely would have been filed against this discriminatory requirement as there is no legal basis to preclude an individual surety from using a legal document permitted to sureties in FAR §28.101-3. Altex Enterprises, Inc., 67 Comp. Gen. 184, B-228200, Jan. 6, 1988, 88-1 CPD ¶7.

In any event, this is a minor matter involving no risk. Scarborough signed the power of attorney making him liable on the bond; he could easily sign the SF 28.

Defendant's position that a non-existent ambiguity in authority of the power of attorney document could be grounds for a non-responsibility determination without investigation is contrary to FAR §28.101-3(e). The CO has not contacted him.

3. The Pledge of Assets is Consistent with the FAR

The third paragraph of Scarborough's pledge of assets requires a final determination of a default preceding any execution on the asset. AR 232. This violates no regulation. The requirement in FAR §28.203-1(b)(i) cited by Defendant addresses obligations of a financial institution for a cash escrow account following a default. There is no error or a basis for a non-responsibility finding.

In sum, had the opportunity been provided, Scarborough would have resolved the CO's concerns or submitted an acceptable substitute asset. Even if the FHWA found the pledged asset unacceptable, no legitimate reason would exist for rejecting an acceptable substitute or for making award to Tip Top, the low, responsive, responsible bidder (including concerns that Tip Top would use delays to "suit its goals", AR 558).

VI. Tip Top Has Established the Other Elements for Injunctive Relief

Defendant does not contest that Tip Top's lost profits are immediate and irreparable harm. This alone establishes this requirement for injunctive relief.

The loss of key personnel is also irreparable harm because it is more than an "economic loss." Declaration of Percy Hollins, Tip Top Memorandum, Ex. 24. Ace-Federal Reporters, Inc. v. Federal Energy Regulatory Commission, 732 F. Supp. 10, 13 (D.D.C. 1990).

Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573 (Fed. Cl. 2003) is not the contrary to the contrary, as Defendant contends. Sierra involved an incumbent that asserted as harm it would lose its employees during a transition period. The Court found that the declaration submitted in support failed to establish this claim.

Defendant's view of the balance of harms presumes that Tip Top's surety cannot establish the acceptability of its pledged coal or substitute an acceptable asset. Tip Top was the low, responsive, responsible bidder. Since FHWA was required to provide that opportunity, none of the higher bidders will be harmed.

Defendant's claims of the burden of investigating the coal asset pledged are in conflict with longstanding case law requiring this effort. Gene Quigley. It is FHWA that is attempting to circumvent regulatory requirements under FAR §28.203(a) as interpreted in those decisions. The intended contract to the higher priced bidder is the result of violations of federal law and regulations. The public has a strong interest in assuring that federal procurements are conducted fairly and correctly. The public also has an interest in assuring that the Government obtains the lowest priced, responsive, responsible bidder which Tip Top represents.

VII. The Court Has Authority to Grant the Relief Requested

Tip Top has not asked the Court to direct an award, only to revert matters to the status quo prior to FHWA's illegal rejection of the bid bond and elimination of Tip Top and to require the agency to properly determine whether the pledged asset or a substitute asset is acceptable. If acceptable, there is no discretion but to award Tip Top the contract. Hawaiian Dredging at p. 317.

In any event, until this required process occurs, this Court has authority enjoin the agency from allowing anyone but Tip Top to perform the contract. Great Lakes Dredge & Dock Co. v. United States, 60 Fed. Cl. 350, 370 (2004); Bean Dredging Corp. v. United States, 19 Cl. Ct. 561, 583 (1990); Essex Electro Engineers, Inc. v. United States, 3 Cl. Ct. 277, 288 (1983).

Defendant's allegations of unidentified and "numerous other responsibility concerns," at best, are not for the CO's evaluation but would have to be referred to the SBA for a COC, and SBA's decision is binding. Tip Top's CPM shows that such a referral would not eliminate Tip Top and indeed, the real concern was that Tip Top had utilized admitted excessive delays in the maximum schedule to its benefit. AR 588. This is not a matter of responsibility.

Tip Top's request for its reasonable costs including costs expended on its CPM are not unsupported. AR 265-87, 573. Gentex Corp. v. United States, 58 Fed. Cl. 634 (2003)(quantum can be determined in later proceedings).

Moreover, Defendant concedes these costs were incurred at FHWA's direction. Def. Br. 4, AR 327-28. Accordingly, they should be considered proposal preparation costs.

CONCLUSION

FHWA's rejection of the bond and refusing to allow the surety to provide additional support or a substitute asset were patently erroneous as a matter of law and fact and an abdication and abuse of discretion denying Tip Top this contract and the public the $1.4 million in savings represented by its low bid. Defendant's post-hoc explanations are irrelevant.

For the reasons set forth above and in Tip Top's initial pleadings and exhibits, Tip Top respectfully requests that this Court grant Tip Top's request for preliminary and permanent injunctive relief.

Respectfully submitted,
s/ Michael A. Gordon
MICHAEL A. GORDON PLLC
1629 K Street N.W., Suite 300
Washington, D.C. 20006
(202) 508-1464 (telephone)
(202) 349-1701 (facsimile)
Attorney of Record
for Plaintiff, Tip Top Construction, Inc.

OF COUNSEL:
Fran Baskin, Esquire
MICHAEL A. GORDON PLLC

June 17, 2008