No. 08-352C
(Judge Bush)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

TIP TOP CONSTRUCTION, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

AMANDA L. TANTUM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 616-8131
Fax. (202) 514-8624

June 26, 2008

Attorneys for Defendant

**TABLE OF CONTENTS**

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Tip Top Has Not And Cannot Demonstrate Prejudice And Therefore Lacks Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. The Court Should Consider Evidence Outside Of The Administrative Record And Outside Of The Contracting Officer's Reasoning In Determining Whether Tip Top Has Been Prejudiced . . . . . . . . . . . . . . . . . 2

B. Tip Top Has Made No Attempt To Demonstrate Its Responsibility, As Required By the Federal Circuit in _Myers Investigative and Security Services, Inc. v. United States_ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C. Mr. Scarborough Could Not And Still Cannot Reprocess The Coal Refuse Because Of His Failure To Obtain Necessary Permits . . . . . . . . . . 5

D. Mr. Scarborough Did Not And Still Does Not Own The Coal Refuse . . . . 6

E. Tip Top's Attempts To Support The Value Of The Coal Refuse Are Unavailing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

F. The Limited Scope Evaluation And Other Documentation Refuting The Existence Of Coal Or Even The Ability To Reprocess Coal Refuse Places The Integrity And Credibility Of The Individual Surety In Doubt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

G. The Failure To Create An Escrow Account Demonstrates Tip Top's Nonresponsibility . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

H. The Ambiguity Created By The Power Of Attorney Makes Tip Top's Bid Nonresponsive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

II. Tip Top's Arguments Regarding The Purported "Post Hoc" Nature Of Any Information Received Or Reasoning Expressed By The Agency Or GAO Following The Contracting Officer's February 19, 2008 Decision Lack Merit. . 16

A. The Record Before The Agency At The Time Of Award Demonstrated The Unacceptability Of The Asset. . . . . . . . . . . . . . . . . . . 16

B. The Agency's Decision To Follow The GAO's Rational Recommendation Was Proper . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III. The Contracting Officer Properly Used Business Judgment To Determine That The "Coal" Was Unacceptable And That Tip Top Was Nonresponsible . . . 18

A. Tip Top Has Failed To Demonstrate That Coal Or Coal Refuse Is A "Readily Marketable Asset" Or That The Contracting Officer's Determination Of Unacceptability Was Irrational . . . . . . . . . . . . . . . . . . 18

B. The Fact That Other Contracting Officers May Have Accepted The Coal Asset Is Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C. The Contracting Officer Was Not Required To Engage In An Investigation Of Mr. Scarborough's Coal Refuse Pile . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1. Under Federal Circuit Caselaw, The Contracting Officer Had No Duty To Request Or Consider Additional Information Regarding The Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

2. The Past GAO Decisions Cited By Tip Top Are Irrelevant To The Determination In This Procurement And Are, In Any Case, Distinguishable Or Based On Pre-1990 Standards . . . . . . . . . . . . 23

3. The FAR, And The Changes Made To It In 1990, Do Not Require Any Investigation Of Assets By The Contracting Officer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

4. The Solicitation Did Not Mandate An Investigation Of The Assets By The Contracting Officer Or Review Of Additional . . . 25

IV. FAR § 28.203-4 Allows, But Does Not Require, The Contracting Officer To Consider An Individual Surety's Request For Substitution Of Assets . . . . . . . . . 26

V. Tip Top's Opposition And Reply Brief Does Not Establish The Protestor's Right To Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VI. The Court Should Reject Tip Top's Requests For Relief. . . . . . . . . . . . . . . . . . . 28

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

## CASES

Adams v. United States,
20 Cl. Ct. 132 (1990). . . . . 3

Awad v. United States,
61 Fed. Cl. 281 (2004). . . . . 2

Galen Med. Assocs., Inc. v. United States,
74 Fed. Cl. 377 (2006). . . . . 3, 13

Honeywell, Inc. v. United States,
870 F.2d 644 (Fed. Cir. 1989). . . . . 17, 18

Indium Corp. of Am. v. Semi-Alloys, Inc.,
781 F.2d 879 (Fed. Cir. 1985). . . . . 3

Integrated Protection Sys., Inc., B-254457,
1994 WL 29886 (1994). . . . . 16

Interstate Rock Prods., Inc. v. United States,
50 Fed. Cl. 349 (2001). . . . . 14, 15, 23

John C. Grimberg Co. v. United States,
185 F.3d 1297 (Fed. Cir. 1999). . . . . passim

Moyer v. United States,
190 F.3d 1314 (Fed. Cir. 1999). . . . . 3

Myers Investigative and Sec. Servs., Inc. v. United States,
275 F.3d 1366 (Fed. Cir. 2002). . . . . 4, 14, 15

News Printing Co. v. United States,
46 Fed. Cl. 740 (2000). . . . . 20

Santurce Constr. Corp., B-240728,
90-2 CPD ¶ 469
1990 WL 292483 (1990). . . . . 13

Shader Contractors, Inc. v. United States,
276 F.2d 1 (Ct. Cl. 1960). . . . . 18

Sierra Military Health Services, Inc. v. United States,
58 Fed. Cl. 573 (2003). . . . . . . . . . 27

Spherix, Inc. v. United States,
62 Fed. Cl. 497 (2004). . . . . . . . . . 27

YRT Servs. Corp. v. United States,
28 Fed. Cl. 366 (1993). . . . . . . . . . 20

Zenith Radio Corp. v. United States,
710 F.2d 806 (Fed. Cir. 1983). . . . . . . . . . 27

## STATUTES

31 U.S.C. §§ 3551-3556 . . . . . . . . . . 16, 17

## FEDERAL ACQUISITION REGULATION

FAR § 2.101 . . . . . . . . . . 14

FAR § 9.103(a) . . . . . . . . . . 4

FAR § 9.104-1(g) . . . . . . . . . . 22

FAR § 28.101-3(d) . . . . . . . . . . 24

FAR § 28.101-3(e) . . . . . . . . . . 16, 24

FAR § 28.101-3(e)(1). . . . . . . . . . . 16

FAR § 28.101-3(e)2. . . . . . . . . . . 16

FAR § 28.203 . . . . . . . . . . 1, 12

FAR § 28.203-1 . . . . . . . . . . 14, 15

FAR § 28.203-1(b)(i) . . . . . . . . . . 15

FAR § 28.203-1(b)(1). . . . . . . . . . . 17

FAR § 28.203-2 . . . . . . . . . . 18, 19, 20

FAR § 28.203-2(a) . . . . . . . . . . 5

FAR § 28.203-2(b) . . . . . . . . . . 19, 20, 21

FAR § 28.203-2(c) . . . . . . . . . . 19

FAR § 28.203-4 . . . . . . . . . . 22, 23, 25, 26

FAR § 28.203(a) . . . . . . . . . . 24

FAR § 28.203(c) . . . . . . . . . . 22

FAR § 28.203-4. . . . . . . . . . 24, 26

## INDEX OF EXHIBITS LISTED IN DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD


| Exhibit | Description | Page |
|---|---|---|
| A | Declaration of Albert C. Rodebaugh, II, Dated June 10, 2008. | A 1 |
| B | Permit Renewal Notice Letter from Sherry Grubb, West Virginia Department of Environmental Protection, Mining and Reclamation, to Green Valley Coal Company, Dated July 11, 2002. | A 3 |
| C | Letter from David C. Hughart, Green Valley Coal Company, to West Virginia Department of Environmental Protection, Dated July 28, 2002. | A 4 |
| D | Letter from Thomas H. Matheny, West Virginia Department of Environmental Protection, Division of Mining and Reclamation, to David C. Hughart, Green Valley Coal Company, Dated July 29, 2002. | A 5 |
| E | Letter from Larry A. Marshall, Green Valley Coal Company, to West Virginia Department of Environmental Protection, Dated December 4, 2007. | A 6 |
| F | November 1996 Deed. | A 7 |
| G | 1992 Quitclaim Deed. | A 38 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TIP TOP CONSTRUCTION, INC. | ) | |
| | ) | |
| Plaintiff, | ) | No. 08-352C |
| | ) | (Judge Bush) |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Pursuant to the Court's May 28, 2008 order and Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), the United States files this reply to plaintiff's June 17, 2008 response to defendant's motion to dismiss and cross-motion for judgment on the administrative record, which defendant filed on June 10, 2008. The Court should dismiss this case because plaintiff, Tip Top Construction, Inc. ("Tip Top"), lacks standing to maintain it, given that Tip Top, in its opposition and reply brief, contradicts the factual allegations made in its complaint; that the coal pledged by the individual surety, Mr. Scarborough, did not exist; that Mr. Scarborough lacked the permits necessary to engage in any reprocessing of coal refuse; and that Mr. Scarborough did not own even the "coal refuse." In any event, even if Tip Top possessed standing, the record unequivocally demonstrates the rationality of the contracting officer's decision to reject the pledged coal as unacceptable under Federal Acquisition Regulation ("FAR") § 28.203, making judgment on the administrative record in the Government's favor appropriate.

## ARGUMENT

### I. Tip Top Has Not And Cannot Demonstrate Prejudice And Therefore Lacks Standing

#### A. The Court Should Consider Evidence Outside Of The Administrative Record And Outside Of The Contracting Officer's Reasoning In Determining Whether Tip Top Has Been Prejudiced

Tip Top has failed to carry its burden of proving that this Court has subject matter jurisdiction over its claims. See Awad v. United States, 61 Fed. Cl. 281, 283 (2004) (plaintiff has burden to establish jurisdiction). Here, Tip Top has failed to respond to facts demonstrating its lack of standing, including the fact that Mr. Scarborough did not have the permits necessary to reprocess the coal refuse pile.

In fact, Tip Top now unapologetically admits that the factual allegations made in its complaint were incorrect. In its complaint, Tip Top repeatedly described the asset as "mined coal," Compl. at 1-2,[1] and "previously mined, extracted, stockpiled, marketable coal." Compl. at 2. Tip Top asserts that "stockpiled coal is not kryptonite," Pl. Reply at 14, yet, like kryptonite, the "stockpiled coal" pledged in this procurement was fictional. Tip Top now admits that it is "coal refuse [that] Scarborough owns," rather than the coal pledged by him, and attempts to assert, without any support, that "coal refuse itself is readily marketable." Pl. Reply at 16. Tip Top's assertions in its reply regarding the marketability and ownership of the coal refuse are also refuted by land transactions preceding Mr. Scarborough's acquisition of the site with which

---

[1] "AR __" refers to pages of the administrative record filed on May 20, 2008, and supplemented on May 28, 2008. " Exh. __" refers to the exhibits accompanying this brief. "A___" refers to the pages of the appendix accompanying this brief. "Compl." refers to the complaint filed in this case. "Pl. Mot." refers to Tip Top's motion for judgment upon the agency record. "Def. Mot." refers to defendant's motion for judgment upon the agency record. "Pl. Reply" refers to Tip Top's opposition and reply brief filed June 17, 2008.

Permit R-707 is associated and other information pertaining to the legality of Mr. Scarborough removing "coal refuse" from that site. As will be discussed more fully below, the available documentation does not support Tip Top's assertion that even coal refuse was owned by the individual surety.

Tip Top repeatedly asserts that the Court may not consider any information or concerns other than the contracting officer's reasoning as expressed in two letters and her statement before the General Accountability Office ("GAO"). Pl. Reply at 10, 14-15, 18. However, if the factual basis for jurisdiction is challenged, the Court may consider any "relevant evidence," and the allegations in the complaint are not controlling. Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Indium Corp. of Am. v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985); Adams v. United States, 20 Cl. Ct. 132, 133 n.1 (1990). As explained in our motion for judgment, "determinations as to standing, which require consideration of prejudice, are not confined to the reasoning expressed by the agency in resolving the merits of the protest controversy." Galen Med. Assocs., Inc. v. United States, 74 Fed. Cl. 377, 380 (2006). In Galen, the Court agreed that the record did not indicate that the contracting officer was aware of the protestor's lapsed corporate status at the time of contract award. Id. at 380. The Court nevertheless concluded that, because the protestor was not in a status allowing it to contract on the date of the award, it was not then an "interested party" and lacked standing. Id. at 383. Tip Top has not contested the Court's use, in standing determinations, of information that the contracting officer may not have had before her at the time of her decision. Pl. Reply at 10.

### B. Tip Top Has Made No Attempt To Demonstrate Its Responsibility, As Required By the Federal Circuit in *Myers Investigative and Security Services, Inc. v. United States*

As explained in our motion for judgment, because awards may not be made to contractors that are not responsible, the burden rests on the protestor affirmatively to demonstrate to the Court its responsibility, without which it would not have a substantial chance of receiving the contract award. Myers Investigative and Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1371 (Fed. Cir. 2002); see also FAR § 9.103(a) and (c). Tip Top does not dispute that it must make this showing of responsibility to the Court and fails to address Myers.

Tellingly, Tip Top fails to respond to the fact that Mr. Scarborough lacked the equipment and permits necessary to reprocess the coal refuse and was not planning to begin reprocessing until July or August 2008. Def. Mot. at 5, 23 (citing AR 356). Documents submitted by Tip Top show that, in a telephone call on February 29, 2008, nearly two months after Mr. Scarborough attested to the existence of mined coal, IBCS Mining informed Sohnen Coal Sales, Inc., that it lacked the necessary equipment and permits to reprocess the coal refuse. AR 356. While Tip Top strenuously defends the coal refuse and the supposedly high-quality coal that it may eventually yield, without the required permits, Mr. Scarborough could not even begin to reprocess the refuse and provide coal should Tip Top default. Through its failure to respond to this argument, Tip Top has essentially conceded that no permits existed.

Tip Top again points to spot prices as a measure of the value of the coal refuse, but fails to acknowledge or respond to the fact that any coal which might have been reprocessed would not be available in the "prompt quarter," making these prices inapplicable. Def. Mot. at 25. Tip Top thus concedes that the spot prices cannot be used to determine a value for the coal, if any, at

R-707. Even if the "price of coal at that time" was, in fact, "soaring," as Tip Top asserts, Pl. Reply at 17, it would not have applied to coal that might have been reprocessed. Tip Top simply cannot demonstrate that its coal refuse is a "readily marketable asset" as required by FAR § 28.203-2(a) or provide a reliable indication of its value.

### C. Mr. Scarborough Could Not And Still Cannot Reprocess The Coal Refuse Because Of His Failure To Obtain Necessary Permits

Indeed, Mr. Scarborough has never obtained the necessary permits, not at the time he attested to the presence of a "tangible mountain of coal" or afterwards. Decl. of Albert C. Rodebaugh, attached as Exh. A, at A1 at ¶ 2. In fact, the only company holding a permit related to the R-707 site is Green Valley Coal Company, which has a permit to reclaim the land by spreading grass seed over the coal refuse. See July 2002 Correspondence Between Green Valley Coal Co. and West Virginia Department of Environmental Protection ("DEP"), attached as Exhs. B, C, and D. Green Valley Coal Company informed the DEP in July 2002 that "[a]ll coal disposal has been completed and backfilling, regrading and reclamation will be completed." July 28, 2002 Letter from Green Valley Coal Co., to DEP, attached as Exh. C, at A4. It updated the DEP on its progress, noting that it had seeded one-third of R-707 on December 4, 2007, one month before Mr. Scarborough attested that he owned a mountain of coal at that location. See Dec. 4, 2007 Letter from Green Valley Coal Co. to DEP, attached as Exh. E, at A6. Had Mr. Scarborough sought to alter this permit from a reclamation permit to a reprocessing permit, the DEP would have provided an advertisement and comment period of at least 51 days and then would have begun a thorough review of plans submitted by Mr. Scarborough. See Decl. of Albert C. Rodebaugh, Exh. A, A1 at ¶ 4. Given that the coal did not exist and that Mr.

Scarborough did not have, and has never obtained, the necessary permits to reprocess it, Tip Top cannot demonstrate that it is a responsible bidder.

### D. Mr. Scarborough Did Not And Still Does Not Own The Coal Refuse

Furthermore, Mr. Scarborough did not, and still does not, own the coal refuse or have the right to reprocess it. The October 22, 2007 Special Warranty Deed, AR 330-32, trumpeted by Tip Top as evidence of Mr. Scarborough's ownership of the coal refuse, expressly conveys no rights related to coal and subjects the land to the deed reservations in the November 15, 1996 deed to Mr. Mullens, the former owner. The October 22, 2007 Special Warranty Deed states that the conveyance of the land to which Permit R-707 applies from Barry L. Mullens and Melissa J. Mullens to Mr. Scarborough is

> made SUBJECT to all covenants, easements and reservations of record affecting the property hereby conveyed, including, but limited to, the obligations set forth in that certain deed dated November 15, 1996, by and between THE LADY H COAL COMPANY, INC., CONSOLIDATED SEWELL, INC., and SEWELL COAL COMPANY and BARRY L. MULLENS and WEYMOUTH L. MULLENS.

AR 331; Compl. Exh. 13.

The 1996 deed to Mr. Mullens memorializes that fact the Lady H Coal Company and others (collectively, "Lady Coal Company") conveyed to Mr. Mullens and Weymouth L. Mullens their interest in the land "subject to all recorded easements, rights of way, restrictive covenants, outconvenyances and all prior reservations of coal, oil, gas, timber, and other mineral rights," including the right of Lady Coal Company or other entities to enter the property to conduct reclamation activities related to prior mining activities. Nov. 15, 1996 Deed, attached as Exh. F, at A9-10. This deed memorializes the fact that Lady Coal Company acquired the tract from New Gauley Coal Corp. pursuant to a Quitclaim Deed dated

November 20, 1992. Id. at A10; Nov. 20, 1992 Quitclaim Deed, attached as Exh. G, at A38.

Mr. Mullens acquired the land pursuant to a bankruptcy sale as the highest bidder at auction. Exh. F, at A7, A14. Mr. Mullens bid at the bankruptcy sale only on "unimproved, non-coal related real estate" and purchased a "surface only real estate tract[]," which was "not related to existing mines or other coal facilities" and had no mining permit or mineral lease. Id. at A27. The surface land Mr. Mullens purchased was item "B-22B New Gauley Co., Parcel 7, 342 acres, Sewell property DB 313/442." Id. at A28 and A34 (describing the tract being auctioned and Messrs. Mullens and Mullens as purchasers of item B22B); Exh. G, at A51-A57; Exh. F, at A8-A10 (describing the tract and referring to it as Parcel 7 in the Quitclaim Deed).

The mining permit associated with the tract, Item A-55, "No. 1 Refuse Area A, Permit No. R-707," was purchased by the Green Valley Coal Company. Exh. F, at A25 and A34 (listing Green Valley Coal Company as purchaser of "Group A"). Mr. Mullens therefore conveyed no coal or mineral rights or rights with respect to Permit R-707 to Mr. Scarborough, because Mr. Mullens had no such rights. Such rights remained with Green Valley Coal Company and/or its successors and assigns. The Special Warranty Deed to Mr. Scarborough thus identified the surface of the land conveyed, not any mineral or mining rights.

The 1992 Quitclaim Deed also reserved certain other rights to New Gauley Coal Company, making them unavailable to Lady Coal Company, Mr. Mullens' Grantor. These rights, therefore, were not transferred with the land's surface either to Mr. Mullens' Grantor or to Mr. Scarborough from Mr. Mullens. New Gauley reserved to itself, its successors or assigns

> all minerals beneath the surface of the above described property. For the purposes of this deed the term "minerals" shall refer to all coal, coal by-products, and substances found in association with coal; all ores and other non-fugacious minerals; . . . all other subterranean substances and products not heretofore

> granted or conveyed by Grantor or its predecessors in title; and all combinations of the same, or any or all of the same that may hereafter be found thereon, whether such minerals are marketable or now have a recognized value. . . .

Exh. G, at A39 (emphasis added). As noted above, when Permit R-707 was renewed in 2002, Green Valley Coal Company asserted in its letter of July 28, 2002, that "[a]ll coal disposal has been completed and backfilling, regrading and reclamation will be completed." Exh. C, at A4. This indicates that any coal and presumably such coal refuse that was at the coal refuse disposal site has been placed either beneath the surface or off of the site. In either case, it is beyond the reach of Mr. Scarborough, who literally only has rights with respect to the surface of the property. Green Valley Coal Company's correspondence demonstrates that there is no coal on the ground surface.

Even assuming that Mr. Scarborough seeks to acquire Green Valley Coal Company's rights and could persuade the DEP to disturb the reclaimed land to allow him to reprocess coal refuse, again, as noted above, 51 days would be required just to publicize the application, with no guarantee that DEP would actually grant a reprocessing permit.

### E. Tip Top's Attempts To Support The Value Of The Coal Refuse Are Unavailing

Tip Top makes a number of futile attempts to support the purported value of the coal refuse that, in fact, contradict the Limited Scope ("LS") document filed with the Court as an exhibit to its complaint. To begin with, Tip Top now claims that the "record shows that the coal refuse Scarborough owns contains significant amounts of coal which were not removed by the processes then employed." Pl. Reply at 16. As explained in our motion for judgment, Alliance's LS report was, as Alliance carefully noted, "limited to the reliability of the data provided to us from the various sources noted" in the report, one of which was IBCS Mining Corp., a company

apparently controlled by Mr. Scarborough, the individual surety. AR 336-37. The tonnage of coal involved was based on the 2008 affidavit of Mr. Mullens, who attested to the "tonnage of coal refuse material placed within the subject refuse disposal area during the period of his familiarity, encompassing the years of 1962 to 1987." AR 336 (emphasis added). Mr. Mullens did not testify that the coal refuse remained at the site over 20 years later or that it was of the same quantity as in 1987. AR 340. His affidavit states: "The time period from 1962 to 1987 Sewell Mine placed this refuse area and by using 50% recovery of the coal mined, it's my estimate 13 million ton of coal refuse in this permitted R-707 area. Also 500,000 ton of slurry was pumped into the impoundment pool." AR 340. This affidavit only indicates the amount of coal refuse present as of 1987.[2]

Tip Top also asserts that "Alliance's independent, scientific determination is strong evidence that the value of pledged coal far exceeded the penal amount of the bond." Pl. Reply at 15. There is no basis in the record for such a conclusion. As explained in our motion for judgment, the LS document was not based on any independent collection and assay of materials by Alliance, but rather on documents provided by IBCS, without any "exploratory drilling, testing of refuse from the specific area of proposed reprocessing, or volumetric calculations of actual in-place material."[3] AR 336. The assay reports regarding the quality of the material were

---

[2] Tip Top asserts that "Defendant omits that Mr. Mullens owned the land until Mr. Scarborough purchased it." Pl. Reply at 16. While Tip Top has ignored our reference to this fact at page 22 of our motion for judgment, Mr. Mullens' ownership is hardly a "key fact," given that he did not testify as to the amount of coal refuse currently at R-707, and, in any event, the rights to reprocess the refuse at R-707 were not conveyed to Mr. Scarborough.

[3] "Alliance Consulting . . . has reviewed various documents provided to us in regard to the historical placement of Sewell seam refuse and the potential future recovery of coal from this material on the area identified as Permit No. R-707." AR 336.

not taken from disposal site R-707, but are "reported to have originated from the same mines (Sewell Mines No. 1 and 4) and processing plant as the No. R-707 material." AR 336. Alliance thus indicated that origination of samples from two separate mines might not guarantee identical quality. The decision not to consider samples from this other coal material that showed extraordinarily high yields does not demonstrate the data's reliability, particularly given Alliance's caution that "it was not within our work scope to address the coal quality, but rather to estimate the prospective quantity of coal that may be recovered." AR 338 (emphasis added). As described more fully in our motion for judgment, Alliance reached no conclusion whatsoever about the post-reprocessing value of the coal in R-707, since the coal refuse assayed did not come from R-707 and the quantity of coal refuse at R-707 was unknown. Alliance merely concluded that, assuming such coal refuse existed at R-707, if the amount of recoverable coal was 3.3 million tons, if it was of high quality, and if the price was $79 per ton, the coal refuse, after reprocessing, would have a gross value of $261 million.

Tip Top's statement that "Sohnen Coal Sales, Inc., a willing buyer, concluded that the coal was '12500 BTU AR and 14 ash AR and (below) 1.0 sulphur AR" is completely unsupported. Pl. Reply at 17. In a letter from Sohnen Coal to IBCS Mining, Sohnen Coal states that, "assuming that this material is only suitable for steam application and will run no more than 12500 BTU AR and 14 ash AR and [below] 1.0 sulphur AR, we are looking at a price FOB truck at plant of $79 per net ton." AR 457. Sohnen Coal based its statements in this letter on representations made by IBCS Mining in a February 29, 2008 telephone call. AR 457. Sohnen Coal did not examine the material or make any conclusion about it, as Tip Top incorrectly asserts.

Tip Top argues that coal "can be readily and economically extracted" from coal refuse, Pl. Reply at 16, but provides not one estimate of the cost of reprocessing or time required for the process. Tip Top claims that "processing/transportation costs were estimated to reduce the approximate net value to $191 million" from $261 million. Pl. Reply at 17. There is no support for this conclusion anywhere in the record and certainly not on the two pages that Tip Top cites, AR 439 and AR 232. These pages simply show that, on January 3, 2008, Mr. Scarborough attested that the coal refuse pile was worth $191 million, while months later, on March 31, 2008, Alliance gave it a possible value of $261 million. Mr. Scarborough's estimate certainly could not be a reduction of the Alliance estimate made three months later.

Tip Top claims that, should Mr. Scarborough fail to reprocess the coal, other coal reprocessing firms could complete the task to allow the coal to be sold immediately upon default. Pl. Reply at 17. This argument is meritless. Even if another firm were interested in reprocessing the coal refuse, it would have to obtain permits to engage in the reprocessing on land owned by Mr. Scarborough, which, as noted above, would take at least two months. Tip Top's arguments would require FHWA to become expert in the hiring of reprocessing firms and the value of coal refuse, rather than quickly recover from the individual surety, which is the very purpose of a bid bond. Plaintiff's arguments only strengthen the obvious conclusion that any coal that can possibly be extracted from the coal refuse is not a "readily marketable" asset. As noted above, the hypothetical "other coal refuse processing firm" eager to reprocess a portion of a reclaimed coal refuse pile would have to obtain rights from Green Valley Coal Company and persuade DEP to disturb the reclaimed land, and, as noted above, would be delayed by, at a minimum, the 51 days required to publicize the application and provide a comment period. While Tip Top also

claims that "Scarborough could have paid cash to support the obligation" had the coal refuse proven not to be readily marketable, Pl. Reply at 17, this argument ignores the purpose of FAR §§ 28.203 and 28.203-2: that the actual asset pledged will unquestionably support the obligation.

Finally, abandoning the assertions in its complaint that the pledged asset was actually coal, Tip Top claims that the "coal refuse" itself is readily marketable. Pl. Reply at 16. However, "marketable" is defined as "fit to be offered for sale in a market." Merriam-Webster's Collegiate Dictionary 760 (11th ed. 1996). Tip Top has not established the existence of any market for coal refuse. Indeed, unprocessed coal refuse has no market and is used only as fill in coal lands reclamation.

Tip Top claims that, despite the evidence presented in the LS report and the true nature of the "coal refuse," a contracting officer could have reasonably concluded that the refuse or yet-to-be-extracted coal was "readily marketable" and again cites the acceptance by six agencies of Mr. Scarborough's coal asset. Pl. Reply at 15, 18. Given that Mr. Scarborough's submission notes that "the same documents provided" in this case were provided in response to the other solicitations, the contracting officers responsible for those procurements likely relied on the incorrect description of the asset in the SF 28. Their acceptance of the asset, therefore, proves nothing. In any event, the issue here is whether the contracting officer here abused her discretion in declining to accept the purported asset, not whether she could have accepted it. Tip Top has identified no abuse of discretion.

Tip Top has made no attempt to demonstrate its responsibility and is clearly unable to do so. It lacks any direct economic interest and, thus, has no standing.

**F. The Limited Scope Evaluation And Other Documentation Refuting The Existence Of Coal Or Even The Ability To Reprocess Coal Refuse Places The Integrity And Credibility Of The Individual Surety In Doubt**

Tip Top claims that "DOJ's post-hoc views of the representations in the pledge of assets are unwarranted and insufficient grounds for questioning Scarborough's credibility." Pl. Reply at 18. Tip Top again fails to recognize or address the Court's ability to look beyond the reasoning expressed by the agency in resolving the merits of the protest controversy. See Galen, 74 Fed. Cl. at 380. The LS report described above and the additional information provided demonstrate the non-existence of the "coal" pledged or even ownership of the coal refuse calls into question the credibility of Mr. Scarborough's representations and his integrity. "[A] contracting officer may reject a bidder as nonresponsible without further inquiries for having unacceptable sureties where there is doubt as to the integrity of the sureties and the credibility of their representations." Santurce Constr. Corp., B-240728, 90-2 CPD ¶ 469, 1990 WL 292483, at *2 (1990). The documents and arguments that Tip Top identifies fail to demonstrate Mr. Scarborough's integrity and credibility and, in fact, prove that these requirements are lacking. Tip Top, therefore, cannot demonstrate its own responsibility and lacks standing.

**G. The Failure To Create An Escrow Account Demonstrates Tip Top's Nonresponsibility**

As noted in our motion for judgment, Def. Mot. at 16, the SF28 requires in Block 7.b. that the individual surety "describe the assets, the details of the escrow account, and attach certified evidence of both." AR 229. The solicitation also incorporated the "Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects (FP-03)," AR 20, 60-61, Def. Mot. Exh. A, which required use of an escrow account. Mr. Scarborough did not

describe the assets or an escrow account or provide certified evidence of an escrow account, referring the contracting officer only to a Certificate of Pledged Assets.

Tip Top fails to address the clear requirements of SF28 and, instead, again claims that FAR §§ 28.203-1 and 28.203-2 do not unambiguously require use of an escrow account. Pl. Reply at 19; Pl. Mot. at 24. Tip Top's failure to demonstrate responsibility to the Court further shows that it lacks a direct economic interest, as discussed in Myers, 275 F.3d at 1371.

### H. The Ambiguity Created By The Power Of Attorney Makes Tip Top's Bid Nonresponsive

As this Court has recognized, "it is a general rule of the law of suretyship that no one incurs a liability to pay a debt or to perform a duty for another unless he expressly agrees to be so bound, for the law does not create relationships of this character by mere implication." Interstate Rock Prods., Inc. v. United States, 50 Fed. Cl. 349, 358 (2001) (quoting Allen County Builders Supply, B-216647, 85-1 CPD ¶ 507 (1985)). This Court concluded that, where the penal sum was not inserted on the bid bond, "no obligation in a sum certain is undertaken by the surety," and "the same protection simply is not afforded by a bond lacking a penal sum as would be provided by a fully completed bond," id. at 359, as this defect "would provide the surety and the contractor with a defense to enforcement." Id. at 361. Similarly, an ambiguity in the power of attorney regarding the identity of the individual surety raises a defense to any attempt by the Government to enforce the bond against Mr. Scarborough.

FAR § 2.101 defines an "individual surety" as "one person, as distinguished from a business entity, who is liable for the entire penal amount of the bond." The Scarborough Bond and Guarantee Program ("Program") listed on the Power of Attorney is not "one person." AR 227. The SF24 also cautions that "[n]o corporation, partnership, or other unincorporated

associations or firms," like the Program, "are acceptable as individual sureties." AR 230. The uncertainty as to the identity of the individual surety makes it unclear which entity is bound and thus makes the bid bond facially invalid, causing Tip Top's bid to be nonresponsive.

Even should the Court determine that this ambiguity raises only responsibility issues, Tip Top has failed to resolve this issue to demonstrate its responsibility to the Court. Myers, 275 F.3d at 1371. The failure of the surety expressly to agree to be bound raises a "defense to enforcement," Interstate Rock Prods., 50 Fed. Cl. at 361, which is not a "minor matter involving no risk," as Tip Top claims.[4] Pl. Reply at 20. To make a nonresponsibility determination based on ambiguities regarding the individual surety's indentity and the authority of the attorney-in-fact to bind him, the contracting officer need not contact the individual surety to request additional information. John C. Grimberg Co. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999). Contrary to Tip Top's assertion, Pl. Reply at 20, FAR § 28.101-3(e) does not require the contracting officer to undertake an investigation of ambiguities in the power of attorney. FAR § 28.101-3(d), the section preceding section 28.101-3(e), merely indicates that questions regarding the authenticity and enforceability of the power of attorney are questions of responsibility that "are handled after bid opening." FAR § 28.101-3(d). This section does not require the contracting officer to engage in any investigation or to contact the individual surety.

---

[4] Through the Certificate of Pledged Assets' requirement of a final determination of a default preceding any execution on the asset, Mr. Scarborough also places a limitation on his ability to be bound to his promise to pay the obligation. AR 232; Def. Mot. at 32. Tip Top, in its response, merely repeats its assumption that FAR § 28.203-1's requirement of an escrow account does not apply to its "coal refuse" asset. Pl. Reply at 20. The GAO correctly concluded that an individual surety must use an escrow account, which provides an "indispensable guarantee that the government can collect on the bond." AR 557. Further, FAR § 28.203-1(b)(i)'s language does not limit it to a "cash escrow account." Pl. Reply at 20.

Furthermore, FAR § 28.101-3(e) merely indicates that, "[i]f the contracting officer contacts the surety to validate the power of attorney," she must document certain information and describes actions that she "may" take if she decides to contact the surety. FAR § 28.101-3(e)(1) and (2).

## II. Tip Top's Arguments Regarding The Purported "Post Hoc" Nature Of Any Information Received Or Reasoning Expressed By The Agency Or GAO Following The Contracting Officer's February 19, 2008 Decision Lack Merit

### A. The Record Before The Agency At The Time Of Award Demonstrated The Unacceptability Of The Asset

Tip Top repeatedly asserts that any consideration of information received by the agency following the contracting officer's initial determination of nonresponsibility on February 19, 2008, is a "post-hoc rationale." See, e.g., Pl. Reply at 2. However, because the agency may revisit a responsibility determination at any time prior to award, Integrated Protection Sys., Inc., B-254457, 1994 WL 29886, at *2 (1994), the Court may consider this document's effect on FHWA's final decision, as demonstrated by the award to the next-lowest bidder, rather than Tip Top.

### B. The Agency's Decision To Follow The GAO's Rational Recommendation Was Proper

Tip Top argues that the GAO's reasoning is irrelevant to the Court's consideration of this protest. However, agencies traditionally have deferred to GAO recommendations made on the specific facts of the procurement at issue and "as a general policy have acceded to the views of the GAO even when those views conflicted with the agency's original position." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989). The 1984 Competition in Contracting Act, 31 U.S.C. §§ 3551-3556 (Supp. IV 1986), provided that, if the Comptroller General determines that an award does not comply with statute and regulation, "he shall recommend that the agency

take specific corrective action, including 'award[ing] a contract consistent with the requirements of such statute and regulations.'" Id. (quoting 31 U.S.C. § 3554(b)(1)(E)). The head of the procuring agency must report to the Comptroller General if the agency has not fully implemented the Comptroller General's recommendations within 60 days, and the Comptroller General must report annually to Congress each instance of agency noncompliance. Id. (citing 31 U.S.C. §§ 3554(e)(1) and (e)(2)). In any subsequent judicial action relating to the procurement, the Comptroller General's recommendation "shall be considered to be part of the agency record subject to review." Id. (quoting 31 U.S.C. § 3556).

As the Federal Circuit noted in Honeywell,

> These provisions show that Congress contemplated and intended that procurement agencies normally would follow the Comptroller General's recommendation. Congress viewed an agency's failure to do so as sufficiently unusual as to require the agency to report such noncompliance to the Comptroller General and to require the latter annually to inform Congress of any instances of noncompliance. In these circumstances, a procurement agency's decision to follow the Comptroller General's recommendation, even though that recommendation differed from the contracting officer's initial decision, was proper unless the Comptroller General's decision itself was irrational. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."

Id. (emphasis added) (citations omitted).

In this case, had the Comptroller General recommended that the contracting officer revisit her responsibility determination, the agency could have taken corrective action and rescinded the contract to allow review of additional information from Tip Top or the individual surety. However, the Comptroller General concluded that the contracting officer need not allow substitution of assets and that coal was not an acceptable asset under FAR § 28.203-1(b)(1). AR 557. As discussed in our motion for judgment, the GAO's conclusions were correct. Def. Mot.

at 16-17, 27-31, 32-37. Furthermore, as noted by Tip Top, Alliance's LS report was presented to the GAO to demonstrate the value of the "coal," Pl. Reply at 15, but the GAO properly held that proving the value of the coal was irrelevant, given that coal was not an acceptable asset. AR 557. The Court should therefore conclude that the FHWA's decision to follow the GAO's rational recommendation was proper. Honeywell, 870 F.2d at 648.

## III. The Contracting Officer Properly Used Business Judgment To Determine That The "Coal" Was Unacceptable And That Tip Top Was Nonresponsible

### A. Tip Top Has Failed To Demonstrate That Coal Or Coal Refuse Is A "Readily Marketable Asset" Or That The Contracting Officer's Determination Of Unacceptability Was Irrational

Given the lack of indication of the coal pile's value, the contracting officer reasonably characterized the asset as "speculative."[5] AR 233. She also considered the "coal" speculative because it "would present more of a burden on the Government to secure or liquidate the asset, since liquidation depends on identifying a willing and responsible buyer." AR 243. Unlike cash, certificates of deposit ("CDs"), or United States Government securities held in an escrow account as described by FAR § 28.203-2, the Government's recovery of money owed through the sale of a pile of coal would indeed present a burden in terms of time, effort, and possible inability to find a buyer. In addition, the contracting officer expressed concern that the value of the coal could not be determined until a sale and that "the price of coal will vary with quality of the coal

[5] Apparently acknowledging that this Court did not, in fact, find coal to be readily marketable in its decision in Shader Contractors, Inc. v. United States, 276 F.2d 1, 6 (Ct. Cl. 1960), Def. Mot. at 17 n.5, Tip Top now relies on Shader to assert a "common knowledge that mined coal is a readily marketable asset." Pl. Reply at 11. A single assertion by plaintiff Shader Contractors, Inc. to this effect during litigation in 1960 certainly does not demonstrate a "common knowledge." Def. Mot. at 17 n.5.

mined."[6] AR 243. As she noted, these characteristics distinguish coal from the acceptable assets listed in FAR § 28.203-2(b), like cash, CDs, and United States Government securities, from FAR § 28.203-2(c)'s examples of unacceptable assets, including corporate assets and speculative assets. AR 243, 263. The contracting officer also noted that the coal was not being held by a third party in an escrow account, but was allegedly present on Mr. Scarborough's land. AR 244. The history of pledges of illiquid and overvalued assets and the intent and language of the regulations at issue establish the validity of her concerns. The contracting officer identified striking reasons why the Government's interest in recovering from the bidder would not be protected, should Mr. Scarborough's "coal" be accepted. These explanations demonstrate that her decision, made using business judgment, was rational. In addition, the contracting officer, using her discretion and business judgment, made a rational determination that, although Tip Top bid $1.4 million less than the next lowest bidder, the recovery of the $1.8 million in assets pledged by its individual surety was uncertain and warranted rejection of the bid.

As in its motion for judgment, Pl. Mot. at 17, 20, Tip Top asserts that "[u]nder the FHWA's reasoning, only if the coal was marketed, i.e.[,] sold first, would it be an acceptable asset." Pl. Reply at 12. This assertion was already discussed in our motion for judgment at page 18. Def. Mot. at 18. Tip Top claims that there is no difference between coal of different qualities and stocks and bonds, identical examples of which have been sold on national securities markets, as required by FAR § 28.203-2(b). Pl. Reply at 12.

---

[6] While Tip Top claims that its failure to provide any proof of the value of the purported coal "was erroneously considered a matter of responsiveness," Pl. Reply at 12, the contracting officer nowhere described her decision as a responsiveness determination.

Tip Top's reference to the "Department of Justice's ('DOJ') post-hoc 'discretion'" is nonsensical. Pl. Mot. at 2. This Court's decisions clearly allow the contracting officer broad discretion in making responsibility determinations. YRT Servs. Corp. v. United States, 28 Fed. Cl. 366, 394 (1993); News Printing Co. v. United States, 46 Fed. Cl. 740, 746 (2000). Given the broad discretion afforded to the contracting officer and deference to her business judgment, Tip Top's disagreements with the contracting officer's choice of words do not demonstrate that her decision was not rational.[7]

Tip Top again asserts that the lists of acceptable and unacceptable assets in FAR § 28.203-2 are not exclusive. Pl. Reply at 7. As explained fully in our motion for judgment, however, the list of acceptable personal property is restricted to those listed in FAR § 28.203-2(b).[8] Def. Mot. at 15. Tip Top quibbles with the title of FAR § 28.203-2, "Acceptability of Assets," asserting that it should have read "Acceptable Assets" were it intended to be exclusive, and with the list of unacceptable personal property, again claiming that it is superfluous. Pl. Reply at 8. Again, as explained in our motion for judgment, the list of unacceptable personal property is not superfluous, as it resulted from a history of non-existent and illiquid personal property being offered as pledged assets. Def. Mot. at 14. Given that the section describes unacceptable assets, the proposed title of "Acceptable Assets" would be inapt.

---

[7] Tip Top again asserts that the contracting officer acted irrationally by not weighing heavily in her decision its one FHWA contract, one FHWA award, and a critical path method diagram ("CPM") of uncertain value that FHWA did not accept. Pl. Reply at 14; Pl. Mot. at 18. This argument was addressed at pages 21 and 22 of our motion for judgment. Def. Mot. at 21-22.

[8] Tip Top claims that "[e]ven the GAO abandoned this unsupportable, post hoc argument in its final decision." Pl. Reply at 8. Tip Top's assertion is unsupported by any statement in the GAO decision and is apparently based solely on the GAO's decision not to address this point and focus instead on the more glaring escrow account defect.

### B. The Fact That Other Contracting Officers May Have Accepted The Coal Asset Is Irrelevant

Tip Top again argues that six agencies accepted the "coal asset" and states that a contracting officer could reasonably conclude that it was readily marketable. Pl. Reply at 18 (citing AR 432). As noted in our motion for judgment, a decision by another contracting officer to accept a particular asset did not require the contracting officer evaluating bids for this solicitation to accept it and is not a basis for questioning this contracting officer's application of otherwise correct procurement practices. Def. Mot. at 19 (citing Niles Janitorial Serv. and Supply, Inc., B-246575, 1992 WL 48458, at *3 (1992)). Tip Top dismisses as "speculation" our comment that the record does not indicate that the coal asset accepted by these agencies was the same coal refuse pledged by Mr. Scarborough. Pl. Reply at 18 n.6. However, the chart apparently created by Mr. Scarborough, AR 432, and the GAO submission that it accompanied, AR 395, refer only to the "coal asset" and the "same coal asset pledged in this case" without indicating that it originated from site R-707.

### C. The Contracting Officer Was Not Required To Engage In An Investigation Of Mr. Scarborough's Coal Refuse Pile

#### 1. Under Federal Circuit Caselaw, The Contracting Officer Had No Duty To Request Or Consider Additional Information Regarding The Assets

Tip Top's assertion that "no discretion was exercised" because the contracting officer requested no additional information also lacks merit. Pl. Reply at 2. The Federal Circuit has repeatedly held that a contracting officer may, in the exercise of discretion, determine that she needs no additional information to make her nonresponsibility determination. See, e.g., Grimberg, 185 F.3d at 1303.

Tip Top provides no explanation as to why the Federal Circuit's conclusions related to responsibility determinations would not apply equally to all responsibility determinations, including those in FAR Part 28. Tip Top claims that FAR Part 9.1 determinations serve a different purpose than those under FAR Part 28, but cites no authority for this conclusion.

The acceptability of the individual surety's asset affects the responsibility of the contractor. Under FAR § 28.203(c), the contracting officer's conclusion that the individual surety utilized by a bidder is unacceptable requires rejection of the bidder as nonresponsible. While "[n]either bid bonds nor sureties are mentioned in FAR Subpart 9.1," Pl. Reply at 6, FAR § 9.104-1(g) requires that, in addition to the listed requirements, a prospective contractor must "[b]e otherwise qualified and eligible to receive an award under applicable laws and regulations," thereby incorporating the requirements of FAR Part 28. The considerations noted in Grimberg – integrity, financial resources, and ability to perform – are the same considerations taken into account in evaluating the individual surety utilized by the bidder. Grimberg, 185 F.3d at 1301.

Tip Top also misinterprets Grimberg as holding that "the CO is not absolutely required to seek clarifying information from the contractor in making a responsibility determination." Pl. Reply at 5. In fact, the Federal Circuit was quite clear that "although the CO is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so." Grimberg, 185 F.3d at 1303. Tip Top's assertion that the Federal Circuit's reasoning in Grimberg "is totally inconsistent with the surety's right to propose an acceptable substitute asset under FAR § 28.203-4," Pl. Reply at 7, relies on a misunderstanding of FAR § 28.203-4 already addressed at length in our motion for judgment. Def. Mot. at 32-37. In short, the language of FAR § 28.203-4 contradicts Tip Top's arguments, as it states that an individual

surety "may request" substitution, which the contracting officer "may" allow. As shown in the quoted language above, Grimberg does not foreclose a review of such a request, in the contracting officer's discretion, but holds that the contracting officer is not obligated to allow additional information to be submitted. Grimberg, 185 F.3d at 1303.

### 2. The Past GAO Decisions Cited By Tip Top Are Irrelevant To The Determination In This Procurement And Are, In Any Case, Distinguishable Or Based On Pre-1990 Standards

Tip Top repeatedly argues that past GAO decisions required the contracting officer in this procurement to conduct an investigation of the assets and review any additional information the contractor might provide. Pl. Reply at 5, 8. However, as this Court explained in a similar situation, "[w]hether the agency was compelled to follow GAO precedent is largely irrelevant." Interstate Rock Prods., 50 Fed. Cl. at 358 n.5.

Furthermore, Tip Top refuses to acknowledge that the GAO decisions that it again cites pre-date changes to the FAR. Pl. Reply at 5. The regulatory history explaining the reasons for the changes is far from irrelevant. Instead, it explains the reasoning of the FAR's drafters in crafting language that Tip Top seeks to distort. Pl. Reply at 7-8. Tip Top points to only two GAO decisions following the 1990 FAR revisions to support its assertion that the agency has a duty to resolve uncertainties in the SF 28 and pledge of assets. Pl. Reply at 8. As noted in our motion for judgment, Jay Jackson is distinguishable from the present case. Def. Mot. at 21. The one remaining GAO decision, Gene Quigley, dates from February 1991 and likely applied the reasoning preceding the FAR's changes. The changes in the FAR are reflected in the fact that Tip Top can find virtually no post-1990 GAO decision recommending that an agency review additional information from an individual surety.

### 3. The FAR, And The Changes Made To It In 1990, Do Not Require Any Investigation Of Assets By The Contracting Officer

As we noted in our motion for judgment, Def. Mot. at 16, FAR § 28.203(a) requires that "[t]he contracting officer shall determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation." FAR § 28.203(a). Once the contracting officer concludes that the pledged assets are insufficient, she must reject the bid as nonresponsible. Tip Top responds only by citing two pre-1990 GAO decisions, Pl. Reply at 13, that pre-date the FAR revisions and are at odds with the Federal Circuit's later conclusions regarding responsibility determinations in Grimberg.

Tip Top asserts, however, that FAR § 28.101-3(e) supports its position that investigation is required. Pl. Reply at 8. As described above in Section I.H, this FAR section and that preceding it, FAR § 28.101-3(d), merely indicate that the contracting officer may request information to clarify issues regarding the authenticity and enforceability of the power of attorney, but impose no duty to engage in an investigation.

Tip Top also asserts that FAR § 28.203-4 "gives the surety the ability to substitute an acceptable asset" and that this provision's retention by FAR drafters demonstrates their intention to continue to require contracting officers to investigate assets pledged by individual sureties. Pl. Reply at 9. As described above and in our motion for judgment, Def. Mot. at 32-37, FAR § 28.203-4 provides no such right to substitute assets and simply reiterates the contracting officer's discretion to agree to such a substitution, should she choose.

**4. The Solicitation Did Not Mandate An Investigation Of The Assets By The Contracting Officer Or Review Of Additional**

Tip Top failed to comply with a solicitation requirement to "[f]urbish documentary evidence as to the ownership and value of the assets pledged in support of the bond and details of the security interest in the assets . . . within 14 calendar days after the opening of bids," which itself was "grounds for declaring the surety unacceptable." AR 61. Tip Top claims that this requirement "comes into existence only if the CO has questions based on the documents submitted and asks for further information." Pl. Reply at 8, 12. Tip Top apparently finds this requirement in the paragraph following that quoted above:

> In addition, the CO may, after reviewing the Affidavit of Individual Surety and documentary information on the security interest and the asset pledged, . . . request the surety to provide further information and/or documents with respect to any of the documents provided. . . . Failure of the surety to accept such mail, or failure of the surety to respond with the requested information within 7 business days of receipt of the request, will be cause for rejection of the surety.

AR 61; Pl. Reply at 12. Again, this section and FP-03 Section 102.04 only state that the contracting officer "may . . . request" further information and place no duty on her to do so. AR 61. While Tip Top appears to claim that the second paragraph somehow subsumes that preceding it, the paragraphs indicate different time frames for submissions, showing that they have differing purposes.

In addition, contrary to Tip Top's assertions, the solicitation, by requiring the individual surety to complete an SF 24 and SF 28, AR 35, affirmatively required bidders to provide evidence relating to the asset. In particular, Block 7.b of the SF28 requires that the individual surety "describe the assets, the details of the escrow account, and attach certified evidence of

both." AR 229. Tip Top again urges the Court to remove any discretion from the contracting officer's decisionmaking by asserting that her "right to reject the bid bond only comes into existence if" the bidder fails to provide information requested by the contracting officer. Pl. Reply at 8. Grimberg demonstrates that the contracting officer has the discretion to determine that she does not need additional information.

## IV. FAR § 28.203-4 Allows, But Does Not Require, The Contracting Officer To Consider An Individual Surety's Request For Substitution Of Assets

As discussed above and in our motion for judgment, Def. Mot. at 32-37, FAR § 28.203-4, which discusses substitution of assets, requires that the individual surety contact the contracting officer to make this request and gives the contracting officer discretion to consider whether to accept information regarding substitute assets. While Tip Top again claims, as in its motion for judgment, that "the surety did request to substitute the asset if Mr. Scarborough was unable to resolve the CO's concerns," citing AR 417, Tip Top fails to respond to the fact, noted in our motion for judgment, Def. Mot. at 33, that this "request" was made to the GAO in Mr. Scarborough's submission and was not an offer made to the FHWA to submit a substitute asset.

Tip Top baldly asserts that "[n]o timeliness considerations with respect to making an award were present at the time of rejection," completely ignoring the agency's statement to the GAO on April 9, 2008, that the next-lowest bidder had only extended its bid to Wednesday, April 16, 2008. AR 308. The "request" made by Mr. Scarborough to the GAO, described above, Pl. Mot. at 9, was made on April 14, 2008, days after the agency notified GAO, Tip Top, and Mr. Scarborough of the urgency of award.

## V. Tip Top's Opposition And Reply Brief Does Not Establish The Protestor's Right To Injunctive Relief

Tip Top claims that defendant has not contested that Tip Top's lost profits were immediate and irreparable harm. Pl. Reply at 21. Our motion for judgment addressed Tip Top's lost profits claim by noting that economic loss, without more, does not rise to the level of irreparable injury. Def. Mot. at 36 (citing Spherix, Inc. v. United States, 62 Fed. Cl. 497, 506 (2004), and Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)). On the issue of the harm, if any, caused by a loss of personnel, Tip Top's comment that the protestor in Sierra Military Health Services, Inc. v. United States, 58 Fed. Cl. 573 (2003), was an incumbent that would lose employees during a transition period fails to provide a meaningful distinction between Sierra and the present case. See Pl. Reply at 21; Def. Mot. at 37. Furthermore, the Court's reasoning in Sierra was not limited to the facts of the particular procurement. Instead, it stated broadly that loss of employees was "not the type[] of harm that constitute[s] irreparable injury." Sierra, 58 Fed. Cl. at 582. Tip Top, therefore, has not demonstrated irreparable harm.

As noted in our motion for judgment, Def. Mot. at 38, and brought into even clearer relief by the additional documentation submitted with this opposition, ordering FHWA to accept as a trustworthy asset a pile of coal refuse that Mr. Scarborough lacks permits or even the right to reprocess would eliminate FHWA's ability to recover should Tip Top default. Were the Court to determine that the contracting officer should have considered a substitute asset, such an order would require FHWA to rely upon an individual surety whose credibility is in doubt. Such a requirement would not serve the public interest in a fair procurement process and the Government's ability to recover monies owed to it.

## VI. The Court Should Reject Tip Top's Requests For Relief

Tip Top apparently retracts its earlier request for a directed award. Pl. Reply at 22. However, Tip Top again urges that, were the Court to determine that the FHWA should consider a substitute asset, the contracting officer would have "no discretion but to award Tip Top the contract," should she find the substitute asset acceptable. Pl. Reply at 22; Pl. Mot. at 28. Tip Top again ignores the fact that the contracting officer would have to make many additional responsibility determinations related to the asset and Mr. Scarborough's acceptability as an individual surety.[9] Additional responsibility determinations related to Tip Top's ability to perform would also require the contracting officer's evaluation prior to any award. The possibility that Tip Top could seek review by the Small Business Administration of the contracting officer's determinations does not in any way deprive the contracting officer of discretion to make an evaluation, as Tip Top asserts. Pl. Reply at 22. Tip Top's claims related to costs expended on creation of the CPM and other costs have already been addressed in our motion for judgment. Def. Mot. at 39-40.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court deny Tip Top's requests for injunctive relief, contract award, and fees and costs and dismiss this protest for lack of jurisdiction or, in the alternative, grant the Government's motion for judgment upon the administrative record.

[9] The numerous, glaring responsibility defects, which Tip Top claims were "unidentified," Pl. Reply at 22, were too voluminous to repeat in Section VI of our motion for judgment and, therefore, were identified as those "explained above" in Section III. Def. Mot. at 39.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Amanda L. Tantum by
s/ Dawn E. Goodman
AMANDA L. TANTUM
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 616-8131
Fax. (202) 514-8624

June 26, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on June 26, 2008, a copy of foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Dawn E. Goodman