DECLARATION OF EDMUND C. SCARBOROUGH

I, Edmund C. Scarborough, being duly sworn, do depose and state under the penalty of perjury that the following is true based on my personal knowledge.

1. I am an adult and am competent to testify herein.

2. I am the individual surety who provided the bid bond to Tip Top Construction Corporation ("Tip Top") for the Federal Highway Administration ("FHWA") project at issue in the Court of Federal Claims protest known as Case No. 1:08-cv-00352-LJB ("this Case").

3. I am not a corporate surety, and the bond provided in this Case was not provided by a corporate surety or any other entity. It was provided by me as an individual surety.

4. As of this date, I have written more than 200 bonds to the Federal Government. Information regarding some of the bonds I have written for the Federal Government, including the FHWA, is contained as part of my Response to the Agency Report ("Response") in the related bid protest before the Government Accountability Office ("GAO"), which Response I understand is a part of the administrative record in this Case. The listing of bonds accepted by Federal Government agencies, including FHWA, is incorporated herein by reference.

5. Several of the more than 200 bonds I have written have been backed by the same coal asset (but a different allocated portion or location) owned by me and pledged in this Case, and others have been backed by similar stockpiles of coal.

6. Although as an individual surety I am able to and do write bonds for contractors of all sizes, my surety services benefit mainly small, minority, disadvantaged, woman-owned and service disabled veteran-owned contractors who, for various reasons including but not limited to lack of bonding capacity, lack of a track record of performance, and/or an insufficient balance sheet cannot qualify for or obtain corporate surety bonds.

7. My program fills a gap in the market created by decisions of many corporate sureties not to bond smaller contractors and/or policies that have the same effect. Therefore, I believe (and many Federal contracting officers have expressed to me) that my bonding program creates opportunities for small, minority, disadvantaged, woman-owned and service disabled veteran-owned contractors, the very group of contractors that the FAR's socioeconomic provisions intend to assist.

8. As part of providing my bonds, I provide other related services and benefits to the project owner and contractor, such as project and contract review, underwriting, risk management, project monitoring, construction consulting/advice, early intervention (including funds control) in situations where problems related to the bonded contractor arise, and take over of a job. These additional activities/services protect not only me as the surety but also, in my opinion, the Government or private project owner and contractor. To the extent that I can prevent problems before they arise or quickly and decisively intervene once problems arise (which is inevitable, in the construction industry), this benefits all parties concerned.

9. Some of these other activities and services are provided by me, personally, and some by other individuals and entities on my behalf.

10. For purposes of marketing and selling my services, and to explain to contractors and owners that my service as an individual surety offers more than simply a bond, I and some of the documents related to my individual surety bonds sometimes refer to the entire package of services and benefits as the "Scarborough Bonding Program."

11. The "Scarborough Bonding Program" is not a corporation, partnership, sole proprietorship, unincorporated association, non-profit or not-for-profit entity. It does not issue

surety bonds and did not execute the bid bond at issue in this Case. It is in the nature of a trade name for my individual surety bonds and related services.

12. Separate from my status and activities as an individual surety, I am an officer and owner or part owner of several other companies, including but not limited to International Bonding and Construction Services, Inc. ("IBCS").

13. IBCS is a risk management, construction consulting, and claims processing corporation providing services to me, in my individual capacity as a surety, as well as to other unrelated individuals, entities and companies.

14. To the extent that IBCS acts as my program risk manager and claims processor, it is part of the total package of benefits/services that I provide to owners and contractors – but that is not to be confused with the fact that I and I alone issue and personally back and/or purchase backing for my individual surety bonds, including the bid bond provided in this Case.

15. To back my bonds, I have in the past used several assets. The asset used to back the bid bond at issue in this Case is the stockpile of coal as described in the Standard Form 28 ("SF 28"), Affidavit of Individual Surety, and incorporated Certificate of Pledged Assets.

16. The pledged coal is presently in the form of coal refuse, also known in the coal industry as Gob Piles. For purposes of the bid bond in this Case, and as I have done on other Federal Government bonds, I pledged an allocated portion of the coal refuse/coal I own.

17. The pledged allocated portion is part of the same stockpile from which I have pledged other allocated portions for other Federal Government bonds.

18. This being said, the same allocated portion is not pledged for more than one bond – *i.e.*, there is no "double-pledging." The aggregate dollar value of coal refuse/coal pledged by all outstanding bonds I have written does not exceed the total value I own.

19. The Alliance Consulting, Inc. Report ("Alliance Report") is but one report that supports or documents the value of the coal I own, and it happened to be the most recent report at the time I was asked to provide support for the coal asset in support of Tip Top's protest at the GAO. I note that the data on which the Alliance Report is based was obtained from independent analyses performed to determine the amount of sellable coal in 2006 and January 2008– *i.e.*, at least one of which was performed before the date of the bid bond and even the date I purchased the R707 Property. To the extent the Government is suggesting that the Alliance Report was based on information I provided, that is incorrect and language which gives rise to such a suggestion was clarified in a later version of the Alliance Report. Since purchasing the R707 Property, I have continued to conduct tests and analyses through independent firms.

20. At the time I wrote the SF 28 and incorporated/attached the Certificate of Pledged Assets for the Tip Top bid bond, I had what I consider to be reliable information and analyses upon which to base my assertion as to the total value of my coal assets, as well as the value of the allocated portion pledged for the bid bond in this Case.

21. In its filings in this Case, the Government implies that coal refuse (*i.e.*, Gob Piles) is trash and has no value, which is incorrect as evidenced in part by the fact that I bought it and Alliance's valuation. Coal refuse is the byproduct of previous coal mining operations. Such coal refuse, including valuable coal which was then deemed uneconomical to separate from the other materials removed from the ground with it, was placed in on the surface of the ground, often pits and valleys, such as the R-707 Property.

22. The coal refuse I own which is located on the R707 Property contains significant amounts of coal which were not removed by the processes then employed and contains other non-coal materials such as rock, shale, slurry and clay.

23. With today's technology, and factoring the recent spikes in worldwide coal prices, the remaining coal in many coal refuse sites, including my own, can be readily and economically extracted. I am in the business (among others) of doing just that. To my knowledge, I have not said that my processing plant is actually processing the coal refuse at this time and if I did that was never my intent. Such processing is scheduled to begin during this Summer of 2008. I have, however, been heavily involved for several months in precursor activities including due diligence reviews, surveys, construction of the processing plant, and permitting issues. I note that, based on my understanding and advice provided to me, nothing in the Federal Acquisition Regulation requires that this asset be processed at the time of the bond or any default.

24. The coal refuse I own contains significant amounts of relatively high quality coal. I have been advised that this coal is high quality Met Coal with 12,000 BTUs and with less than 14 % ash and 3% sulphur. Coal meeting this description has a price equal to or higher than the "spot price" for steam coal and can be sold either to processors "as is" or following processing.

25. To my understanding, Sohnen Coal Sales, Inc.'s ("Sohnen") written offer to a mining company of mine of $79 per ton was based on such market pricing information as well as existing independent data regarding the coal, and was not based on information or representations from me. I believe it is clear from the language of Sohnen's letter that the $79 per ton offer is a "worst case price," with the price per ton to be higher if the coking characteristics turned out to be better than Sohnen's minimum requirements stated in the offer.

26. The pledged coal refuse/coal is located on the R707 Property. I alone own the surface rights to the R707 Property, including the right to process or use the coal refuse/coal on that property.

27. My coal refuse/coal stockpiles are located such that one centrally located processing plant can service all, and the coal can be trucked to a nearby barge or rail head, allowing economical shipping of the coal. The transfer of the ownership of the coal occurs when the coal is delivered to the railcar or barge.

28. I have been informed by experts that the value of the coal I own significantly exceeds the value of all known processing, transportation and transaction costs, the total cost of which has been estimated. The processing of the coal refuse material to extract the remaining valuable coal and the steps required to get the coal to market is, in my opinion, economically viable, which is why I have entered into this business and am in the process of obtaining all required state and any other license required to allow me to do so.

29. Coal refuse can also be sold "as is" – *i.e.*, without first being processed – at a profit, although generally a higher profit can be made if the owner first processes the coal refuse to extract the coal contained within. To my knowledge and belief, a sale of all or a portion of unencumbered coal refuse I own would net more than the penal sum of the bid bond in this Case.

30. I have relied on the Alliance Report and other analyses in estimating the value of my coal assets. As a result of the Alliance Report and other information, I believe my coal to be worth approximately the amount stated in the bid bond documents and perhaps even more today, but in any case significantly beyond the penal sum of the bid bond and even the aggregate amount of bonds I have written.

31. Based on my experience, and that of other knowledgeable personnel in the coal business, including the consultant Charles Steven Robinson who provided an affidavit in support of my Response in the GAO bid protest, which is part of the administrative record in this case, coal including the coal refuse I own, is a widely traded commodity and a readily marketable asset.

32. The coal pledged to back the Tip Top bid bond is readily marketable and readily could be sold in unprocessed form.

33. As an individual surety, it is in my economic interest to minimize defaults by bonded contractors. Although I strive very hard to do so, and believe I have an enviable track record, contractor defaults are an inevitable part of this business.

34. I have always made good on my bond obligations to the Government. Of course, the law provides me and any other surety a number of protections and defenses and, where applicable, I have relied on the same. However, it is my policy to, and I believe I have, promptly dealt with each and every meritorious bond claim.

35. It is my opinion that the Government's position in this case is based, at least in part, on the misunderstanding that, in the event of a contractor default, the Government can simply and without further action or notice to the surety take possession of the asset and sell it. This is not the case. In the event of a contractor default, the contracting officer must look to the surety and only if the surety defaults on his obligation after a demand can the Government then reach and sell the pledged asset.

36. I am advised that one of the rights I have as a surety in the event of a contractor default and valid demand by the contracting officer is to satisfy the demand with any assets available to me once I have determined that the claim on the bond is valid.

37. Another option would be to obtain a loan from a financial institution using the in place coal refuse as collateral for the loan and use the proceeds of the loan to pay the bond obligation. Based on the amount of coal refuse/coal I own, I am advised that I could obtain a loan in an amount exceeding the value of the bid bond at issue in this case.

38. Yet another option is to turn ownership of the coal refuse in place over to the Government.

39. In the past, upon receipt of a claim, I have paid the amount of the surety's obligation from other assets I own or called upon reinsurers of the asset to provide cash in lieu of converting the asset, which is my right as a surety. No contracting officer has complained about how I settled claims as a surety. I have never had to sell coal (or any other commodity asset pledged) to make good on a claim filed under a bond I have issued.

40. If Tip Top had defaulted and I had been called upon to make good on my bid bond obligation, I would have first covered the obligation with other assets I own. I have sufficient other assets to cover this bid bond obligation.

41. Moreover, I have sufficient other assets which comply with the FAR that, if unable to persuade the CO to accept the coal, I could and would have substituted such assets for the coal. The available assets for substitution include, but are not limited to, cash and cash equivalents.

42. Had the Contracting Officer ("CO") asked me for information or documentation regarding the quality and value of the coal which I pledged to back the bid bond, or otherwise supporting the asset, I could and would have provided the same. She did not ask.

Further your declarant sayeth not.

Edmund C. Scarborough