# In the United States Court of Federal Claims

No. 08-352 C

(Filed August 1, 2008)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * | * | |
| TIP TOP CONSTRUCTION, INC., | * | |
| | * | Post-Award Bid Protest; |
| *Plaintiff*, | * | FAR 28.203, 48 C.F.R. § 28.203 |
| | * | (2007); Bid Bond; Individual |
| v. | * | Surety; Rejection of Contractor |
| | * | Because Found Non-Responsible; |
| THE UNITED STATES, | * | Contracting Officer's Decision |
| | * | was not Arbitrary, or Capricious; |
| *Defendant*. | * | No Injunctive Relief. |
| | * | |
| * * * * * * * * * * * * * * * | * | |

*Michael A. Gordon*, Washington, D.C., for plaintiff. *Fran Baskin*, Washington, D.C., of counsel.

*Amanda Tantum*, United States Department of Justice, with whom were *Peter D. Keisler*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Todd M. Hughes*, Assistant Director, Washington, D.C., for defendant.

---

## OPINION

---

**Bush**, *Judge*

Plaintiff Tip Top Construction, Inc. (Tip Top) filed its post-award bid protest on May 15, 2008. Tip Top seeks declaratory and injunctive relief voiding the award of a contract to Island Roads Corporation (IRC) for the "construction of a five-leg roundabout, and related work, on the island of St. John."[1] Compl. ¶ 11.

---

[1]/ A roundabout is essentially a traffic circle.

Plaintiff claims that defendant Federal Highway Administration (FHWA or agency) improperly eliminated Tip Top from the competition on the ground that Tip Top's bid bond was "defective." *Id.* ¶ 1. Tip Top claims that the agency's determination was "improper," and in "violation of federal law and regulation." *Id*.

The court ordered an expedited briefing schedule to quickly resolve this protest on the merits. The administrative record (AR) in this matter was filed on May 20, 2008 and supplementation of the administrative record was completed on May 28, 2008. Plaintiff filed a Motion for Judgment on the Administrative Record on June 3, 2008. Defendant filed its cross-motion for judgment on the administrative record on June 10, 2008. Plaintiff filed a reply on June 17, 2008, and defendant replied on June 24, 2008. Oral argument was held on July 3, 2008. For the reasons discussed below, plaintiff's motion for judgment on the administrative record is denied, defendant's cross-motion is granted, and the award of the contract to IRC is upheld.

## BACKGROUND

### I. Tip Top's Bid Bond

On November 1, 2007, the Eastern Federal Lands Highway Division of the FHWA, United States Department of Transportation issued an Invitation for Bids, No. DTFH71-08-B-0002 (IFB or solicitation) for the construction of a five-leg roundabout, and other related work, on the island of St. John in the U.S. Virgin Islands. AR at 1. More specifically, FHWA requested the "construction of a five-leg roundabout, demolition of the existing Texaco gas station, earthwork, asphalt paving, installation of drainage structures, concrete footing underpinning at parking area walls, gravity retaining walls, utility relocation (water, electric, sewer, telephone, cable TV), street lighting, traffic control with detour, signing, stripping, and other work." AR at 2. The FHWA estimated that it would take 675 calendar days to complete the contract within the price range of $4,000,000 to $7,000,000. AR at 22-23. The contract would be awarded to the "responsive, responsible bidder with the lowest Total Price of Project . . . ." AR at 25.

The IFB listed several requirements for the bidders, including the submission of prices and schedules for the contract. AR at 24-25. The IFB required bidders to submit a bid guarantee "in the amount of not less than 20

percent of the bid price or $3 million," whichever was less. AR at 23. The IFB included the Standard Form (SF) 24 which sureties were required to complete. AR at 34-35. Execution of the SF 24 signifies that sureties are liable for the amount of the bond. AR at 34. In this particular case, instruction 4(b) of the SF 24 stated that bidders had the option of using individual sureties for the bid bond:

> (b) Where individual sureties are involved, a completed Affidavit of Individual Surety (Standard Form 28), for each individual surety, shall accompany the bond. The Government may require the surety to furnish additional substantiating information concerning its financial capability.

AR at 35. Therefore, in accordance with the IFB provisions, individual sureties providing a bid bond were required to complete both the SF 24 and SF 28.

The SF 28, Affidavit of the Individual Surety, is a one-page form that generally required the individual surety to describe the assets that were being pledged in support of the bid bond. AR at 229. Blocks 1-6 of the form required personal contact information and employer information. *Id*. In block 7(a) of the SF 28, the individual surety was required to give a full representation of the pledged assets. The individual surety had to disclose the encumbrances, liens or judgments attached to the pledged assets. *Id*. Block 7(b) required the individual surety to "describe the assets, the details of the escrow account, and to attach certified evidence thereof." *Id*. Block 8 required the individual surety to identify mortgages, liens, judgment, and other encumbrances on the pledged asset. *Id*. Block 9 stated that the surety must identify all bonds for which the subject assets had been pledged within the past three years. Finally, blocks 10, 11 and 12 were set aside for signatures and execution by a notary public. *Id*.

The SF 28 was required to be accompanied by a Certificate of Pledged Assets. AR at 232. The Certificate of Pledged Assets certified that the individual surety (1) has good title of the pledged assets, (2) has pledged assets free from liens and encumbrances, (3) will not assign or sell any rights of the pledged assets to another party, and (4) has provided that the government has been given a secured interest in the assets pursuant to Article 9 of the Uniform Commercial Code (UCC). *Id*.

On January 10, 2008, the agency opened bids. The agency received three

bids: GEC Inc., with a total bid price of $7,950,000; Island Roads Corporation (IRC) with a total bid price of $6,929,380; and Tip Top with a total bid price of $6,482,505. AR at 218. Tip Top was the lowest bidder, being $1.4 million dollars lower than IRC's bid. Tip Top also estimated that it would take 300 calendar days to complete construction of the five-leg roundabout and other miscellaneous work, as opposed to the 675 calendar days proposed by IRC. *Id.*

Tip Top utilized Edmund C. Scarborough (ECS), as an individual surety to furnish plaintiff's bid bond asset. AR at 227-32. Connie F. Souleyrette, ECS's attorney-in-fact, signed the bid bond (SF 24), Affidavit of Surety (SF 28), and accompanying Certificate of Pledged Assets. *Id.* In the Certificate of Pledged Assets, ECS described the proffered asset as an "allocated portion of $191,350,000.00 of previously, mined, extracted, stockpiled, marketable, coal, located on the property of E.C. Scarborough, all of that certain lot of parcel of land in Kentucky District, Nicholas County, West Virginia." AR at 232. ECS pledged that the asset was "free from liens and encumbrances or prior pledge, and [ECS] has full authority to transfer said assets as collateral in support of bonds." *Id.* ECS affirmed that, during the term of this contract, ECS "shall not assign or sell any rights to the pledged assets, or pledge the same assets to another pledgee." *Id.* ECS further affirmed that "[n]o other bonds have been pledged to the allocated portion of the assets which are subject of the attached Certificate of Pledged Assets." AR at 229. ECS also declared to the FHWA that the government was being given a security interest in the pledged asset pursuant to Article 9 of the UCC:

> The Pledgee [FHWA] understands acknowledges that fulfillment of this pledge is subject to a valid and final determination that the Principal [Tip Top] cannot or will not accept the contract for performance of the project for which its bid or proposal has been submitted and the failure of the individual surety to otherwise fulfill the obligations of the bid bond. Upon default of payment by the individual surety named above on the bid bond identified above, or breach of this pledge agreement, the Pledgee/Obligee or holder shall have full rights to foreclose on the above-described assets and exercise its rights as a secured party pursuant to Article 9 of the Uniform Commercial Code.

AR at 232.

Based on its low bid, and the anticipation that it had fulfilled the requirements of the IFB, Tip Top expected to be awarded the contract. However, FHWA's contracting officer (CO), in a letter dated February 19, 2008, rejected Tip Top's bid on the basis that plaintiff had failed to "furnish a bid guarantee in accordance with the requirements of the invitation for bids." AR at 233. The basis for the CO's rejection of Tip Top's bid was set forth as follows:

> We have reviewed the Bid Bond submitted with your Bid in response to the subject Invitation for Bid and find it to be inadequate. It does not meet the requirements of the Federal Acquisition Regulations (FAR) for an individual surety at Section 28.203. Individual Surety Bonds must be supported by acceptable assets, as listed in the FAR. Acceptable assets include cash, United States Government securities, stocks and bonds that are actively traded, real property owned in fee simple, and irrevocable letters of credit. Speculative assets-which would include marketable coal-are specifically excluded by Subsection 28.203-2(c)(7).
>
> Your bid is hereby rejected in accordance with FAR Section 14.404-2(i), failure to furnish a bid guarantee in accordance with the requirements of the invitation for bids.

*Id*. In short, Tip Top was eliminated from the competition because the agency did not consider "marketable coal" as an acceptable asset for a bid bond. In the agency's view, marketable or mined coal was a "speculative asset" excluded by section 28.203-2(c)(7) of the Federal Acquisition Regulation (FAR).

## II. Events Preceding the Rejection of Tip Top's Bid

As previously stated, bids were opened on January 10, 2008. Tip Top was the lowest bidder, with a bid approximately $1.4 million lower than the second lowest bidder, IRC (the successful offeror). At this time, Tip Top was still in the competition, and FHWA had not yet expressed concern about plaintiff's choice of bid bond. Rather, FHWA was concerned with plaintiff's 300 day proposed schedule to complete the contract. On January 28, 2008, FHWA e-mailed Tip Top, expressing that very concern, and asking plaintiff to "provide a construction schedule (CPM) with a written explanation of how [Tip Top] will perform the work within the limitations of the contract and specifically how you plan to accomplish this project in the short time frame with the heavy volume of traffic."

AR at 327-28. Tip Top was required to submit the CPM schedule within five business days of receipt of the FHWA's letter. *Id.* Plaintiff hired a CPM consultant to draft a preliminary CPM, which was timely submitted to FHWA. AR at 323.

On February 11, 2008, FHWA sent additional questions regarding Tip Top's proposed construction schedule. AR at 322. The agency wanted plaintiff to submit more information on the crew size and workday schedule. *Id.* The FHWA also wanted a copy of the construction schedule "listing the sequence of work in the Critical Path." *Id.* Tip Top responded that it would provide the requested information, but it would not spend significant resources drafting a final CPM until it was given a formal award notice. AR at 321.

Tip Top did not hear from FHWA again until February 19, 2008, when the agency abruptly eliminated plaintiff from the competition on the basis that Tip Top's bid bond was "inadequate" because it did not meet the requirements for an individual surety under FAR 28.203. AR at 233.

## III. Events After FHWA's Rejection of Tip Top's Bid

By e-mail dated February 20, 2008, Tip Top wrote to the CO, requesting an opportunity "to clarify the assets on the assets sheet listed on the bid bond," and mentioning the fact that ECS possessed "other marketable assets including cash." AR at 565. Tip Top followed with several other e-mails on the same day, asking the CO to allow plaintiff to clarify the pledged asset, and reconsider its decision. AR at 567-68.

On February 21, 2008, ECS's counsel, Mr. Dennis C. Ehlers, wrote to the agency, arguing that FHWA had misinterpreted FAR Part 28. AR at 260-62. ECS asserted that the list of acceptable assets under section 28.203-2(b) of the FAR is not an exclusive list. AR at 260. ECS conceded that although the FAR list does not "specifically include already-mined, marketable coal," as an acceptable asset, it "does not mean that coal of this kind is an unacceptable asset." AR at 260-61.

ECS also argued that FHWA's CO was wrong in labeling the pledged coal as a "speculative asset" excluded under FAR 28.203-2(c)(7). AR at 261. The term "speculative asset" is not defined by the FAR. Instead, the FAR provides the term "mineral rights" as an example of a "speculative asset." ECS explained that the

pledged coal cannot fall within the category of a mineral right. A mineral right, as defined by Black's Law Dictionary, 6th edition, 1990, page 995, "is an interest in minerals in land. A right to take minerals or a right to receive a royalty." AR at 261. ECS asserted that other agencies like the Department of Justice, the Air Force, and the Federal Bureau of Prisons have used coal bonded by ECS as an asset to support their bid bonds. AR at 261. ECS concluded that the pledged coal was a "readily acceptable asset" under FAR 28.203-2(a), and ECS was "able and willing to provide [FHWA ] [with] documentation to support both the quality (e.g., assays) and market price (e.g., spot prices) of the pledged coal . . . ." AR at 261. Based on the foregoing explanations, ECS requested that FHWA reverse its rejection. *Id.*

By letter dated February 26, 2008, FHWA refused to reconsider its rejection. AR at 263-64. First, the CO argued that Tip Top's bid bond was not complete at the time of submission. The CO asserted that FAR 28.203-1 requires the security interest to be furnished with the bond, and therefore, ECS's offer to provide additional documents to support both the quality and the market price of the pledged coal was "untimely" and that " it would be a violation of the procurement regulations to accept support of a bid bond at this time." AR at 263. The CO stated that the "bid bond must be acceptable on its face, and in this instance, no proof of value was submitted with the bond." *Id.*

Second, the CO informed ECS that she disagreed with ECS's view that coal fell within the category of acceptable assets under the FAR 28.203-2:

> In our analysis, the asset listed in this instance - mined but not marketed coal - is closer in similarity to a corporate asset, speculative asset, or accounts receivable, than it is to cash, certificates of deposit, or U.S. Government securities. In any case, the determination of which category the proposed asset falls into belongs to the Contracting Officer-as stated at FAR Section 28.203(a), "The Contracting officer shall determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation."

AR at 263. The CO stated that since Tip Top had not provided an acceptable individual surety to support plaintiff's bid guarantee, Tip Top's bid had been rejected as non-responsible. AR at 264.

## IV. GAO Proceedings

On February 29, 2008, Tip Top filed a protest with the Office of General Counsel (GAO). AR at 234-35. In that protest, plaintiff claimed that it was "erroneously eliminated because its bid bond did not meet the requirements for an individual surety - specifically, that the previously mined, marketable coal offered as an asset to support the bond was a speculative asset expressly excluded by FAR 28.203-2(c)(7)." AR at 234. Tip Top argued that FHWA had not established a rational basis as to why "previously mined, marketable coal" was not an acceptable asset under the FAR. *Id*. Because Tip Top believed that FHWA had made an erroneous decision, it sought a stay of performance of the contract pursuant to the Competition in Contracting Act (CICA), 31 U.S.C. § 3553(c) (2000) until the protest was decided. *Id*.

Three days later, on March 3, 2008, Tip Top filed a supplemental protest with GAO. Attached to Tip Top's supplemental protest was ECS's February 29, 2008 letter to the CO which included a list of other agencies that had allowed ECS's coal as an acceptable asset for their procurements. AR at 579-85.

On March 26, 2008, FHWA submitted a report concerning Tip Top's protest to the GAO. Attached to the report was the CO's statement which asserted that Tip Top's pledged coal was not an acceptable asset:

> In my analysis, the asset listed in this instance - mined but not marketed coal - is closer in similarity to a corporate asset, speculative asset, or accounts receivable, than it is to cash, certificates of deposit, or U.S. Government securities; because the actual value of the named asset is not known, and can only be conjectured until an actual sale takes place. The price of coal will vary with the quality of the coal mined and the fluctuations of the market. In addition, I found the asset to be speculative because it is [sic] would present more of a burden on the Government to secure or liquidate the asset, since liquidation depends upon identifying a willing and responsible buyer. The Protester argues that mined but not marketed coal does not fall into the category of "speculative assets (e.g. mineral rights)" because the coal is out of the ground. But my analysis is that "mineral rights" includes the right to sell the coal after it is mined, and that the asset is still speculative as to liquidity and value.

AR at 243. In sum, the CO's position before the GAO was that Tip Top's coal was a "speculative asset" because (1) the actual value of the coal is unknown until after a sale takes place; (2) the price of the coal is not fixed, and could fluctuate depending on the quality of the coal mined and the fluctuations of the market; and, (3) the government would find it burdensome to secure or liquidate the asset, since liquidation is dependent upon finding a buyer. *Id*.

The CO also indicated in her report to GAO that Tip Top and its individual surety had not provided sufficient documentation to support the bond. "In this instance, the only documentation provided by the Individual Surety with the Bond was a 'Certificate of Pledged Assets.'. . . There was no independent basis offered for the valuation suggested by the Individual Surety. Nor was there an independent confirmation that the assets validly belonged to the named Individual Surety." AR at 244. The CO also added that "not only the nature of the asset, but the absence of a valid security interest caused me to reject it as speculative and therefore unacceptable." *Id*. The CO noted even if ECS's counsel had provided documentation to support the quality and value of the coal as offered in counsel's February 21, 2008 letter, the CO would still have found the coal "so speculative as to be unacceptable because of the liquidity issue." *Id*.

On April 9, 2008, Tip Top and ECS submitted rebuttal comments on the agency report to GAO. The comments were accompanied by a "Limited Scope" document which showed "the type, grade and value of the coal." Pl.'s Mot at 22; AR at 304, 310-81. On April 11, 2008, Tip Top's counsel sent an e-mail to FHWA and inquired again whether FHWA would consider the "possibility of accepting substitute assets from the surety." AR at 564. Tip Top's counsel also asked whether FHWA was going to issue an override. If so, Tip Top wanted a copy of the override decision. AR at 564. The FHWA neither responded to Tip Top's offer to substitute the assets, nor plaintiff's inquiry about the override.

On April 14, 2008, Tip Top and ECS sent more comments to GAO, arguing that coal was an acceptable asset under the FAR, and that ECS would be willing to provide a substitute asset. AR at 391-418. Two days later, on April 16, 2008, the agency informed GAO that FHWA was overriding the GAO stay, and awarding the contract to the next lowest bidder.

Finally, on May 2, 2008, GAO issued its decision, denying Tip Top's protest. AR at 553-57. The GAO concluded that mined coal was an unacceptable

asset under the FAR because it could not be placed in an escrow account as required by FAR 28.203-1(b). AR at 557. The GAO also determined that plaintiff's interpretation of FAR 28.203-4 was wrong and that an agency is allowed to reject a bid bond without granting the bidder's request for substitution of assets. *Id*. Subsequently, Tip Top filed suit in this court on May 15, 2008.

## DISCUSSION

## I. Jurisdiction

As stated, this is a post-award bid protest action. There is no question that the Tucker Act provides the United States Court of Federal Claims with bid protest jurisdiction. 28 U.S.C.A. § 1491(b)(1)-(5) (West 2006 & Supp. 2008); *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1300 (Fed. Cir. 2001); *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 268-69 (2004). The statute explicitly provides that this court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see Hunt Building*, 61 Fed. Cl. at 269 (quoting 28 U.S.C. § 1491(b)(1)). The statute also states that the Court of Federal Claims "shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." 28 U.S.C. § 1491(b)(1). Accordingly, this court has subject matter jurisdiction to entertain this bid protest, unless some other impediment to jurisdiction prevents consideration of plaintiff's suit.

## II. Standard of Review

### A. Judgment on the Administrative Record

Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1, the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The court must make fact findings where necessary. *Id.* The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record. *Id.*

**B. Bid Protest Review**

As a threshold jurisdictional matter, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*). This may be accomplished by demonstrating that the plaintiff was an actual bidder and that it was prejudiced by the award to the successful offeror. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). Prejudice is proven by establishing that the plaintiff had a substantial chance of receiving the contract, but for the alleged procurement error. *Id.* (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).[2] Standing is an element of this court's jurisdiction over bid protest cases. *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006) (upholding a dismissal for lack of jurisdiction because the protestor was not an actual bidder on the disputed contract and could not show prejudice, *i.e.*, that it had a substantial chance of receiving the contract but for the alleged procurement errors).

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2000)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (*Banknote*) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); *see also* 28 U.S.C. § 1491(b)(4) (describing this court's standard of review for bid protests). Under this standard, a procurement

---

[2]/ This first showing of prejudice to the protestor, in order to prove standing, must occur before reaching the merits of the bid protest review. *See Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (stating that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits"). The Federal Circuit has also stated that the two-step review of contract awards begins with a "without rational basis or contrary to law" review of an award and then proceeds to the issue of prejudice to the protestor. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). This court thus looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether a plaintiff shall be afforded relief. *See Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392 & n.23 (2005) (characterizing the prejudice determination for standing purposes as a "limited review for prejudice," seeking "minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing").

decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the bid process." *Id.* at 1358 (citations omitted). If a protestor can show that, but for the procurement error of the agency, there was a substantial chance that it would have won the contract award, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## III. Subject Matter Jurisdiction Of Tip Top's Claims

In bid protest cases, the Court of Federal Claims must determine, in the first instance, whether the protestor has standing to bring suit in this court. "Standing is a threshold jurisdictional issue and one the Federal Circuit has repeatedly stressed must be determined at the outset in bid protest cases." *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 391 (2005) (citing *ITAC*, 316 F.3d at 1319); *Myers Investigative & Sec. Servs., Inc., v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002)). The protestor bears the burden of establishing standing. *See ITAC*, 316 F.3d at 1319.

In order to establish standing, Tip Top must show that it was an "actual or

prospective bidder[] or offeror[] whose direct economic interest would be affected by award of the contract or by failure to award the contract." *Myers*, 275 F.3d at 1370 (quoting *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). Tip Top has established that it is an "actual bidder" because plaintiff submitted a bid for the contract. *See Rex Service*, 448 F.3d at 1308 (holding that plaintiff did not meet the first element of standing because plaintiff did not actually bid). Tip Top has also established that its "direct economic interest" would be affected if it is not awarded the contract. To prove a direct economic interest, plaintiff must show that it was prejudiced. "[P]rejudice (or injury) is a necessary element of standing." *Myers*, 275 F.3d at 1370. To establish prejudice, Tip Top is required to show that "it would have had a substantial chance of receiving the award." *Id.*; *see also Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996) (stating that prejudice requires protestor to "establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error"). "In other words, [Tip Top's] chance of securing the award must not have been insubstantial." *ITAC*, 316 F.3d at 1319; *see also Impresa*, 238 F.3d at 1334.

Tip Top asserts that it has standing to bring this bid protest because it was prejudiced by FHWA's actions. Plaintiff asserts that it would have had a substantial chance of winning this contract if the agency had allowed "Tip Top and ECS the opportunity either to resolve the agency's concern with the [coal] or to provide a substitute asset before rejecting the bid bond and eliminating Tip Top from the competition . . . ." Pl.'s Mot. at 14.

In response, defendant argues that Tip Top had no substantial chance of winning the contract because in the first instance, plaintiff submitted a non-responsive bid bond, and thus, lacks standing. Def.'s Mot. at 8. Specifically, defendant asserts that Tip Top's bid bond was facially invalid because: (1) the power of attorney is ambiguous, thus, making the SF 24 non-responsive, and (2) the SF 28 was signed by the attorney-in-fact which was prohibited by the IFB. *Id.* at 10-11. Defendant also contends that Tip Top lacks standing because plaintiff has failed to establish that it was a "responsible" contractor. Def.'s Reply at 4.

The government's arguments regarding Tip Top's lack of standing are

confusing and appear to conflate the protestor's responsibility to establish standing with that which Tip Top must demonstrate in order to win on the merits of its case. The government argues that in order to establish standing: (1) Tip Top must defend against two alleged bid bond defects which were never brought up as issues by the contracting officer; and (2) Tip Top must defend and win on the key issue of responsibility, which, in fact, constitutes the merits of its case.

With regard to the so-called 'responsiveness' issues concerning the facial validity of the bid bond, the court notes that the government starts down a slippery slope when it attempts to interject technical bid bond defects, never considered nor cited by the contracting officer as grounds for proposal rejection in the first instance, as a basis to argue before the court that a protestor lacks standing to bring its suit. If the government is able to peruse a protestor's proposal after the fact with a fine tooth comb to discover technical problems that the agency never even considered in its rejection of the proposal and then be permitted to cite to those alleged defects as roadblocks to standing, the government stands in danger of contravening the Federal Circuit's decision in *OMV Medical, Inc. v. United States*, 219 F.3d 1337, 1343-44 (Fed. Cir. 2000) (stating the court lacks authority to uphold an agency action on grounds not considered by the agency); *see also All Seasons Constr., Inc. v. United States*, 55 Fed. Cl. 175, 177 n.1 (2003). The CO failed to raise these technical objections to the protestor's power of attorney or its SF 28, and therefore, the government cannot now base an argument for lack of standing on these alleged errors.

Even to the extent that defendant's allegations that Tip Top's bid bond was facially invalid could be raised, these are issues of responsibility that could have been resolved after the opening of the bid, and prior to the award of the contract. The alleged discrepancies in the power of attorney were resolvable pursuant to FAR 28.101-3(d)(2) which mandates that the contracting officer "[t]reat questions regarding the authenticity and enforceability of the power of attorney at the time of bid opening as a matter of responsibility." FAR 28.101-3(d)(2). In addition, the alleged discrepancy that the SF 28 was executed by the attorney-in-fact rather than the individual surety is another issue of responsibility that is resolvable after bid opening. Such "uncertainties or defects" in the SF 28 are insufficient to render a bid nonresponsive:

> The SF 28 and related supporting documentation . . . , serve solely as an aid in determining the responsibility of an individual surety. *Consequently, uncertainties or defects in these documents do not warrant the automatic rejection of a bidder. This is so because information bearing on responsibility may generally be provided at any time prior to award.*

*Gene Quigley, Jr.*, B-241565, 91-1 CPD ¶ 182 (Comp. Gen. Feb. 19, 1991) (emphasis added) (citations omitted); *see also Astro Painting Co.*, B-247922-2, 92-1 CPD ¶ 535 (noting that "agencies may not automatically reject a bidder for unacceptable individual sureties because the SF 28 and supporting documentation contain minor defects that might easily be remedied"); *E.C. Dev., Inc.*, B-231523, 88-2 CPD ¶ 285 (Comp. Gen. Sept. 26, 1988). Based on the foregoing, "uncertainties or defects" on the SF 28 are generally regarded as issues of responsibility that do not warrant an outright rejection of a bid.

Defendant's second argument on standing is that in order to establish standing Tip Top must first prove the merits of its case on the issue of responsibility. The government's argument that Tip Top cannot prove that it was responsible and therefore cannot show the prejudice necessary to establish standing because it does not have a substantial chance of winning contract award without being responsible is a circular argument. The establishment of standing is not so convoluted. All that a plaintiff is required to show in order to establish standing are two elements: (1) that plaintiff was an actual bidder, and (2) that plaintiff was prejudiced by the award to the successful bidder. *See ITAC*, 316 F.3d at 1319; *see also Rex Service*, 448 F.3d at 1307-08 (upholding a dismissal for lack of jurisdiction because the protestor was not an actual bidder on the disputed contract and could not show prejudice, *i.e.*, that it had a substantial chance of receiving the contract but for the alleged procurement errors); *Fed. Data Corp. v. United States*, 911 F.2d 699, 704 (Fed. Cir. 1990) (finding no standing because a bidder withdrew from the procurement), if the bid protest was successful, the contract would have been awarded to another party); *MCI Telecomms. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989) (finding no standing because the protestor did not submit a proposal for the bid).

A protestor showing of standing requires an initial review of the administrative record "to determine if there are sufficient facts in the record to

establish standing – it does not include weighing facts and making substantive determinations on the merits." *Night Vision*, 68 Fed. Cl. at 392. Therefore, defendant's allegations of deficiencies in the bid, or in the procurement process in this instance are not jurisdictional issues, but rather issues that are properly discussed in the merits of the bid protest review. *See Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1370 (Fed. Cir. 2003) (stating that standing is a jurisdictional requirement, and "lack of standing precludes a ruling on the merits").

Here, Tip Top would have had a substantial chance of winning the contract but for the alleged procurement errors. Three bidders submitted proposals in response to the IFB. Tip Top was the lowest priced bidder with a bid total of $6,482,505.00, which was $1.4 million dollars less than the successful offeror, IRC. AR at 218. Tip Top was a qualified bidder, and plaintiff would have secured the contract if FHWA had determined the coal asset to be acceptable, had given Tip Top the opportunity to address the agency's concerns about the pledged coal, or had allowed a substitute asset. Based on these facts, Tip Top has established prejudice "because it had greater than an insubstantial chance of securing the contract if successful on the merits of the bid protest." *ITAC*, 316 F.3d at 1319.

## IV. The Contracting Officer's Responsibility Determination that the Pledged Coal was an Unacceptable Asset was Not Arbitrary, Capricious, Unsupported by Substantial Evidence in the Administrative Record, or Contrary to the Law

In this case, the CO rejected Tip Top's coal asset on two grounds: (1) that the asset "does not meet the requirements of the Federal Acquisition Regulations (FAR) for an Individual Surety at Section 28.203. . . . Acceptable assets include cash, United States Government securities, stocks and bonds that are actively traded, real property owned in fee simple, and irrevocable letters of credit" and, (2) that the coal asset is a "speculative asset," which is specifically excluded by Subsection 28.203-2(c)(7)." AR at 233. Plaintiff contends that the CO's determination that the pledged coal was an unacceptable asset was arbitrary and unreasonable because the CO did not give Tip Top an opportunity, as the lowest bidder, to resolve concerns that FHWA had about the coal asset and/or to allow substitution of the asset under FAR 28.203-4. Pl.'s Mot. at 2. Tip Top further

contends that but for the CO's violation of the FAR regulations, Tip Top would have won the contract as the low, responsive, responsible, bidder. *Id*.

In rebuttal, the government asserts that the CO's determination was based on a rational interpretation of the FAR, and thus, was not arbitrary, or capricious. The government's main arguments are: (1) the pledged coal is not an acceptable asset under the FAR; (2) that the CO had no duty to request, or to even consider additional information regarding the coal, and (3) the CO had no duty to suggest substitution of the coal asset and had discretion to reject plaintiff's request that it be allowed to substitute the asset. Def.'s Mot at 13-22, 33-37. Thus, the primary issue in this case is whether the CO had a rational basis for determining that Tip Top's pledged coal was not an acceptable asset to cover the bond obligation and rejecting its proposal on that basis. *See Hawaiian Dredging*, 59 Fed. Cl. at 308 ("The test under the arbitrary and capricious standard is whether 'the contracting agency provided a coherent and reasonable explanation of its exercise [of] discretion.'") (quoting *Impresa*, 238 F.3d at 1333)). The court's review of the CO's responsibility determination will focus on the CO's February 19, 2008 decision, which set forth the grounds upon which the CO based her decision. In *SEC v. Chenery Corp*., 332 U.S. 194 (1947), the Supreme Court stated:

> [A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*SEC*, 332 U.S. at 196. As this court stated in *All Seasons*:

> It is the agency's decision, not the decision of the GAO that is subject to judicial review. *Chas. H. Tompkins Co. v. United States,* 43 Fed. Cl. 716 (1999). Although the GAO upheld the agency's decision on grounds not asserted by the contracting officer ("CO"), this Court lacks authority to uphold an agency action on grounds not considered by the agency. *OMV Medical Inc. v. United States*, 219 F.3d 1337, 1343-44 (Fed. Cir. 2000).

*All Seasons*, 55 Fed. Cl. at 177 n.1. For clarification purposes, the court emphasizes that in determining whether the CO's decision to reject the coal asset was proper, it will not consider material that was not before the CO when she made her February 19, 2008 decision. None of the evidence gathered after the CO's decision on February 19, 2008, including documents filed with the GAO, following Tip Top's protest of the bid solicitation, will be considered by this court in its determination as to whether the CO acted in an arbitrary and capricious manner.[3] *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (stating that review of the agency's decision must be based on the record that was before the agency at the time it made its decision); *Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 424 (2006) ("We review the materials before the agency when it made its procurement selection and cannot accept any 'post hoc rationalizations' offered as the basis for the decision.") (citation omitted); *Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 508 (2003) (stating that post-hoc rationalizations should be "afforded limited importance in the court's analysis," and the court's review should focus on the evidence that was before the agency when it made its final decision). Following precedent, the court has reviewed the documents that were before the CO when she made her February 19, 2008 decision. The court concludes, as shown below, that the CO's reasoning was rational, and thus, was not arbitrary, or capricious.

## A. Standard of Review for Responsibility Determinations

The CO's determination that Tip Top's pledged asset was unacceptable under the FAR was based on a responsibility determination. FAR 9.103(b) ("No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility."). A contracting officer must award, or purchase from only "responsible prospective contractors." FAR 9.103(a). A prospective contractor bears the burden of proving to the contracting officer that it

---

[3]/ For example, the court will not consider the Limited Scope (LS) document that plaintiff filed with its report to the GAO. AR at 310-20, 334-39. The LS document was not before the CO when she made her decision on February 19, 2008 to eliminate Tip Top from the competition. Although the LS document revealed that the pledged asset was actually coal refuse, the court is precluded from considering that fact in this opinion. The focus is solely on the facts and information that the CO knew, or was aware of, at the time of her decision.

is responsible. FAR 9.103(c).[4]

It is well-established that the contracting officer has a considerable degree of discretion in making a responsibility determination, and "the contracting officer is the arbiter of what, and how much, information he needs." *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999): *see also Impresa*, 238 F.3d at 1335. "In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of non-responsibility." FAR 9.103(b).

Responsibility determinations are based on the contracting officer's business judgment and "'are not readily susceptible to reasoned judicial review.'" *YRT Servs. Corp. v. United States*, 28 Fed. Cl. 366, 394 (1993) (quoting *Hayes Int'l Corp. v. United States*, 7 Cl. Ct. 681, 685 (1985)); *see also New Printing Co. v. United States*, 46 Fed. Cl. 740, 746 (2000). Thus, the contracting officer bears the burden of exercising proper business judgment to obtain a responsible contractor.

Plaintiff argues that the responsibility standard under FAR Part 9.1 does not apply to the present set of facts. Plaintiff asserts that FAR Part 9.1 focuses on the contractor's responsibility, and does not mention "bid bonds nor sureties." Pl.'s Reply at 6. Therefore, Tip Top contends that the court should apply the responsibility standard under FAR Part 28 which focuses on the financial responsibility of the individual surety.

---

[4]/ FAR 9.103 entitled "Policy" provides:

> (a) Purchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only.
> (b) No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility. In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility.

FAR 9.103.

Defendant, on the other hand, argues that the responsibility standard in FAR Part 9.1, and applied by the Federal Circuit in *Grimberg*, is the general standard for responsibility, and, therefore, it applies to the present case. Def.'s Reply at 23. Defendant explains that the "acceptability of the individual surety's asset affects the responsibility of the contractor." *Id*. at 22. Therefore, defendant asserts that it does not understand why the *Grimberg* standard would not apply when FAR 28.203(c) states that "if the contracting officer determines that no individual surety in support of a bid guarantee is acceptable, the [contractor] utilizing the individual surety shall be rejected as nonresponsible." Def. Reply at 22. Defendant further argues that the factors considered in *Grimberg* — ability to perform, financial resources, and integrity — are the same factors that a contracting officer must consider to determine whether the individual surety utilized by the contractor is responsible.[5] *Id*.

---

[5]/ FAR 9.104-1 entitled "General standards" provides:

> To be determined responsible, a prospective contractor must--
> (a) Have adequate financial resources to perform the contract, or the ability to obtain them (see 9.104-3(a));
> (b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;
> (c) Have a satisfactory performance record (see 48 CFR 9.104-3(b) and part 42, subpart 42.15). A prospective contractor shall not be determined responsible or nonresponsible solely on the basis of a lack of relevant performance history, except as provided in 9.104-2;
> (d) Have a satisfactory record of integrity and business ethics;
> (e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them (including, as appropriate, such elements as production control procedures, property control systems, quality assurance measures, and safety programs applicable to materials to be produced or services to be performed by the prospective contractor and subcontractors) (see 9.104-3(a));
> (f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them (see 9.104-3(a)); and
> (g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.

The court agrees with defendant. Tip Top cites to no authority as to why the responsibility standard cited in FAR Part 9.1 and *Grimberg* is not applicable to all responsibility determinations, including those in FAR Part 28. It is the court's conclusion that the responsibility standard in FAR Part 9.1, and in *Grimberg*, is a general standard for responsibility which this court is free to apply in the instant case.

**B. FAR 28.203 and its Accompanying Sections**

Tip Top's bid was rejected on the basis that plaintiff failed to furnish a bid bond in accordance with the requirements of the IFB. The CO determined that the asset pledged by plaintiff, "previously, mined, extracted, stockpiled, and marketable coal," was a "speculative asset" excluded by FAR 28.203-2(c)(7), and thus, was an unacceptable asset.

Plaintiff argues that coal is an acceptable asset under FAR 28.203-2 because the lists of acceptable and unacceptable assets in FAR 28.203-2 are not exclusive. Pl.'s Reply at 7. Plaintiff asserts:

> The lists of acceptable and unacceptable assets in FAR 28.203-2 are not exclusive under the regulatory language discussed below, as the FHWA has conceded. AR 263. Thus, when an asset is not listed in either category, and the CO has concerns, under longstanding GAO case law, the CO must take steps to see if they can be resolved so that the low bid can be preserved.

*Id*. Tip Top also argues that the CO erred in categorizing "previously, mined, extracted, stockpiled, and marketable coal," as a "speculative asset." The sole example of a "speculative asset" under FAR 28.203(c)(7) is a "mineral right," and Tip Top's pledged asset is not a mineral right:

> The example of a "speculative" asset is defined as the "right to search for, develop, and remove minerals from land or to receive a royalty based on the production of minerals." *See Black's Law Dictionary* (8th ed. 2004). Because the value of the minerals is uncertain and intangible until they are mined and above ground

---

FAR 9.104-1.

> where they can be assayed and quantified, mineral interests are considered "speculative." In stark contrast, mined coal is an existing, already-mined, tangible, above-ground and stockpiled mineral. . . . Mined coal is therefore "readily marketable," meeting the standard for acceptability in FAR 28.203-2(a).

Pl.'s Mot. at 21. In Tip Top's view, mined coal is a "readily marketable" asset that falls within the category of acceptable assets. Pl.'s Mot. at 21. Plaintiff explains that coal is a marketable asset because its value is "readily determinable" by the "spot prices" published by the Department of Energy and other industry indices. *Id*. By relying on the published spot price, plaintiff asserts that the mined coal can easily be transported and sold on the active coal market. *Id*. at 22.

Although the CO's February 19, 2008 decision did not specifically refer to the fact that plaintiff failed to provide an escrow account for the coal, plaintiff argues that it was sufficient for ECS to provide a security interest in the mined coal, and that an escrow account was not required.[6] *Id*. at 22-28. Plaintiff admits that coal could not physically be placed in an escrow account. Pl.'s Reply at 19. Therefore, Tip Top interprets FAR 28.203-1(b) entitled "Security interests by an individual surety," as providing that an escrow account is only required for cash or money assets:

> FAR 28.203-1(b), which is included as part of the requirement for a security interest, and entitled "Security interests by an individual surety," provides that the value of pledged asset "may be provided by one or a combination of" methods which include an escrow account and a lien on real property. (Emphasis added). It does not say "shall" or exclude other methods. The word "may" indicates the contrary. . . . Moreover, the minimum "escrow account" requirements in subparagraphs (b)(1)(i)-(v) show that "escrow accounts" are only required for cash and money assets."

Pl.'s Mot. at 24. Tip Top also argues that the government is confused about the escrow requirements in the FAR. Tip Top contends that the FAR drafters did not contemplate individual sureties providing escrow accounts for "stock or irrevocable letters of credit or, of course, for coal." Pl.'s Reply at 19. And if an

[6]/ Tip Top asserts that a security interest in the mined coal was provided to the government pursuant to Article 9 of the UCC. Pl.'s Mot. at 23.

escrow account had been necessary, and if the CO had raised the issue, Tip Top argues that plaintiff would have made escrow arrangements comparable to the escrow account requirements under the FAR:

> As shown in Tip Top's opening brief, *the "escrow account" requirements in FAR § 28.203-1(b) address only cash assets*. Defendant confuses an "escrow account" with escrow arrangements not in the FAR. Regardless of what the FAR drafters may have intended, neither FAR § 28.203-1 nor FAR § 28.203-2 contain any "escrow account" requirement for stock or irrevocable letters of credit or, of course, for coal. *Here an escrow account was not included because the coal could not be physically placed into a bank. However, this would not preclude an escrow arrangement, if the CO had raised this issue, under which coal of an agreed-to-value of $1.8 million could be placed in a bonded area and sold by an escrow agent*.

*Id*. at 19 (emphasis added). Based on the foregoing, Tip Top concludes that coal is a readily marketable asset under FAR 28.203(a) and should have been determined to be an acceptable asset by the CO.

The government argues in support of the CO's decision that coal is a "speculative asset" under FAR 28.203(c)(7). The government contends that the "coal pile" submitted by Tip Top as an asset to cover the bid bond is not "the type of personal property that was acceptable under FAR §§ 28.203(b) and 28.203-2." Def.'s Mot. at 17. Defendant contends that the only acceptable assets, or personal property, other than real property contemplated by the FAR drafters under FAR 28.203-2(b) are "cash, CDs, and certain other cash equivalents and stocks and bonds." *Id*. at 15. Defendant also contends that FAR 28.203-1(b) requires acceptable assets to be physically placed in an escrow account. *Id*. at 29. Because coal cannot be physically placed in an escrow account, defendant argues that coal does not qualify as an acceptable asset under FAR 28.203-2(b). The government asserts that Tip Top has misread the FAR, and has failed to comply with the instructions in the solicitation and SF 28 that require an escrow account for pledged assets:

> Despite the clear instructions provided by SF28, FAR § 53.301-28, and the Solicitation, Tip Top, without reference to these regulations and requirements, asserts that a lack of clarity in language of FAR §§ 28.203 and 28.203-2 eliminates the

> requirement of an escrow account. Pl. Mot. at 24. . . . Tip Top also relies on a strained reading of FAR § 28.203-1(b) to assert that cash and money assets are the only forms of personal property that can placed in escrow. Pl. Mot. at 24-25. While FAR § 28.203-1(b)(1)(i) specifies the minimum requirements of an escrow account containing "funds," *i.e.*, money, that fact does not implicitly exempt other highly liquid personal property listed in FAR § 28.203-2 from the requirements of an escrow account.

Def.'s Mot. at 28-30. The government also states that the FAR was amended in 1989 to reflect the requirement of an escrow account for acceptable personal property. *See* Federal Acquisition Regulation (FAR), Miscellaneous Amendments, 54 Fed. Reg. 48978 (Nov. 28, 1989). The amendment was issued on November 28, 1989, and became effective on February 26, 1990:

> This final rule is issued to make revisions to the FAR procedures governing the use of individual sureties in support of a bonding requirement. Among other things, the revisions would:
>
> 1. Require individual sureties to pledge specific assets to support a bond.
> 2. Identify and limit the types of assets which are acceptable for pledge based upon a standard of identifiable value and ready marketability.
> 3. Require objective evidence of asset ownership and unencumbered value.
> 4. *Requires a Government security interest in the pledged assets by means of a lien o[n] real property or the establishment of an escrow account for acceptable personal property.*
> 5. Provide for the Governmentwide suspension or debarment of sureties who commit serious improprieties.

*Id*. (emphasis added).[7] Thus, defendant concludes that Tip Top's pledged coal is

---

[7]/ The government relies on its interpretation of FAR 28.203 published in the Federal Register. Courts are required to give "broad deference" to an agency's interpretation of its own regulation:

> [I]t is well settled that an agency's interpretation of its own regulations is entitled to broad deference from the courts. Deference to an agency's interpretation of its own regulations is

not acceptable because the FAR drafters contemplated that individual sureties were to pledge assets like cash, CDs, or stocks and bonds which could easily be placed into a mandatory escrow account.

### C. The CO's Decision that Coal was not an Acceptable Asset Under the FAR was Reasonable

Based on the above discussion, the court notes that there are two main areas of dispute between the parties regarding the relevant FAR provisions. The first area of dispute is whether the list of acceptable assets under FAR 28.203-2(b) is exclusive, or whether the list is merely an example of the type of acceptable assets that an individual surety can submit as a bond. The second area is whether FAR 28.203-1(b) requires all acceptable personal property to be placed into an escrow. Because of the convoluted manner in which the disputed FAR provisions were drafted, they are arguably open to different interpretations. As previously discussed, the CO regarded the pledged coal as a speculative asset under FAR 28.203-2(c)(7). Defendant interprets FAR 28.203-2(b) to be exclusive, and thus, deems coal as an unacceptable asset. Defendant also interprets FAR 28.203-1(b) to require that acceptable personal property be physically placed into an escrow account. Tip Top reads FAR 28.203-2(b) to be inclusive which means coal falls into the category of acceptable assets. Tip Top also interprets FAR 28.203-1(b) as not requiring an escrow account for *all* acceptable personal property.

Before the court engages in a discussion of the various interpretations of the

---

> broader than deference to the agency's construction of a statute, because in the latter case the agency is addressing Congress's intentions, while in the former it is addressing its own. Thus, as the Supreme Court has explained, the agency's construction of its own regulations is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation." That generous degree of deference is due to an agency interpretation of its own regulations even when that interpretation is offered in the very litigation in which the argument in favor of deference is made.

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1363-64 (Fed. Cir. 2005) (citations omitted).

relevant FAR provisions, for ease of reference, the court will set forth the FAR provisions pertinent to this case. First, FAR 28.203, entitled "Acceptability of individual sureties," states that "(a) An individual surety is acceptable for all types of bonds except position schedule bonds." It also states that:

> [t]he contracting officer shall determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation. (See 2 8.203-7 for information on excluded individual sureties.)
>
> (b) An individual surety must execute the bond, and the unencumbered value of the assets (exclusive of all outstanding pledges for other bond obligations) pledged by the individual surety, must equal or exceed the penal amount of each bond. The individual surety shall execute the Standard Form 28 and provide a security interest in accordance with 28.203-1. . . .
>
> (c) If the contracting officer determines that no individual surety in support of a bid guarantee is acceptable, the offeror utilizing the individual surety shall be rejected as nonresponsible, except as provided in 28.101-4. A finding of nonresponsibility based on unacceptability of an individual surety, need not be referred to the Small Business Administration for a competency review. (See 19.602-1(a)(2)(i) and 61 Comp. Gen. 456 (1982)).
>
> (d) A contractor submitting an unacceptable individual surety in satisfaction of a performance or payment bond requirement may be permitted a reasonable time, as determined by the contracting officer, to substitute an acceptable surety for a surety previously determined to be unacceptable.
>
> (e) When evaluating individual sureties, contracting officers may obtain assistance from the office identified in 28.202(d).
>
> (f) Contracting officers shall obtain the opinion of legal counsel as to the adequacy of the documents pledging the assets prior to accepting the bid guarantee and payment and performance bonds.

FAR 28.203. With respect to the instant case, the noteworthy sub-sections of FAR 28.203 are subsections (a) and (c) which relate to the contracting officer's obligations in determinating the acceptability of the individual sureties and their pledged assets. FAR 28.203(a) provides that the contracting officer shall "determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation." FAR

28.203(a); *see also Santurce Constr. Corp.*, B-240728, 90-2 CPD ¶ 469 (Comp. Gen. Dec. 10, 1990) ("The contracting officer is vested with a wide degree of discretion and business judgment in determining the acceptability of an individual surety, and we will not question such a determination so long as it is reasonable."). FAR 28.203(c) states that if the contracting officer "determines that no individual surety in support of a bid guarantee is acceptable, the offeror utilizing the individual surety shall be rejected as nonresponsible . . . ." FAR 28.203(c).

Section 28.203-2, entitled "Acceptability of Assets," of the FAR provides that the government will "accept only cash, readily marketable assets, or irrevocable letters of credit from a federally insured financial institution from individual sureties to satisfy the underlying bond obligations." FAR 28.203-2(a). The list of acceptable assets is enumerated in subsection 28.203-2(b) of the FAR as follows:

> (b) Acceptable assets include--
> (1) Cash, or certificates of deposit, or other cash equivalents with a federally insured financial institution;
> (2) United States Government securities at market value (An escrow account is not required if an individual surety offers Government securities held in book entry form at a depository institution. In lieu thereof, the individual shall provide evidence that the depository institution has (i) placed a notation against the individual's book entry account indicating that the security has been pledged in favor of the respective agency; (ii) agreed to notify the agency prior to maturity of the security; and (iii) agreed to hold the proceeds of the security subject to the pledge in favor of the agency until a substitution of securities is made or the security interest is formally released by the agency);
> (3) Stocks and bonds actively traded on a national U.S. security exchange with certificates issued in the name of the individual surety. National security exchanges are--(i) the New York Stock Exchange; (ii) the American Stock Exchange; (iii) the Boston Stock Exchange; (iv) the Cincinnati Stock Exchange; (v) the Midwest Stock Exchange; (vi) the Philadelphia Stock Exchange; (vii) the Pacific Stock Exchange; and (viii) the Spokane Stock Exchange. These assets will be accepted at 90 percent of their 52-week low, as reflected at the time of submission of the bond. Stock options and stocks on the over-the-counter (OTC) market or NASDQ Exchanges will not be accepted. Assistance in evaluating the acceptability of securities may be obtained from the Securities

> and Exchange Commission, Division of Enforcement, 450 Fifth Street NW., Washington, DC 20549.
> (4) Real property owned in fee simple by the surety without any form of concurrent ownership, except as provided in paragraph (c)(3)(iii) of this subsection, and located in the United States or its outlying areas. These assets will be accepted at 100 percent of the most current tax assessment value (exclusive of encumbrances) or 75 percent of the properties' unencumbered market value provided a current appraisal is furnished (see 28.203-3).
> (5) Irrevocable letters of credit (ILC) issued by a federally insured financial institution in the name of the contracting agency and which identify the agency and solicitation or contract number for which the ILC is provided.

FAR 28.203-2(b). The list of unacceptable assets is enumerated in subsection 28.203-2(c) of the FAR as follows:

> (c) Unacceptable assets include but are not limited to--
> (1) Notes or accounts receivable;
> (2) Foreign securities;
> (3) Real property as follows:
> (i) Real property located outside the United States and its outlying areas.
> (ii) Real property which is a principal residence of the surety.
> (iii) Real property owned concurrently regardless of the form of co-tenancy (including joint tenancy, tenancy by the entirety, and tenancy in common) except where all co-tenants agree to act jointly.
> (iv) Life estates, leasehold estates, or future interests in real property.
> (4) Personal property other than that listed in paragraph (b) of this subsection (e.g., jewelry, furs, antiques);
> (5) Stocks and bonds of the individual surety in a controlled, affiliated, or closely held concern of the offeror/contractor;
> (6) Corporate assets (e.g., plant and equipment);
> (7) Speculative assets (e.g., mineral rights);
> (8) Letters of credit, except as provided in 28.203-2(b)(5).

FAR 28.203-2(c).

With respect to the pledge of acceptable assets, section 28.203-6 of the FAR instructs agencies to "insert the clause of 52.228-11 in solicitations and contracts

which require the submission of bid guarantees, performance, or payment bonds." FAR 52.228-11, entitled "Pledges of Assets," mandates the individual surety's pledge of assets to be in the form of "an escrow account containing cash, certificates of deposit, commercial or Government securities, or other assets described in FAR 28.203-2." Specifically, FAR 52.228-11 provides, in pertinent part:

> As prescribed in 28.203-6, insert the following clause:
>
> PLEDGES OF ASSETS (FEB 1992)
>
> (a) Offerors shall obtain from each person acting as an individual surety on a bid guarantee, a performance bond, or a payment bond—
> (1) Pledge of assets; and
> (2) Standard Form 28, Affidavit of Individual Surety.
> (b) Pledges of assets from each person acting as an individual surety shall be in the form of--
> (1) Evidence of an escrow account containing cash, certificates of deposit, commercial or Government securities, or other assets described in FAR 28.203-2 (except see 28.203-2(b)(2) with respect to Government securities held in book entry form) and/or;
> (2) A recorded lien on real estate.

FAR 52.228-11.

FAR 28.203-1, entitled "Security interests by an individual surety" is the last relevant section in our analysis. This section of the FAR states:

> (a) An individual surety may be accepted only if a security interest in assets acceptable under 28.203-2 is provided to the Government by the individual surety. The security interest shall be furnished with the bond.
> (b) The value at which the contracting officer accepts the assets pledged must be equal to or greater than the aggregate penal amounts of the bonds required by the solicitation and may be provided by one or a combination of the following methods:
> (1) An escrow account with a federally insured financial institution in the name of the contracting agency. (See 28.203-2(b)(2) with respect to Government securities in book entry form.) Acceptable securities for deposit in escrow are discussed in 28.203-2. While the offeror is responsible for establishing the escrow account, the terms and conditions must be acceptable to the contracting officer. At a minimum, the escrow account shall provide for the following:
> (i) The account must provide the contracting officer the sole and

> unrestricted right to draw upon all or any part of the funds deposited in the account. A written demand for withdrawal shall be sent to the financial institution by the contracting officer, after obtaining the concurrence of legal counsel, with a copy to the offeror/contractor and to the surety. Within the time period specified in the demand, the financial institution would pay the Government the amount demanded up to the amount on deposit. If any dispute should arise between the Government and the offeror/contractor, the surety, or the subcontractors or suppliers with respect to the offer or contract, the financial institution would be required, unless precluded by order of a court of competent jurisdiction, to disburse monies to the Government as directed by the contracting officer.
> (ii) The financial institution would be authorized to release to the individual surety all or part of the balance of the escrow account, including any accrued interest, upon receipt of written authorization from the contracting officer.
> (iii) The Government would not be responsible for any costs attributable to the establishment, maintenance, administration, or any other aspect of the account.
> (iv) The financial institution would not be liable or responsible for the interpretation of any provisions or terms and conditions of the solicitation or contract.
> (v) The financial institution would provide periodic account statements to the contracting officer.
> (vi) The terms of the escrow account could not be amended without the consent of the contracting officer.
> (2) A lien on real property, subject to the restrictions in 28.203-2 and 28.203-3.

FAR 28.203-1.

The CO's February 19, 2008 decision cites to the provisions of FAR 28.203 as the primary basis upon which she determined that the asset supplied by Tip Top's individual surety was unacceptable. The court acknowledges that the various related sections of these particular provisions of the FAR are convoluted and not easily followed. The manner in which these provisions have been worded has brought about a lengthy debate between the protestor and defendant over the issue of what constitutes an acceptable asset as opposed to a speculative asset. However, despite any ambiguities created by the imprecise language of some of the relevant provisions, when read together, the pertinent FAR provisions in the final analysis support the CO's final determination that Tip Top's proffered coal asset

was unacceptable. The court's decision does not reach the issue of whether the list of acceptable assets set forth in FAR 28.203-2(b) is clearly exclusive or whether the list simply sets forth examples of the types of assets which are acceptable. Indeed, the unfortunate wording of the provisions controlling that specific issue is so ambiguous as to serve to make the undertaking of such an endeavor daunting, indeed, and the court counts itself fortunate not to have to reach that issue. Instead, the focus of this decision is on the interpretation of the provisions of FAR 28.203 and related sections as they prescribe the particular security interest required for personal property pledged as an asset.

At the outset, FAR 28.203-1(a) states that a security interest in assets acceptable under FAR 28.203-2 is a requirement.[8] In the next subsection, FAR 28.203-1(b) goes on to state:

> (b) The value at which the contracting officer accepts the assets pledged . . . may be provided by one or a combination of the following methods:
> (1) An escrow account with a federally insured financial institution in the name of the contracting agency. . . . Acceptable securities for deposit in escrow are discussed in 28.203-2. . . .
> (2) A lien on real property.

FAR 28.203-1(b).

These FAR provisions provide a clear indication that the security interest called for when individual sureties pledge assets is either an escrow account for personal property or a lien on real property. The court acknowledges that the use of the phrase "may be provided" permits some degree of ambiguity with regard to whether other measures might suffice for the security interest required. However, certain remaining FAR provisions, when read in conjunction with the foregoing, instruct the reader that the provisions of FAR 28.203 and related sections of subpart 28.2, when read as a whole, require the submission of an escrow account in order for personal property to be received as an acceptable asset. In that regard,

---

[8]/ FAR 28.203-2 describes these 'acceptable assets' as follows: the "Government will accept only cash, readily marketable assets, or irrevocable letters of credit" and that acceptable assets include (1) cash, certificates of deposit or other cash equivalents; (2) Government securities; (3) actively traded U.S. stocks and bonds; (4) U.S. real property; and (5) federally insured irrevocable letters of credit.

FAR 28.203(b) mandates that "[t]he individual surety shall execute the Standard Form 28 and provide a security interest in accordance with 28.203-1." As quoted above, section 28.203-1 only indicates that an escrow account "may be provided" when offering personal property as an asset. The provisions of the Standard Form (SF) 28, however, go a step further and actually reflect a specific requirement that an escrow account be provided for all assets other than real estate. In particular, Block 7(b) of SF 28 requires that the individual surety set forth the details of an escrow account to be provided for all personal property as follows: "7(b) Assets other than real estate (describe the assets, the details of the escrow account, and attach certified evidence thereof." AR at 229.

Another pertinent FAR section, FAR 28.203-6, makes the contract clause found at FAR 52.228-11 a mandatory solicitation provision in this case, thereby again setting forth a requirement for an escrow account for personal property. AR at 37. FAR 28.203-6 states: "Insert the clause at 52.228-11 in solicitations and contracts which require the submission of bid guarantees, performance, or payment bonds." In compliance with that directive, the clause at FAR 52.228-11 was made a part of the solicitation and provided, in pertinent part:

> PLEDGES OF ASSETS (FED 1992)
> (a) Offerors shall obtain from each person acting as an individual surety on a bid guarantee, a performance bond, or a payment bond—
> (1) Pledge of assets; and
> (2) Standard Form 28, Affidavit of Individual Surety.
> (b) Pledges of assets from each person acting as an individual surety shall be in the form of—
> (1) Evidence of an escrow account containing cash, certificates of deposit, commercial or Government securities, or other assets described in FAR 28.203-2 with respect to Government securities held in book entry form) and/or;
> (2) A recorded lien on real estate.

FAR 52.228-11. The foregoing provision requires that pledges of assets must be either in the form of a recorded lien on real estate or an escrow account for all other proffered assets (*i.e.*, personal property).

Thus, the court disagrees with Tip Top's contentions and finds that the solicitation and FAR provisions, when read harmoniously, are reasonably

construed to require the surety to provide an asset (other than real estate) which could be placed into an escrow account. These FAR provisions, when read as a whole and in conjunction with the terms of the solicitation, instructed potential offerors as to the government's requirements for the pledge of assets by individual sureties. *See Banknote*, 365 F.3d at 1353 n.4 ("The principles governing interpretation of Government contracts apply with equal force to the interpretation of solicitations issued by the Government for such contracts."); *see also Grumman*, 88 F.3d at 997-98 (interpreting a solicitation using contract interpretation rules). A careful review of the controlling FAR provisions, as cited by the CO, reflects that the coal asset offered by Tip Top was not an acceptable asset because, as acknowledged by the protestor, coal cannot be placed into an escrow account, as required by the terms of the solicitation and controlling FAR provisions.[9] Accordingly, the CO's February 19, 2008 decision that Tip Top's bid bond was inadequate due to the unacceptability of the individual surety's coal asset was reasonable and was not arbitrary or capricious.

### D. Patent Ambiguities in the Solicitation

As previously stated, the parties engaged in protracted debates over the correct interpretation of the disputed FAR and solicitation provisions as those terms controlled the questions pending before the court. To the extent that any issues of ambiguity may have been raised, the court finds that any such alleged ambiguities would have been patent. There has been extensive disagreement between the parties as to how the controlling FAR provisions should be interpreted and applied to the disputed solicitation as well as disagreement concerning certain portions of the solicitation itself in that regard. Most significantly, those debates include: (1) whether the list of acceptable assets set forth in FAR 28.203-2(b) is clearly exclusive or whether the list simply sets forth examples of the types of assets which are acceptable; and (2) whether an escrow account was required for all personal property proffered as a pledged asset. The court earlier observed that

---

[9]/ The court's role is to determine whether the CO's decision, or in these circumstances, the CO's interpretation was reasonable. *See Ellsworth Assocs., Inc. v. United States*, 45 Fed. Cl. 388, 393 (1999) ("The court's only role is to determine whether any rational and reasonable basis supports the agency's decision."). While there may have been other interpretations which might have been considered to be within reason as well, as long as the CO's decision was itself reasonable, it must be upheld. *See Honeywell*, 870 F.2d at 648 (stating that the contracting officer's decision must be upheld if the decision has a rational basis).

the issue regarding the exclusivity of the list of acceptable assets was one which, in the court's opinion, was highly susceptible to more than one interpretation and that the issue regarding the requirement of an escrow account for personal property was difficult, as well, again due to FAR provisions which were written in a convoluted manner. The arguments presented by each party had strong and weak sides, due primarily, to the confounding manner in which the disputed FAR provisions were written. As a result, both parties could easily be construed as having reasonable arguments, with the CO's position being victorious only because the standard of review dictates such an outcome when both sides have reasonable positions. *See Hawaiian Dredging*, 59 Fed. Cl. at 308 (noting that the contracting officer is only required to make a "'coherent and reasonable explanation of its exercise [of] discretion.'" (quoting *Impresa*, 238 F.3d at 1333)). Where the solicitation requirements and applicable FAR provisions necessary for the interpretation of a disputed matter are susceptible to more than one reasonable interpretation, under established caselaw, an ambiguity exists with regard to the disputed issues. *See Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999) (stating that "[t]o show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a 'zone of reasonableness.'" (citations omitted)).

Here, inasmuch as it is established that the disputed provisions were ambiguous, the obvious issue to be addressed is whether the ambiguity is patent. "A patent ambiguity is one that is 'obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start.'" *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004) (quoting *H & M Moving, Inc. v. United States*, 499 F.2d 660, 671 (Ct. Cl. 1974)). "An ambiguity will only be construed against the government if it was not obvious on the face of the solicitation and reliance is shown." *Id*. (citation omitted). The existence of a patent ambiguity places the burden on the contractor to inquire into the ambiguity. *Id*. "If an ambiguity is obvious and a [contractor] fails to inquire with regard to the provision, his interpretation will fail." *Id*.; *see also Triax Pac., Inc. v. West*, 130 F.3d 1469, 1474-75 (Fed. Cir. 1997) ("That duty requires the contractor to inquire of the contracting officer as to the true meaning of the contract before submitting a bid.").

In the present case, the ambiguities in the solicitation, the SF 28, and the FAR were so apparent that Tip Top had a duty to ask for clarification before bidding. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed.

Cir. 2007) ("Under the doctrine, where a government solicitation contains a patent ambiguity, the government contractor has 'a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation in a subsequent action against the government.'") (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed. Cir. 1996)). Plaintiff cannot argue that it was unaware of these ambiguities at the time of bidding because "the presence or absence of a patent ambiguity is not determined by the contractor's actual knowledge, but rather by what a reasonable contractor would have perceived in studying the bid packet." *Triax*, 130 F.3d at 1475 (citations omitted). If Tip Top had inquired into these ambiguities, the CO would have had the opportunity to advise plaintiff to not pledge coal as an asset, and advise plaintiff that an escrow account was required for all acceptable personal property. The failure to make these inquiries has resulted in costly and time-consuming litigation that could have been avoided. Accordingly, the court finds that to the extent that patent ambiguities existed in the procurement, Tip Top had a duty to inquire into these ambiguities prior to submitting its bid for the FHWA contract.

## V. The CO was Reasonable to Not Inquire Further into the Nature of the Coal Asset and Allow Substitution of the Asset

### A. The CO had No Duty to Inquire into the Coal Asset

Relying on GAO decisions, Tip Top argues that the CO has a duty to ensure that the surety has provided sufficient assets to cover the bid bond. Pl.'s Reply. at 5. Plaintiff contends that the GAO decisions suggest that the contracting officer must give the surety "an opportunity to resolve uncertainties in the SF 28 or pledge of assets either by proving additional documentation or substituting assets." *Id.* To support its contention, plaintiff cites to *Gene Quigley, Jr.*, B-241565, 91-2 CPD ¶ 182, in which the GAO ruled that the contracting officer had acted unreasonably in automatically rejecting the contractor's sureties without giving them an opportunity to cure their pledge of assets. In *Gene Quigley, Jr.*, the individual sureties pledged real estate as assets to cover the bond obligation. However, the contracting officer found that there were problems with the pledged assets because "(1) there was no evidence that the lien required by FAR 28.203-3(d) had been filed on the properties, (2) the certificates of title used by the title companies contained a standard form disclaimer that the agency felt negated the legitimacy of these certificates, (3) the title to the second surety's property was in the name of the mortgage holder, and (4) the net value of the combined pledged assets of the

sureties was less than required when the recorded liens of the properties were considered." *Gene Quigley, Jr.*, B-241565, 91-2 CPD ¶ 182. The GAO held:

> As discussed below, the problems in the individual sureties' pledged properties could easily have been cleared up if Mr. Quigley had been given the opportunity to do so. . . . Indeed, the agency considered only Mr. Quigley's bid price to be reasonable and proceeded to cancel the IFB when his bid was rejected. Thus, the contracting officer acted unreasonably in automatically rejecting Mr. Quigley's sureties. . . . We recommend that the agency provide Mr. Quigley with the opportunity to obtain from his two individual sureties the pledge of acceptable assets of sufficient value to satisfy the bond requirements.

*Id*. Plaintiff also cites to *Jay Jackson & Assocs.*, B-271236-3, 96-2 CPD ¶ 111 (Comp. Gen. Sept. 10, 1996), *Gulf & Texas Trading Co.*, B-253991-2, 94-1 CPD ¶ 3 (Comp. Gen. Jan. 24, 1994), and *Astro Painting Co.*, B-247922-2, 92-1 CPD ¶ 535 (Comp. Gen. June 19, 1992), which demonstrate that an automatic rejection of the bid bond is improper without giving the surety an opportunity to resolve the problem.

The government does not share plaintiff's view. The government, relying on *Grimberg*, asserts that the CO was not obligated to ask for more information about the pledged coal. Def.'s Mot. at 19-20. Defendant asserts that the contracting officer is given "wide discretion" in making responsibility determinations. *Id*. at 20. Based on *Grimberg*, defendant contends that the CO had "discretion to determine that she need not request additional information or to review any information that Mr. Scarborough offered to provide." *Id*.

As previously discussed, the *Grimberg* standard of responsibility is applicable to responsibility determinations by the CO involving individual sureties and the pledges of their assets. *See supra*. Furthermore, the GAO decisions cited by plaintiff are distinguishable. In those decisions, the contracting officers inquired into assets that were already categorized as acceptable assets under the FAR. For example, in *Gene Quigley, Jr.*, the assets in question were real estate properties which clearly fell within the acceptable asset list under FAR 28.203-2(b). *See Gene Quigley, Jr.*, B-241565, 91-2 CPD ¶ 182. The problem in *Gene Quigley, Jr*. was that the contracting officer had insufficient information on the acceptable assets. *Id*. In *Gulf & Texas Trading*, the pledged asset was also a piece

of real property. The agency in *Gulf & Texas Trading* requested more information on the real estate property because it discovered that the property had no real value. *See Gulf & Texas Trading*, B-253991-2, 94-1 CPD ¶ 3. In *Astro Painting*, the contracting officer found deficiencies in the documentation submitted with the pledged real property. *See Astro Painting*, B-247922-2, 92-1 CPD ¶ 535. The bidder was given an opportunity to resolve these deficiencies. *Id*.

Finally, Tip Top cites to *Jay Jackson* for the proposition that although the surety in that case pledged "lode mining claims" which constituted a "speculative asset" under the FAR; the contracting officer gave the bidder "repeated" opportunities to prove the acceptability of the asset. *See Jay Jackson*, B-271236-3, 96-2 CPD ¶ 111. *Jay Jackson* is nonetheless distinguishable because the surety listed as assets pledged to the government "a lien on real estate" which was described as " lode mining claims." The contracting officer, in that case, sought more information about the pledged asset because it was unclear whether the pledged asset was real estate (an acceptable asset), or mineral rights (an unacceptable asset). Such an ambiguity does not exist here.

In this case, the CO remained within her rights under the FAR not to inquire into the coal asset. The CO determined that coal was not an acceptable asset under the FAR, and thus, it was unnecessary to solicit more information about the asset. More importantly, the Federal Circuit in *Grimberg* has ruled that a contracting officer has discretion as to whether to request additional information prior to making a determination of nonresponsibility:

> We disagree with Grimberg's reading of the regulation. Although FAR 9.105-1(a) does require the contracting officer to have, or to obtain, enough information to make a responsibility determination, the contracting officer is the arbiter of what, and how much, information he needs. Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision. Thus, although the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so.

*Grimberg*, 185 F.3d 1303 (citations omitted). The court finds that the CO properly

exercised her discretion, and a further inquiry into the coal asset was not required.[10]

### B. The CO had No Duty to Allow Substitution of the Coal Asset

Tip Top asserts that even if the CO believed that an inquiry into the asset would not cure the problems associated with the coal, the CO should have afforded ECS the opportunity to submit an acceptable substitute asset pursuant to FAR 28.203-4. FAR 28.203-4 entitled "Substitution of Assets" provides:

> An individual surety may request the Government to accept a substitute asset for that currently pledged by submitting a written request to the responsible contracting officer. The contracting officer may agree to the substitution of assets upon determining, after consultation with legal counsel, that the substitute assets to be pledged are adequate to protect the outstanding bond or guarantee obligations. If acceptable, the substitute assets shall be pledged as provided for in subpart 28.2.

FAR 28.203-4.

Defendant's main argument in this regard is that the CO had no duty to consider, or allow, substitution of the coal asset. Def.'s Mot. at 33-37. Defendant asserts that the contracting officer has discretion as to whether to permit the surety to substitute the asset. Def.'s Reply at 22-23. This is the same level of discretion articulated by the Federal Circuit in *Grimberg*. *Id*. at 23. The Federal Circuit has made it clear that "although the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so." *Grimberg*, 185 F.3d at 1303. In the same vein, the CO was under no obligation to allow substitution of the coal asset. Furthermore, the language of FAR 28.203-4 does not suggest that the contracting officer has an affirmative duty to allow, or consider, substitution of an asset. The regulation states that the "individual surety *may* request," and the contracting officer "*may*

---

[10]/ Even if the court were to agree with Tip Top's contention that the CO's failure to ask for more information amounted to an abuse of discretion, such an error would be deemed to have been harmless error. This court has already upheld the CO's determination that the coal was not an acceptable asset under the FAR. Thus, additional inquiry into the specifics of the proffered coal asset would have been a futile exercise.

agree to the substitution of assets . . . . " FAR 28.203-4.

In the instant case, plaintiff argues that even though the CO was not required to allow Tip Top's surety to substitute another asset for the coal asset offered, the CO abused her discretion in this matter by failing to exercise discretion in that regard. Specifically, plaintiff asserts that Tip Top's president, Mr. Hollins, sent a February 20, 2008 e-mail to the CO which asked that the CO permit a cash asset to be substituted for the coal asset. Mr. Hollins also stated in a declaration before the court that he followed up his e-mail with a telephone call to the CO informing her that the surety was willing to provide a cash substitute. Supp. Decl. of Percy J. Hollins at 1. Plaintiff argues that the CO's failure to respond to Mr. Hollins and to address his request should be deemed by this court to be an abuse of discretion by the CO. Again, the court must disagree with plaintiff.

FAR 28.203-4 requires that any request for substitution of assets be submitted to the contracting officer in writing, by the individual surety. That did not happen in this case. The February 20, 2008 e-mail from Mr. Hollins stated, in pertinent part, "[t]he bid bond entity has other marketable assets including cash in addition to what you reference as a deficiency in your letter." AR at 565. This single sentence did not actually even request that the individual surety be permitted to substitute assets, nor did it set forth a definitive listing of or the specific particulars of any cash asset to be offered. Instead, the sentence simply stated that the surety possessed cash. The court does not view this sparse statement as a sufficiently formal request to substitute assets. Equally damaging is the fact that the referenced correspondence did not come from the surety, but instead came from the president of Tip Top. Clearly, such a request for a substitution of assets coming from an offeror failed to satisfy the FAR requirements for a written request from the individual surety. Accordingly, under the FAR, the CO had no obligation to respond to Mr. Hollins' correspondence.

Significantly, the CO did respond to a February 21, 2008 request from the individual surety's lawyers asking that ECS be permitted to provide documentation to support the proffered coal asset. AR at 263. The fact that the CO chose to respond to such a request from the individual surety, while at essentially the same time, choosing not to acknowledge Mr. Hollins' request is supportive of the court's conclusion that the CO viewed Mr. Hollins' request as inappropriate and improperly submitted by the offeror. In accordance with the foregoing, the court determines that the CO's failure to allow a substitution for the coal asset did not

violate applicable FAR provisions.[11]

## VI. Tip Top was Not Prejudiced by the Award to IRC, and Thus, is Not Entitled to Injunctive Relief

Because plaintiff has not succeeded on the merits of this bid protest, the court need not consider whether Tip Top was prejudiced by the award to IRC, or whether the standard for injunctive relief has been met in this case.

## CONCLUSION

Plaintiff has not shown that the award of the contract to IRC was arbitrary, capricious or contrary to law. For these reasons, plaintiff's bid protest cannot be sustained.

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion for Judgment on the Administrative Record, filed June 3, 2008, is **DENIED**. Defendant's Cross-Motion for Judgment on the Administrative Record, filed June 10, 2008 is **GRANTED**;

(2) The Clerk's Office is directed to **ENTER** final judgment in

---

[11]/ This court is constrained to uphold the CO's decision because her determination fell within the parameters of rationality under the controlling regulations and survived the standard of judicial review applicable in bid protests. However, given the totality of the circumstances and in particular, the broad range of discretion allowed the agency's contracting officer, it is certainly not an outcome which this court would have necessarily sanctioned if allowed *de novo* review of the responsibility determination. This court has noted the observations of commentators on certain inherent problems of complexity and cost with respect to bid bonds: "'It is extremely doubtful whether such cost and complexity is justified by whatever benefits the Government receives from bonds and guarantees.'" *All Seasons*, 55 Fed. Cl. at 181-82 (citation omitted). This case, unfortunately, is yet another illustration of the problem. Here, Tip Top was a highly experienced federal road construction contractor which had done work for FHWA previously and had even received awards for its highway design work. Tip Top had gone to great lengths and expense to demonstrate to the agency its ability to complete the project within a much shorter time period than that required and at a bid price $1.4 million below that of the successful offeror, IRC. In the end, however, it is not within the court's province to establish procurement policy, but rather to point out the sometimes unfortunate results.

favor of defendant, **DISMISSING** the complaint, with prejudice; and

(3) Each party shall bear its own costs.

/s/ Lynn J. Bush
LYNN J. BUSH
Judge